**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **Tuesday Morning Corporation,** *et al.*,[1] | § | **Case No. 23-90001** |
| | § | |
| **Debtors.** | § | **Jointly Administered** |

**INTERIM ORDER**
**(I) AUTHORIZING DEBTORS TO**
**(A) USE CASH COLLATERAL ON A LIMITED BASIS**
**AND (B) OBTAIN POSTPETITION FINANCING ON A SECURED,**
**SUPERPRIORITY BASIS, (II) GRANTING ADEQUATE PROTECTION,**
**(III) SCHEDULING A FINAL HEARING, AND (IV) GRANTING RELATED RELIEF**

**CAME ON FOR CONSIDERATION** on February 15, 2023, the *Debtors' Emergency Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364 (I) Authorizing Debtors to (A) Use Cash Collateral on a Limited Basis and (B) Obtain Postpetition Financing on a Secured, Superpriority Basis, (II) Granting Adequate Protection,*

---

[1] The Debtors in these Chapter 11 cases (the "Cases"), along with the last four digits of each Debtor's federal tax identification number, include: Tuesday Morning Corporation (8532) ("TM Corp."); TMI Holdings, Inc. (6658) ("TMI Holdings"); Tuesday Morning, Inc. (2994) ("TMI"); Friday Morning, LLC (3440) ("FM LLC"); Days of the Week, Inc. (4231) ("DOTW"); Nights of the Week, Inc. (7141) ("NOTW"); and Tuesday Morning Partners, Ltd. (4232) ("TMP"). The location of the Debtors' service address is 6250 LBJ Freeway, Dallas, TX 75240.

Exhibit 13

*(III) Scheduling a Final Hearing, and (IV) Granting Related Relief*] [Docket No. [●]] (the "<u>Motion</u>") filed by the above-captioned debtors, as debtors-in-possession (collectively, the "<u>Debtors</u>") seeking entry of an interim order (this "<u>Interim Order</u>") pursuant to sections 105, 361, 362(d), 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 503(b), and 507 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), and Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of Texas (the "<u>Local Rules</u>"), and the Procedures for Complex Chapter 11 Cases (the "<u>Complex Case Procedures</u>"), inter alia:

    (i)      authorizing the Debtors to obtain a superpriority secured debtor-in-possession term loan facility of up to **$51,500,000** (the "<u>DIP New Money Loans</u>"), the loan commitments thereunder subject to terms acceptable to the DIP Lenders (defined below), as provided for and consistent with the DIP Documents (defined below), this Interim Order, and the Final DIP Order (defined below), as applicable, (the "<u>DIP Term Loan Commitments</u>") composed of (i) an initial **$25,000,000** (the "<u>Closing Date DIP Term Loans</u>") to be available immediately following the entry of the Interim Order, a portion of which will be used for (a) repay in full the **$3,170,000** Bridge Loan (defined below), (b) refinance the Pre-Petition ABL Obligations (defined below) other than the Pre-Petition LC Obligations (defined below) and the Pre-Petition ABL Disputed Amounts (defined below), (c) fund the Cases, and (d) provide working capital; (ii) **$16,500,000** million of additional DIP New Money Loans; and (iii) **$10,000,000** Delay Draw Loans ((ii) and (iii) collectively, the "<u>Final DIP Term Loans</u>") to be available upon entry of the Final DIP Order, pursuant to the terms and conditions set forth herein and in that certain *Senior Secured Priority Debtor-in-Possession Credit Agreement* dated as of February 16, 2023 (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "<u>DIP Term Loan Agreement</u>"),[2] by and among the Borrowers (as defined therein), the Guarantors (as defined therein), Cantor Fitzgerald Securities ("<u>Cantor</u>"), as administrative agent (in such capacity, the "<u>DIP Agent</u>"), for itself and for and on behalf of the other lenders party thereto (collectively, the "<u>DIP Lenders</u>," and together with the DIP Agent, collectively, the "<u>DIP Secured Parties</u>"), and all other related agreements and documents

---

[2]    A copy of the DIP Term Loan Agreement is attached hereto as **<u>Exhibit 1</u>** and is incorporated herein as if set forth *in haec verba*. Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the DIP Term Loan Agreement.

(ii)       authorizing the Debtors to execute, deliver, and perform under the DIP Term Loan Agreement and the other DIP Documents (as defined herein), the DIP Orders (defined below), and all other related agreements and documents creating, evidencing, or securing indebtedness or obligations of any of the Debtors to the DIP Agent and the DIP Lenders on account of the DIP Facility or granting or perfecting liens or security interests by any of the Debtors in favor of and for the benefit of the DIP Agent, for itself and for and on behalf of the DIP Lenders, on account of the DIP Facility, as same now exists or may hereafter be amended, modified, supplemented, ratified, assumed, extended, renewed, restated, or replaced, and any and all of the agreements and documents currently executed or to be executed in connection therewith or related thereto, by and among any of the Debtors, the DIP Agent, and the DIP Lenders, and, in accordance with the DIP Documents (defined below), the terms of which are referenced and incorporated herein as if set forth *in haec verba* (collectively, the "<u>DIP Documents</u>");

(iii)     approving the terms and conditions of the DIP Term Loan Agreement and the DIP Documents, including, subject to entry of a Final DIP Order, the terms of the DIP Term Loan Agreement providing that for each $1.61 million of DIP New Money Loans committed by a Prepetition Term Loan Lender (defined below) or a Prepetition FILO C Noteholder (defined below), as applicable, such Prepetition Term Loan Lender or Prepetition FILO C Noteholder, as applicable, shall forgive and release $1.00 million of Prepetition Term Loans (defined below) due and owing under the Prepetition Term Loan Credit Agreement (defined below) or $1.00 million of Pre-Petition FILO C Convertible Notes (defined below) due and owing under the Pre-Petition Convertible Note Purchase Agreement (defined below) and receive $1 million of roll-up loans that shall replace a DIP New Money Loan on a 1:1 basis (the "<u>Roll-Up Loans</u>"); provided that the maximum amount of Roll-Up Loans shall be (x) $24,474,000 with respect to the Pre-Petition Term Loan Documents and (y) $7,742,479 with respect to the Pre-Petition FILO C Convertible Notes, which is the total outstanding principal amount due under such notes issues under the Pre-Petition Convertible Note Purchase Agreement, plus interest thereon;

(iv)     authorizing, upon entry of this Interim Order, the Debtors to repay financing provided by the Backstop Lenders to the Borrower to bridge to the filing pursuant to that certain Secured Promissory Note, dated as of February 10, 2023, among the Borrower, Parent, and Intermediate Holdings as co-borrowers] and the Lenders party thereto (the "<u>Bridge Loan</u>");]

(v)     authorizing, upon entry of this Interim Order, the Debtors to refinance the Pre-Petition ABL Obligations (defined below) of (a) Wells Fargo, in its capacity as administrative agent (in such capacity, the "<u>Prepetition ABL Agent</u>") for itself and for and on behalf of the other lenders (collectively, including the Prepetition ABL Agent, the "<u>Prepetition ABL Lenders</u>") under that certain *Credit Agreement* dated as of May 9, 2022, by and among, among others, the Debtors, the Prepetition Agents, and the Prepetition ABL Lenders (as amended from time to time, the "<u>Prepetition ABL Credit Agreement</u>") and (b) the FILO B Secured Parties, and following such refinancing all liens and security interests of the Pre-Petition ABL

Agent for the benefit of the Pre-Petition ABL Lenders shall be released, all in accordance with the terms and conditions set forth in the DIP Term Loan Agreement; *provided, however*, that the Debtors' authority to pay the Pre-Petition ABL Disputed Amounts is conditioned on either (y) the entry of a Final Order (or orders) requiring the payment of such amounts as directed by this Court, or (z) the written consent of the DIP Lenders;

(vi) providing that upon payment in full of the Pre-Petition ABL Obligations, the liens and security interests, if any, in the Cash Collateral (defined below) shall be released and be of no further force or effect;

(vii) until occurrence of the Termination Declaration Date or Expiration Date (as each term is defined below), authorizing the Debtors to use Cash Collateral (defined below) of (a) the DIP Agent, for itself and for and on behalf of the DIP Lenders, (b) Alter Domus (US) LLC, in its capacity as the term loan representative (the "Prepetition Term Loan Representative") for itself and on behalf of the other lenders (together with the Prepetition Term Loan Representative, collectively, the "Prepetition Term Loan Lenders") under that certain *Credit Agreement*, dated as of December 31, 2020, by and among the Debtors, the Prepetition Term Loan Representative, and the Prepetition Term Loan Lenders (as amended from time to time, the "Prepetition Term Loan Credit Agreement" and, together with the Prepetition ABL Credit Agreement, the "Prepetition Credit Agreements"), and (c) TASCR Ventures CA, LLC, in its capacity as the collateral agent (the "Prepetition Convertible Notes Agent" and, together with the Prepetition ABL Agent and Prepetition Term Loan Representative, collectively, the "Prepetition Agents") for itself and on behalf of the purchasers (the "Prepetition Convertible Noteholders" and, together with the Prepetition ABL Lenders and the Prepetition Term Loan Lenders, collectively, the "Prepetition Lenders" and, together with the DIP Lenders, collectively, the "Lenders") under that certain *Amended and Restated Note Purchase Agreement*, dated as of September 20, 2022, by and among Tuesday Morning Corporation, Tuesday Morning, Inc., the Prepetition Convertible Noteholders and the Prepetition Convertible Notes Agent (as amended from time to time, the "Prepetition Convertible Note Purchase Agreement") in accordance with the terms and conditions set forth herein;

(viii) authorizing the Debtors to use the proceeds of the DIP Facility in accordance with this Interim Order, the DIP Documents, and the Budget (defined below), including (a) to pay certain costs, fees, and expenses related to the Cases and (b) to fund the working capital needs and expenditures of the Debtors during the Cases;

(ix) to the extent proceeds of the DIP Facility are deposited into any account maintained by the Debtors, including the TMI Master Concentration Account and the Master Operating Account, that is subject to a Deposit Account Control Agreement or other methods of perfection by "control" within the meaning set forth in Section 9-104 of the Uniform Commercial Code (collectively "Control Agreement"), such Control Agreement shall not restrict the use of any funds in that account; further, the Debtors' use of the proceeds of the DIP Facility shall not be restricted in any

way by such Control Agreement, meaning (a) proceeds of the DIP Facility may not be swept by any prepetition Bank or any prepetition agreement, (b) no proceeds may be swept or otherwise transferred into the Wells Fargo Cash Dominion Account (as that term is defined in the Cash Management Motion), and (c) no liens of any prepetition Bank or Prepetition Lender shall attach to the proceeds;

(x)     modifying the automatic stay of section 362 of the Bankruptcy Code (the "Automatic Stay") to the extent provided herein;

(xi)    granting to the DIP Agent, for itself and for and on behalf of the DIP Lenders, and authorizing the Debtors to incur, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected DIP Liens (defined below) in all DIP Collateral (defined below) pursuant to sections 364(c)(2), (c)(3), and (d)(1), to secure all obligations and indebtedness of any of the Debtors to the DIP Agent and the DIP Lenders under the DIP Documents (the "DIP Obligations"), which DIP Liens shall be subject to the relative rankings and priorities set forth in this Interim Order; provided however (a) that the DIP Agent and DIP Lenders' liens shall be junior on the Term Loan Priority Collateral (as defined in the ABL / Term Subordination Agreement) to any valid and perfected pre-petition security interest granted to the Prepetition Term Loan Lenders on such Term Loan Priority Collateral; (b) that the DIP Agent and DIP Lenders' properly perfected priming liens shall be junior, only to the amount of any Diminution in Value (defined below), to the Adequate Protection Liens (defined herein); and (c) that the DIP Agent and DIP Lenders' properly perfected priming liens shall be junior to the LC Adequate Protection Liens (defined below);

(xii)   granting to the DIP Agent, for itself and for and on behalf of the DIP Lenders, allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code against each of the Debtors in each of the Cases and any Successor Cases (as each term is defined below) in respect of all DIP Obligations, subject to the priorities set forth herein;

(xiii)  granting automatically perfected liens, security interests and other adequate protection liens on inventory on account of the Pre-Petition LC Obligations (defined below) (the "LC Adequate Protection Liens") to the Prepetition ABL Agent, for and on behalf of a Prepetition ABL Lender that is a Revolving Secured Party, LC Issuer, or Issuing Bank in connection with a Letter of Credit (each as those terms are defined in the ABL Credit Agreement); provided that such LC Adequate Protection Liens remain in effect only until the termination, expiration, or cancellation and return of all Letters of Credit;

(xiv)   granting automatically perfected liens, security interests and other adequate protection to the Prepetition Term Loan Representative and Prepetition Convertible Notes Agent, for themselves and for and on behalf of the Prepetition Term Loan Lenders and Prepetition Convertible Noteholders, respectively, to the extent of any Diminution in Value (defined below) of their interests in the Collateral (defined below) subject to the Subordination Agreements (defined below);

(xv)     granting to the Prepetition Term Loan Representative and the Prepetition Convertible Notes Agent, for themselves and for and on behalf of the Prepetition Term Loan Lenders and Prepetition Convertible Noteholders, respectively, allowed superpriority administrative expense claims against the Debtors pursuant to section 364(c)(1) of the Bankruptcy Code in each of the Cases and any Successor Cases to the extent of any Diminution in Value (defined below) of their interests in the Collateral, subject to the priorities set forth herein;

(xvi)    subject to entry of the Final DIP Order, waiving the equitable doctrine of "marshaling" and other similar doctrines with respect to (a) the DIP Collateral and (b) the Prepetition Lenders' Collateral;

(xvii)   scheduling the Final Hearing (defined below) within thirty (30) days of the entry of the Interim Order and approving notice with respect thereto in accordance with Bankruptcy Rule 4001(c)(2); and

(xviii)  waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the Interim Order and providing for the immediate effectiveness of the Interim Order.

The Court having considered the Motion, the terms of the DIP Term Loan Agreement and the DIP Documents, the testimony and the evidence submitted at the interim hearing held before this Court on February 15, 2023 to consider entry of this Interim Order (the "Interim Hearing"); and in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), and 9014 and the Local Rules, notice of the Motion and the Interim Hearing having been given; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing and is otherwise fair and reasonable and in the best interests of the Debtors, their creditors and their estates, and essential for the continued operation of the Debtors' businesses; and all objections, if any, to the entry of this Interim Order having been withdrawn, resolved or overruled by the Court; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

1.        The Debtors, the DIP Lenders, and the DIP Agent have represented to this Court that they have agreed in good faith to the terms and conditions of the DIP Term Loan Agreement and this Interim Order. The extension of credit under the DIP Facility reflects the Debtors' exercise of prudent business judgment, consistent with their fiduciary duties, and is supported by reasonably equivalent value and consideration. The DIP Facility and the use of Cash Collateral were negotiated in good faith and at arms' length among the Debtors and the DIP Lenders. The use of Cash Collateral and credit to be extended under the DIP Documents, and the financial accommodations provided thereunder, shall be deemed to have been so allowed, advanced, made, provided, used or extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the claims, security interests and liens, and other rights, benefits and protections granted to each of the DIP Agent and DIP Lenders shall be entitled to the full protection and benefits of section 364(e) of the Bankruptcy Code and this Interim Order in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

2.        The Debtors and the DIP Agent, on direction of the requisite lenders required under the DIP Term Loan Agreement, have stipulated and agreed as follows, and based upon the pleadings and evidence at the Interim Hearing before this Court, this Court hereby acknowledges such stipulations, and grants the relief herein, on an interim basis, pursuant to Bankruptcy Rule 4001 to prevent immediate and irreparable harm to the Debtors and their estates. Therefore,

consistent with sections 361, 362, 363, 364, 503(b), and 507 of the Bankruptcy Code, this Court hereby finds and orders:

## <u>OPPORTUNITY TO OBJECT</u>

3.        A final hearing on the Motion shall take place before the Honorable E. Lee Morris, United States Bankruptcy Judge, at the United States Bankruptcy Court, Northern District of Texas, Fort Worth Division, 501 W. Tenth Street, Courtroom 204, Fort Worth, Texas 76102, at a date and time to be noticed by the Debtors to all parties in interest in a subsequent notice of hearing (the "<u>Final Hearing</u>"). Objections shall be in writing and shall be filed with the Clerk of the Court so that any such objections are received on or before the deadline for filing such objections. Pursuant to Bankruptcy Rule 4001(d)(2), any objection to the entry of a final order on the Motion (the "<u>Final DIP Order</u>," and together with the Interim Order, the "<u>DIP Orders</u>") must be filed on or before 5:00 p.m. Central Time on the date that is five (5) business days prior to the Final Hearing.

4.        The Debtors and the DIP Lenders have represented to the Court that they have negotiated at arm's length and have acted in good faith in the negotiation and preparation of the DIP Term Loan Agreement and this Interim Order, have been represented by counsel, and intend to be and are bound by their respective terms. The terms and conditions of this Interim Order and the DIP Documents reflect the Debtors' exercise of prudent business judgment under exigent circumstances and are consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration.

## <u>STATEMENT OF JURISDICTION</u>

5.        This Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (D), (G), (K), (M) and (O).

## NOTICE

6.        Notice of the Motion and the Interim Hearing has been given to prevent immediate and irreparable harm pursuant to Bankruptcy Rules 2002, 4001, 9006, and 9014 and the Local Rules, and as required by sections 102, 105, 361, 362, 363, and 364 of the Bankruptcy Code. Other than the notice provided for herein, no further notice of the interim relief sought in the Motion is necessary.

## FACTUAL AND PROCEDURAL BACKGROUND

7.        On February 13, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors have continued in the management and possession of their business and property as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

8.        On February 15, 2023, the Court conducted the Interim Hearing on the Motion and pronounced interim approval of the Motion as set forth herein.

9.        An official committee of unsecured creditors (the "Committee") has not yet been appointed in these chapter 11 cases (the "Cases").

### PREPETITION CREDIT AGREEMENTS AND PREPETITION CONVERTIBLE NOTES PURCHASE AGREEMENT

#### The Prepetition Lenders' Claims

10.       *Prepetition ABL Lenders' Claim*. The Debtors believe that as of the Petition Date the approximate aggregate amount owed to the Prepetition ABL Agent and the Prepetition ABL Lender is $998,105.14 in revolving credit loans with the outstanding principal amount of $928,715.14 and accrued interest of approximately $69,390.00 (the "Prepetition Revolving Obligations"); and (ii) FILO B Obligations (as defined in Prepetition ABL Credit Agreement) in the amount of $7,422,050.00 with the outstanding principal amount of $7,375,000.00 and accrued

interest of approximately $47,050.00 (the "Prepetition FILO B Obligations" and, together with the Prepetition Revolving Obligations, collectively, the "Pre-Petition ABL Obligations"); *provided, however*, that the Pre-Petition FILO B Prepayment Premium, the Pre-Petition Revolving Facility Early Termination Fee, and the $1,228,940 FILO B Consent Fee (collectively the "Pre-Petition ABL Disputed Amounts") are not included in the Pre-Petition ABL Obligations; *provided further* that the Pre-Petition ABL Obligations do not include the "Pre-Petition LC Obligations," which is defined as the issued and outstanding letters of credit, which Pre-Petition LC Obligations in the amount of $14,590,671 as of the Petition Date shall be adequately protected by the LC Adequate Protection Liens.

11.     The "Prepetition ABL Lenders' Claim" is defined as the Pre-Petition ABL Obligations together with post-Petition Date interest and any fees, costs, and charges determined by a final non-appealable order of Bankruptcy Court to be allowable to the Prepetition ABL Agent and the Prepetition ABL Lenders on such claim pursuant to section 506(b) of the Bankruptcy Code; *provided* that the Prepetition ABL Lenders' Claim does not include the Pre-Petition LC Obligations or the Pre-Petition ABL Disputed Amounts until such time as the Bankruptcy Court determines the Pre-Petition ABL Disputed Amounts are allowable by a Final Order.

12.     *Prepetition Term Loan Lenders' Claim*. As of the Petition Date, the Debtors believe the Prepetition Term Loan Representative and the Prepetition Term Loan Lenders are owed in an aggregate amount approximately $24,474,459 under the Prepetition Term Loan Claim Documents and applicable law (the "Prepetition Term Loan Lenders' Secured Indebtedness," and together with Post-Petition Date interest, fees, costs, and charges allowed or allowable to the Prepetition Term Loan Representative and the Prepetition Term Loan Lenders on such claim pursuant to section 506(b) of the Bankruptcy Code, collectively the "Prepetition Term Loan Lenders' Claim").

13.    *Prepetition Convertible Noteholders' Claim*. The Debtors believe that as of the Petition Date they owe the Prepetition Convertible Notes Agent and the Prepetition Convertible Noteholders in an approximate outstanding amount of $21,183,000, consisting of (i) a series of junior secured convertible notes in the approximate outstanding amount of $7,742,479 (the "FILO C Notes"); (ii) a series of junior secured convertible notes in the approximate outstanding amount of $10,353,021 (the "JSC Notes"); and (i) a series of junior secured convertible notes in the approximate outstanding amount of $3,087,500 (the "Management JSC Notes" and, together with the FILO C Notes and the JSC Notes, collectively, the "Prepetition Convertible Notes") for unpaid principal, plus any and all interest, fees, costs, expenses, charges, and other claims, debts or obligations of the Debtors to the Prepetition Convertible Notes Agent and the Prepetition Convertible Noteholders that have accrued as of the Petition Date under the Prepetition Convertible Note Documents and applicable law on account of such junior secured convertible notes (the "Prepetition Convertible Note Secured Indebtedness" and together with post-Petition Date interest, fees, costs, and charges allowed or allowable to the Prepetition Convertible Notes Agent and the Prepetition Convertible Noteholders on such claim pursuant to section 506(b) of the Bankruptcy Code, collectively the "Prepetition Convertible Noteholders' Claim" and, together with the Prepetition ABL Lenders' Claim and the Prepetition Term Loan Lenders' Claim, the "Prepetition Lenders' Claims").

### The Prepetition Claim Documents

14.    *Prepetition ABL Claim Documents*. The Prepetition ABL Agent and the Prepetition ABL Lenders assert that the Pre-Petition ABL Obligations and the Pre-Petition ABL Disputed Amounts are evidenced by certain documents executed and delivered to the Prepetition ABL Agent and the Prepetition ABL Lenders by the Debtors, including, without limitation, the Prepetition ABL Credit Agreement and all notes, security agreements, assignments, pledges, mortgages, deeds

of trust, guaranties, forbearance agreements, letters of credit, and other instruments or documents executed in connection therewith or related thereto (collectively the "Prepetition ABL Claim Documents"). True and correct copies of certain of the Prepetition ABL Claim Documents are maintained by the Debtors and the Prepetition ABL Agent and will be made available to interested parties upon request.

15.     *Prepetition Term Loan Claim Documents.* The Prepetition Term Loan Representative and the Prepetition Term Loan Lenders assert that the Prepetition Term Loan Lenders' Claim is evidenced by certain documents executed and delivered to the Prepetition Term Loan Representative and the Prepetition Term Loan Lenders by the Debtors, including, without limitation, the Prepetition Term Loan Credit Agreement and all notes, security agreements, assignments, pledges, mortgages, deeds of trust, guaranties, forbearance agreements, and other instruments or documents executed in connection therewith or related thereto (collectively the "Prepetition Term Loan Claim Documents"). True and correct copies of certain of the Prepetition Term Loan Claim Documents are maintained by the Debtors and the Prepetition Term Loan Representative and will be made available to interested parties upon request.

16.     *Prepetition Convertible Notes Claim Documents.* The Prepetition Convertible Notes Agent and the Prepetition Convertible Noteholders assert that the Prepetition Convertible Noteholders' Claim is evidenced by certain documents executed and delivered to the Prepetition Convertible Notes Agent and the Prepetition Convertible Noteholders by the Debtors, including, without limitation, the Prepetition Convertible Note Purchase Agreement and all notes, security agreements, assignments, pledges, mortgages, deeds of trust, guaranties, forbearance agreements, and other instruments or documents executed in connection therewith or related thereto (collectively the "Prepetition Convertible Notes Claim Documents" and, together with the

4856-5231-4449v.1

Prepetition ABL Claim Documents and the Prepetition Term Loan Claim Documents, the "Prepetition Claim Documents"). True and correct copies of certain of the Prepetition Convertible Notes Claim Documents are maintained by the Debtors and the Prepetition Convertible Notes Agent and will be made available to interested parties upon request.

### **Subordination Agreements**

17.    The Prepetition ABL Agent is party to: (i) that certain Intercreditor and Subordination Agreement, dated as of May 9, 2022, by and among the Prepetition ABL Agent and the Prepetition Term Loan Representative (as may be amended from time to time, the "ABL / Term Subordination Agreement"); and (ii) that certain Intercreditor and Subordination Agreement, dated as of September 20, 2022, by and among the Prepetition ABL Agent and the Prepetition Convertible Notes Agent (as may be amended from time to time, the "ABL / Convertible Notes Subordination Agreement"). The Prepetition Term Loan Representative is party to: (i) the ABL / Term Subordination Agreement; (ii) that certain Term Loan / FILO C Convertible Notes Intercreditor and Subordination Agreement, dated as of September 20, 2022, by and among the Prepetition Term Loan Representative and the Prepetition Convertible Notes Agent in its capacity as the FILO C Collateral Agent (as defined therein) (as may be amended from time to time, the "Term / FILO C Subordination Agreement"); and (iii) that certain Term Loan / Junior Secured Convertible Notes Intercreditor and Subordination Agreement, dated as of September 20, 2022, by and among the Prepetition Term Loan Representative and the Prepetition Convertible Notes Agent in its capacity as the JSC Collateral Agent (as defined therein) (as may be amended from time to time, the "Term / JSC Subordination Agreement" and, together with the ABL / Term Subordination Agreement, the ABL Convertible Notes Subordination Agreement and the Term / FILO C Subordination Agreement, collectively, the "Subordination Agreements").

18.     Each of the Subordination Agreements is a "subordination agreement" within the meaning of section 510(a) of the Bankruptcy Code. The respective rights of the Prepetition Agents shall continue to be governed by the Subordination Agreements, except as provided in the following paragraph.

19.     Upon payment in full of the Pre-Petition ABL Obligations, the respective rights of the Prepetition ABL Agent and Prepetition Term Loan Representative shall no longer be governed by the ABL / Term Subordination Agreement. Additionally, upon payment in full of the Prepetition Pre-Petition ABL Obligations, the respective rights of the Prepetition ABL Agent and the Prepetition Convertible Notes Agent shall no longer be governed by the ABL / Convertible Notes Subordination Agreement.

## The Prepetition Lenders' Collateral

20.     The Prepetition Claim Documents state that Prepetition Lenders' Claims are secured by perfected liens and security interests, subject to the terms of the Subordination Agreements, and as more fully set forth in the Prepetition Claim Documents, in substantially all of the Debtors' assets, including, without limitation, all accounts, inventory, equipment, general intangibles and all Collateral (as such term is defined in the applicable Prepetition Claim Documents) wherever located and now-owned or at any time hereafter acquired or in which such Debtor now has or at any time in the future may acquire any right, title, or interest (collectively, the "Prepetition Lenders' Collateral"). Notwithstanding the foregoing, nothing in this paragraph shall be deemed to admit or stipulate to any prepetition lien.

## USE OF CASH UNTIL DEBTORS TRANSITION THEIR BANK ACCOUNTS

21.     For the purposes of this Interim Order only, and until such time as the Debtors transition their bank accounts, to the extent that the cash in each of the Debtors' bankruptcy estates, wherever located, and all cash equivalents, whether in the form of negotiable instruments,

documents of title, securities, deposit accounts, investment accounts, or in any other form, that were on the Petition Date in any of the Debtors' possession, custody or control, or in which any of the Debtors will obtain an interest during the pendency of these Cases or which represent income, proceeds, products, rents, or profits of any of the Prepetition Lenders' Collateral, such cash will be treated as the cash collateral (collectively, "Cash Collateral[3]").

### Need For and Consent to Limited Use of Cash Collateral

22.    The Prepetition Lenders do not consent to the Debtors' use of Cash Collateral except in strict accordance with the terms and conditions contained in this Interim Order. The relief hereunder is necessary to avoid immediate and irreparable harm to the Debtors' estates because, without the limited use of Cash Collateral, the Debtors will not have the funds necessary to maintain their assets, sell or otherwise liquidate their assets, provide financial information, and pay employee compensation, payroll taxes, overhead, and other expenses necessary to maximize the value of the Debtors' estates. The Debtors require the use of Cash Collateral as provided herein.

23.    Good, adequate, and sufficient cause has been shown to justify the granting of the relief requested herein. The use of Cash Collateral will benefit the Debtors and their estates. The ability of the Debtors to maximize the value of their estates depends upon the Debtors' ability to use Cash Collateral. Accordingly, the use of Cash Collateral by the Debtors is actual and necessary to preserving their estates.

### Authorization for Limited Use of Cash Collateral

24.    The Debtors are hereby authorized, on a limited basis, to use Cash Collateral only in strict accordance with the terms and conditions provided in this Interim Order until the

---

[3] The reference herein to "Cash Collateral" is not an agreement, stipulation, or acknowledgement by the Debtors, the DIP Agent, or the DIP Lender that any of the Debtors' cash is cash collateral of any of the Prepetition Lenders; and none of the Debtors, DIP Agent, or DIP Lender believe that consent of the Prepetition Lenders is required.

occurrence of the earlier of: (a) the Termination Declaration Date; *provided*, that the Debtors shall be authorized to use Cash Collateral following delivery of a Termination Declaration solely to the extent set forth in this Interim Order; or (b) the Expiration Date unless extended by written agreement to the extent set forth in this Interim Order.

## DIP FACILITY

### Need for DIP Facility

25.     Without the ability to use Cash Collateral and obtain the loans under the DIP Facility, the Debtors will not have sufficient funds to maintain their assets, sell or otherwise liquidate their assets, provide financial information, or pay employee compensation, payroll taxes, overhead, and other expenses necessary to maximize the value of the Debtors' estates. The use of Cash Collateral and the loans provided under the DIP Facility are actual and necessary to preserving the Debtors and their estates. The DIP Agent and the DIP Lenders are willing to provide the DIP Facility to or for the benefit of the Debtors only in accordance with the terms of the DIP Documents and this Interim Order.

26.     The Debtors have requested that the DIP Agent, the DIP Lenders, the Prepetition Term Loan Representative, and the Prepetition Convertible Notes Agent, provide use of Cash Collateral and the DIP Facility in order to provide funds to be used for the purposes set forth in the Budget (defined below), and such other purposes as permitted by this Interim Order and to which the DIP Agent, on the direction of requisite lenders under the DIP Term Loan Agreement, consents in writing.

27.     As set forth in the Motion and the evidence presented to the Court, the DIP Facility is the best source of debtor-in-possession financing available to the Debtors. The Debtors have been and continue to be unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the terms of the DIP Facility. The Debtors have also been unable to

obtain: (a) unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien. Financing on a postpetition basis is not otherwise available without granting the DIP Agent, for the benefit of itself and the DIP Lenders: (a) perfected security interests in and DIP Liens (as defined and provided for herein) on the DIP Collateral (defined below) as set forth herein, (b) superpriority claims with the priorities set forth herein, and (c) the other protections set forth in this Interim Order.

28.     The terms of the DIP Facility and this Interim Order, including, without limitation, the related fees and priming liens in accordance therewith, are fair, just, and reasonable under the circumstances, are ordinary and appropriate for secured financing to debtors-in-possession, reflect the Debtors' exercise of their prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration. Any credit extended under the terms of this Interim Order and the DIP Facility shall be deemed to have been extended in good faith by the DIP Agent and the DIP Lenders, as the term "good faith" is used in section 364(e) of the Bankruptcy Code.

### Authorization to Obtain Credit

29.     The Debtors are hereby authorized to obtain credit under the DIP Facility only in accordance with the DIP Term Loan Agreement, the DIP Facility, this Interim Order, and the Budget.

30.     The Debtors are hereby authorized (a) on an interim basis, to obtain the Interim DIP Term Loans in an amount not to exceed **$25,000,000** and (b) subject to entry of the Final DIP Order, to obtain additional DIP Term Loans on a final basis in an amount not to exceed

4856-5231-4449v.1

(x) **$26,500,000** plus (y) the Roll-up Loans (cumulative of the Interim DIP Term Loans (the "<u>DIP Facility</u>"), as provided in the DIP Term Loan Agreement, in accordance with the terms and conditions set forth herein and in the DIP Term Loan Agreement and the DIP Documents.

31.    Upon entry of this Interim Order and closing on the DIP Term Loan Agreement, the Debtors shall (i) repay in full the Bridge Loan, and (ii) refinance the Pre-Petition ABL Obligations, other than the Pre-Petition ABL Disputed Amounts and the Pre-Petition LC Obligations.

32.    The DIP Documents and the terms therein, including, without limitation, the fees, indemnification provisions, and priming lien provisions, are approved in their entirety. The Debtors are authorized to execute, deliver, and perform under the DIP Documents.

<strong><u>Authorization to Use Proceeds of the DIP Facility</u></strong>

33.    The Debtors are hereby authorized to use the proceeds of the DIP Facility in accordance with this Interim Order, the DIP Documents, and the Budget, including (a) to pay certain costs, fees, and expenses related to the Cases and (b) to fund the working capital needs and expenditures of the Debtors during the Cases.

<strong><u>DIP Liens and Superpriority Administrative Claims</u></strong>

34.    As security for the DIP Obligations, effective and automatically perfected as of the date of this Interim Order, and subject and subordinate to the Carve-Out, as set forth more fully in this Interim Order, the DIP Agent, for the benefit of the DIP Secured Parties, is hereby granted (without the necessity of the execution, recordation, or filing by the Debtors or the DIP Agent of mortgages, security agreements (including intellectual property security agreements), lockbox or control agreements, pledge agreements, financing statements, or any other instruments and without the necessity of possession or control by the DIP Agent or the DIP Lenders), valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens and security interests

(the "<u>DIP Liens</u>") in all DIP Collateral (defined below) in the manner set forth in clauses (i)-(iii) below, as collateral security for the prompt and complete performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of all DIP Obligations, subject to the rankings and priorities set forth below:

i) **Liens on Unencumbered Property**. Pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a perfected priming first priority lien on all encumbered and unencumbered now owned or after acquired assets of the Debtors that are not otherwise subject to any valid, non-avoidable and perfected lien prior to the Petition Date;

ii) **Liens Junior to Certain Other Liens**. Pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all now owned or after acquired assets of the Debtors that are (x) Term Loan Priority Collateral (as defined in the ABL / Term Subordination Agreement), (y) subject to any valid, perfected and non-avoidable lien in existence on the Petition Date, or (z) liens that were in existence immediately prior to the Petition Date that are perfected as permitted by Section 546(b) of the Bankruptcy Code.

iii) **Liens Priming Prepetition Liens**. Pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by a perfected priming first priority lien on the ABL Priority Collateral (as defined in the ABL / Term Subordination Agreement).

iv) **LC Adequate Protection Liens**;

v) **Adequate Protection Superpriority Claims**. To the extent of such Diminution in Value, junior only in right to any DIP Superpriority Claims, any amounts in a Professional Fee Escrow set forth in this Interim Order, and the Carve-Out

35.    All liens and security interests granted hereby and under the DIP Documents securing the DIP Facility, including the DIP Liens, are subject only to any Prior Permitted Liens (if any), any amounts in a Professional Fee Escrow set forth in this Interim Order, the Carve-Out, and the Adequate Protection Liens, and hereby are granted in and attach to, all personal property of the Debtors and their bankruptcy estates, tangible or intangible, wherever located, including, but not limited to, all accounts, receivables, chattel paper, cash, cash equivalents, letters of credit, letter of credit rights, supporting obligations, deposit accounts, commodity accounts, securities accounts, documents, fixtures, goods, instruments, investment property, inventory, equipment,

owned real property, all proceeds of leases of real property, patents, trademarks, copyrights, other general intangibles and membership interests, and, subject to the entry of the Final DIP Order (other than those avoidance actions arising under section 549 of the Bankruptcy Code), any avoidance actions under chapter 5 of the Bankruptcy Code or otherwise), whether now existing or hereafter acquired by the Debtors and the Debtors' bankruptcy estates, and all proceeds, products, rents, revenues, and profits of same (the "DIP Collateral," and together with the Prepetition Lenders' Collateral and the Cash Collateral, the "Collateral"); *provided*, *however*, the DIP Liens shall not attach to, and DIP Collateral shall not include, the Debtors' interest in its leases of nonresidential real property (except as may be permitted by such leases and in any event shall include any proceeds or value of such leasehold interests obtained whether by sale, financing, or other disposition or form of transfer or transaction).

36.    Additionally, on account of any outstanding DIP Obligations under the DIP Facility, the DIP Agent, for itself and for and on behalf of the DIP Lenders, is hereby granted superpriority administrative claims (the "DIP Superpriority Claims") and all other benefits and protections allowable under sections 507(b) and 503(b)(1) of the Bankruptcy Code, senior in right to all other administrative claims against the Debtors' estates, subject to any amounts in a Professional Fee Escrow set forth in this Interim Order, the Carve-Out and the priorities among the DIP Lenders set forth in the DIP Documents.

## Cash and DIP Proceeds

37.    To the extent proceeds of the DIP Facility are deposited into any account maintained by the Debtors, including the TMI Master Concentration Account and the Master Operating Account, that is subject to a Deposit Account Control Agreement or other methods of perfection by "control" within the meaning set forth in Section 9-104 of the Uniform Commercial

Code (collectively "Control Agreement"), such Control Agreement shall not restrict the use of any funds in that account.

38.    Further, the Debtors' use of the proceeds of the DIP Facility shall not be restricted in any way by such Control Agreement, meaning (a) proceeds of the DIP Facility may not be swept by any prepetition Bank or any prepetition agreement, (b) no proceeds may be swept or otherwise transferred into the Wells Fargo Cash Dominion Account (as that term is defined in the Cash Management Motion), and (c) no liens of any prepetition Bank or Prepetition Lender shall attach to the proceeds the DIP Facility.

39.    The Debtors may, without further order of the Court, agree to and implement changes to the cash management systems and procedures in the ordinary course of business, including, without limitation, the opening and closing of bank accounts acceptable to the DIP Agent as directed by the requisite lenders under the DIP Term Loan Agreement.

40.    The proceeds from any sale of any of the Debtors' assets, any settlement, casualty, or condemnation proceeds relating to any of the Debtors' assets shall be paid to the DIP Agent for application in accordance with the DIP Term Loan Agreement and consistent with the terms of the Subordination Agreements.

41.    To the extent there exists or comes to exist any cash of the Debtors' estates that is not Cash Collateral, wherever located and however held, such cash shall be deemed to have been used first by the Debtors' estates, and such cash, to the extent applicable, shall be subject to the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens (defined below), LC Adequate Protection Liens, and Adequate Protection Superpriority Claims (defined below) granted to the DIP Agent, Prepetition Term Loan Representative, and Prepetition Convertible Notes Agent hereunder.

## **ADEQUATE PROTECTION**

### **Budgeted Cash Usage**

42.      As adequate protection of the DIP Lenders' interests in the DIP Collateral and the

Prepetition Term Loan Lenders' and Prepetition Convertible Noteholders' interests in the

Prepetition Lenders' Collateral and for the Prepetition Term Loan Lenders' and Prepetition

Convertible Noteholders' agreement for the Debtors to use Cash Collateral and as a condition

precedent to the DIP Lenders' agreement to provide the DIP Facility, there shall be established a

13-week cash flow budget (the "Budget"), a summary of which is attached hereto as **Exhibit 2**,

for the Debtors' cash receipts and expenses (including professional fees and expenses), which shall

provide, among other things, for the payment of interest in respect of the DIP Facility to the DIP

Lenders in accordance with the terms of the DIP Documents, and the adequate protection liens set

forth herein. Only so long as a Termination Declaration or reservation of rights shall not have been

delivered, the Debtors are authorized to and shall use the Cash Collateral (including the advances

under the DIP Facility) strictly in accordance with the Budget and the terms of this Interim Order.

The Debtors shall comply with and update the Budget from time to time in accordance with the

DIP Documents.

43.      The Debtors hereby covenant and agree that commencing on the Petition Date and

at all times thereafter, the Debtors shall strictly perform in accordance with the Budget, subject to

the following (the "Permitted Variance"): (i) Actual Cash Receipts for any Measurement Period,

shall not be less than **90%** of the "Total Cash Receipts" line item of the approved Budget for such

Measurement Period, as set forth in the most recent approved Budget; (ii) the actual amount of

Total Disbursements for any Measurement Period shall not be more than **110%** of the cumulative

amount projected in the Total Operating Disbursements and Total Non-Operating Disbursements

line items of the approved Budget for such Measurement Period (but, in all cases, excluding

professional fees of the Debtors, DIP Agent, and DIP Lenders); provided, that in all circumstances, savings in any one Measurement Period may be carried over for use in the subsequent Measurement Periods, but such carry-over amount shall be reduced to $0 upon approval of a new approved Budget.

44.     The Debtors shall deliver to the DIP Agent, by not later than 3:00 p.m. (Central time), on the Thursday of each week (commencing with the first such day of the first full calendar week following the Petition Date) a Budget Compliance Report in accordance with the terms of the DIP Term Loan Agreement.

45.     The use of Cash Collateral and the DIP Lenders' agreement to extend credit extends only to amounts actually incurred in accordance with the Budget. Subject to the amounts in a Professional Fee Escrow and the Carve-Out, upon the delivery of a Termination Declaration, the DIP Lenders' consent to use of Cash Collateral or agreement to extend credit shall automatically and immediately terminate and any consent for use of Cash Collateral or agreement to extend credit to satisfy projected, budgeted expenditures shall be immediately terminated and deemed withdrawn unless the Termination Declaration is modified or withdrawn, by the DIP Agent in its sole discretion, for itself and for and on behalf of the DIP Lenders; *provided* that the Debtors shall be authorized to use Cash Collateral following delivery of a Termination Declaration solely to the extent set forth in this Interim Order; *provided* further that the DIP Agent, in its discretion as directed by the requisite lenders under the DIP Term Loan Agreement, may consent to the Debtors' use of Cash Collateral in accordance with the Budget notwithstanding delivery of a Termination Declaration.

46.     Except as may specifically be provided in the Budget including, without limitation, for ordinary course payroll, benefits, and expense reimbursements, the Debtors agree that no

transfer of Cash Collateral shall be made to any of the Debtors' insiders, as that term is defined in

section 101(31) of the Bankruptcy Code. Any transfers to insiders shall be so identified in the

Budget.

### Adequate Protection Liens

47.    Taking into account all factors in these Cases, as adequate protection of the

Prepetition Term Loan Lenders' and the Prepetition Convertible Noteholders' interests in the

Collateral and for the Debtors' use of Cash Collateral, and subject only to Prior Permitted Liens,

if any, any amounts in a Professional Fee Escrow set forth in this Interim Order and the Carve-

Out, the Prepetition Term Loan Representative, for the benefit of itself and the other Prepetition

Term Loan Lenders, and the Prepetition Convertible Notes Agent, for the benefit of itself and the

Prepetition Convertible Noteholders, are hereby granted, effective as of the Petition Date, and

subject to the terms of the Subordination Agreements, valid and automatically perfected

replacement liens and security interests in and on (the "Adequate Protection Liens") all real and

personal property of the Debtors and their bankruptcy estates, tangible or intangible, wherever

located, including, but not limited to, all accounts, receivables, chattel paper, cash, cash

equivalents, letters of credit, letter of credit rights, supporting obligations, deposit accounts,

commodity accounts, securities accounts, documents, fixtures, goods, instruments, investment

property, inventory, equipment, owned real property, all proceeds of leases of real property,

patents, trademarks, copyrights, other general intangibles and membership interests, and, subject

to the entry of the Final DIP Order (other than those avoidance actions arising under section 549

of the Bankruptcy Code), any avoidance actions under chapter 5 of the Bankruptcy Code or

otherwise), whether now existing or hereafter acquired by the Debtors and the Debtors' bankruptcy

estates, and all proceeds, products, rents, revenues, and profits of same (the "Adequate Protection

Collateral") that shall secure any Diminution in Value of the Prepetition Term Loan Lenders' and Prepetition Convertible Noteholders' interests in the Collateral and for the Debtors' use of Cash Collateral; *provided*, *however*, the Adequate Protection Liens shall not attach to, and Adequate Protection Collateral shall not include, the Debtors' interest in its leases of nonresidential real property (except as may be permitted by such leases and in any event shall include any proceeds or value of such leasehold interests obtained whether by sale, financing, or other form or transfer or transaction).

48.    Pursuant to this Interim Order and the entry of a Final DIP Order, the DIP Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral subject, as to priority, only to (i) the Adequate Protection Liens, (ii) the Carve-Out, (iii) any amounts in a Professional Fee Escrow, (iv) the Pre-Petition LC Obligations until the Pre-Petition LC Termination, and (v) the Pre-Petition ABL Disputed Amount until the funding of any amounts following entry of a Final Order or written consent of the DIP Lenders; provided however that the DIP Agent and DIP Lenders' liens shall be junior on the Term Loan Priority Collateral (as defined in the ABL / Term Subordination Agreement) to any valid and perfected pre-petition security interest granted to the Prepetition Term Loan Lenders on such Term Loan Priority Collateral.

**Adequate Protection Superpriority Claims**

49.    As adequate protection for the interest of the Prepetition Term Loan Lenders and the Prepetition Convertible Noteholders in the Collateral on account of the granting of the DIP Liens, the incurrence of the DIP Obligations, the subordination of the liens and security interests granted under the Prepetition Claim Documents to the Carve-Out, the Professional Fee Escrow, any diminution in value arising out of the imposition of the automatic stay or the Debtors' use, sale, depreciation, or disposition of the Prepetition Term Loan Lenders' or Prepetition Convertible Noteholders' Collateral and Cash Collateral during the pendency of the Cases (collectively,

"Diminution in Value"), the Prepetition Term Loan Representative and the Prepetition Convertible Notes Agent are hereby granted superpriority administrative claims (the "Adequate Protection Superpriority Claims") and all of the other benefits and protections allowable under section 507(b) of the Bankruptcy Code to the extent of such Diminution in Value, junior only in right to any DIP Superpriority Claims, any amounts in a Professional Fee Escrow set forth in this Interim Order, and the Carve-Out.

## Automatic Perfection

50.     This Interim Order shall be sufficient and conclusive evidence of the priority, perfection, attachment, and validity of all of the DIP Lenders' and the Prepetition Term Loan Lenders' and Prepetition Convertible Noteholders' security interests in and liens on the Collateral granted and created hereunder, and such security interests and liens shall constitute valid, automatically perfected and unavoidable security interests and liens, with the priorities granted hereunder, effective as of the Petition Date, without the necessity of creating, filing, recording, or serving any financing statements, continuation statements, mortgages, or other documents that might otherwise be required under federal or state law in any jurisdiction or the taking of any other action to validate or perfect the security interests and liens granted to the DIP Agent, the Prepetition Term Loan Representative, and the Prepetition Convertible Notes Agent, for themselves and for and on behalf of the DIP Lenders, Prepetition Term Loan Lenders, and Prepetition Convertible Noteholders, by this Interim Order.

51.     To the extent that any applicable non-bankruptcy law otherwise would restrict the granting, scope, enforceability, attachment, or perfection of the liens and security interests granted and created by this Interim Order or otherwise would impose filing or registration requirements with respect to such liens and security interests, such law is hereby pre-empted to the maximum

extent permitted by the Bankruptcy Code, applicable federal law, and the judicial power of the United States Bankruptcy Court.

52.    By virtue of the terms of this Interim Order, to the extent that the DIP Agent, Prepetition Term Loan Representative, or Prepetition Convertible Notes Agent have filed Uniform Commercial Code financing statements or other security or perfection documents under the names of any of the Debtors, such filings shall be deemed to properly perfect the liens and security interests granted under this Interim Order, including, without limitation, the DIP Liens and the Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including entering into any deposit account control agreement, collateral access agreement, customs broker agreement or freight forwarding agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens and the Adequate Protection Liens, or to entitle the DIP Agent, Prepetition Term Loan Representative, Prepetition Convertible Notes Agent, DIP Lenders, Prepetition Term Loan Lenders, or Prepetition Convertible Noteholders, as applicable, to the priorities granted herein.

53.    If the DIP Agent, Prepetition Term Loan Representative, or Prepetition Convertible Notes Agent shall elect, in their determination and in the case of the DIP Agent as directed by requisite lenders under DIP Term Loan Agreement, for any reason to file any Uniform Commercial Code financing statements or other recordable documents, or execute or enter into deposit account control agreements, to further evidence perfection of their interests in property of the estates, the DIP Agent (as directed by the requisite lenders under the DIP Term Loan Agreement, Prepetition Term Loan Representative, or Prepetition Convertible Notes Agent, as applicable, or, upon the

4856-5231-4449v.1

request of the DIP Agent Prepetition Term Loan Representative, or Prepetition Convertible Notes Agent, as applicable, the Debtors, are authorized and directed to execute, enter into, and/or file, or cause to be executed, entered into, and/or filed, all such financing statements or deposit account control agreements and other such documents, and the execution, entering into, filing, recording, or service (as the case may be) of such financing statements, deposit control agreements, or similar documents shall be deemed to have been made at the time of and on the Petition Date, and the signature(s) of any person(s) designated by the Debtors, whether by letter to the DIP Agent, Prepetition Term Loan Representative, or Prepetition Convertible Notes Agent, as applicable, or by appearing on any one or more of the agreements or other documents respecting the security interests and liens granted hereunder shall bind the Debtors and their estates. The DIP Agent, Prepetition Term Loan Representative, or Prepetition Convertible Notes Agent, as applicable, may execute such documents on behalf of the Debtors as the Debtors' attorney-in-fact or file a certified copy of this Interim Order in any filing or recording office in any county or other jurisdiction in which any of the Debtors have real or personal property, and, in such event, the subject filing or recording officer is authorized and directed to file or record such documents or certified copy of this Interim Order.

## **Authorization to Act**

54.     The Debtors are hereby authorized and directed to perform all acts, take any action, and execute and comply with the terms of such other documents, instruments and agreements, as the DIP Agent may require as evidence of and for the protection of the Collateral, or that may be otherwise deemed necessary by the DIP Agent or the DIP Lenders to effectuate the terms and conditions of this Interim Order and the DIP Facility.

55.     Until such time as the DIP Obligations shall have been indefeasibly paid and satisfied in full in accordance with the terms of the DIP Documents, and without further order of

the Court: (a) the Debtors shall use the proceeds of the DIP Facility and all Cash Collateral strictly

in accordance with the terms of the Budget requirements and the other terms of this Interim Order;

(b) the Debtors shall not, without prior order of the Court, engage in any transaction that is not in

the ordinary course of the Debtors' business, and (c) the Debtors shall timely comply with all of

the covenants set forth in the DIP Documents.

### Prior Permitted Liens

56.     The security interests and liens granted pursuant to the terms of this Interim Order

are subject to any other valid, perfected and unavoidable liens and security interests of any secured

creditor, other than the Prepetition Lenders in such capacity, in any assets of any of the Debtors

existing on the Petition Date that are senior in priority under applicable law to the liens and security

interests granted under the Prepetition Claim Documents in the Prepetition Lenders' Collateral

(collectively, the "Prior Permitted Liens"). The Debtors or any other party in interest, including

the DIP Agent, Prepetition Term Loan Representative, and Prepetition Convertible Notes Agent,

shall have the right to object to the validity, priority, or extent of any such Prior Permitted Liens,

or the allowance of such debts secured thereby, or to institute any actions or adversary proceedings

with respect thereto. The DIP Liens granted to the DIP Agent and the DIP Lenders pursuant to this

Interim Order shall not at any time be (a) made subject or subordinated to, or made *pari passu*

with, any other lien or security interest existing on the Petition Date, or any claim, lien, or security

interest created under sections 363 or 364(d) of the Bankruptcy Code or otherwise (except with

respect to any Prior Permitted Liens), or (b) subject to any lien or security interest that is avoided

and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code.

For the avoidance of doubt, no liens of the Prepetition Lenders on the Prepetition Lenders'

Collateral are Prior Permitted Liens.

Exhibit 13    Page 30 of 54

## No Additional Liens

57.     Until such time as the DIP Obligations shall have been indefeasibly paid and satisfied in full in accordance with the terms of the DIP Documents and this Interim Order, the Debtors shall not be authorized to obtain credit secured by a lien or security interest in the Collateral, other than the DIP Facility, without the prior written consent of the DIP Agent, for itself and for and on behalf of the DIP Lenders.

## No Liability

58.     No act committed or action taken by the DIP Agent, for itself and for and on behalf of the DIP Lenders, as applicable, under this Interim Order, the DIP Facility, the DIP Documents, or the collection of the DIP Obligations, shall be used, construed, or deemed to hold the DIP Agent and/or the DIP Lenders, as applicable, to be in "control" of or participating in the governance, management, or operations of the Debtors for any purpose, without limitation, or to be acting as a "responsible person(s)" or "owner(s) or operator(s)" or a person(s) in "control" with respect to the governance, management, or operation of the Debtors or their businesses (as such terms, or any similar terms, are used in the Internal Revenue Code, WARN Act, Comprehensive Environmental Response, Compensation and Liability Act, or the Bankruptcy Code, each as may be amended from time to time, or any other federal or state statute, at law, in equity, or otherwise) by virtue of the interests, rights, and remedies granted to or conferred upon the DIP Agent and DIP Lenders, as applicable, under the DIP Documents, or this Interim Order including, without limitation, such rights and remedies as may be exercisable by the DIP Agent and DIP Lenders, as applicable, in connection with this Interim Order, the DIP Facility, or the DIP Documents.

## Release

59.     Subject to entry of the Final Order, the Debtors, on behalf of themselves and their respective estates, hereby absolutely, irrevocably, and unconditionally release and forever

discharge and acquit the Backstop Lender (Invictus Special Situations Master I, L.P.) and DIP

Agent (Cantor) (for avoidance of doubt not the Prepetition Lenders) and their respective former,

current, or future officers, partners, directors, managers, members, principals, employees, agents,

related funds, affiliates, investors, financing sources, financial advisors, attorneys, accountants,

investment bankers, consultants, representatives, and other professionals and the respective

successors and assigns thereof, in each case solely in their capacities as such (collectively, the

"Released Parties"), from any and all claims, offsets, defenses, counterclaims, set off rights,

objections, challenges, causes of action, liabilities, losses, damages, responsibilities, disputes,

remedies, actions, suits, controversies, reimbursement obligations (including, attorneys' fees),

costs, expenses, or judgments of every type, whether known or unknown, asserted or unasserted,

fixed or contingent, or pending or threatened, of any kind or nature whatsoever, whether arising at

law or in equity (including, without limitation, any so-called "lender liability" or equitable

subordination claims or defenses, recharacterization, subordination, avoidance, any claim arising

under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar

provisions of applicable state or federal law, or any other claim or cause of action arising under

the Bankruptcy Code or applicable non-bankruptcy law), in each case, arising under, in connection

with, or related to the Debtors or their estates, the extent, amount, validity, enforceability, priority,

security, and perfection of the DIP Facility, the DIP Obligations, the DIP Liens, the DIP

Documents, the negotiation thereof and of the deal reflected thereby, in each case that the Debtors

at any time had, now have or may have, or that their successors or assigns hereafter can or may

have against any of the Released Parties for or by reason of any act, omission, matter, cause, or

thing whatsoever arising at any time on or prior to the date of this Interim Order, except to the

extent such claim, damage, loss, liability, or expense is found in a final non-appealable judgment

by a court of competent jurisdiction to have resulted primarily from such Released Party's gross negligence, actual fraud, or willful misconduct.

## **Automatic Stay**

60.     The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to: (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, LC Adequate Protection Lien, and DIP Superpriority Claims; (b) permit the Debtors to perform such acts as the DIP Secured Parties or the Prepetition Agents, as applicable, may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Secured Parties and the Prepetition Agents under the DIP Documents, the DIP Facility, and this Interim Order, as applicable; and (d) authorize the Debtors to pay, and the DIP Secured Parties and Prepetition Agents to retain and apply, payments made in accordance with this Interim Order.

## **Collateral Insurance, Maintenance, Taxes, and Deposits**

61.     The Debtors shall maintain, with financially sound and reputable insurance companies, insurance of the kind covering the Collateral, and in accordance with the Prepetition Claim Documents and the DIP Documents.

62.     The Debtors shall make any and all payments necessary, permitted under the Budget, and in accordance with the DIP Documents to keep the Collateral and their other property in good repair and condition and not permit or commit any waste thereof.

63.     To the extent the Debtors have made or make any deposits for the benefit of utility companies or any other entity, or otherwise set aside funds for the benefit of any entity (and the Debtors shall not make any such deposits or otherwise set aside funds which are not included in the Budget without first obtaining prior written consent of the DIP Agent), such deposits shall be,

and hereby are, upon any return of same to the Debtors, subject to the first-priority perfected liens and security interests of the DIP Agent in respect of the DIP Facility and the Debtors' use of Cash Collateral granted by this Interim Order.

## Reporting Requirements

64.    The Debtors are authorized and directed to provide to the DIP Agent all of the documentation and reports required under the DIP Documents unless the DIP Agent waives or modifies such requirements in writing.

## Interest, Fees, Costs and Expenses of the DIP Lenders

65.    During the Cases, subject to the terms of the DIP Term Loan Agreement, the interest, fees, costs, and expenses, including attorneys' fees and expenses, due at any time to the DIP Agent or DIP Lenders under the DIP Documents may be charged by the DIP Agent or the DIP Lenders, as applicable, and shall be paid by the Debtors out of the Cash Collateral or out of any DIP Facility advances, in accordance with the terms of this Interim Order and the applicable DIP Documents.

66.    The Debtors are hereby authorized to pay the DIP Agent's and DIP Lenders' reasonable and documented (in summary format) fees and out-of-pocket expenses in connection with the preparation of the documentation of the DIP Loans including, but not limited to, legal fees (limited to one external counsel and one local counsel for DIP Agent, which are Shipman & Goodwin LLP and Polsinelli PC; one external counsel and one local counsel for DIP Lenders, which are Ropes & Gray and Polsinelli PC), fees of one restructuring advisor (which is Seaport Pericles), fees of the DIP Agent (which is Cantor), audit fees, search fees, filing fees, and documentation fees without the DIP Agent, the DIP Lenders, or their counsel having to file any further application with this Court for approval or payment. The DIP Agent's and DIP Lenders' other costs, fees and expense, including legal fees and expenses that are incurred after the Petition

Date that constitute fees and expenses incurred by any professional retained by the DIP Agent or

the DIP Lenders shall be paid within five (5) calendar days of the expiration of the Review Period

(as defined below). Any professional retained by the DIP Agent or the DIP Lenders seeking

payment of fees and expenses incurred after the Petition Date pursuant to this paragraph 66 shall

deliver a summary invoice to the Debtors (which shall not be required to contain time entries or

otherwise comply with the Guidelines of the United States Trustee, but shall include a general,

brief description of the nature of the matters for which services were performed consistent with

the local rules, and which may be redacted or modified to the extent necessary to delete any

information subject to the attorney-client privilege, any information constituting attorney work

product, or any other confidential information, and the provision of such invoices shall not

constitute any waiver of the attorney client privilege or of any benefits of the attorney work product

doctrine), with a copy to the U.S. Trustee and any official Committee appointed in these Cases;

*provided*, *however*, that (i) any redacted fee statements shall retain all privileges irrespective of

any disclosure of any privileged matter, and any such disclosure shall be deemed inadvertent for

all purposes and deemed stricken from any record in these Cases, any Successor Cases or

otherwise, (ii) if the Debtors, the U.S. Trustee, or any official Committee objects to the

reasonableness of such fees and expenses—and such objection is noticed via electronic mail to

counsel to the professional and to the professional—and such objection cannot be resolved within

ten (10) calendar days of service of such summary invoice(s) (the "Review Period"), the Debtors,

the U.S. Trustee, or any official Committee, as the case may be, shall file and serve upon such

professional an objection with the Court (a "Fee Objection") limited to the issue of the

reasonableness of the disputed fees and expenses prior to the expiration of the Review Period,

(iii) if the Debtors, the U.S. Trustee, or any official Committee fail to object to the reasonableness

of such fees and expenses within the Review Period (or such objection is later withdrawn), any objection of the Debtors, the U.S. Trustee, or any official Committee, as the case may be, shall be waived, (iv) the Debtors shall timely pay in accordance with this Interim Order the undisputed fees and expenses reflected on any invoice to which a Fee Objection has been timely filed, and (v) notwithstanding the foregoing (i) – (iv) of this sentence, the DIP Agent's or DIP Lenders' costs, fees and expenses, including legal fees and expenses incurred prior to and unpaid as of the Petition Date shall be paid indefeasibly upon entry of this Interim Order. All DIP Agent and DIP Lender costs, fees and expenses, including legal fees and expenses owed shall constitute obligations under the DIP Facility and shall be secured by the DIP Collateral and afforded all priorities and protections afforded to the DIP Facility under this Interim Order and the DIP Documents.

### **Professional Fees of the Estates; Carve-Out**

67.    Amounts set forth in the Budget for Estate Professionals (defined below) for periods prior to the delivery of a Termination Declaration shall be set aside weekly and held by the Debtors in escrow in a separate, segregated account in the name of any of the Debtors for the benefit of Debtor Professionals (defined below) and the Committee Professionals (defined below) (the "Professional Fee Escrow") for the sole purpose of funding allowed fees and expenses of Estate Professionals (defined below) incurred prior to the delivery of a Carve-Out Trigger Notice. When funding the Professional Fee Escrow, the Debtors shall be deemed to first use unencumbered cash they may have, if any. To the extent funds in a Professional Fee Escrow are not used for such purposes, such amount of unused funds shall be returned to the Debtors estates, subject to the DIP Liens. Any amounts payable by the Debtors to Estate Professionals on account of fees or expenses incurred prior to the delivery of a Termination Declaration shall only be paid upon allowance or authorization by the Court and first from funds on deposit in the applicable Professional Fee Escrow.

68.     Notwithstanding anything to the contrary herein, the Debtors' obligations to the DIP Secured Parties and the Prepetition Agents and Prepetition Lenders, and the liens, security interests and superpriority claims granted by this Interim Order or under the Prepetition Credit Agreements and the DIP Documents, and the payment of all such obligations, shall be subject and subordinate in all respects to payment of the following fees and expenses: (a) the payment of unpaid fees required to be paid to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a); (b) fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (c) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, but subject to final allowance by the Court, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals"), and any appointed Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Estate Professionals") at any time before the delivery by the DIP Agent of a Carve-Out Trigger Notice (defined below); and (c) Allowed Professional Fees of all Estate Professionals in an aggregate amount, after application of all retainers, not to exceed **$2,000,000** incurred on or after the first business day following delivery by the DIP Agent of a Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (such amount, the "Post-Carve-Out Trigger Notice Cap") (the foregoing clauses (a) through (c), collectively, the "Carve-Out"). The Term "Carve-Out Trigger Notice" shall mean a written notice stating that the Post-Carve-Out Trigger Notice Cap has been invoked, delivered by hard copy or email by the DIP Agent at the direction of the requisite lenders under the DIP Term Loan Agreement to lead bankruptcy counsel for the Debtors, the U.S. Trustee, and counsel to the Committee, if any, which notice may be

4856-5231-4449v.1

delivered following the occurrence and continued existence of a Postpetition Default (as defined herein) under the terms of this Interim Order.

69.     Any payment or reimbursement made to any Estate Professional in respect of any Allowed Professional Fees prior to the delivery of the Carve-Out Trigger Notice shall not reduce the Carve-Out.

70.     Payments from the Carve-Out shall be subject to any terms and conditions of the engagement agreements and appurtenant orders for the employment of each Estate Professional. The Debtors shall be permitted to pay compensation and reimbursement of expenses incurred prior to the occurrence of a Postpetition Default or delivery of a Termination Declaration in accordance with the Budget to the extent allowed and payable under sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable first from the applicable Professional Fee Escrow.

71.     Until such time as the DIP Obligations shall have been indefeasibly paid and satisfied in full in accordance with the DIP Documents, any remaining unapplied retainer funds at the conclusion of an Estate Professional's engagement shall be immediately returned to the DIP Agent, as the DIP Lenders' Cash Collateral.

## No Marshaling

72.     Subject to and effective upon entry of the Final DIP Order, the DIP Secured Parties shall not be subject in any way whatsoever to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral.

## Section 552(b) of the Bankruptcy Code

73.     The DIP Agent shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and subject only to and effective upon entry of the Final DIP Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Agent with respect to proceeds, products, offspring, or profits of any of the Collateral.

### Limitation on Charging Expenses Against Collateral

74.     Subject to and effective only upon entry of the Final DIP Order, and without limiting the scope of the Carve-Out, no costs or expenses of administration of these Cases or any Successor Cases or future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral (including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent and no consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent Secured Parties and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Secured Parties to any charge, lien, assessment, or claims against the DIP Collateral under section 506(c) of the Bankruptcy Code or otherwise.

### No Proofs of Claim

75.     The DIP Secured Parties shall not be required to file proofs of claim in any of the Cases or Successor Cases of the Debtors under any chapter of the Bankruptcy Code, and the Debtors' stipulations in this Interim Order shall be deemed to constitute a timely filed proof of claim against the applicable Debtor(s).   Any order entered by the Court in relation to the establishment of a bar date for any claim (including without limitation, administrative expense claims and priority claims) in any of the Cases or Successor Cases shall not apply to the claims of the DIP Secured Parties with respect to the DIP Obligations. Notwithstanding the foregoing, the DIP Agent (on behalf of itself and the DIP Lenders) is hereby authorized and entitled, in its determination, but not required, to file (and amend and/or supplement, as applicable) a master proof of claim for any claims of the DIP Agent or any of the DIP Lenders in respect of the DIP Obligations, as applicable; *provided*, *however*, that nothing in this Interim Order shall waive the right of any Lender to file its own proof of claim against any of the Debtors.

## Limitations on Use of DIP Facility Proceeds and Collateral

76.    No DIP Loans, DIP Collateral, or any portion of the Carve-Out, may be used

directly or indirectly by any Debtor, any statutory, or non-statutory committee (including any

Committee, if appointed), or any trustee appointed in the Chapter 11 Cases or any Successor Case,

including any chapter 7 case, or any other person, party, or entity (a) in connection with the

investigation, initiation, or prosecution of any claims, causes of action, adversary proceedings, or

other litigation (i) against any of the DIP Secured Parties or their respective predecessors in

interest, officers, directors, employees, agents, affiliates, representatives, attorneys, or advisors, or

any action purporting to do the foregoing in respect of the DIP Obligations, the DIP Liens, the DIP

Superpriority Claims, or the Adequate Protection Liens, or (ii) challenging the amount, validity,

perfection, priority or enforceability of or asserting any defense, counterclaim or offset with

respect to, the DIP Obligations, the DIP Superpriority Claims, or the liens, claims, rights, or

security interests granted under this Interim Order or the DIP Documents including, in each case,

without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or

552 of the Bankruptcy Code, applicable non-bankruptcy law, or otherwise; (b) to prevent, hinder,

or otherwise delay the DIP Agent's, or the DIP Lenders', as applicable, enforcement or realization

on the DIP Obligations, DIP Superpriority Claims, DIP Collateral, and the liens, claims, and rights

granted to such parties under this Interim Order, each in accordance with the DIP Documents or

this Interim Order; (c) to seek to modify any of the rights and remedies granted to the DIP Agent,

or the DIP Lenders under this Interim Order or the DIP Documents, as applicable; (d) to apply to

the Court for authority to approve superpriority claims or grant liens (other than the liens permitted

pursuant to the DIP Documents) or security interests in the DIP Collateral or any portion thereof

that are senior to, or *pari passu* with, the DIP Liens, DIP Obligations, DIP Superpriority Claims,

and Adequate Protection Liens Claims, unless all DIP Obligations and claims granted to the DIP

4856-5231-4449v.1

Secured Parties under this Interim Order, have been paid in full in cash or as otherwise agreed to in writing by the Required DIP Lenders, or (e) to seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are agreed to in writing by the Required DIP Lenders or are otherwise included in the Budget; provided, that notwithstanding anything to the contrary herein, the Committee (if appointed) may use the proceeds of the DIP Loans, DIP Collateral (including Cash Collateral), and the Carve-Out in an amount not to exceed $25,000 (the "Investigation Budget Cap") only to investigate, but not prosecute, (y) the claims and liens of the Prepetition Secured Parties, and (z) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties.

## POSTPETITION DEFAULT/REMEDIES

### Postpetition Defaults

77.    The occurrence of any of an "Event of Default" under the DIP Term Loan Agreement shall constitute an event of default under this Interim Order (each, a "Postpetition Default").

### Remedies

78.    Subject to the terms of the DIP Documents and this Interim Order, immediately upon the occurrence and during the continuance of a Postpetition Default, the DIP Agent, as directed by the requisite lenders under the DIP Term Loan Agreement, may (i) declare the DIP Facility terminated (such declaration, a "Termination Declaration") or (ii) send a reservation of rights notice to the Debtors, which notice may advise the Debtors that any further advances under the DIP Facility will be made in the sole discretion of the DIP Lenders.

79.    Upon two business days after the issuance of a Termination Declaration: (I) all or any portion of the Commitments of the DIP Lenders to make loans or otherwise extend credit may be suspended or terminated in accordance with the DIP Documents; (II) all DIP Obligations may

be deemed immediately due and payable in accordance with the DIP Documents; (III) after expiration of the Remedies Notices Period (as defined herein), the DIP Agent and the DIP Lenders, consistent with the terms of this Interim Order and the DIP Documents, may exercise all other rights and remedies available to them under the DIP Term Loan Agreement; and (IV) after expiration of the Remedies Notice Period, any right or ability of the Debtors to use any Cash Collateral may be terminated, reduced or restricted by the DIP Agent, *provided* that, during the Remedies Notice Period, the Debtors may use Cash Collateral solely to meet payroll (other than severance) and payroll taxes and to pay expenses critical to the preservation of the Debtors and their estates as agreed by the DIP Agent as directed by the requisite lenders under the DIP Term Loan Agreement, in its sole discretion, in each case in accordance with the terms and provisions of the Budget.

80.    Furthermore, following delivery of a Termination Declaration, and subject to the Remedies Notice Period, then without further act, notice, or action by the DIP Agent, or any further notice, hearing or order of this Court, the Automatic Stay shall be immediately modified and the DIP Agent and DIP Lenders shall be and is hereby authorized, to take any and all actions and remedies that the DIP Agent and DIP Lenders may deem appropriate to proceed against, take possession of, protect, and realize upon the Collateral and any other property of any of the Debtors' estates, including, without limitation, (a) any right or remedy set forth in the DIP Documents, (b) any right or remedy that the DIP Agent or DIP Lenders may deem appropriate to proceed against, take possession of, foreclose upon, sell (in whole or in part), protect, and realize upon the Collateral and any other property of any of the Debtors' estates upon which the DIP Agent and DIP Lenders have been or may hereafter be granted liens and security interests to obtain repayment of the DIP Obligations, (c) the commencement of actions for specific performance and for the

foreclosure upon any Collateral, (d) the sale of the Collateral, or any portion thereof, either as a whole or in part, at private or public auction, and the DIP Agent, for itself and for and on behalf of the DIP Lenders, shall have the right to purchase the Collateral at same by credit bidding, as directed by the requisite lenders under the DIP Term Loan Agreement, all or a part of their debt or otherwise, (e) taking possession of the Collateral and the exercise, without interference, and, if necessary, as the attorney-in-fact for the Debtors, of any rights of the Debtors in the management, possession, operation, protection or preservation of the Collateral, (f) the receipt of proceeds from the sale of any Collateral, (g) the direction of the payment for any purchase of the Collateral directly to the DIP Agent, for itself and for and on behalf of the DIP Lenders, (h) the right of setoff and recoupment as to any funds of the Debtors' estates held by the DIP Agent, for itself and for and on behalf of the DIP Lenders, and (i) the right to seek and obtain the appointment of a receiver, chief restructuring officer, or trustee over the Debtors and/or the Collateral; *provided* that the DIP Agent and the DIP Lenders, as applicable, shall not be obligated to take title to any of the Collateral in the pursuit of any of the DIP Agent's or the DIP Lenders' rights and remedies, and the Debtors shall cooperate with the DIP Agent in conjunction with the exercise of any right and the pursuit of any remedy by the DIP Agent. No party-in-interest (other than the (A) the DIP Agent, (B) the Prepetition Term Loan Representative, and (C) solely with respect to any particular DIP Collateral that is the subject of a Prior Permitted Lien, holders of such Prior Permitted Liens) may at any time exercise any rights and remedies available to them against the DIP Collateral until the DIP Obligations and the Prepetition Term Loan Lenders' Claim are paid in full in cash.

81.    Any Termination Declaration shall be given by electronic mail to the Debtors, counsel to the Debtors, counsel to each Prepetition Lender, counsel to the Committee, if any, and the U.S. Trustee (the date any such Termination Declaration is made shall be referred to herein as

the "Termination Declaration Date"). The DIP Obligations shall be due and payable, without notice or demand, and the use of Cash Collateral shall automatically cease on the Termination Declaration Date, except as otherwise expressly provided for herein. The Automatic Stay otherwise applicable to the DIP Agent and DIP Lenders is hereby modified so that five (5) business days after the Termination Declaration Date (the "Remedies Notice Period") the DIP Agent shall be entitled to exercise all rights and remedies against the DIP Collateral in accordance with the DIP Documents and this Interim Order, and shall be permitted to satisfy the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens and Adequate Protection Superpriority Claims, subject only to the Carve-Out and Prior Permitted Liens. During the Remedies Notice Period, a party shall be entitled to seek an emergency hearing with the Court pursuant to the local rules. Unless the Court during the Remedies Notice Period orders otherwise, the Automatic Stay shall automatically be terminated at the end of the Remedies Notice Period without further notice or order and the DIP Agent shall be permitted to exercise all remedies set forth herein, in the DIP Documents, and as otherwise available at law against the DIP Collateral, without further order of or application or motion to the Court, and without restriction or restraint by any stay under sections 105 or 362 of the Bankruptcy Code, or otherwise, against the enforcement of the liens and security interest in the DIP Collateral or any other rights and remedies granted to the DIP Agent with respect thereto pursuant to the DIP Documents or this Interim Order.

82.    With respect to any of the Debtors' leasehold locations, the DIP Agent's rights shall be limited to such rights (i) as may be ordered by this Court upon motion and notice to the applicable landlord with an opportunity to respond that is reasonable under the circumstances; (ii) to which the applicable landlord agrees in writing with the DIP Agent; or (iii) which the DIP

Agent has by agreement or under applicable non-bankruptcy law, all of which are expressly reserved and not waived, modified, or limited by immediately preceding (i) and (ii).

83.     Upon or after the occurrence of any Postpetition Default, the DIP Agent and the DIP Lenders may, in their sole determination, consistent with the terms of this Interim Order and the DIP Documents, advance funds to the Debtors or may consent to the Debtors' use of Cash Collateral, and all such advances or consent to use of Cash Collateral shall not constitute a waiver, limitation, or modification of the DIP Agent's and the DIP Lenders' rights and remedies pursuant to the DIP Documents, this Interim Order, and applicable law.

**Milestones**

84.     The Debtors shall achieve each of the milestones (as the same may be extended from time to time with the written consent of the DIP Agent as directed by the requisite lenders under the DIP Term Loan Agreement (the "<u>Milestones</u>")) set forth on **Exhibit 3** hereto.

85.     The Debtors covenant and agree that they will comply with each of the Milestones. Each of the Milestones may be extended or waived in writing by the DIP Agent as directed by the requisite lenders under the DIP Term Loan Agreement, in its sole discretion. The Debtors shall promptly file with the Court a notice of any extension or waiver of any Milestone granted by the DIP Agent.

**Right to Credit Bid**

86.     Upon entry of the Final DIP Order, the DIP Agent, for itself and for and on behalf of the DIP Lenders, as directed by the requisite lenders under the DIP Term Loan Agreement, may credit bid (the "<u>Credit Bid Right</u>") any portion and up to the entire amount of the DIP Obligations, at any time on any individual asset, portion of the assets, or all assets constituting their respective Collateral in conjunction with any sale pursuant to section 363 of the Bankruptcy Code (a "<u>363 Sale</u>"). Upon entry of the Final DIP Order, the DIP Agent, the DIP Lenders, or any special purpose

entity created by them, shall be a qualified and permitted bidder in all respects at any auction, and shall not be required to submit a deposit, purchase agreement, or any other deliverable or documentation to the Debtors or their representatives or agents. Upon entry of the Final DIP Order, and upon exercise of the Credit Bid Right, neither the DIP Agent nor the DIP Lenders shall be required to take title to any individual asset, portion of the assets, or all of the assets, and the DIP Agent, as directed by the requisite lenders under the DIP Term Loan Agreement, shall have the right to designate any person or entity that shall take title to the individual asset, portion of the assets, or all of the assets that are subject to the Credit Bid Right.

## DIP Election Procedures

87.    The procedures governing the participation of the Prepetition Term Loan Lenders and the Prepetition FILO C Noteholders in the DIP Facility (the "DIP Election Procedures"), as set forth in the DIP Credit Agreement, are fair and reasonable and are hereby approved.  The DIP Agent may, in connection with allocations of the commitments under the DIP Facility or any other allocations contemplated to be made pursuant to, and in accordance with, the DIP Credit Agreement, conclusively rely on, and shall have no obligation to determine, investigate or confirm, and shall incur no liability whatsoever with respect to, any ownership information with respect to the Prepetition Term Loan Obligations or the obligations owing with respect to the Pre-Petition FILO C Notes. The DIP Agent may conclusively rely on any allocations of the commitments under the DIP Facility as provided to the DIP Agent by the advisors to the Debtors and/or the DIP Lenders without incurring liability therefor.

## OTHER TERMS

88.    The Debtors and the DIP Agent, as directed by the requisite lenders under the DIP Term Loan Agreement, are authorized to implement, in accordance with the terms of the DIP Documents, any modifications or amendments to any DIP Document which are not material and

adverse to the Debtors. Any modifications or amendments of any DIP Document which are material and adverse to the Debtors shall be subject to prior approval by this Court upon motion by the Debtors, and any party (including the DIP Agent) may seek to have such motion heard on an expedited basis.

89.     The DIP Agent and the DIP Lenders may assign or participate any portion of their DIP Obligations in accordance with and subject to the terms of the DIP Documents; *provided*, however, that any assignee or participant with respect to DIP Obligations shall be subject to the terms of this Interim Order and any Final DIP Order.

90.     Other than any Prior Permitted Liens and the Carve-Out, no priority claims shall be allowed that are or will be prior to or on parity with the superpriority claims or secured claims of the DIP Agent, against the Debtors and their estates arising from the DIP Documents and this Interim Order.

91.     No obligations incurred or payments or other transfers made by or on behalf of the Debtors on account of the DIP Facility shall be avoidable or recoverable from the DIP Agent or the DIP Lenders under any section of the Bankruptcy Code, or any other federal, state, or other applicable law.

92.     Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect or incidental beneficiary.

93.     Except for the reasonable and necessary sale of inventory in the ordinary course of the Debtors' business and as may be provided for in the Budget and consistent with the terms of the DIP Term Loan Agreement, the Debtors shall not sell, transfer, lease, encumber, or otherwise

dispose of any of the Collateral, without the prior written consent of the DIP Agent as set forth herein.

94.    All advances under the DIP Term Loan Agreement are made in reliance on this Interim Order, and so long as the DIP Obligations remain unpaid, there shall not at any time be entered in these Cases any other order that, except as consented to by the DIP Agent, as directed by the requisite lenders under the DIP Term Loan Agreement, in writing, as directed by the requisite lenders under the DIP Term Loan Agreement, (a) authorizes the use of Cash Collateral or the sale, lease, or other disposition of the Collateral unless the cash proceeds will indefeasibly pay the DIP Obligations in full, in cash (b) authorizes the obtaining of credit or the incurring of indebtedness secured by a lien or security interest in property in which the DIP Agent holds or asserts liens or security interests, or (c) grants to any claim a priority administrative claim status that is equal or superior to the superpriority status granted to the DIP Agent herein.

95.    The terms hereunder and under the DIP Documents, the security interests and liens granted to the DIP Agent and Prepetition Agents, for themselves and for and on behalf of the Lenders, under this Interim Order, and the rights of the DIP Agent, Prepetition Agents and the Lenders pursuant to this Interim Order with respect to the Collateral, and treatment of the Prepetition Lenders' Claim and DIP Obligations shall not be altered, modified, extended, impaired, or affected by any plan of reorganization of the Debtors without the prior written approval of the DIP Agent, as directed by the requisite lenders under the DIP Term Loan Agreement.

96.    The terms and provisions of this Interim Order and any actions taken pursuant hereto shall be enforceable against the Debtors and their estates and any successors thereto, including, without limitation, any trustee or other estate representative appointed in the Cases, or any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases

(collectively, "Successor Cases") or any order dismissing these Cases, except for the Debtors'

authority to use Cash Collateral and any obligations of the DIP Agent and the DIP Lenders under

the DIP Documents (all of which shall immediately terminate upon entry of such an order). The

terms and provisions of this Interim Order, as well as the priorities in payment, liens, and security

interests granted pursuant to this Interim Order and the DIP Documents, shall continue in this or

any Successor Case of the Debtors, and such priorities in payment, liens, and security interests

shall maintain their priority as provided by this Interim Order until such time as the DIP

Obligations shall have been indefeasibly paid and satisfied in full in accordance with the terms of

the DIP Documents and the DIP Agent shall have no further obligation or financial

accommodation to the Debtors.

97.     The provisions of this Interim Order shall inure to the benefit of the Debtors, the

DIP Agent, Prepetition Agents and Lenders, and they shall be binding upon (a) the Debtors and

their successors and assigns, including any trustee or other fiduciary hereafter appointed as legal

representative of the Debtors or with respect to property of the estates of the Debtors, whether

under chapter 11 of the Bankruptcy Code, any confirmed plan, or any subsequent chapter 7 case,

and (b) all creditors of the Debtors and other parties in interest.

98.     If any or all of the provisions of this Interim Order are hereafter modified, vacated,

or stayed without the prior written agreement of the DIP Agent as directed by the requisite lenders

under the DIP Term Loan Agreement, such modification, vacation, or stay shall not affect (a) the

validity of any obligation, indebtedness or liability incurred by the Debtors to the DIP Agent,

Prepetition Agents and Lenders before the effective date of such modification, vacation, or stay or

(b) the validity or enforceability of any security interest, lien, priority or other protection

authorized, granted, or created hereby or pursuant to any of the DIP Documents or Prepetition

Claim Documents. Notwithstanding any such modification, vacation, or stay, any indebtedness, obligations, or liabilities incurred by the Debtors to the DIP Agent or Prepetition Agents, for themselves or for and on behalf of the DIP Lenders or Prepetition Lenders, as applicable, before the effective date of such modification, vacation, or stay shall be governed in all respects by the original provisions of this Interim Order, and the DIP Agent or Prepetition Agents, for themselves and for and on behalf of the DIP Lenders or Prepetition Lenders, as applicable, shall be entitled to all the liens, rights, remedies, privileges, and benefits granted herein and pursuant to the DIP Documents and Prepetition Claim Documents with respect to all such indebtedness, obligations, or liabilities.

99.     To the extent the terms and conditions of the DIP Documents or Prepetition Claim Documents are in express conflict (as opposed to being additive, limiting, or more specific than this Interim Order) with the terms and conditions of this Interim Order, the terms and conditions of this Interim Order shall control.

100.     No approval, agreement, or consent requested of the DIP Agent by the Debtors pursuant to the terms of this Interim Order or otherwise shall be inferred from any action, inaction, or acquiescence of the DIP Agent other than a writing acceptable to the DIP Agent, as directed by the requisite lenders under the DIP Term Loan Agreement, that is signed by the DIP Agent and expressly shows such approval, agreement or consent, without limitation. Nothing herein shall in any way affect the rights of the DIP Agent, Prepetition Agents and Lenders as to any non-Debtor entity, without limitation. Except as expressly and contrarily set forth herein, any determination, agreement, decision, consent, election, approval, acceptance, waiver, designation, authorization, or other similar circumstance or matter of or by the DIP Agent, Prepetition Agents and Lenders

hereunder or related hereto, without limitation, shall be in the determination of the DIP Agent, Prepetition Agents and Lenders, as applicable.

101.    Nothing herein shall be deemed or construed to waive, limit, or modify the rights of the DIP Agent or any of the Prepetition Agents, for themselves and for and on behalf of the Lenders, and in accordance with and subject to the terms of the Subordination Agreements, to obtain further adequate protection and other statutory protections for the use of the Collateral, including Cash Collateral, or to seek other relief in these Cases or any Successor Cases in accordance with any provision of the Bankruptcy Code or applicable law.

102.    Unless expressly and specifically provided otherwise herein, nothing herein shall be deemed or construed to waive, limit, modify or prejudice the claims, rights, protections, privileges and defenses of the DIP Agent, Prepetition Agents and the Lenders afforded pursuant to the Bankruptcy Code.

103.    This Interim Order, and the findings of fact and conclusions of law contained herein, shall be effective upon signature by the Court, and may be relied upon by the DIP Agent, DIP Lender, the Prepetition Agents, the Lenders and the Debtors without the necessity of entry into the docket sheet of these Cases. To the extent any findings may constitute conclusions, and vice versa, they are hereby deemed as such.

104.    This Court hereby expressly retains jurisdiction over all persons and entities, co-extensive with the powers granted to the United States Bankruptcy Court under the Bankruptcy Code, to enforce the terms of this Interim Order and to adjudicate any and all disputes in connection therewith by motion and without necessity of an adversary proceeding.

105.    All headings in this Interim Order are descriptive and for reference only, and do not have separate meaning or change any terms therein.

## NOTICE

106.    The Debtors' proposed counsel shall serve this Interim Order on all of the following

parties: (a) the Office of the United States Trustee; (b) the attorneys for each of the DIP Agent and

DIP Lenders, Prepetition Agents, and Prepetition Lenders; (c) all creditors known to the Debtors

who have or may assert liens against any of the Debtors' assets; (d) the United States Internal

Revenue Service; (e) the 40 largest unsecured creditors of the Debtors; and (f) all parties in interest

who have filed a notice of appearance or upon whom service must be effected under the Federal

Rules of Bankruptcy Procedure or the Local Rules.

## EXPIRATION DATE/MATURITY

107.    The consent of the DIP Agent, as directed by the requisite lenders under the DIP

Term Loan Agreement, the Debtors' authority to use Cash Collateral and the DIP Lenders'

commitment to provide credit under the DIP Term Loan Agreement and this Interim Order, subject

to the funding and Budget limitations above, shall be effective upon entry of this Interim Order to

and including the earlier of: (a) the Termination Declaration Date; *provided* that the Debtors shall

be authorized to use Cash Collateral following delivery of a Termination Declaration solely to the

extent set forth in this Interim Order; or (b) August 15, 2023, at 5:00 p.m. Central Time, at which

time all of the Debtors' authority to use Cash Collateral and to obtain credit under the DIP Term

Loan Agreement and this Interim Order shall terminate, as shall the DIP Agent's and the DIP

Lenders' obligation to continue funding the DIP Facility, unless extended by written agreement of

the parties hereto, a copy of which with an updated Budget shall be promptly filed with this Court

by the Debtors (the "Expiration Date").

108.    THIS ORDER IS EFFECTIVE IMMEDIATELY.

# # # END OF ORDER # # #

## **EXHIBIT 1**

**FORM OF DIP TERM LOAN AGREEMENT**

**Exhibit 1**

## **EXHIBIT 2**

## **SUMMARY OF INITIAL BUDGET**

**Exhibit 2**

**4856-5231-4449v.1**

**EXHIBIT 3**

**MILESTONES**

(a) Sale Milestones:

  i.    Company and its advisors shall file a bid procedures motion that includes a stalking horse bid on or before February 24, 2023;

  ii.    a bid deadline of no later than April 10, 2023;

  iii.    an auction is conducted by no later than April 12, 2023;

  iv.    a sale hearing is held by no later than April 19, 2023; and

  v.    the final sale order is entered by no later than April 21, 2023

(b) Plan Milestones:

  i.    on or before May 8, 2023 (the "Filing Deadline"), the Debtors shall have filed a plan of reorganization and a related disclosure statement that are, in each case, in form and substance acceptable to the DIP Lender (respectively, "Acceptable Plan" and "Acceptable Disclosure Statement"), provided that a plan of reorganization that is a feasible plan which provides for the payment in full in cash of the DIP Facility on the effective date thereof shall be deemed to be an Acceptable Plan;

  ii.    on or before June 8, 2023, the Bankruptcy Court shall have held a hearing with respect to the Acceptable Disclosure Statement;

  iii.    on or before July 12, 2023 after Acceptable Disclosure Statement is approved, the Bankruptcy Court shall have entered a Confirmation Order (the date such order is entered, the "Confirmation Date");

  iv.    on or before 15 calendar days after the Confirmation Date, the effective date of the Accepted Plan shall have occurred