*Filing Version*

SENIOR SECURED SUPER PRIORITY

DEBTOR-IN-POSSESSION TERM LOAN AGREEMENT

dated as of February [16][1], 2023,

among

TUESDAY MORNING CORPORATION,
as Holdings,

TUESDAY MORNING, INC.,
as Borrower,

THE GUARANTORS PARTY HERETO,

THE LENDERS PARTY HERETO,

and

CANTOR FITZGERALD SECURITIES,
as Administrative Agent

---

[1] NTD: to be dated on the Closing Date, following entry of Interim Order.

Exhibit 14

**TABLE OF CONTENTS**

ARTICLE I Definitions ......................................................................................... 2

    Section 1.01   Defined Terms ...................................................................... 2
    Section 1.02   Terms Generally ................................................................. 28
    Section 1.03   Accounting Terms .............................................................. 28
    Section 1.04   Rounding .......................................................................... 29
    Section 1.05   Timing of Payment or Performance .................................... 29
    Section 1.06   Reserved ........................................................................... 29
    Section 1.07   References to Laws ............................................................. 30

ARTICLE II The Commitments and Borrowings ...................................................... 30

    Section 2.01   The Loans ......................................................................... 30
    Section 2.02   Loans and Borrowings ....................................................... 30
    Section 2.03   Requests for Borrowings and Notices .................................. 31
    Section 2.04   [Reserved] ........................................................................ 32
    Section 2.05   Funding of Borrowings ...................................................... 32
    Section 2.06   [Reserved] ........................................................................ 32
    Section 2.07   Repayment of Loans .......................................................... 32
    Section 2.08   Evidence of Debt ............................................................... 33
    Section 2.09   Fees ................................................................................. 34
    Section 2.10   Interest ............................................................................ 34
    Section 2.11   Taxes ............................................................................... 35
    Section 2.12   Payments Generally; Pro Rata Treatment; Sharing of Set-offs ... 38
    Section 2.13   Mitigation Obligations; Replacement of Lenders .................. 39
    Section 2.14   [Reserved] ........................................................................ 41
    Section 2.15   Defaulting Lenders ............................................................ 41

ARTICLE III Representations and Warranties ......................................................... 42

    Section 3.01   Organization; Powers ........................................................ 42
    Section 3.02   Authorization .................................................................... 42
    Section 3.03   Enforceability ................................................................... 42
    Section 3.04   Governmental Approvals .................................................... 43
    Section 3.05   Financial Condition ........................................................... 43
    Section 3.06   No Material Adverse Effect ................................................. 43
    Section 3.07   Properties ......................................................................... 43
    Section 3.08   Capitalization and Subsidiaries ........................................... 44
    Section 3.09   Litigation; Compliance with Laws ....................................... 44
    Section 3.10   Investment Company Act .................................................... 44
    Section 3.11   Use of Proceeds ................................................................ 44
    Section 3.12   Federal Reserve Regulations ............................................... 44
    Section 3.13   Tax ................................................................................. 45
    Section 3.14   Disclosure ........................................................................ 45

i

Section 3.15   Employee Benefit Plans ........................................................................... 45
Section 3.16   Environmental Matters ............................................................................ 46
Section 3.17   Security Documents ................................................................................. 46
Section 3.18   Affiliate Transactions .............................................................................. 46
Section 3.19   Labor Matters .......................................................................................... 46
Section 3.20   Insurance .................................................................................................. 47
Section 3.21   USA PATRIOT Act and OFAC ............................................................... 47
Section 3.22   EEA Financial Institution ....................................................................... 47
Section 3.23   Plan Assets ............................................................................................... 47
Section 3.24   Accounts ................................................................................................... 47
Section 3.25   Approved Budget ...................................................................................... 47
Section 3.26   Material Agreements ................................................................................ 48
Section 3.27   Chapter 11 Cases ..................................................................................... 48

ARTICLE IV Conditions of Lending ............................................................................... 48

Section 4.01   Closing Date ............................................................................................. 49
Section 4.02   Conditions Precedent to Other Loans ..................................................... 52

ARTICLE V Affirmative Covenants ................................................................................. 53

Section 5.01   Existence; Conduct of Business ............................................................... 53
Section 5.02   Insurance .................................................................................................. 53
Section 5.03   Taxes ........................................................................................................ 54
Section 5.04   Financial Statements, Reports and Other Information ............................. 54
Section 5.05   Notices of Material Events ....................................................................... 56
Section 5.06   Compliance with Laws ............................................................................. 57
Section 5.07   Maintaining Records; Access to Properties and Inspections ................... 57
Section 5.08   Compliance with Environmental Laws ..................................................... 58
Section 5.09   Further Assurances; Mortgages .............................................................. 58
Section 5.10   Fiscal Year; Accounting .......................................................................... 59
Section 5.11   Appointment ............................................................................................. 59
Section 5.12   Collateral Monitoring and Reporting ...................................................... 59
Section 5.13   Use of Proceeds ....................................................................................... 60
Section 5.14   Approved Budget ...................................................................................... 60
Section 5.15   Case Milestones ....................................................................................... 62
Section 5.16   Material Agreements ................................................................................ 62
Section 5.17   [Reserved]. ............................................................................................... 62
Section 5.18   Lender Party's Advisors .......................................................................... 62
Section 5.19   Orders ...................................................................................................... 62
Section 5.20   Debtor-In-Possession Obligations ........................................................... 62
Section 5.21   Payment of Obligations ........................................................................... 62
Section 5.22   Compliance with Terms of Leaseholds ..................................................... 63

ARTICLE VI Negative Covenants .................................................................................... 63

Section 6.01   Indebtedness ............................................................................................. 63

Section 6.02    Liens................................................................................................ 65
Section 6.03    [Reserved] ....................................................................................... 68
Section 6.04    Investments, Loans and Advances ................................................... 68
Section 6.05    Mergers, Consolidations and Dispositions ...................................... 69
Section 6.06    Dividends and Distributions ........................................................... 70
Section 6.07    Transactions with Affiliates ............................................................ 70
Section 6.08    Business of Holdings, the Borrower and the Subsidiaries................ 70
Section 6.09    Limitation on Modification of Indebtedness; Modification of
                Certificate of Incorporation, By-Laws and Certain Other
                Agreements; etc. .............................................................................. 71
Section 6.10    Financial Covenants........................................................................ 72
Section 6.11    Use of Proceeds............................................................................... 72
Section 6.12    Orders............................................................................................... 72
Section 6.13    Prepayments of Other Debt.............................................................. 72
Section 6.14    Reclamation of Claims .................................................................... 72
Section 6.15    Insolvency Proceeding Claims......................................................... 73
Section 6.16    Bankruptcy Actions ........................................................................ 73
Section 6.17    Subrogation ..................................................................................... 73
Section 6.18    Modification of Engagement Letter ................................................ 73

ARTICLE VII Events of Default................................................................................. 73

Section 7.01    Events of Default ............................................................................. 73
Section 7.02    Allocation ........................................................................................ 79

ARTICLE VIII The Agents ......................................................................................... 80

Section 8.01    Appointment, Authority and Duties of the Administrative Agent........... 80
Section 8.02    Agreements Regarding Collateral and Field Examination Reports.......... 81
Section 8.03    Reliance By the Administrative Agent ............................................ 82
Section 8.04    Action Upon Default ....................................................................... 82
Section 8.05    Payments Received by Defaulting Lender........................................ 82
Section 8.06    Limitation on Responsibilities of the Agents................................... 82
Section 8.07    Successor Administrative Agent and Co-Agents.............................. 83
Section 8.08    Due Diligence and Non-Reliance .................................................... 84
Section 8.09    Remittance of Payments and Collections ....................................... 84
Section 8.10    Survival............................................................................................ 84
Section 8.11    Withholding Tax .............................................................................. 84
Section 8.12    Indemnification ............................................................................... 85
Section 8.13    Certain ERISA Matters ................................................................... 85
Section 8.14    Erroneous Payments........................................................................ 86
Section 8.15    Flood Laws....................................................................................... 87

ARTICLE IX Miscellaneous ....................................................................................... 87

Section 9.01    Notices ............................................................................................. 87
Section 9.02    Survival of Agreement .................................................................... 88

Section 9.03    Binding Effect .......................................................................... 88
Section 9.04    Successors and Assigns.............................................................. 89
Section 9.05    Expenses; Indemnity ................................................................. 92
Section 9.06    Right of Set-off ......................................................................... 94
Section 9.07    Applicable Law ......................................................................... 94
Section 9.08    Waivers; Amendment ................................................................ 94
Section 9.09    Interest Rate Limitation ............................................................ 96
Section 9.10    Entire Agreement ...................................................................... 96
Section 9.11    WAIVER OF JURY TRIAL ..................................................... 97
Section 9.12    Severability ............................................................................... 97
Section 9.13    Counterparts .............................................................................. 97
Section 9.14    Headings .................................................................................... 97
Section 9.15    Jurisdiction; Consent to Service of Process .............................. 97
Section 9.16    Confidentiality .......................................................................... 98
Section 9.17    Release of Liens and Guarantees .............................................. 99
Section 9.18    USA PATRIOT Act ................................................................... 99
Section 9.19    Marshalling; Payments Set Aside ............................................. 99
Section 9.20    Obligations Several; Independent Nature of Lenders' Rights ................. 99
Section 9.21    Electronic Execution of Assignments ..................................... 100
Section 9.22    Acknowledgements.................................................................. 100
Section 9.23    Lender Action .......................................................................... 100
Section 9.24    Judgment Currency ................................................................. 101
Section 9.25    Acknowledgement and Consent to Bail-In of EEA Financial
                Institutions ............................................................................... 101
Section 9.26    Force Majeure ......................................................................... 102

ARTICLE X ...................................................................................................... 102

Collateral ......................................................................................................... 102

Section 10.01    Grant of Security Interest.......................................................... 102
Section 10.02    Perfection of Security Interest .................................................. 103
Section 10.03    The Administrative Agent's and Lenders' Rights, Duties, and
                 Liabilities ................................................................................. 103
Section 10.04    Rights in Respect of Investment Property ................................ 104
Section 10.05    Remedies ................................................................................... 104
Section 10.06    Administrative Agent's Appointment as Attorney-in-Fact, etc. ............ 106
Section 10.07    Duty of Administrative Agent ................................................... 107
Section 10.08    Execution of Financing Statements ........................................... 108
Section 10.09    Authority of Administrative Agent ............................................ 108
Section 10.10    Appointment of Co-Collateral Agents....................................... 108

ARTICLE XI Guaranty...................................................................................... 108

Section 11.01    Guaranty; Limitation of Liability............................................... 108
Section 11.02    Guaranty Absolute .................................................................... 109
Section 11.03    Waivers and Acknowledgments ................................................ 110

iv

Section 11.04  Subrogation ............................................................................ 110
Section 11.05  Continuing Guaranty; Assignments ....................................... 111

EXHIBITS; SCHEDULES; ANNEX

| | |
|---|---|
| Exhibit A | Form of Assignment and Acceptance |
| Exhibit B | Form of Borrowing Request |
| Exhibit C | Form of Joinder Agreement |
| Exhibit D-1 | [Reserved] |
| Exhibit D-2 | [Reserved] |
| Exhibit E | [Reserved] |
| Exhibit F | Form of Compliance Certificate |
| Exhibit G | Forms of Tax Certificates |
| | |
| Schedule 1.01(A) | Specified Stores |
| Schedule 1.03 | Fiscal Calendar |
| Schedule 2.01 | Commitments and Pro Rata Shares |
| Schedule 3.07(a) | Real Property |
| Schedule 3.07(b) | Intellectual Property |
| Schedule 3.08 | Capitalization and Subsidiaries |
| Schedule 3.20 | Insurance |
| Schedule 3.26 | Material Agreements |
| Schedule 5.12 | Deposit, Securities, Commodities and Excluded Accounts |
| Schedule 5.15 | Case Milestones |
| Schedule 6.01 | Indebtedness |
| Schedule 6.02 | Liens |
| Schedule 6.04 | Investments |
| Schedule 6.07 | Transactions with Affiliates |
| | |
| ANNEX A | Approved Budget |

This SENIOR SECURED SUPER PRIORITY DEBTOR-IN-POSSESSION TERM LOAN AGREEMENT dated as of February [16], 2023 (this "**Agreement**"), among TUESDAY MORNING, INC., a Texas corporation (the "**Borrower**"), each of the Subsidiary Guarantors (as hereinafter defined), TUESDAY MORNING CORPORATION, a Delaware corporation ("**Parent**"), TMI HOLDINGS, INC., a Delaware corporation ("**Intermediate Holdings**"), the LENDERS party hereto from time to time, CANTOR FITZGERALD SECURITIES, as administrative agent and collateral agent (in such capacity, the "**Administrative Agent**").

## RECITALS

WHEREAS, the Borrower and the Guarantors each commenced a voluntary case (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), and the Chapter 11 Cases are being jointly administered in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "**Court**", and the date the Chapter 11 Cases are commenced, the "**Petition Date**");

WHEREAS, from and after the Petition Date, the Borrower and the Guarantors continue to operate their business and manage their property as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, prior to the Petition Date, certain lenders provided financing to the Borrower pursuant to that certain Credit Agreement, dated as of May 9, 2022, among the Borrower, the Subsidiary Guarantors, Parent, Intermediate Holdings, the "Lenders" from time to time party thereto (the "**Pre-Petition ABL Lenders**"), Wells Fargo Bank, National Association, as the Pre-Petition ABL Administrative Agent and 1903P Loan Agent, LLC, as the Pre-Petition FILO B Documentation Agent, and the other parties from time to time party thereto (as amended, restated, modified, waived or supplemented through the date hereof, the "**Pre-Petition ABL Credit Agreement**");

WHEREAS, prior to the Petition Date, the Backstop Lenders provided financing to the Borrower to bridge to the filing pursuant to that certain Secured Promissory Note, dated as of February 10, 2023, among the Borrower, Parent, Intermediate Holdings, each as co-borrowers and certain of the Lenders party thereto (the "**Bridge Loan**");

WHEREAS, the Borrower has requested, and, upon the terms and conditions set forth in this Agreement, the Lenders have agreed to make available to the Borrower, a senior secured, super-priority term loan facility of up to $51,500,000 in the aggregate, consisting of (x) a $[25,000,000] Closing Date Term Loan in order to (a) repay the Bridge Loan in full, (b) repay the Pre-Petition ABL Obligations as provided herein (other than Pre-Petition Contingent LC Obligations and Pre-Petition ABL Disputed Amounts), (c) fund the Chapter 11 Cases, (d) make certain other payments as more fully provided in this Agreement, and (e) provide working capital and other general corporate purposes for the Borrower and the other Loan Parties during the pendency of the Chapter 11 Cases as provided herein, (y) $[16,500,000] Incremental Final Loans and (z) $10,000,000 in Delay Draw Loans, in each case, in accordance with the Orders and the Approved Budget;

WHEREAS, the Backstop Lenders shall (on a several, but not joint, basis) backstop and provide the full aggregate amount of the Commitment;

WHEREAS, participation in the Loans will be offered to the Pre-Petition Term Lenders and the Pre-Petition FILO C Noteholders in proportion to the amount of each such Pre-Petition Term Lender's outstanding Pre-Petition Term Loans or Pre-Petition FILO C Convertible Notes, as applicable;

WHEREAS, any Pre-Petition Term Lender or Pre-Petition FILO C Noteholder wishing to participate in the Loans will be required to notify the Administrative Agent in writing by no later than three

(3) Business Days following the Closing Date and fund its portion of the Loans within one (1) Business Day thereafter;

WHEREAS, for approximately each $1.61 million of DIP New Money Loans committed by a Pre-Petition Term Lender or Pre-Petition FILO C Noteholders, as applicable, such Pre-Petition Term Lender or Pre-Petition FILO C Noteholder, as applicable, shall forgive and release $1.00 million of Pre-Petition Term Loans due and owing under the Pre-Petition Term Loan Documents or $1.00 million of Pre-Petition FILO C Convertible Notes due and owing under the Pre-Petition Convertible Note Purchase Agreement and receive $1.00 million of Roll-Up Loans.  The maximum amount of Roll-Up Loans shall be (x) $24,474,000 with respect to the Pre-Petition Term Loan Documents and (y) $[7,500,000] with respect to the Pre-Petition FILO C Convertible Notes, which is the total outstanding principal amount due under such notes issued under the Pre-Petition Convertible Note Purchase Agreement, plus interest thereon;

WHEREAS, each Loan Party has agreed to secure all of the Secured Obligations under the Loan Documents by granting to the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties, a security interest in and lien upon substantially all of their existing and after-acquired personal (subject to the limitations and priorities contained in the Loan Documents and the Orders);

WHEREAS, each Loan Party's business is a mutual and collective enterprise and the Loan Parties believe that the loans and other financial accommodations to the Borrower under this Agreement will enhance the aggregate borrowing power of the Borrower and facilitate the administration of the Chapter 11 Cases and their loan relationship with the Administrative Agent and the Lenders, all to the mutual advantage of the Loan Parties;

WHEREAS, each Loan Party acknowledges that it will receive substantial direct and indirect benefits by reason of the making of loans and other financial accommodations to the Borrower as provided in this Agreement; and

WHEREAS, the Lenders' willingness to extend financial accommodations to the Borrower as more fully set forth in this Agreement and the other Loan Documents, is done solely as an accommodation to the Loan Parties and at the Loan Parties' request and in furtherance of the Loan Parties' mutual and collective enterprise.

NOW THEREFORE, in consideration of the mutual covenants and agreements herein contained and of the loans, extensions of credit and commitments hereinafter referred to, the parties hereto agree as follows:

ARTICLE I

Definitions

Section 1.01    <u>Defined Terms</u>.  As used in this Agreement, the following terms shall have the meanings specified below:

"**ABL / Term Subordination Agreement**" shall have the meaning assigned to such term in the Interim Order.

"**Account**" shall have the meaning as defined in the UCC, including all rights to payment for goods sold or leased, or for services rendered.

"**Account Debtor**" shall mean a Person who is obligated under an Account, Chattel Paper or General Intangible.

2

"**Acquisition**" shall mean, with respect to any Person, (a) an Investment in, or a purchase of a Controlling interest in, the Equity Interests of any other Person (whether by merger or consolidation of such Person with any other Person or otherwise) or (b) a purchase or other acquisition of all or substantially all of the assets or properties of another Person or of any business unit of another Person (whether by merger or consolidation of such Person with any other Person or otherwise).

"**Actual Cash Receipts**" shall mean the sum of all cash receipts received by the Loan Parties (excluding any Borrowing under this Agreement).

"**Adequate Protection Liens**" has the meaning assigned to the term "Adequate Protection Liens" in the Interim Order (or the Final Order, when applicable).

"**Administrative Agent**" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Administrative Questionnaire**" shall mean an Administrative Questionnaire in form and substance reasonably satisfactory to the Administrative Agent.

"**Affiliate**" shall mean, when used with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; provided, however, no Agent or Lender shall be deemed to be an Affiliate of the Borrower or its Subsidiaries with respect to transactions evidenced by any Loan Document.

"**Agent Indemnitees**" shall mean each Agent and its officers, directors, employees, Affiliates, agents and attorneys.

"**Agent Professionals**" shall mean attorneys, accountants, appraisers, auditors, environmental engineers or consultants, and other professionals and experts retained by the Administrative Agent.

"**Agents**" shall mean the Administrative Agent.

"**Agreement**" shall have the meaning assigned to such term in the introductory paragraph of this Agreement, as the same may from time to time be amended, modified, supplemented or restated.

"**Agreement Currency**" has the meaning assigned to such term in **Section 9.24**.

"**Anti-Corruption Laws**" shall mean all laws, rules, and regulations of any jurisdiction applicable to the Borrower or its Subsidiaries from time to time concerning or relating to bribery, corruption, money laundering, any predicate crime to money laundering or any financial record keeping an reporting requirements related thereto.

"**Applicable Law**" shall mean all applicable laws, rules, regulations and binding governmental requirements having the force and effect of law applicable to the Person in question or any of its property or assets, including all applicable statutory law, common law and equitable principles, and all provisions of constitutions, treaties, statutes, rules, regulations, orders and decrees of Governmental Authorities.

"**Approved Budget**" shall mean the budget prepared by the Borrower in the form of Annex A and initially furnished to the Administrative Agent and the Lenders on the Closing Date and which is approved by, and in form and substance satisfactory to, the Required Lenders in their sole discretion, as the same may be updated, modified or supplemented from time to time as provided in **Section 5.14**.

3

"**Assignment and Acceptance**" shall mean an assignment and acceptance entered into by a Lender and an assignee, and accepted by the Administrative Agent and the Borrower (if the Borrower's consent is required by this Agreement), in the form of **Exhibit A** or such other form as shall be approved by the Administrative Agent.

"**Auction**" shall have the meaning set forth in the definition of "Bidding Procedures Order".

"**Automatic Stay**" shall mean the automatic stay provided under Section 362 of the Bankruptcy Code.

"**Avoidance Actions**" has the meaning set forth in the Order.

"**Backstop Lenders**" shall mean the "Backstop Lender" under the Commitment Letter.

"**Bail-In Action**" shall mean the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" shall mean, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bankruptcy Code**" has the meaning set forth in the recitals to this Agreement

"**Bankruptcy Rules**" shall mean the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Chapter 11 Cases.

"**Beneficial Ownership Regulation**" shall mean 31 C.F.R. § 1010.230.

"**Benefit Plan**" shall mean any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of the Plan Asset Regulations or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"**Bidding Procedures Order**" shall mean an order of the Bankruptcy Court, in form and substance acceptable to the Administrative Agent and the Required Lenders, establishing bidding and sale procedures with respect to a sale transaction under the Bankruptcy Code and providing for an auction (the "**Auction**") and a hearing to consider entry of a Sale Order.

"**Board**" shall mean the Board of Governors of the Federal Reserve System of the United States of America, or any successor thereto.

"**Borrower**" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Borrower Financial Advisor**" shall mean BDO Consulting Group, LLC, as financial advisor to the Loan Parties or any other Person acceptable to Borrower and the Required Lenders.

"**Borrowing**" shall mean a group of Loans.

"**Borrowing Request**" shall mean a request by the Borrower in substantially the form of **Exhibit**

4

**B** for a Borrowing in accordance with **Section 2.03**.

"**Bridge Loan**" shall have the meaning assigned to such term in the recitals to this Agreement.

"**Budget Compliance Report**" has the meaning assigned to such term in Section 5.14(d).

"**Business Day**" shall mean any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law or other governmental action to remain closed.

"**Capital Lease Obligations**" shall mean the obligations of any Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases or financing leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"**Carve-Out**" has the meaning assigned to the term "Carve-Out" in the Interim Order (or Final Order, when applicable).

"**Case Milestones**" shall mean the covenants set forth on Schedule 5.15.

"**Casualty Event**" shall mean any loss, casualty or other insured damage to, or any nationalization, taking under power of eminent domain or by condemnation or similar proceeding of, any Property of the Borrower or any of its Subsidiaries.

"**Change in Control**" shall mean:

(a)      except as otherwise permitted by **Section 6.05(b)**, the acquisition of record ownership or direct beneficial ownership by any Person other than Parent of any Equity Interests in Intermediate Holdings, such that after giving effect thereto Parent shall cease to beneficially own and control 100% of the Equity Interests of Intermediate Holdings, or

(b)      the acquisition of record ownership or direct beneficial ownership by any Person other than Intermediate Holdings of any Equity Interests in the Borrower, such that after giving effect thereto Intermediate Holdings shall cease to beneficially own and control 100% of the Equity Interests of the Borrower, or

(c)      the acquisition of beneficial ownership, directly or indirectly, by any Person or group (within the meaning of the Securities Exchange Act of 1934, as amended, and the rules of the SEC thereunder as in effect on the date hereof), other than any employee benefit plan and/or Person acting as a trustee, agent or other fiduciary or administrator in respect thereof, of Equity Interests in Parent representing more than 35% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests in Parent.

"**Change in Law**" shall mean (a) the adoption of any law, rule or regulation after the Closing Date, (b) any change in law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the Closing Date or (c) compliance by any Lender (or, for purposes of Section 2.12(b), by any Lending Office of such Lender or by such Lender's holding company, if any) with any written request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Closing Date; provided that, notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements or

5

directives thereunder or issued in connection therewith or in the implementation thereof, and (y) all requests, rules, guidelines, requirements or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted, issued or implemented.

"**Chapter 11 Cases**" shall have the meaning assigned to such term in the recitals to this Agreement.

"**Charges**" shall have the meaning assigned to such term in **Section 9.09**.

"**Chattel Paper**" shall have the meaning set forth in Article 9 of the UCC.

"**Claims**" shall mean all claims, liabilities, obligations, losses, damages, penalties, judgments, proceedings, interests, costs and expenses of any kind (including remedial response costs, reasonable attorneys' fees) at any time (including after Full Payment of the Obligations, resignation or replacement of the Administrative Agent or replacement of any Lender) incurred by any Indemnitee or asserted against any Indemnitee by any Loan Party or other Person, in any way relating to (a) any Loans, Loan Documents, or the use thereof or transactions relating thereto, (b) any action taken or omitted to be taken by an Indemnitee in connection with any Loan Documents, (c) the existence or perfection of any Liens, or realization upon any Collateral, (d) exercise of any rights or remedies under any Loan Documents or Applicable Law, or (e) failure by any Loan Party to perform or observe any terms of any Loan Document, in each case including all costs and expenses relating to any investigation, litigation, arbitration or other proceeding (including an Insolvency Proceeding or appellate proceedings), whether or not the applicable Indemnitee is a party thereto.

"**Closing Date**" shall mean the date on which the conditions specified in Section 4.01 are satisfied.

"**Closing Date Term Loans**" shall have the meaning assigned to such term in **Section 2.01(b)(i)**.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended.

"**Collateral**" shall have the meaning assigned to such term in **Section 10.01**.

"**Commitment**" shall mean for any Lender, the commitment of such Lender to make Loans hereunder, as such commitment may be reduced from time to time pursuant to (a) Section 2.07, (b) assignments by or to such Lender pursuant to **Section 9.04** and (c) **Section 2.02(b)**. The initial amount of each Lender's Commitment is set forth on **Schedule 2.01**, or in the Assignment and Acceptance pursuant to which such Lender shall have assumed its Commitment, as applicable.

"**Commitment Letter**" shall mean the Commitment Letter, dated February 10, 2023, by Invictus Special Situations Master I, L.P. for the benefit of Tuesday Morning, Inc.

"**Commitments**" shall mean the aggregate amount of such commitments of all Lenders, which shall be $51,500,000 as of the Closing Date before giving effect to the Closing Date Term Loan.

"**Commodities Accounts**" shall have the meaning assigned thereto in Article 9 of the UCC.

"**Compliance Certificate**" shall mean a certificate of a Financial Officer in substantially the form of **Exhibit F**.

"**Contracts**" shall mean all contracts and agreements between any Loan Party and any other person (in each case, whether written or oral, or third party or intercompany) as the same may be amended, assigned, extended, restated, supplemented, replaced or otherwise modified from time to time including (i) all rights of any Loan Party to receive moneys due and to become due to it thereunder or in connection therewith, (ii) all rights of any Loan Party to receive proceeds of any insurance, indemnity, warranty or guaranty with respect thereto, (iii) all rights of any Loan Party to damages arising thereunder and (iv) all rights of any Loan Party to terminate and to perform and compel performance of, such Contracts and to exercise all remedies thereunder.

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and "**Controlling**" and "**Controlled**" shall have meanings correlative thereto.

"**Control Agreement**" shall mean an agreement that grants the Administrative Agent "control" as defined in the UCC in effect in the applicable jurisdiction over the applicable Deposit Account, Commodity Account or Securities Account, in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders (it being agreed that any agreement requiring the Administrative Agent to indemnify any third party in the Administrative Agent's individual capacity shall not be reasonably satisfactory to the Administrative Agent).

"**Copyrights**" shall mean, with respect to any Person, all of such Person's right, title, and interest in and to the following: (a) all copyrights, rights and interests in copyrights, works protectable by copyright, copyright registrations, and copyright applications; (b) all renewals of any of the foregoing; (c) all income, royalties, damages, and payments now or hereafter due and/or payable under any of the foregoing, including, without limitation, damages or payments for past or future infringements for any of the foregoing; (d) the right to sue for past, present, and future infringements of any of the foregoing; and (e) all rights corresponding to any of the foregoing throughout the world.

"**Court**" has the meaning set forth in the recitals to this Agreement.

"**Cost**" shall mean the lower of cost or market value of Inventory, determined in accordance with the accounting policies used in the preparation of the Borrower's audited financial statements (pursuant to which the retail method of accounting is utilized for substantially all merchandise Inventories), which policies are in effect on the Closing Date. "Cost" does not include inventory capitalization costs or other non-purchase price charges (such as freight) used in the Borrower's calculation of cost of goods sold.

"**Customs Broker Agreement**" shall mean an agreement, in form and substance reasonably satisfactory to the Administrative Agent (acting at the direction of the Required Lenders), among the Borrower, a customs broker or other carrier, and the Administrative Agent, in which the customs broker or other carrier acknowledges that it has control over and holds the documents evidencing ownership of the subject Inventory for the benefit of the Administrative Agent and agrees, upon notice from the Administrative Agent, to hold and dispose of the subject Inventory solely as directed by the Administrative Agent.

"**Default**" shall mean any event or condition that upon notice, lapse of time or both would constitute an Event of Default.

"**Defaulting Lender**" shall mean any Lender that (a) has failed to perform any funding obligations hereunder, and such failure is not cured within two (2) Business Days of the date of the funding obligation; (b) has notified the Administrative Agent or the Borrower that such Lender does not intend to comply with its funding obligations hereunder or generally under other agreements to which it commits to extend credit

7

or has made a public statement to that effect; (c) has failed, within three (3) Business Days following written request by the Administrative Agent or the Borrower, to confirm in a manner reasonably satisfactory to the Administrative Agent and the Borrower that such Lender will comply with its funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this **clause (c)** upon receipt by the Administrative Agent of such confirmation); (d) has, or has a direct or indirect parent company that has, become the subject of an Insolvency Proceeding or taken any action in furtherance thereof, including, in the case of any Lender, the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such capacity; provided, however, that a Lender shall not be a Defaulting Lender solely by virtue of a Governmental Authority's ownership of any equity interest in such Lender or parent company so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of the courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender or (e) has become the subject of a Bail-in Action.

"**Delay Draw Loans**" has the meaning set forth in Section 2.01(b)(i) of this Agreement.

"**Deposit Account**" shall have the meaning assigned thereto in Article 9 of the UCC.

"**Designated Amount**" shall have the meaning assigned to such term in **Section 2.07(c)(v)**.

"**DIP New Money Loan**" shall mean all Loans hereunder other than any Roll-Up Loans.

"**Disposition**" shall mean any sale, transfer, lease or other disposition (whether effected pursuant to a Division or otherwise) of assets.  "**Dispose**" shall have a meaning correlative thereto.

"**Dividing Person**" has the meaning assigned to it in the definition of "Division".

"**Division**" shall mean the division of the assets, liabilities and/or obligations of a Person (the "**Dividing Person**") among two or more Persons (whether pursuant to a "plan of division" or similar arrangement), which may or may not include the Dividing Person and pursuant to which the Dividing Person may or may not survive.

"**Division Successor**" shall mean any Person that, upon the consummation of a Division of a Dividing Person, holds all or any portion of the assets, liabilities and/or obligations previously held by such Dividing Person immediately prior to the consummation of such Division. A Dividing Person which retains any of its assets, liabilities and/or obligations after a Division shall be deemed a Division Successor upon the occurrence of such Division.

"**Documents**" shall have the meaning set forth in Article 9 of the UCC.

"**Dollars**" or "**$**" shall mean lawful money of the United States of America.

"**EEA Financial Institution**" shall mean (a) any institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in **clause (a)** of this definition, or (c) any institution established in an EEA Member Country which is a subsidiary of an institution described in **clauses (a)** or **(b)** of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" shall mean any of the member states of the European Union, Iceland, Liechtenstein and Norway.

"**EEA Resolution Authority**" shall mean any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Electing DIP Lender Funding Date**" has the meaning specified in **Section 2.02(b)**.

"**Electing Lenders**" means collectively the Electing Term Lenders and the Electing Noteholders.

"**Electing Noteholder**" has the meaning specified in **Section 2.02(b)**.

"**Electing Term Lender**" has the meaning specified in **Section 2.02(b)**.

"**Election Deadline**" shall mean 5:00 p.m. Eastern standard time on February 17, 2023.

"**Eligible Assignee**" shall mean (i) any Lender, any Affiliate of any Lender and any Related Fund (any two or more Related Funds being treated as a single Eligible Assignee for all purposes hereof);  (ii) any Pre-Petition Term Lender; and (iii) any commercial bank, insurance company, investment or mutual fund or other entity that is an "accredited investor" (as defined in Regulation D under the Securities Act) and which extends credit or buys loans.

"**Eligible Inventory**" shall mean, as of the date of determination thereof, without duplication, (i) Eligible In-Transit Inventory, and (ii) all items of Inventory of the Loan Parties that are finished goods, merchantable and readily saleable to the public in the ordinary course deemed by the Required Lenders to be eligible hereunder, in each case that, except as otherwise agreed by the Required Lenders, is not excluded as ineligible by virtue of one or more of the criteria set forth below.  Except as otherwise agreed by the Required Lenders, any items of Inventory included within any of the following categories shall not constitute Eligible Inventory:

      (a)      Inventory that is not solely owned by a Loan Party or as to which a Loan Party does not have good, valid and marketable title, free and clear of any Lien (other Liens permitted under this Agreement);

      (b)      Inventory that is not subject to a perfected first priority Lien in favor of the Administrative Agent to secure the Obligations (other than Inventory that may be subject to Liens permitted by **Section 6.02**);

      (c)      Inventory that is leased by, or is on consignment to, a Loan Party, or that is consigned by a Loan Party to a Person which is not a Loan Party;

      (d)      Inventory (other than Eligible In-Transit Inventory) that is not located in the United States (excluding territories or possessions of the United States);

      (e)      Inventory (other than Eligible In-Transit Inventory) that is not located at a location that is owned or leased by a Loan Party or a "pool point" in the Loan Parties' distribution network;

      (f)      Inventory that is comprised of goods which (i) are damaged, defective, "seconds," or otherwise unmerchantable, (ii) are to be returned to the vendor, (iii) are obsolete or slow moving, or custom items, work-in-process, raw materials, or that constitute spare parts, promotional, marketing, packaging and shipping materials or supplies used or consumed in any Loan Party's business, (iv) are seasonal in nature and which have been packed away for sale in a subsequent season, (v) are not in compliance in all material respects with all standards imposed by any

governmental authority having regulatory authority over such Inventory, its use or sale, or (vi) are bill and hold goods;

(g)      Inventory that consists of samples, labels, bags, packaging, and other similar non-merchandise categories;

(h)      Inventory that is not insured in compliance with the provisions of <u>Section 5.02</u>;

(i)      Inventory that has been sold but not yet delivered or as to which the applicable Loan Party has accepted a deposit;

(j)      Inventory that is (x) subject to a license agreement with any Affiliate or Permitted Holder (or their respective affiliates), other than Inventory subject to a brand license agreement as to which the requirements set forth in <u>clause (y)</u> below are satisfied, (y) subject to any brand license agreement, unless (1) such brand license agreement is in full force and effect, and (2) if required by the Required Lenders, an Inventory Appraisal covering the Inventory subject to such brand license agreement has been completed with results satisfactory to the Required Lenders, and (z) subject to any other license agreement (other than a brand license agreement) with any third party from which any Loan Party or any Subsidiary has received notice of a dispute in respect of any such agreement, unless (i) to the extent requested by the Required Lenders, the Administrative Agent shall have received a licensor consent agreement with respect to such license agreement or other agreement and (ii) the Administrative Agent is reasonably satisfied that it may sell or otherwise Dispose of such Inventory without (A) infringing the rights of such third party, (B) violating any contract with such third party or (C) incurring any liability with respect to the payment of royalties other than royalties incurred in connection with the sale of such Inventory pursuant to the current licensing agreement relating thereto.

"**Eligible In-Transit Inventory**" shall mean, as of any date of determination thereof, without duplication of other Eligible Inventory, In-Transit Inventory:

(a)      which has been shipped from a location and, at the time of determination of eligibility pursuant hereto, is due for receipt by a Loan Party at a distribution center of a Loan Party within thirty (30) days after such date of determination, but which has not yet been delivered to the applicable Loan Party;

(b)      for which the purchase order is in the name of a Loan Party and title has passed to a Loan Party;

(c)      for which the document of title reflects a Loan Party as consignee or, if requested by the Administrative Agent after the occurrence and during the continuance of a Default or an Event of Default, names the Administrative Agent as consignee (it being understood that, in the case of a Domestic In-Transit Inventory, no document of title may be issued);

(d)      which is insured in compliance with <u>Section 5.02</u>; and

(e)      which does not qualify as Eligible Inventory solely because it (i) is not located in the United States of America (excluding territories or possessions of the United States) or (ii) is located at a location satisfying the requirements of <u>clause (d)</u> of the definition Eligible Inventory, but which otherwise constitutes Eligible Inventory.

"**Enforcement Action**" shall mean any action to enforce any Obligations or Loan Documents or

10

to exercise any rights or remedies relating to any Collateral (whether by judicial action, self-help, notification of Account Debtors, exercise of setoff or recoupment, exercise of any right to vote or act in a Loan Party's Insolvency Proceeding, or otherwise), in each case solely to the extent permitted by the Loan Documents.

"**environment**" shall mean ambient and indoor air, surface water and groundwater (including potable water, navigable water and wetlands), the land surface or subsurface strata, natural resources such as flora and fauna, the workplace or as otherwise defined in any Environmental Law.

"**Environmental Laws**" shall mean all laws (including common law), rules, regulations, codes, ordinances, orders, decrees or judgments, promulgated or entered into by or with any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the generation, management, Release or threatened Release of, or actual or alleged exposure to, any Hazardous Materials or to occupational health and safety (to the extent relating to the environment or Hazardous Materials).

"**Equipment**" shall have the meaning set forth in Article 9 of the UCC.

"**Equity Interests**" of any Person shall mean any and all shares, interests, participations or other equivalents of or interests in (however designated) equity of such Person, including any preferred stock, any limited or general partnership interest and any limited liability company membership interest and any and all warrants, rights or options to purchase or other rights to acquire any of the foregoing, but excluding for the avoidance of doubt any Indebtedness convertible into or exchangeable for any of the foregoing (until so converted or exchanged).

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended, or any successor statute and the rules and regulations promulgated thereunder.

"**ERISA Affiliate**" shall mean any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414(b) or (c) of the Code, or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 (m) or (o) of the Code.

"**ERISA Event**" shall mean (a) any Reportable Event; (b) the existence with respect to any Loan Party, any ERISA Affiliate or any Plan of a non-exempt Prohibited Transaction; (c) the failure by any Plan to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA), applicable to such Plan, whether or not waived; (d) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Plan or the failure to make any required contribution to a Multiemployer Plan; (e) the receipt by any Loan Party or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or to appoint a trustee to administer any Plan under Section 4042 of ERISA; (f) the receipt by any Loan Party or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from any Loan Party or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, Insolvent, in Reorganization, or terminated (within the meaning of Section 4041A of ERISA); or (g) the failure by any Loan Party or any ERISA Affiliate to pay when due (after expiration of any applicable grace period) any installment payment with respect to Withdrawal Liability under Section 4201 of ERISA.

"**EU Bail-In Legislation Schedule**" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

11

"**Event of Default**" shall have the meaning assigned to such term in **Section 7.01**.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended from time to time and any successor statute.

"**Excluded Accounts**" shall mean (a) any accounts used specifically, solely and exclusively as payroll, trust, tax withholding and employee benefit accounts, or accounts located outside of the U.S., in each case, maintained by Holdings or any of its Subsidiaries in the ordinary course of business (b) any account that constitutes Term Loan Priority Collateral, and (c) accounts that do not have a daily balance at any time in excess of $250,000; provided that the aggregate amount of funds in all accounts excluded under this clause (c) shall not exceed $1,000,000.

"**Excluded Collateral**" shall mean, collectively, (a) Excluded Accounts; (b) any governmental licenses or state or local franchises, charters or authorizations, to the extent security interests in such licenses, franchises, charters or authorizations are prohibited or restricted thereby, after giving effect to the applicable anti-assignment provisions of the UCC or other Applicable Law of any applicable jurisdiction; (c) any intent-to-use United States trademark applications for which an amendment to allege use or statement of use has not been filed under 15 U.S.C. § 1051(c) or 15 U.S.C. § 1051(d), respectively, or if filed, has not been deemed in conformance with 15 U.S.C. § 1051(a) or examined and accepted, respectively, by the U.S. Patent and Trademark Office; and (d) the Real Property.

"**Excluded Taxes**" shall mean, with respect to the Administrative Agent, any Lender, or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) income taxes imposed on (or measured by) its net income (or franchise taxes imposed in lieu of net income taxes) by any jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located or any other jurisdiction as a result of such recipient engaging in a trade or business in such jurisdiction for tax purposes (other than a trade or business arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document), (b) any branch profits tax or any similar tax that is imposed by any jurisdiction described in **clause (a)** above, (c) in the case of a Lender making a Loan to the Borrower, any U.S. federal withholding tax that (x) is in effect under Applicable Law and would apply to amounts payable hereunder to such Lender at the time such Lender becomes a party to such Loan to the Borrower (or designates a new Lending Office) except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new Lending Office (or assignment), to receive additional amounts from a Loan Party with respect to any U.S. federal withholding tax pursuant to **Section 2.11(a)** or **Section 2.11(c)** or (y) is attributable to such Lender's failure to comply with **Section 2.11(e)** with respect to such Loan unless such failure to comply with **Section 2.11(e)** is a result of a change in law after the date such Lender becomes a party to such Loan to the Borrower (or designates a new Lending Office), (d) any interest, additions to taxes or penalties with respect to the foregoing and (e) any withholding taxes imposed pursuant to FATCA.

"**Extraordinary Receipts**" means any cash received by or paid to or for the account of any Loan Party not in the ordinary course of business (and not consisting of proceeds described in any of clauses (i), (ii) or (iii) of Section 2.07(c)), including, without limitation, pension plan reversions, purchase price and other monetary adjustments (including indemnification claims or representations and warranties policy claims) made in connection with any acquisition.

"**FATCA**" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to

12

comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"**Federal Funds Effective Rate**" shall mean, for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depositary institutions, as determined in such manner as the NYFRB shall set forth on its public website from time to time, and published on the next succeeding Business Day by the NYFRB as the effective federal funds rate; provided that if the Federal Funds Effective Rate as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"**Fee Letter**" shall mean that certain Fee Letter, dated as of February 13, 2023 between the Borrower and the Administrative Agent.

"**FILO B Obligations**" shall have the meaning assigned to such term in the Pre-Petition ABL Credit Agreement.

"**Final Loans**" shall have the meaning assigned to such term in **Section 2.01**.

"**Final Order**" shall mean an order of the Court in the Chapter 11 Cases, in form and substance satisfactory to the Administrative Agent, the Required Lenders in their sole discretion and Borrower, authorizing and approving on a final basis, among other things, the borrowings by the Borrower under this Agreement.

"**Financial Officer**" of any Person shall mean the Chief Financial Officer (including interim Chief Financial Officer), principal accounting officer, Treasurer, Assistant Treasurer or Controller of such Person.

"**Fixtures**" shall have the meaning set forth in Article 9 of the UCC.

"**Flood Laws**" has the meaning given thereto in Section 8.15.

"**Foreign Benefit Arrangement**" shall mean any employee benefit arrangement mandated by non-U.S. law that is maintained or contributed to by any Loan Party or any ERISA Affiliate.

"**Foreign Lender**" shall mean any Lender that is not a U.S. Person.

"**Foreign Plan**" shall mean each employee benefit plan (within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA) that is not subject to U.S. law and is maintained or contributed to by any Loan Party or any ERISA Affiliate.

"**Foreign Plan Event**" shall mean, with respect to any Foreign Benefit Arrangement or Foreign Plan, (a) the failure to make or, if applicable, accrue in accordance with normal accounting practices, any employer or employee contributions required by Applicable Law or by the terms of such Foreign Benefit Arrangement or Foreign Plan; (b) the failure to register or loss of good standing with applicable regulatory authorities of any such Foreign Benefit Arrangement or Foreign Plan required to be registered; or (c) the failure of any Foreign Benefit Arrangement or Foreign Plan to comply with any material provisions of Applicable Law and regulations or with the material terms of such Foreign Benefit Arrangement or Foreign Plan.

"**Foreign Subsidiary**" shall mean any Subsidiary that is incorporated or organized under the laws

13

of any jurisdiction other than the United States of America, any State thereof or the District of Columbia.

"**Full Payment**" shall mean with respect to any of the Secured Obligations, the full cash payment thereof (other than obligations for taxes, indemnification, charges and other inchoate or contingent or reimbursable liabilities for which no claim or demand for payment has been made or, in the case of indemnification, no notice has been given (or, in each case, reasonably satisfactory arrangements have otherwise been made)), including any interest, fees and other charges accruing during an Insolvency Proceeding (whether or not allowed in such proceeding). No Loans shall be deemed to have been paid in full until all Commitments related to such Loans have expired or been terminated.

"**GAAP**" shall mean generally accepted accounting principles in effect from time to time in the United States.

"**General Intangibles**" shall mean all "general intangibles" (as such term is defined in the UCC) of the Loan Parties.

"**Goods**" shall have the meaning set forth in Article 9 of the UCC.

"**Governmental Authority**" shall mean any federal, state, local or foreign court or governmental agency, authority, instrumentality or regulatory or legislative body or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign entity or government.

"**Guarantee**" of or by any Person (the "**guarantor**") shall mean any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.

"**Guaranteed Obligations**" has the meaning assigned to such term in Section 11.01(a).

"**guarantor**" shall have the meaning assigned to such term in the definition of the term "Guarantee."

"**Guarantors**" shall mean, collectively, Parent, Intermediate Holdings, the Subsidiary Guarantors and any other Loan Party (including the Borrower with respect to any Secured Obligations of another Loan Party).

"**Hazardous Materials**" shall mean all pollutants, contaminants, wastes, chemicals, materials, substances and constituents of any nature which are subject to regulation by any Governmental Authority or which would reasonably be likely to give rise to liability under any Environmental Law, including, without limitation, explosive or radioactive substances or petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls or radon gas.

"**Holdings**" shall mean a collective reference to Parent and Intermediate Holdings, or, if Intermediate Holdings ceases to exist, shall mean Parent.

"**Indebtedness**" of any Person shall mean, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments to the extent the same would appear as a liability on a balance sheet prepared in accordance with GAAP, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (d) all obligations of such Person issued or assumed as the deferred purchase price of property or services (other than current intercompany liabilities (but not any refinancings, extensions, renewals or replacements thereof) incurred in the ordinary course of business and maturing within three hundred sixty-five (365) days after the incurrence thereof), to the extent the same would be required to be shown as a long term liability on a balance sheet prepared in accordance with GAAP, (e) all Guarantees by such Person of Indebtedness of others, (f) all Capital Lease Obligations of such Person, (g)  the principal component of all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and (h) the principal component of all obligations of such Person in respect of bankers' acceptances.  The Indebtedness of any Person shall include the Indebtedness of any partnership in which such Person is a general partner, other than to the extent that the instrument or agreement evidencing such Indebtedness expressly limits the liability of such Person in respect thereof. The Indebtedness of the Borrower and the Subsidiaries shall exclude (i) accrued expenses and accounts and trade payables, (ii) liabilities under vendor agreements to the extent such indebtedness may be satisfied through non-cash means such as purchase volume earnings credits and (iii) reserves for deferred income taxes.

"**Indemnified Taxes**" shall mean all Taxes other than Excluded Taxes and Other Taxes.

"**Indemnitee**" shall have the meaning assigned to such term in **Section 9.05(b)**.

"**Insolvency Proceeding**" shall mean any case or proceeding commenced by or against a Person under any state, federal, provincial, territorial or foreign law for, or any agreement of such Person to, (a) the entry of an order for relief under the Bankruptcy Code, or any other insolvency, bankruptcy, debtor relief or debt adjustment law; (b) the appointment of a receiver, interim receiver, monitor, trustee, liquidator, administrator, conservator, custodian or other similar Person for such Person or any part of its Property, including, in the case of any Lender, the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such capacity; or (c) an assignment for the benefit of creditors.

"**Insolvent**" with respect to any Multiemployer Plan, shall mean the condition that such plan is insolvent within the meaning of Section 4245 of ERISA.

"**Insurance**" shall mean all insurance policies covering any or all of the Collateral (regardless of whether the Administrative Agent is the loss payee thereof).

"**Instruments**" shall have the meaning set forth in Article 9 of the UCC.

"**Intellectual Property**" shall mean the collective reference to all rights, priorities and privileges relating to intellectual property arising under United States laws, including the Copyrights, the Patents, the Trademarks, and the Licenses.

"**Interest Payment Date**" shall mean, (a) the first Business Day of each calendar month and (b) the Termination Date.

"**Interim Order**" shall mean, collectively, the order of the Court entered in the Chapter 11 Cases

15

after an interim hearing (assuming satisfaction of the standard prescribed in Section 324 of the Bankruptcy Code and Bankruptcy Rule 4001 and other Applicable Law), together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to the Administrative Agent, the Required Lenders in their sole discretion and Borrower, which, among other matters but not by way of limitation, authorizes, on an interim basis, the Loan Parties to execute and perform under the terms of this Agreement and the other Loan Documents.

"**Intermediate Holdings**" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"**In-Transit Inventory**" shall mean Inventory of a Loan Party which is in transit from one location to another location.

"**Inventory**" has the meaning given that term in the UCC, and shall also include, without limitation, all:  (a) goods which (i) are leased by a Person as lessor, (ii) are held by a Person for sale or lease or to be furnished under a contract of service, (iii) are furnished by a Person under a contract of service, or (iv) consist of raw materials, work in process, or materials used or consumed in a business; (b) goods of said description in transit; (c) goods of said description which are returned, repossessed or rejected; and (d) packaging, advertising, and shipping materials related to any of the foregoing.

"**Investment**" shall have the meaning assigned to such term in **Section 6.04**.

"**Investment Property**" shall have the meaning set forth in Article 9 of the UCC.

"**IRS**" shall mean the United States Internal Revenue Service.

"**Joinder Agreement**" shall mean a Joinder Agreement in substantially the form of **Exhibit C**.

"**Judgment Currency**" has the meaning assigned to such term in **Section 9.24**.

"**Lender**" shall mean each financial institution listed on **Schedule 2.01** (other than any such Person that has ceased to be a party hereto pursuant to an Assignment and Acceptance in accordance with **Section 9.04**), as well as any Person that becomes a "Lender" hereunder in accordance with **Section 9.04**.

"**Lender Party**" shall mean the Administrative Agent or any other Lender.

"**Lending Office**" shall mean, as to any Lender, the applicable branch, office or Affiliate of such Lender designated by such Lender to make Loans.

"**Letter-of-Credit Rights**" shall have the meaning set forth in Article 9 of the UCC.

"**Licenses**" shall mean, with respect to any Person, all of such Person's right, title, and interest in and to (a) any and all licensing agreements or similar arrangements in and to its Patents, Copyrights, or Trademarks, (b) all income, royalties, damages, claims, and payments now or hereafter due or payable under and with respect thereto, including, without limitation, damages and payments for past and future breaches thereof, and (c) all rights to sue for past, present, and future breaches thereof.

"**Lien**" shall mean, with respect to any asset, (a) any mortgage, deed of trust, lien, hypothecation, pledge, encumbrance, charge or security interest in or on such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.

16

"**LLC**" shall mean any Person that is a limited liability company under the laws of its jurisdiction of formation.

"**Loan Documents**" shall mean, collectively, this Agreement, any promissory notes issued pursuant to this Agreement, the Security Documents, the Fee Letter, all Approved Budgets, all Budget Compliance Reports, Compliance Certificates, and all other written matter whether heretofore, now or hereafter executed by or on behalf of any Loan Party, or any employee of any Loan Party, and delivered to the Administrative Agent or any Lender in connection with this Agreement or the transactions contemplated hereby.

"**Loan Guaranty**" shall mean Article XI of this Agreement

"**Loan Parties**" shall mean, collectively, the Borrower, the Guarantors, and any other Person who becomes a party to this Agreement pursuant to a Joinder Agreement and their successors and assigns, and the term "Loan Party" shall mean any one of them or all of them individually, as the context may require.

"**Loan-to-Value Ratio**" shall mean, with respect to any calendar week, for the Loan Parties on a consolidated basis, the ratio of (a) the outstanding principal amount of the DIP New Money Loans as of the last day of such week to (b) (i) the sum of (x) the aggregate value of all Inventory of the Loan Parties for such week multiplied by 80.0% and (y) all cash and cash equivalents (including restricted cash) of the Loan Parties for such week minus (ii) the Pre-Petition Contingent LC Obligations as of the last day of such week multiplied by 105.0%.

"**Loans**" shall mean the (a) loans and advances made by the Lenders pursuant to Section 2.01, including the Closing Date Term Loan and (b) following the entry of the Final Order, the Incremental Final Loans, the Delay Draw Loans and the Roll-Up Loans.

"**Local Time**" shall mean Dallas, Texas time.

"**Margin Stock**" shall mean margin stock within the meaning of Regulations T, U and X, as applicable.

"**Material Adverse Effect**" shall mean a material adverse change in, or material adverse effect on, (a) the business, operations, Property, or financial condition of the Loan Parties, taken as a whole, other than any change, event, effect, or occurrence, arising individually or in the aggregate, solely from (i) events leading up to the commencement of the Chapter 11 Cases, (ii) events that would reasonably be expected to result from the filing or commencement of the Chapter 11 Cases or the announcement of the filing of the Chapter 11 Cases, or (iii) the commencement of the Chapter 11 Cases, (b) the ability of the Loan Parties to perform their obligations under the Loan Documents, taken as a whole, (c) the validity or enforceability of any Loan Document or (d) the rights and remedies of the Administrative Agent and the Lenders under the Loan Documents.

"**Material Agreement**" shall mean, any contract or agreement pursuant to which Holdings or its Subsidiaries is a party the breach or termination of which would reasonably be expected to result in a Material Adverse Effect.

"**Material Indebtedness**" shall mean any Indebtedness (other than the Loans), of any one or more of Holdings and its Subsidiaries in an aggregate principal amount exceeding $5,000,000.

"**Maturity Date**" shall mean August 15, 2023.

"**Maximum Rate**" shall have the meaning assigned to such term in **Section 9.09**.

"**Measurement Period**" shall have the meaning assigned to such term in Section 5.14(d).

"**Moody's**" shall mean Moody's Investors Service, Inc.

"**Mortgage**" shall mean any mortgage, deed of trust or other agreement which conveys or evidences a Lien in favor of the Administrative Agent, for the benefit of the Administrative and the other Secured Parties, on the Real Property, including any amendment, restatement, modification or supplement thereto.

"**Multiemployer Plan**" shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which any Loan Party or any ERISA Affiliate (other than one considered an ERISA Affiliate only pursuant to subsection (m) or (o) of Code Section 414) is making or accruing an obligation to make contributions, or has within any of the preceding six (6) plan years made or accrued an obligation to make contributions.

"**Net Income**" shall mean, for any period, the consolidated net income (or loss) of the Borrower and its Subsidiaries, determined on a consolidated basis in accordance with GAAP.

"**Net Proceeds**" shall mean, with respect to any event, (a) the cash proceeds received in respect of such event including (i) any cash received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but excluding any interest payments), but only as and when received, (ii) in the case of a casualty, insurance proceeds and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, minus (b) the sum of (i) all reasonable fees and out-of-pocket expenses paid to third parties (other than Affiliates) in connection with such event, (ii) in the case of Disposition of an asset (including pursuant to a casualty or a condemnation or similar proceeding), the amount of all payments required to be made as a result of such event to repay Indebtedness (other than Loans) secured by such asset or otherwise subject to mandatory prepayment as a result of such event and (iii) the amount of all taxes paid (or reasonably estimated to be payable) by any Loan Party and the amount of any reserves established to fund contingent liabilities reasonably estimated to be payable, in each case during the year that such event occurred or the next succeeding year and that are directly attributable to such event (as determined reasonably and in good faith by a Financial Officer).

"**Non-Consenting Lender**" shall have the meaning assigned to such term in **Section 2.13(c)**.

"**Note DIP Portion**" has the meaning specified in **Section 2.02(b)**.

"**NYFRB**" shall mean the Federal Reserve Bank of New York.

"**NYFRB Rate**" shall mean, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day (or for any day that is not a Business Day, for the immediately preceding Business Day); provided that if none of such rates are published for any day that is a Business Day, the term "NYFRB Rate" shall mean the rate for a federal funds transaction quoted at 11:00 a.m. on such day received by the Administrative Agent from a federal funds broker of recognized standing selected by it; provided, further, that if any of the aforesaid rates shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"**Obligations**" shall mean for purposes of the Loan Documents, all obligations of every nature of each Loan Party from time to time owed to the Agents (including former Agents) or the Lenders, under any Loan Document, whether for principal, interest, fees, expenses, indemnification or otherwise.

"**OFAC**" shall mean the Office of Foreign Assets Control of the United States Department of the Treasury.

"**Operating Account**" shall have the meaning specified in Section 4.01(e).

"**Order**" shall mean, as applicable, and as the context may require, the Interim Order or the Final Order, whichever is then applicable, or the Interim Order and the Final Order as the "Orders".

"**Other Taxes**" shall mean any and all present or future stamp, court, intangible, recording, filing, documentary, excise, property or similar Taxes arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, the Loan Documents, and any and all interest and penalties related thereto.

"**Overnight Bank Funding Rate**" shall mean, for any day, the rate comprised of both overnight federal funds and overnight eurodollar borrowings by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on its public website from time to time, and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate.

"**Parent**" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"**Parent Entity**" shall mean any of (i) Holdings and (ii) any other Person of which Holdings is a Subsidiary.

"**Participant**" shall have the meaning assigned to such term in **Section 9.04(g)**.

"**Participant Register**" shall have the meaning assigned to such term in **Section 9.04(g)**.

"**Patents**" shall mean, with respect to any Person, all of such Person's right, title, and interest in and to: (a) any and all patents and patent applications; (b) all inventions and improvements described and claimed therein; (c) all reissues, divisions, continuations, renewals, extensions, and continuations-in-part thereof; (d) all income, royalties, damages, claims, and payments now or hereafter due or payable under and with respect thereto, including, without limitation, damages and payments for past and future infringements thereof; (e) all rights to sue for past, present, and future infringements thereof; and (f) all rights corresponding to any of the foregoing throughout the world.

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"**Permitted Investments**" shall mean:

(a)    direct obligations of the United States of America or any agency thereof or obligations guaranteed by the United States of America or any agency thereof, in each case with maturities not exceeding two (2) years;

(b)    time deposit accounts, certificates of deposit and money market deposits maturing within one hundred eighty (180) days of the date of acquisition thereof issued by a bank or trust company that is organized under the laws of the United States of America, any state thereof or any foreign country recognized by the United States of America having capital, surplus and undivided profits in excess of $250.0 million and whose long-term debt, or whose parent holding company's

long-term debt, is rated A (or such similar equivalent rating or higher by at least one (1) nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act));

(c)      repurchase obligations with a term of not more than one hundred eighty (180) days for underlying securities of the types described in **clause (a)** above entered into with a bank meeting the qualifications described in **clause (b)** above;

(d)      commercial paper, maturing not more than one (1) year after the date of acquisition, issued by a corporation organized and in existence under the laws of the United States of America or any foreign country recognized by the United States of America with a rating at the time as of which any investment therein is made of P-2 (or higher) according to Moody's, or A-1 (or higher) according to S&P;

(e)      securities with maturities of two (2) years or less from the date of acquisition issued or fully guaranteed by any State, commonwealth or territory of the United States of America, or by any political subdivision or taxing authority thereof, and rated at least A by S&P or A by Moody's;

(f)      shares of mutual funds whose investment guidelines restrict 95% of such funds' investments to those satisfying the provisions of **clauses (a)** through **(e)** above; and

(g)      money market funds that (i) comply with the criteria set forth in Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5.0 billion.

"**Permitted Variance**" shall have the meaning assigned to such term in Section 5.14(b).

"**Person**" shall mean any natural person, corporation, business trust, joint venture, association, company, partnership, limited liability company, individual or family trust, or other organization (whether or not a legal entity), or any government or any agency or political subdivision thereof.

"**Petition Date**" shall have the meaning assigned to such term in the recitals to this Agreement.

"**Plan**" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which any Loan Party or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4062 or Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"**Plan Asset Regulations**" shall mean 29 CFR § 2510.3-101 *et seq.*, as modified by Section 3(42) of ERISA, as amended from time to time.

"**Plan of Reorganization**" shall mean a plan of reorganization in form and substance satisfactory to the Required Lenders in all respects and consented to by the Required Lenders, confirmed by an order (in form and substance satisfactory to the Required Lenders in all respects) of the Court under the Chapter 11 Cases; provided that a plan of reorganization that is a feasible plan which provides for the payment in full in cash of the Loans (including the Roll-up Loans) on the effective date thereof shall be deemed to be an Acceptable Plan, and such Plan of Reorganization shall be in full force and effect and shall not have been modified, altered, amended, or otherwise changed or supplemented without the prior written consent of the Administrative Agent and the Required Lenders.

"**Pledged Collateral**" has the meaning given thereto in Section 10.04.

"**<u>Prepayment Notice Date</u>**" shall have the meaning assigned to such term in **<u>Section 2.07(c)(v)</u>**.

"**<u>Pre-Petition ABL Credit Agreement</u>**" has the meaning specified in the recitals to this Agreement.

"**<u>Pre-Petition ABL Disputed Amounts</u>**" shall mean the Pre-Petition FILO B Prepayment Premium, the Pre-Petition Revolving Facility Early Termination Fee and the $1,229,940 FILO B Consent Fee.

"**<u>Pre-Petition ABL Lenders</u>**" has the meaning specified in the recitals to this Agreement.

"**<u>Pre-Petition ABL Loan Documents</u>**" shall mean the "Loan Documents" as defined in the Pre-Petition ABL Credit Agreement.

"**<u>Pre-Petition ABL Obligations</u>**" shall mean "Obligations" as defined in the Pre-Petition ABL Credit Agreement.

"**<u>Pre-Petition Contingent LC Obligation"</u>** shall mean the contingent reimbursement obligations with respect to the outstanding Letters of Credit (as defined in the Pre-Petition ABL Credit Agreement) on the Petition Date.

"**<u>Pre-Petition Convertible Note Documents</u>**" shall mean, collectively, (a) the Pre-Petition Convertible Note Purchase Agreement, (b) the Pre-Petition Convertible Notes, (c) any offering memorandum relating to the Pre-Petition Convertible Notes, (d) the Pre-Petition Convertible Note Security Documents, (e) the guarantees in respect of the Pre-Petition Collateral Note Obligations and (f) the other documents, instruments or agreement entered into in connection with any of the foregoing, in each case, as the same may be amended, modified, supplemented or replaced in accordance therewith.

"**<u>Pre-Petition Convertible Note Obligations</u>**" shall mean all Indebtedness and other obligations of the Loan Parties, which are incurred or owing under the Pre-Petition Convertible Note Documents, including all obligations in respect of the payment of principal, interest, fees, and indemnification obligations.

"**<u>Pre-Petition Convertible Note Purchase Agreement</u>**" shall mean that certain Pre-Petition Note Purchase Agreement, dated as of September 20, 2022, among the Parent, as issuer thereunder, the Pre-Petition Convertible Note Purchasers and the Pre-Petition Convertible Notes Collateral Agent, pursuant to which the Pre-Petition Convertible Notes have been issued.

"**<u>Pre-Petition Convertible Note Purchasers</u>**" shall mean the purchasers of the Pre-Petition Convertible Notes identified on "Schedule I" to the Pre-Petition Convertible Note Purchase Agreement.

"**<u>Pre-Petition Convertible Note Security Documents</u>**" shall mean, collectively, any security agreements, pledge agreements, collateral assignments, mortgages, deeds of trust, control agreements, guarantees, notes and any other documents or instruments now existing or entered into after September 20, 2022 that create or purport to create Liens on any assets or properties of any Loan Party to secure any Pre-Petition Convertible Note Obligations or under which rights or remedies with respect to such Liens are governed, as the same may be amended, modified, supplemented or replaced.

"**<u>Pre-Petition Convertible Notes</u>**" shall mean, collectively, (a) the Pre-Petition FILO C Convertible Notes, (b) the Pre-Petition Junior Secured Convertible Notes and (c) the Pre-Petition Management Junior Secured Convertible Notes.

21

"**Pre-Petition Convertible Notes Collateral Agent**" shall mean TASCR Ventures CA, LLC, a Delaware limited liability company, in its capacity as "Collateral Agent" under and as defined in the Pre-Petition Convertible Note Purchase Agreement and the other Pre-Petition Convertible Note Documents, together with its successors and permitted assigns in such capacities.

"**Pre-Petition FILO B Prepayment Premium**" shall have the meaning assigned the term "FILO B Prepayment Premium" in the Pre-Petition ABL Credit Agreement.

"**Pre-Petition FILO C Convertible Notes**" shall mean the 6.50% floating rate asset-based exchangeable notes issued pursuant to the Pre-Petition Convertible Note Purchase Agreement.

"**Pre-Petition FILO C Noteholder**" shall mean the noteholders under and as defined in the Pre-Petition FILO C Convertible Notes.

"**Pre-Petition Junior Secured Convertible Notes**" shall mean the 6.50% floating rate junior secured exchangeable notes issued pursuant to the Convertible Note Purchase Agreement.

"**Pre-Petition LC Termination**" shall mean the termination, expiration, or cancellation and return of all Letters of Credit (as defined in the Pre-Petition ABL Loan Documents).

"**Pre-Petition Loan Documents**" shall mean, collectively, the Pre-Petition Term Loan Documents, the Pre-Petition ABL Loan Documents and the Pre-Petition Convertible Note Documents.

"**Pre-Petition Management Junior Secured Convertible Notes**" shall mean the 6.50% floating rate junior secured exchangeable notes issued to members of management of the Loan Parties pursuant to the Pre-Petition Convertible Note Purchase Agreement.

"**Pre-Petition Obligations**" shall mean, collectively, the Pre-Petition ABL Obligations, the Pre-Petition Term Loan Obligations and the Pre-Petition Convertible Note Obligations.

"**Pre-Petition Resolution Date**" shall have the meaning assigned to such term in **Section 4.02(h)**.

"**Pre-Petition Revolving Facility Early Termination Fee**" shall have the meaning assigned the term "Revolving Facility Early Termination Fee" in the Pre-Petition ABL Credit Agreement.

"**Pre-Petition Term Credit Agreement**" shall mean that certain Credit Agreement, dated as of December 31, 2020, by and among the Borrower, the Guarantors, the lenders party thereto and the Pre-Petition Term Loan Agent, as the same may be amended, amended and restated, restated, supplemented or otherwise modified from time to time prior to the Petition Date.

"**Pre-Petition Term Loan Agent**" shall mean Alter Domus (US) LLC, in its capacity as "Administrative Agent" under the Pre-Petition Term Credit Agreement and the other Pre-Petition Term Loan Documents, together with its successors and permitted assigns.

"**Pre-Petition Term Loan Documents**" shall mean the "Loan Documents" as defined in the Pre-Petition Term Credit Agreement.

"**Pre-Petition Term Loan Lenders**" shall mean the "Lenders" under and as defined in the Pre-Petition Term Credit Agreement.

"**Pre-Petition Term Loan Obligations**" shall mean all obligations of the Loan Parties, which are incurred or owing under the Term Loan Documents, including all obligations in respect of the payment of principal, interest, fees, prepayment premiums and indemnification obligations.

"**Pre-Petition Term Loans**" shall mean those term loans borrowed by the Borrower pursuant to the Pre-Petition Term Credit Agreement in the original aggregate principal amount of $25.0 million.

"**primary obligor**" shall have the meaning assigned to such term in the definition of "Guarantee."

"**Pro Rata**" shall mean with respect to any Lender, a percentage (rounded to the ninth decimal place) determined (a) while Commitments are outstanding, by dividing the amount of such Lender's Commitment by the aggregate amount of all Commitments; and (b) at any other time, by dividing the amount of such Lender's Loans by the aggregate amount of all outstanding Loans.

"**Proceeds**" shall mean all "proceeds" as such term is defined in Section 9-102(a)(64) of the UCC.

"**Prohibited Transaction**" shall have the meaning assigned to such term in Section 406 of ERISA and/or Section 4975(c) of the Code.

"**Property**" shall mean any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible (including cash, securities, accounts, contract rights and Equity Interests or other ownership interests of any Person), whether now in existence or owned or hereafter acquired.

"**PTE**" shall mean a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"**Qualified Capital Stock**" shall mean any Equity Interest of any Person that does not by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable or exercisable) or upon the happening of any event (a) provide for scheduled payments of dividends in cash (other than at the option of the issuer) prior to the date that is, at the time of issuance of such Equity Interest, ninety-one (91) days after the Maturity Date, (b) become mandatorily redeemable at the option of the holder thereof (other than for Qualified Capital Stock or pursuant to customary provisions relating to redemption upon a change of control or sale of assets) pursuant to a sinking fund obligation or otherwise prior to the date that is, at the time of issuance of such Equity Interest, ninety-one (91) days after the Maturity Date or (c) become convertible or exchangeable at the option of the holder thereof for Indebtedness or Equity Interests that are not Qualified Capital Stock; provided further, that if any such Equity Interest is issued pursuant to a plan for the benefit of the employees, directors, officers, managers or consultants of Holdings (or any Parent Entity thereof), the Borrower or its Subsidiaries or by any such plan to such Persons, such Equity Interest shall not be regarded as an Equity Interest not constituting Qualified Capital Stock solely because it may be required to be repurchased by Holdings (any Parent Entity), the Borrower or its Subsidiaries in order to satisfy applicable regulatory obligations.

"**Real Property**" shall have the meaning assigned to such term in **Section 3.07**.

"**Refinance**" shall have the meaning assigned to such term in the definition of the term "Refinancing" and "Refinanced" shall have meanings correlative thereto.

"**Register**" shall have the meaning assigned to such term in **Section 9.04(e)**.

"**Regulation D**" shall mean Regulation D of the Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

23

"**Regulation T**" shall mean Regulation T of the Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"**Regulation U**" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation X**" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Related Fund**" shall mean, with respect to any Lender, any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities and is administered, advised or managed by (i) such Lender, (ii) an Affiliate of such Lender or (iii) an entity or an Affiliate of an entity that administers, advises or manages such Lender.

"**Related Parties**" shall mean, with respect to any specified Person, such Person's Affiliates and the respective directors, trustees, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"**Release**" shall mean any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, emanating or migrating in, into, onto or through the environment.  "**Released**" shall have a meaning correlative thereto.

"**Remedies Notice Period**" has the meaning specified in the Interim Order (or Final Order, when applicable).

"**Reorganization**" shall mean, with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

"**Report**" shall have the meaning assigned to such term in **Section 8.02(b)**.

"**Reportable Event**" shall mean any reportable event as defined in Section 4043(c) of ERISA or the regulations issued thereunder with respect to a Plan (other than a Plan maintained by an ERISA Affiliate that is considered an ERISA Affiliate only pursuant to subsection (m) or (o) of Section 414 of the Code), other than those events as to which the thirty (30)-day notice period referred to in Section 4043(c) of ERISA has been waived.

"**Required Lenders**" shall mean, at any time, the Lenders holding more than 50% of the aggregate amount of Commitments and DIP New Money Loans outstanding at any time; provided, that, the Backstop Lender shall constitute Required Lenders until the aggregate amount of Commitments and DIP New Money Loans outstanding of the Backstop Lender is less than 10% of the aggregate amount of Commitments and DIP New Money Loans of all Lenders; provided, however, the Commitments and Loans of any Defaulting Lender shall be excluded from such calculation; provided, further, if the DIP New Money Loans have been repaid in full, Required Lenders shall be the Lenders holding more than 50% of the aggregate amount of Roll-Up Loans outstanding at any time.

"**Responsible Officer**" of any Person shall mean any executive officer or Financial Officer of such Person and any other officer or similar official thereof responsible for the administration of the obligations of such Person in respect of this Agreement.

"**Restricted Payment**" shall have the meaning assigned to such term in **Section 6.06**.

24

"**Revolving Obligations**" shall have the meaning assigned to such term in the Pre-Petition ABL Credit Agreement.

"**Roll-Up Loan**" shall mean a Pre-Petition Term Loan or payment obligation under a Pre-Petition FILO C Convertible Note that is forgiven and released in exchange for a DIP New Money Loan hereunder.  For each $1.61 million of DIP New Money Loans committed and funded by such Pre-Petition Term Loan Lender or Pre-Petition FILO C Noteholder, as applicable, on the Electing DIP Lender Funding Date, such lender shall forgive and release $1 million of Pre-Petition Term Loans or $1 million under the Pre-Petition FILO C Convertible Notes, as applicable, due and owing under the Pre-Petition Term Loan Agreement or Pre-Petition Convertible Note Purchase Agreement and receive $1 million of Roll-Up Loans automatically upon the entry of the Final Order in accordance with Section 2.01(b)(iii).  The maximum amount of Roll-Up Loans shall be (x) $24,474,000 with respect to the Pre-Petition Term Loans which is the total outstanding principal amount of Pre-Petition Term Loans due under the Pre-Petition Term Credit Agreement, plus interest thereon and (y) $[7,500,000] with respect to the Pre-Petition FILO C Convertible Notes, which is the total outstanding principal amount of Pre-Petition FILO C Convertible Notes due under the Pre-Petition Convertible Note Purchase Agreement, plus interest thereon.  The amount of interest on the Pre-Petition Term Loans and on the Pre-Petition FILO C Convertible Notes shall be provided to the Administrative Agent by the Lenders' financial advisors.

"**S&P**" shall mean Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business.

"**Sale Order**" shall mean an order approving the Stalking Horse Agreement (or such other agreement effecting a sale transaction (including pursuant to a successful bid at the Auction) that is in form and substance acceptable to the Required Lenders, authorizing the Borrower to consummate such sale transaction and containing any other provisions as may be required to be contained therein by the Stalking Horse Agreement or other such agreement effecting a sale transaction.

"**Sanctioned Country**" shall mean, at any time, a country, region or territory which is itself the subject or target of any Sanctions.

"**Sanctioned Person**" shall mean, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by OFAC, the U.S. Department of State, the or by the United Nations Security Council, (b) any Person operating, organized or resident in a Sanctioned Country, (c) any Person directly or indirectly owned or controlled (individually or in the aggregate) by any such Person or Persons described in the foregoing **clauses (a)** or **(b)**, or (d) any Person otherwise the subject, or target, of any Sanctions.

"**Sanctions**" means individually and collectively, respectively, any and all economic sanctions, trade sanctions, financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes anti-terrorism laws and other sanctions laws, regulations or embargoes, including those imposed, administered or enforced from time to time by:  (a) the United States of America, including those administered by OFAC, the U.S. Department of State, the U.S. Department of Commerce, or through any existing or future executive order, (b) the United Nations Security Council, (c) the European Union or any European Union member state, (d) Her Majesty's Treasury of the United Kingdom, or (e) any other Governmental Authority with jurisdiction over any Loan Party or any of their respective Subsidiaries or Affiliates.

"**SEC**" shall mean the Securities and Exchange Commission or any successor thereto.

"**Section 363 Sale**" shall mean a sale of all or substantially all of the assets and business of the Loan Parties conducted pursuant to Section 363 of the Bankruptcy Code.

"**Secured Obligations**" shall mean the Obligations.

"**Secured Parties**" shall mean (a) the Administrative Agent, (b) the Lenders, and (c) the successors and assigns of each of the foregoing.

"**Securities**" shall have the meaning assigned thereto in Article 8 of the UCC.

"**Securities Account**" shall have the meaning assigned thereto in Article 8 of the UCC.

"**Securities Act**" shall mean the Securities Act of 1933.

"**Security Documents**" shall mean, collectively, the Orders, this Agreement, the Mortgages and any other agreements, instruments and documents executed by any Loan Party in connection with this Agreement that are intended to create, perfect or evidence Liens to secure the Secured Obligations, including, without limitation, all other security agreements, pledge agreements, debentures, share charges, loan agreements, notes, pledges, powers of attorney, assignments, notices, and any financing statements whether theretofore, now or hereafter executed by any Loan Party and delivered to the Administrative Agent in connection with this Agreement.

"**Specified Store Closing Sales**" means the store locations of Loan Party listed on **Schedule 1.01** provided to the Administrative Agent and Lenders prior to the Petition Date, or any other store location selected by mutual agreement of Borrower and the Required Lenders.

"**Stalking Horse Agreement**" shall mean an asset purchase agreement acceptable to the Required Lenders, between the Borrower and a stalking horse purchaser, together with all documents and schedules related thereto.

"**Stock Rights**" shall mean all dividends, instruments or other distributions and any other right or property which the Loan Parties shall receive or shall become entitled to receive for any reason whatsoever with respect to, in substitution for or in exchange for any Equity Interest constituting Collateral, any right to receive an Equity Interest and any right to receive earnings, in which the Loan Parties now have or hereafter acquire any right, issued by an issuer of such Equity Interest.

"**subsidiary**" shall mean, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, by the parent and/or one or more subsidiaries of the parent.

"**Subsidiary**" shall mean any direct or indirect subsidiary of the Borrower or a Loan Party, as applicable.

"**Subsidiary Guarantor**" shall mean each Loan Party other than Holdings. Notwithstanding anything to the contrary in this Agreement or in any other Loan Document, in no event shall Tuesday Morning Cares, a Texas not-for profit entity, be or be required to become a Subsidiary Guarantor.

"**Supporting Obligations**" shall have the meaning set forth in Article 9 of the UCC.

"**Taxes**" shall mean any and all present or future taxes, levies, imposts, duties (including stamp duties), deductions, charges (including ad valorem charges), assessments, fees or withholdings imposed by any Governmental Authority and any and all interest and penalties related thereto.

"**Term DIP Portion**" has the meaning specified in **Section 2.02(b)**.

"**Term Loan Priority Collateral**" shall have the meaning assigned to such term in the ABL / Term Subordination Agreement.

"**Termination Date**" shall mean the earliest of (a) Maturity Date, (b) the date of consummation of a sale of all or substantially all of the Loan Parties' assets under Section 363 or a plan under Section 1129 of the Bankruptcy Code, (c) the effective date of a Plan of Reorganization, (d) the date on which the Obligations become due and payable pursuant to this Agreement, whether by acceleration or otherwise, and (e) the date which the Administrative Agent delivers written notice to the Borrower of its election (acting at the direction of the Required Lenders), on account of the occurrence of an Event of Default, to accelerate all Obligations hereunder.

"**Trademarks**" shall mean, with respect to any Person, all of such Person's right, title, and interest in and to the following:  (a) all trademarks (including service marks), trade names, trade dress, and trade styles and the registrations and applications for registration thereof and the goodwill of the business symbolized by the foregoing; (b) all licenses of the foregoing, whether as licensee or licensor; (c) all renewals of the foregoing; (d) all income, royalties, damages, and payments now or hereafter due or payable with respect thereto, including, without limitation, damages, claims, and payments for past and future infringements thereof; (e) all rights to sue for past, present, and future infringements of the foregoing, including the right to settle suits involving claims and demands for royalties owing; and (f) all rights corresponding to any of the foregoing throughout the world.

"**Transaction Costs**" shall mean fees and expenses payable or otherwise borne by Holdings, any other Parent Entity, the Borrower and its Subsidiaries in connection with the Transactions occurring on or about the Closing Date.

"**Transactions**" shall mean, collectively, the transactions to occur pursuant to the Loan Documents, including the execution and delivery of the Loan Documents and the initial borrowings hereunder.

"**UCC**" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York or in any other state the laws of which are required to be applied in connection with the issue of perfection of security interests.

"**U.S. Person**" shall mean any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"**U.S. Tax Compliance Certificate**" shall have the meaning assigned to such term in **Section 2.11(e)(i)(B)(3)**.

"**U.S. Trustee**" shall mean the United States Trustee applicable in the Chapter 11 Cases.

"**USA PATRIOT Act**" shall mean The Uniting and Strengthening America by Providing Adequate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107 56 (signed into law October 26, 2001)).

"**Weighted Average Life to Maturity**" shall mean, when applied to any Indebtedness at any date,

27

the number of years obtained by dividing:  (a) the sum of the product obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including a payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth that will elapse between such date and the making of such payment); by (b) the outstanding principal amount of such Indebtedness.

"**Withdrawal Liability**" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"**Write-Down and Conversion Powers**" shall mean, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02    Terms Generally.

(a)The definitions set forth or referred to in **Section 1.01** shall apply equally to both the singular and plural forms of the terms defined.  The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."   All references herein to Articles, Sections, Exhibits and Schedules shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, the Loan Documents in which the reference appears unless the context shall otherwise require.

(b)Except as otherwise expressly provided herein, any reference in this Agreement to any Loan Document or other document, agreement or instrument (including any by-laws, limited partnership agreement, limited liability company agreement, articles of incorporation, certificate of limited partnership or certificate of formation, as the case may be) shall mean such Loan Document, agreement or instrument as amended, restated, amended and restated, supplemented, otherwise modified, replaced, renewed, extended or refinanced from time to time and any reference in this Agreement to any Person shall include a reference to such Person's permitted assigns and successors-in-interest.

(c)Unless otherwise defined herein, the following terms are used herein as defined in the UCC (and if defined in more than one Article of the UCC, such terms shall have the meanings given in Article 9 thereof):   Account Debtor, Certificated Security, Chattel Paper, Commodity Account, Documents, Deposit Account, Electronic Chattel Paper, Equipment, Farm Products, General Intangibles, Goods, Instruments, Inventory, Letter of Credit, Letter-of-Credit Rights, Money, Payment Intangibles, Securities Account, Security, Supporting Obligations and Tangible Chattel Paper.

Section 1.03    Accounting Terms.

(a)Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; underlined provided that, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such

purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith; provided further that if an amendment is requested by the Borrower or the Required Lenders, then the Borrower, the Required Lenders and the Administrative Agent shall negotiate in good faith to enter into an amendment of such affected provisions (without the payment of any amendment or similar fees to the Lenders) to preserve the original intent thereof in light of such change in GAAP or the application thereof subject to the approval of the Required Lenders (not to be unreasonably withheld, conditioned or delayed); provided further that all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made without giving effect to (i) any election under Accounting Standards Codification 825-10-25 (previously referred to as Statement of Financial Accounting Standards 159) (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Borrower or any Subsidiary at "fair value," as defined therein and (ii) any treatment of Indebtedness in respect of convertible debt instruments under Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof.

(b) Notwithstanding anything to the contrary contained in **paragraph (a)** above or the definition of Capital Lease Obligations, in the event of an accounting change requiring all leases to be capitalized, only those leases (assuming for purposes hereof that they were in existence on the date hereof) that would constitute Capital Lease Obligations on the date hereof shall be considered Capital Lease Obligations and all calculations and deliverables under this Agreement or any other Loan Document shall be made in accordance therewith (provided that all financial statements delivered to the Administrative Agent in accordance with the terms of this Agreement after the date of such accounting change shall contain a schedule showing the adjustments necessary to reconcile such financial statements with GAAP as in effect immediately prior to such accounting change).

(c) It is understood that Holdings and its Subsidiaries have and will continue to utilize a 5-4-4 reporting period method of accounting with a fiscal year ending on the Saturday closest to June 30th of each calendar year. The fiscal year of Holdings and its Subsidiaries is divided into four quarters of 13 weeks, each beginning on a Sunday and containing one five-week "month" followed by two 4-week "months." An additional week is included in the fourth fiscal quarter approximately every five years to realign fiscal quarters with calendar quarters. Each fiscal quarter and fiscal year of Holdings ending after the Closing Date shall commence and end as set forth on Schedule 1.03.

Section 1.04    Rounding.  Except as otherwise expressly provided herein, any financial ratios required to be maintained by the Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one (1) place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding up if there is no nearest number).

Section 1.05    Timing of Payment or Performance.  When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment or performance shall extend to the immediately succeeding Business Day and such extension of time shall be reflected in computing interest or fees, as the case may be.

Section 1.06    Reserved.

29

Section 1.07    <u>References to Laws</u>.  Unless otherwise expressly provided herein, references to any law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such law.

ARTICLE II

The Commitments and Borrowings

Section 2.01    <u>The Loans</u>.

(a) Each Lender agrees, severally on a Pro Rata basis, up to its Commitment, subject to the terms set forth herein and in the Orders, to make, on the applicable borrowing date, Loans to the Borrower in an amount not to exceed such Lender's Commitment.

(b) The Borrower may make only five Borrowings under the Commitment that shall consist of:

(i) in the case of the Loans made on and after the entry of the Interim Order the Borrower may make one Borrowing on the Closing Date which shall be in the aggregate principal amount not to exceed $25,000,000 (the "**Closing Date Term Loans**").  Further, effective upon the occurrence of the Closing Date, without any further action by any parties to this Agreement, the Bankruptcy Court or any other Person, the Bridge Loans shall be repaid by the Closing Date Term Loans hereunder including the outstanding principal balance of and interest and fees accrued under the Bridge Loan and all other amounts in respect thereof owing to the lender thereunder.  For avoidance of doubt, an amount equal to the Bridge Loans shall be netted out of the amount received by the Borrower.

(ii) following entry of the Final Order, the Borrower may make up to three Borrowings in an aggregate principal amount of up to $16,500,000 (the "**Incremental Final Loans**").

(iii) following entry of the Final Order and no earlier than April 1, 2023, the Borrower may make one Borrowing in an aggregate principal amount of up to $10,000,000 (the "**Delay Draw Loans**" and together with the Incremental Final Loans, the "**Final Loans**").

(iv) Upon entry of the Final Order, without any further action by any parties to this Agreement, the Bankruptcy Court or any other Person, the Pre-Petition Term Loans and Pre-Petition FILO C Convertible Notes owing to each Electing Lender as of the Final Order shall be refinanced into and constitute Roll-Up Loans hereunder and the outstanding principal balance of and interest and fees accrued under the Roll-Up Loan and all other amounts in respect thereof owing to such Electing Lender shall constitute Obligations hereunder.  The Borrower in consultation with the Lenders' advisors shall provide an updated Schedule 2.01 to the Administrative Agent upon the entry of the Final Order with respect to the Roll-Up Loans.

(v) Each Loan that is made shall automatically and permanently reduce the aggregate Commitments and the Commitment of each Lender.  Amounts borrowed under this <u>Section 2.01</u> and subsequently repaid or prepaid may not be reborrowed.  The maximum amount of Loans the Lenders are committed to advance to the Borrower at any time shall be subject to and limited by the terms of the Orders and the Approved Budget.

Section 2.02    <u>Loans and Borrowings</u>.

(a)All Loans shall be made by the Lenders ratably in accordance with their respective

Commitments. The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder.

(b)The parties hereto hereby acknowledge and agree that (i) each Pre-Petition Term Lender (in such capacity, an "**Electing Term Lender**") may participate with the other Electing Term Lenders to provide its *pro rata* portion of 70% of the Commitments (the "**Term DIP Portion**"), and (ii) each Pre-Petition FILO C Noteholder (in such capacity, an "**Electing Noteholder**" and together with the Electing Term Lenders, the "**Electing Lenders**") may participate with the other Electing Noteholders to provide its *pro rata* portion of 30% of the Commitments (the "**Note DIP Portion**") in each case, by notifying Seaport Global Securities, LLC (Daniel Vellon; DVellon@seaportglobal.com) and the Administrative Agent in writing (which may be by electronic mail) at the address for the Administrative Agent set forth in Section 9.01(a)(ii) no later than the Election Deadline, and provide such documents (including, without limitation, an Administrative Questionnaire, tax documentation and a signature page to an Assignment and Acceptance) as the Administrative Agent may require. Such participation shall be on a pro rata basis in accordance with (x) for Electing Term Lenders, the proportion of (1) the obligations under the Pre-Petition Term Credit Agreement owed to each such Pre-Petition Term Lender to (2) the obligations owed to all Pre-Petition Term Lenders under the Pre-Petition Term Credit Agreement on the Petition Date and (y) for Electing Noteholders, the proportion of (1) the obligations under the Pre-Petition Convertible Note Purchase Agreement owed to each such Pre-Petition FILO C Noteholder to (2) the obligations owed to all Pre-Petition FILO C Noteholders under the Pre-Petition Convertible Note Purchase Agreement on the Petition Date. Each such Electing Lender shall become a Lender upon the funding by such Electing Lender immediately following the Election Deadline (the "**Electing DIP Lender Funding Date**") and the provision by such Electing Lender of a Commitment, of its applicable amount, upon which **Schedule 2.01** shall be revised with the consent of the Borrower (not to be unreasonably withheld or delayed) to reflect the Commitments of the Electing Lenders. The Administrative Agent shall have no obligation to verify the accuracy of the allocation of Loans and/or Commitments to the Electing Lenders and may conclusively rely on the information provided to it by the Borrower or the Lenders' advisors.

Section 2.03    Requests for Borrowings and Notices.

(a)To request a Borrowing of Loans, the Borrower shall notify the Administrative Agent of such request by telephone (a) in the case of a Borrowing of Incremental Final Loans or Delay Draw Loans, not later than 12:00 p.m., Local Time, two (2) Business Days before the date of the proposed Borrowing or (b) in the case of a Borrowing of the Closing Date Term Loan, not later than 12:00 p.m., Local Time, on the date prior to the proposed Borrowing. Such telephonic Borrowing Request shall be irrevocable and shall be confirmed promptly by hand delivery, fax or other electronic transmission (including by ".pdf" or ".tif") to the Administrative Agent of a written Borrowing Request in a form approved by the Administrative Agent and signed by the Borrower. Such telephonic and written Borrowing Request shall specify the following information in compliance with **Section 2.02**:

(i)the aggregate amount of the requested Borrowing;

(ii)the date of such Borrowing, which shall be a Business Day.

(iii)the location and number of the Borrower's account to which funds are to be disbursed, which shall be the Operating Account and as otherwise set forth on the funds flow memorandum provided as of the Closing Date.

(b)Promptly following receipt of a Borrowing Request in accordance with this

31

Section, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

Section 2.04    [Reserved]

Section 2.05    Funding of Borrowings.

(a)Each Lender shall make a Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 1:00 p.m., Local Time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders. The Administrative Agent will make the proceeds of such Loans available to the Borrower by promptly transferring the amounts so received, in like funds, to the Operating Account or as otherwise set forth on the funds flow memorandum provided as of the Closing Date.

(b)Unless the Administrative Agent shall have received notice from a Lender prior to the date of the Borrowing Request that such Lender will not make available to the Administrative Agent such Lender's share of the Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with **paragraph (a)** of this Section and may, in reliance upon such assumption (but without any obligation), make available to the Borrower a corresponding amount.  In such event, if a Lender has not in fact made its share of the Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower agrees to pay to the Administrative Agent (provided, that any such payment by the Borrower to the Administrative Agent is without prejudice to any claim the Borrower may have against such applicable Lender) forthwith on demand (without duplication) such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the NYFRB Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of the Borrower, the prevailing interest rate under this Agreement.  If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.

Section 2.06    [Reserved].

Section 2.07    Repayment of Loans.

(a)The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, subject to prior written notice not later than 2:00 p.m. (Local time) two Business Days before the date of such prepayment (subject to the Exit Fee as set forth in **Section 2.09(d)**). Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of the Loans to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment.

(b) Loans shall be due and payable in full on the Maturity Date, unless payment is sooner required hereunder.

(c) (i) The Borrower shall prepay the Loans as hereafter provided in an aggregate amount equal to 100% of the Net Proceeds of all Dispositions (other than Dispositions expressly permitted under this Agreement) and Casualty Events unless consented to by Required Lenders. Any prepayment pursuant to this clause (i) shall be applied as set forth in clause (f) below.

(ii) Immediately upon receipt by any Loan Party or any Subsidiary of the Net Proceeds of any issuance or incurrence of Indebtedness (other than Indebtedness permitted under Section 6.01), the Borrower shall prepay the Loans as hereafter provided in an aggregate amount equal to 100% of such Net Proceeds (such prepayment to be applied as set forth in clause (f) below).

(iii) Immediately upon receipt by any Loan Party or any Subsidiary of the Net Proceeds of any issuance of equity, the Borrower shall prepay the Loans as hereafter provided in an aggregate amount equal to 100% of such Net Proceeds (such prepayment to be applied as set forth in clause (f) below).

(iv) Immediately upon the receipt by any Loan Party or any Subsidiary of the Net Proceeds of any Extraordinary Receipts, the Borrower shall prepay the Loans in an aggregate amount equal to 100% of such Net Cash Proceeds (such prepayment shall be applied as set forth in clause (f) below).

(v) If on any Monday (commencing with the second Monday after the Closing Date) (the "**Prepayment Notice Date**") there shall have been cash and cash equivalents in excess of $5,000,000 ("**Designated Amount**") on the Friday preceding such Prepayment Notice Date, then Borrower shall, provide notice of such prepayment and two Business Days following such Prepayment Notice Date prepay the Loans in an aggregate amount equal to such excess (such prepayment shall be applied as set forth in clause (f) below); provided that, each Lender in its sole discretion may elect to forgo prepayment on its Loans in its pro rata portion of the Designated Amount by notice to the Borrower and the Administrative Agent in writing within one Business Day of the Prepayment Notice Date; provided further, if (x) the Required Lenders have determined to credit bid in connection with an asset sale by March 31, 2023 and (y) the Borrower has selected a third party, other than any combination of the Lenders, as the stalking horse bidder, then at the Required Lenders sole discretion the Designated Amount may be reduced to $2,500,000.

(d) The Commitments shall terminate on the Maturity Date, unless sooner terminated in accordance with this Agreement.

(e) [reserved].

(f) Each prepayment of Borrowings pursuant to this Section 2.07 shall be applied as set forth in Section 2.12. Prepayments pursuant to this Section 2.07(f) shall be accompanied by accrued and unpaid interest.

(g) Prepayments permitted or required under Section 2.07(c) shall be without premium or penalty (other than the Exit Fee as set forth in **Section 2.09(d)**).

Section 2.08   Evidence of Debt.

(a) Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(b) The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(c)The entries made in the accounts maintained pursuant to paragraph (d) of this Section shall be, absent manifest error, prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement; and, provided, further that in the event of any inconsistency between the Register and any Lender's records, the recordations in the Register shall govern.

(d)Any Lender may request that Loans made by it be evidenced by a promissory note. In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns). Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 9.04) be represented by one or more promissory notes in such form.

Section 2.09    Fees. In consideration of the agreements contained in this Agreement, Borrower hereby agrees to pay to Administrative Agent the following nonrefundable fees:

(a)Administrative Agent Fee. The Borrower agrees to pay to the Administrative Agent for its own account, fees payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent set forth in the Fee Letter.

(b)Backstop Premium.  An amount equal to seven percent (7%) of the aggregate Commitment, which premium shall be due and payable in full on the Closing Date and shall be payable from the initial funding of the Loans under this Agreement, which shall be treated as a premium paid by the Borrower to the Backstop Lenders in exchange for the issuance of a put right to the Borrower with respect to the Loans for U.S. federal income tax purposes, and the Borrower agrees not to take any tax position inconsistent therewith.

(c)Commitment Premium.  An amount equal to three percent (3%) of any DIP New Money Loan, which premium shall be due and payable in full on the date of the advance of such DIP New Money Loan and shall be payable from the funding of such Loans under this Agreement and the Electing Term Lenders that fund on the Electing DIP Term Lender Funding Date shall be entitled to the benefit of the Commitment Premium on the Closing Date Term Loans, which shall be treated as original discount for U.S. federal income tax purposes, and the Borrower agrees not to take any tax position inconsistent therewith.

(d)Exit Fee.  An amount equal to five percent (5%) of the Commitment (the "**Exit Fee**") shall be due and payable on the Maturity Date; provided that upon each repayment of any Loans such Loans will be accompanied by an amount equal to 5% of such Loans ("**Proportional Exit Fee**") and the Exit Fee at Maturity shall be less any Proportional Exit Fee paid prior to the Maturity Date; provided that, notwithstanding the foregoing, no Exit Fee shall be due or payable if payment in full of all of the Loans occurs on or prior to the date that is sixty (60) days following the Closing Date, which shall be treated as original discount for U.S. federal income tax purposes, and the Borrower agrees not to take any tax position inconsistent therewith.

(e)Generally.  All such fees shall be paid on the dates due, in immediately available Dollars. Once paid, none of these fees shall be refundable under any circumstances.

Section 2.10    Interest.

34

(a) The DIP New Money Loans shall bear interest at 12.75% per annum.

(b) The Roll-Up Loans shall bear interest at 10.00% per annum.

(c) Notwithstanding the foregoing, if any principal of or interest on any Loan or any Fees or other amount payable by the Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise or if any Event of Default has occurred and is continuing, all overdue amounts shall automatically bear interest, after as well as before judgment, at a rate per annum equal to 5.00% plus the rate otherwise applicable to such Loan.

(d) Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan and on the Maturity Date; provided that interest accrued pursuant to **paragraph (b)** of this Section shall be payable on demand.

(e) All interest hereunder shall be computed on the basis of a year of three hundred sixty (360) days, and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

Section 2.11    Taxes.

(a) Any and all payments by or on account of any obligation of any Loan Party hereunder shall be made free and clear of and without deduction or withholding for any Indemnified Taxes or Other Taxes; provided that if a Loan Party or other applicable withholding agent shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable by any Loan Party shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Administrative Agent or any Lender, as applicable, receives an amount equal to the sum it would have received had no such deductions been made, (ii) the applicable withholding agent shall make such deductions and (iii) the applicable withholding agent shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with Applicable Law.

(b) In addition, the Loan Parties shall timely pay to the relevant Governmental Authority in accordance with Applicable Law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c) Each Loan Party shall indemnify the Administrative Agent, each Lender, within ten (10) days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent or such Lender, as applicable, on or with respect to any payment by or on account of any obligation of such Loan Party hereunder (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto.  A certificate as to the amount of such payment or liability, prepared in good faith and delivered to such Loan Party by a Lender or by the Administrative Agent on its own behalf, on behalf of another Agent or on behalf of a Lender, shall be conclusive absent manifest error.

(d) As soon as practicable after any payment of Indemnified Taxes or Other Taxes by a Loan Party to a Governmental Authority, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent and the affected Lenders.

35

(e)Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two (2) sentences, the completion, execution and submission of such documentation (other than such documentation set forth in **Section 2.11(e)(ii)(A)**, **(ii)(B)** and **(ii)(D)** below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person,

(A)      any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)      any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)      in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. Federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)      executed copies of IRS Form W-8ECI;

(3)      in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit G-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code (a "**U.S. Tax Compliance Certificate**") and (y) executed copies of IRS Form W-8BEN or W-8BEN-E; or

(4)      to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or W-

36

8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-2 or Exhibit G-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one (1) or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-4 on behalf of each such direct and indirect partner;

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by Applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by Applicable Law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)    if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this **clause (D)**, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(f)If the Administrative Agent or a Lender determines, in its sole discretion exercised in good faith, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by a Loan Party or with respect to which such Loan Party has paid additional amounts pursuant to this **Section 2.11**, it shall pay over such refund to such Loan Party (but only to the extent of indemnity payments made, or additional amounts paid, by such Loan Party under this **Section 2.11** with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender (including any Taxes imposed with respect to such refund) as is determined by the Administrative Agent or Lender and in its sole discretion, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that such Loan Party, upon the request of the Administrative Agent or such Lender, agrees to repay as soon as reasonably practicable the amount paid over to such Loan Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this **paragraph (f)**, in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this **paragraph (f)** the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect

37

to such Tax had never been paid. This **Section 2.11(f)** shall not be construed to require the Administrative Agent or any Lender to make available its Tax returns (or any other information relating to its Taxes which it deems confidential) to the Loan Parties or any other Person.

(g)Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for (i) any Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Taxes and without limiting the obligation of the Loan Parties to do so) and (ii) any Taxes attributable to such Lender's failure to comply with the provisions of **Section 9.04(c)** relating to the maintenance of a Participant Register, in either case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this **paragraph (g)**.

Section 2.12    Payments Generally; Pro Rata Treatment; Sharing of Set-offs.

(a)Unless otherwise specified, the Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees, or of amounts payable under **Section 2.11**, or otherwise) prior to 2:00 p.m., Local Time, on the date when due, in immediately available funds, without condition or deduction for any defense, recoupment, set-off or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent to the applicable account designated to the Borrower by the Administrative Agent. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. All payments hereunder shall be made in Dollars. Any payment required to be made by the Administrative Agent hereunder shall be deemed to have been made by the time required if the Administrative Agent shall, at or before such time, have taken the necessary steps to make such payment in accordance with the regulations or operating procedures of the clearing or settlement system used by the Administrative Agent to make such payment.

(b)Any proceeds of Collateral received by the Administrative Agent not constituting either a specific payment of principal, interest, fees or other sum payable under the Loan Documents shall be applied ratably:

(i)first, to pay any fees, indemnities, or expense reimbursements including amounts then due to the Administrative Agent from the Borrower,

(ii)second, to pay any fees or expense reimbursements then due to the Lenders from the Borrower,

(iii)third, to pay interest due in respect of Closing Date Term Loans (if any);

(iv)fourth, to pay the principal of Closing Date Term Loans (if any);

(v)fifth, to pay interest due in respect of Final Loans;

(vi)sixth, to pay the principal of Final Loans;

(vii)seventh, to pay interest due in respect of Roll-Up Loans;

(viii)eighth, to pay the principal of Roll-Up Loans.

(c)[reserved].

(d)If (other than (x) any payment obtained by a Lender as consideration for the assignment or sale of a participation in any of its Loans to any assignee or participant, including any assignee or participation that is a Loan Party or any of its Affiliates or (y) as otherwise expressly provided elsewhere herein, including, without limitation, as provided in or contemplated by **Section 9.04(f)**) any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this **paragraph (d)** shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement.  The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under Applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(e)Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption (but without any obligation), distribute to the Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it but excluding the date of payment to the Administrative Agent, at the greater of the NYFRB Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(f)If any Lender shall fail to make any payment required to be made by it pursuant to **Section 2.04(b)**, **Section 2.05(b)** or **Section 2.12(e)**, then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 2.13    Mitigation Obligations; Replacement of Lenders.

(a)If the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to **Section 2.11**, then such Lender

shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to **Section 2.11**, as applicable, in the future and (ii) would not subject such Lender to any material unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender in any material respect.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)If the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to **Section 2.11**, or if any Lender is a Defaulting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, (i) terminate the Commitments of such Lender and repay all Obligations of the Borrower owing to such Lender relating to the Loans and participations held by such Lender as of such termination date or (ii) require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in **Section 9.04**), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that (i) the Borrower shall have received the prior written consent of the Administrative Agent (at the direction of the Required Lenders), which consent shall not unreasonably be withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts), (iii) in the case of any such assignment or payments required to be made pursuant to **Section 2.11**, such assignment will result in a reduction in such compensation or payments, (iv) [reserved], (v) such assignment shall otherwise comply with **Section 9.04** (provided that the Borrower shall be obligated to pay the registration and processing fee referred to therein) and (vi) until such time as such Commitments are terminated, obligations are repaid or such assignment is consummated, the Borrower shall pay all additional amounts (if any) required pursuant to **Section 2.11**.  Nothing in this **Section 2.13** shall be deemed to prejudice any rights that the Borrower, the Administrative Agent or any Lender may have against any replaced Lender.  Each Lender hereby grants to the Administrative Agent an irrevocable power of attorney (which power is coupled with an interest) to execute and deliver, on behalf of such Lender as assignor, any Assignment and Acceptance necessary to effectuate any assignment of such Lender's interests hereunder in the circumstances contemplated by this **Section 2.13(b)**.

(c)If any Lender (such Lender, a "**Non-Consenting Lender**") has failed to consent to a proposed amendment, waiver, discharge or termination which pursuant to the terms of **Section 9.08** requires the consent of all of the Lenders or all of the Lenders affected and with respect to which the Required Lenders shall have granted their consent, then the Borrower shall have the right (unless such Non-Consenting Lender grants such consent) to replace such Non-Consenting Lender by (i) terminating the Commitments of such Lender and repaying all obligations of the Borrower owing to such Lender relating to the Loans and participations held by such Lender as of such termination date or (ii) requiring such Non-Consenting Lender to assign (in accordance with and subject to the restrictions contained in **Section 9.04**) all or the affected portion of its Loans and its Commitments hereunder to one (1) or more assignees, provided that:  (a) all Obligations of the Borrower owing to such Non-Consenting Lender being replaced shall be paid in full to such Non-Consenting Lender concurrently with such assignment, (b) the replacement Lender shall purchase the foregoing by paying to such Non-Consenting Lender a price equal to the principal amount thereof plus accrued and unpaid interest thereon, (c) [reserved], (d) such assignment shall otherwise comply with **Section 9.04**

(<u>provided</u> that the Borrower shall be obligated to pay the registration and processing fee referred to therein) and (e) the replacement Lender shall grant its consent with respect to the applicable proposed amendment, waiver, discharge or termination.  Each Lender hereby grants to the Administrative Agent an irrevocable power of attorney (which power is coupled with an interest) to execute and deliver, on behalf of such Lender as assignor, any Assignment and Acceptance necessary to effectuate any assignment of such Lender's interests hereunder in the circumstances contemplated by this **Section 2.13(c)**.

Section 2.14    [Reserved].

Section 2.15    <u>Defaulting Lenders</u>.

(a)<u>Reallocation of Pro Rata Share; Amendments</u>.  For purposes of determining the Lenders' obligations to fund or acquire participations in Loans, the Administrative Agent may exclude the Commitments and Loans of any Defaulting Lender(s) from the calculation of Pro Rata shares and any Commitments of any such Defaulting Lender shall automatically be reallocated among the non-Defaulting Lenders Pro Rata in accordance with their Commitments up to an amount such that the Commitment of each non-Defaulting Lender does not exceed its Commitments, so long as the conditions set forth in **Section 4.02** are satisfied at the time of such reallocation.  A Defaulting Lender shall have no right to vote on any amendment, waiver or other modification of a Loan Document, except as provided in **Section 9.08**.

(b)<u>Payments; Fees</u>.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of a Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to **Article VII** or otherwise, and including any amounts made available to the Administrative Agent by that Defaulting Lender pursuant to **Section 9.06**), shall be applied at such time or times as may be determined by the Administrative Agent as follows:  *first*, to the payment of any amounts owing by that Defaulting Lender to the Administrative Agent hereunder; *second*, [reserved]; *third*, [reserved]; *fourth*, to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *fifth*, if so determined by the Administrative Agent or the Borrower, to be held in a deposit account and released in order to satisfy obligations of that Defaulting Lender to fund Loans under this Agreement; *sixth*, to the payment of any amounts owing to the Lenders, as a result of any judgment of a court of competent jurisdiction obtained by any Lender, against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; *seventh*, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and *eighth*, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto.  A Lender shall not be entitled to receive any fees accruing hereunder during the period in which it is a Defaulting Lender.

(c)<u>Cure</u>.  The Borrower and the Administrative Agent may agree in writing that a Lender is no longer a Defaulting Lender.  At such time, Pro Rata shares shall be reallocated without exclusion of such Lender's Commitments and Loans, and all outstanding Loans and other exposures under the Commitments shall be reallocated among the Lenders and settled by the Administrative Agent (with appropriate payments by the reinstated Lender) in accordance with the readjusted Pro Rata shares.  Unless expressly agreed in writing by the Borrower and the Administrative Agent (each of which shall make such determination, in its sole discretion), no reinstatement of a Defaulting Lender

41

shall constitute a waiver or release of claims against such Lender.  The failure of any Lender to fund a Loan or otherwise to perform its obligations hereunder shall not relieve any other Lender of its obligations, and no Lender shall be responsible for default by another Lender.   No reallocation hereunder shall constitute a wavier or release of any claim of any party hereunder against a Defaulting Lender arising from that Lender having become a Defaulting Lender, including any claim of a non-Defaulting Lender as a result of such non-Defaulting Lender's increased exposure following such reallocation.

ARTICLE III

Representations and Warranties

Each of Holdings (solely to the extent applicable to it) and each other Loan Party represents and warrants to the Administrative Agent and each of the Lenders that:

Section 3.01     Organization; Powers.  Subject to any restriction arising on account of each Loan Party's status as a "debtor" under the Bankruptcy Code and any required approvals of the Court, each of Holdings, the Borrower and each of the Subsidiaries (a) is a limited partnership, limited liability company or corporation duly organized, validly existing and in good standing (or, if applicable in a foreign jurisdiction, enjoys the equivalent status under the laws of any jurisdiction of organization outside the United States) under the laws of the jurisdiction of its organization, (b) has all requisite power and authority to own its property and assets and to carry on its business as now conducted, (c) is qualified to do business and in good standing in each jurisdiction where such qualification is required; except in each case referred to in this **Section 3.01** (other than in **clause (a)** and **clause (b)**, respectively, with respect to the Borrower), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

Section 3.02     Authorization.  Subject to the entry of the Order, the execution, delivery and performance by Holdings, the Borrower and each of the Subsidiary Guarantors of each of the Loan Documents to which it is a party, and the borrowings hereunder, the transactions forming a part of the Transactions and the payment of the Transaction Costs (a) have been duly authorized by all corporate, stockholder, limited partnership or limited liability company action required to be obtained by Holdings, the Borrower and such Subsidiary Guarantors and (b) other than violations arising as a result of the commencement of, or otherwise related to, Chapter 11 Cases or where enforcement is stayed as upon commencement of the Chapter 11 Cases or as otherwise excused by the Court, will not (i) violate (A) any provision of (x) law, statute, rule or regulation applicable to such party, or (y) of the certificate or articles of incorporation or other constitutive documents or by-laws of Holdings, the Borrower or any such Subsidiary Guarantor, (B) any applicable order of any court or any rule, regulation or order of any Governmental Authority or (C) any provision of any indenture, certificate of designation for preferred stock, agreement or other instrument to which Holdings, the Borrower or any such Subsidiary Guarantor is a party or by which any of them or any of their property is or may be bound, (ii) be in conflict with, result in a breach of or constitute (alone or with notice or lapse of time or both) a default under, give rise to a right of or result in any cancellation or acceleration of any right or obligation (including any payment) or to a loss of a material benefit under any such indenture, certificate of designation for preferred stock, agreement or other instrument, where any such conflict, violation, breach or default referred to in **clause (b)(i)(A)(x)**, **(b)(i)(B)**, **(b)(i)(C)** or **(b)(ii)** of this **Section 3.02**, could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, or (iii) result in the creation or imposition of any Lien upon or with respect to any property or assets now owned or hereafter acquired by Holdings, the Borrower or any such Subsidiary Guarantor, other than the Liens created by the Loan Documents and Liens permitted by **Section 6.02** hereof.

Section 3.03     Enforceability.  Subject to the entry of the Order, this Agreement has been duly

42

executed and delivered by Holdings and the Borrower and constitutes, and each other Loan Document when executed and delivered by each Loan Party that is party thereto will constitute, a legal, valid and binding obligation of such Loan Party enforceable against each such Loan Party in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance or other similar laws affecting creditors' rights generally, (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) and (iii) implied covenants of good faith and fair dealing.

Section 3.04    <u>Governmental Approvals</u>.    Other than violations arising as a result of the commencement of, or otherwise related to, the Chapter 11 Cases or where enforcement is stayed as upon commencement of the Chapter 11 Cases or as otherwise excused by the Court, no action, consent or approval of, registration or filing with or any other action by any Governmental Authority is or will be required in connection with the Transactions and the payment of the Transaction Costs, except for (a) the filing of Uniform Commercial Code financing statements, (b) filings with the United States Patent and Trademark Office and the United States Copyright Office and comparable offices in foreign jurisdictions and equivalent filings in foreign jurisdictions, (c) recordation of the Mortgages, (d) such as have been made or obtained and are in full force and effect and (e) such actions, consents, approvals, registrations or filings the failure to be obtained or made which could not reasonably be expected to have a Material Adverse Effect.

Section 3.05    <u>Financial Condition</u>.

(a)All financial statements of the Loan Parties that have been or may hereafter be delivered by any Loan Party to the Administrative Agent and/or the Lenders present fairly, in all material respects, the consolidated financial condition and results of operations and cash flows of the Borrower and its Subsidiaries as of the date(s) and for the period(s) thereof in accordance with GAAP.

(b)No Loan Party or any Subsidiary has on the date hereof any material Debt or any material contingent liabilities, off-balance sheet liabilities or liabilities for Taxes, except as referred to or reflected or provided for in the Approved Budget, the "first day" orders or the financial statements of the Loan Parties or their Subsidiaries previously delivered to the Lenders.

Section 3.06    <u>No Material Adverse Effect</u>.    Since the Petition Date, no event, development, circumstance or change has occurred that has or would reasonably be expected to have a Material Adverse Effect.

Section 3.07    <u>Properties</u>.

(a)As of the date of this Agreement, **<u>Schedule 3.07(a)</u>** sets forth the address of each parcel of real property that is owned by any Loan Party and each material parcel of real property that is leased by any Loan Party (collectively, the "**<u>Real Property</u>**"). To the knowledge of the Loan Parties, (i) each of such leases and subleases is valid and enforceable in accordance with its terms and is in full force and effect, (ii) each Loan Party has paid all of its material monetary obligations (to the extent arising after the Petition Date) with respect to each of its leases and subleases, and (iii) there are no other material defaults with respect to obligations arising after the Petition Date with respect to any of such leases or subleases, subject to any applicable cure periods, other than defaults arising solely as a result of, or as otherwise related to, the commencement of the Chapter 11 Cases and others disclosed to the Administrative Agent and the Required Lenders on or prior to the Petition Date, provided that the representation set forth in this sentence shall not apply to where such representation would not be true solely as a result of the commencement of the Chapter 11 Cases. Each of the Loan Parties and each of its Subsidiaries has good and indefeasible title to, or valid leasehold interests in, all of its

43

material real and personal property, free of all Liens other than those permitted by **Section 6.02**.

(b)Each Loan Party and each Subsidiary owns, or is licensed to use, all material trademarks, tradenames, copyrights, patents and other Intellectual Property necessary to its business as currently conducted. A correct and complete list of such Trademarks, Copyrights, Patents, Licenses and other Intellectual Property, as of the date of this Agreement, is set forth on **Schedule 3.07(b)**. To the knowledge of the Loan Parties or any Subsidiary, the use of such Trademarks, Copyrights, Patents, Licenses and other Intellectual Property by each Loan Party and each Subsidiary does not infringe in any material respect upon the rights of any other Person, and each Loan Party's and each Subsidiary's rights thereto are not subject to any licensing agreement or similar arrangement except as set forth on **Schedule 3.07(b)**.

Section 3.08    Capitalization and Subsidiaries.    **Schedule 3.08** sets forth as of the Closing Date the name and jurisdiction of incorporation, formation or organization of each Subsidiary of Holdings and, as to each such Subsidiary, the percentage of each class of outstanding Equity Interests owned by Holdings or by any such Subsidiary. All of the issued and outstanding Equity Interests owned by any Loan Party have been (to the extent such concepts are relevant with respect to such ownership interests) duly authorized and issued and are fully paid and non-assessable. Other than as may be set forth in the Pre-Petition Convertible Note Documents, there are no outstanding commitments or other obligations of any Loan Party to issue, and no options, warrants or other rights of any Person to acquire, any shares of any class of capital stock or other equity interests of such Loan Party.  Holdings has no Foreign Subsidiaries.

Section 3.09    Litigation; Compliance with Laws.

(a)Except in connection with the Chapter 11 Cases, there are no actions, suits, investigations or proceedings at law or in equity or by or on behalf of any Governmental Authority or in arbitration now pending against, or to the knowledge of Holdings or the Borrower threatened in writing against, Holdings or the Borrower or any of the Subsidiaries or any business, property or rights of any such Person (i) that involve any Loan Document, the Transactions or the payment of the Transaction Costs or (ii) that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)None of Holdings, the Borrower, the Subsidiaries or their respective properties or assets is in violation of any law, rule or regulation (including any zoning, building, ordinance, code or approval or any building permit, but excluding any Environmental Laws that are the subject of **Section 3.16**) or any restriction of record or agreement affecting any owned Real Property or is in default with respect to any judgment, writ, injunction or decree of any Governmental Authority, where such violation or default could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect unless non-compliance therewith is permitted by any applicable Governmental Authority (including any order of the Court) or as a result of the commencement of the Chapter 11 Cases.

Section 3.10    Investment Company Act.  None of Holdings, the Borrower or any Subsidiary is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

Section 3.11    Use of Proceeds.  The proceeds of the Loans have been used and will be used, whether directly or indirectly, as set forth in Section 5.13.

Section 3.12    Federal Reserve Regulations.

44

(a)None of Holdings, the Borrower or any Subsidiary is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying Margin Stock.

(b)No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, (i) to purchase or carry Margin Stock or to extend credit to others for the purpose of purchasing or carrying Margin Stock or to refund indebtedness originally incurred for such purpose, or (ii) for any purpose that entails a violation of, or that is inconsistent with, the provisions of the Regulations of the Board, including Regulation U or Regulation X.

Section 3.13    Tax.

(a)Each of Holdings, the Borrower and its Subsidiaries has filed or caused to be filed all U.S. federal, state, local and non-U.S. Tax returns required to have been filed by it that are material to such companies, taken as a whole, and each such Tax return is true and correct in all material respects;

(b)Each of Holdings, the Borrower and its Subsidiaries has timely paid or caused to be timely paid all Taxes shown to be due and payable by it on the returns referred to in **clause (a)** and all other material Taxes or assessments (except Taxes for which payment is stayed or excused under the Bankruptcy Code or assessments that are being contested in good faith by appropriate proceedings in accordance with **Section 5.03** and for which Holdings, the Borrower or any of its Subsidiaries (as the case may be) has set aside on its books adequate reserves (in accordance with GAAP)); and

(c)With respect to each of Holdings, the Borrower and its Subsidiaries, no tax lien has been filed, and, to the knowledge of the Borrower and its Subsidiaries, no claim is being asserted, with respect to any such Post-Petition Taxes, in each case in an amount in excess of $1,000,000 in the aggregate for all such tax liens and claims.

Section 3.14    Disclosure.

(a)The Loan Parties have disclosed to the Lenders all material agreements, instruments and corporate or other restrictions to which any Loan Party or any Subsidiary is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  No reports, financial statements, certificates or other information furnished by or on behalf of any Loan Party or any Subsidiary to the Administrative Agent or any Lender in connection with the negotiation of this Agreement or any other Loan Document (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time delivered and, if such projected financial information was delivered prior to the Closing Date, as of the Closing Date.

Section 3.15    Employee Benefit Plans.

(a)Except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect:  (i) each Loan Party and each ERISA Affiliate is in compliance with the applicable provisions of ERISA and the provisions of the Code relating to Plans and the regulations and published interpretations thereunder; and (ii) no ERISA Event has occurred or is reasonably

45

expected to occur; the present value of all accumulated benefit obligations under each Plan (based on those assumptions used for purposes of Accounting Standards Codification No. 715: Compensation Retirement Benefits) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of such Plan allocable to such accrued benefits and the present value of all accrued benefit obligations of all underfunded Plans did not, as of the date of the most recent financial statements reflecting such amounts, exceed the value of the assets of all such underfunded Plans.

(b)Except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, no Foreign Plan Event has occurred.

Section 3.16    Environmental Matters.  Except as to matters that could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:  (i) no written notice of violation, request for information, order, complaint or assertion of penalty has been received by the Borrower or any of the Subsidiaries, and there are no judicial, administrative or other actions, suits or proceedings pending or, to the knowledge of the Borrower, threatened which allege a violation of or liability under any Environmental Laws or concerning Hazardous Materials, in each case relating to the Borrower or any of the Subsidiaries, (ii) the Borrower and the Subsidiaries has all permits necessary for its operations to comply with all applicable Environmental Laws and is, and during the term of all applicable statutes of limitation, has been, in compliance with the terms of such permits and with all other applicable Environmental Laws, (iii) no Hazardous Material is located at any property currently or formerly owned, operated or leased by the Borrower or any of the Subsidiaries in quantities or concentrations that would reasonably be expected to give rise to any liability or obligation of the Borrower or any of the Subsidiaries under any Environmental Laws, and no Hazardous Material has been generated by or on behalf of the Borrower or any of the Subsidiaries that has been transported to or Released at or from any location in a manner that would reasonably be expected to give rise to any liability or obligation of the Borrower or any of the Subsidiaries, and (iv) there is no agreement to which the Borrower or any of the Subsidiaries is a party in which the Borrower or any of the Subsidiaries has assumed or undertaken, or retained, responsibility for any known or reasonably likely liability or obligation arising under or relating to Environmental Laws.

Section 3.17    Security Documents.  Upon the entry of, and subject to, the Interim Order, this Agreement is effective to create in favor of the Administrative Agent (for the benefit of the Secured Parties) a legal, valid and enforceable security interest in the Collateral described herein and proceeds thereof.

Section 3.18    Affiliate Transactions.  Except as permitted by Section 6.07, there are no existing agreements, arrangements or transactions between any Loan Party and any of its Affiliates (other than the Borrower or any of its Subsidiaries).

Section 3.19    Labor Matters.  Except as, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect:  (a) there are no strikes or other labor disputes pending or, to the knowledge of Holdings or the Borrower, threatened in writing against the Borrower or any of the Subsidiaries; (b) the hours worked and payments made to employees of the Borrower and the Subsidiaries have not been in violation of the Fair Labor Standards Act or any other Applicable Law dealing with such matters; (c) all Persons treated as contractors by the Borrower and the Subsidiaries are properly categorized as such, and not as employees, under Applicable Law; and (d) all payments due from the Borrower or any of the Subsidiaries or for which any claim may be made against the Borrower or any of the Subsidiaries, on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of the Borrower or such Subsidiary to the extent required by GAAP. Except as, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect the consummation of the Transactions and the payment of the Transaction Costs will not give rise to a right of termination or right of renegotiation on the part of any union under any material collective

bargaining agreement to which the Borrower or any of its Subsidiaries (or any predecessor) is a party or by which Holdings, the Borrower or any of its Subsidiaries (or any predecessor) is bound.

Section 3.20    Insurance.  **Schedule 3.20** sets forth a true, complete and correct description of all material insurance maintained by or on behalf of Holdings, the Borrower or the Subsidiaries as of the Closing Date.  Except as, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, as of such date, such insurance is in full force and effect.

Section 3.21    USA PATRIOT Act and OFAC.

(a)To the extent applicable, each Loan Party is in compliance, in all material respects, with the (i) Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (ii) USA PATRIOT Act.  To the knowledge of the Borrower, no part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

(b)the Borrower has implemented and maintains in effect policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and Sanctions, and the Borrower, its Subsidiaries and their respective officers and employees.

(c)To the knowledge of the Borrower, its directors and agents are in compliance with Anti-Corruption Laws and Sanctions in all material respects.

(d)None of (i) the Borrower, any Subsidiary or any of their respective directors, officers or employees, or (ii) to the knowledge of the Borrower, any agent of the Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.

(e)No Borrowing, use of proceeds by the Borrower or other transaction contemplated by this Agreement will violate Anti-Corruption Laws or Sanctions.

Section 3.22    EEA Financial Institution. No Loan Party is an EEA Financial Institution.

Section 3.23    Plan Assets. None of the Borrower or any of its Subsidiaries is an entity deemed to hold "plan assets" (within the meaning of the Plan Asset Regulations).

Section 3.24    Accounts. As of the Closing Date, all of each Loan Party's Deposit Accounts, Securities Accounts and Commodities Accounts (other than Excluded Accounts) are listed on **Schedule 5.12**, including the name of the institution where such account is maintained, the account number and description of account.

Section 3.25    Approved Budget. The initial Approved Budget, attached hereto as Annex A, which was delivered to the Administrative Agent and the Lenders prior to the Closing Date, and the then-applicable Approved Budget, was prepared in good faith upon assumptions the Borrower believed to be reasonable assumptions on the date of delivery of the then-applicable Approved Budget or update thereto. To the knowledge of the Borrower, no facts exist that (individually or in the aggregate) would result in any

material change in the then-applicable Approved Budget.

Section 3.26    Material Agreements. All Material Agreements to which any Loan Party or any Subsidiary is a party or is bound as of the date of this Agreement are listed on **Schedule 3.26**. Except for any defaults or events of default arising solely as a result of the commencement of the Chapter 11 Cases, any defaults or events of default arising under the Pre-Petition Loan Documents, no Loan Party nor any Subsidiary is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in (i) any Material Agreement to which it is a party or (ii) any agreement or instrument evidencing or governing any Material Indebtedness, in each case, as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

Section 3.27    Chapter 11 Cases.

(a)The Chapter 11 Cases were commenced on the Petition Date in accordance with Applicable Law and proper notice thereof was given for (i) the motion seeking approval of the Loan Documents and the Interim Order and Final Order, (ii) the hearing for the entry of the Interim Order, and (iii) the hearing for the entry of the Final Order.

(b)After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Loan Parties now existing or hereafter arising, of any kind whatsoever, including all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject to (i) the Carve-Out and (ii) the priorities set forth in the Interim Order or Final Order, as applicable.

(c)After the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations will be secured by a valid and perfected Lien on all of the Collateral as set forth in the applicable Order.

(d)The Interim Order (with respect to the period on and after entry of the Interim Order and prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), vacated, or, without the Administrative Agent's consent (at the direction of the Required Lenders), modified or amended. The Loan Parties are in compliance in all material respects with the applicable Order.

(e)Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Order or the Final Order, as the case may be, upon the Termination Date (whether by acceleration or otherwise) of any of the Secured Obligations, the Administrative Agent and Lenders shall be entitled to immediate payment of such Secured Obligations and to enforce the remedies provided for hereunder or under Applicable Law, without further notice, motion or application to, hearing before, or order from, the Court.

ARTICLE IV

Conditions of Lending

The Administrative Agent and the Lenders shall not be required to fund any Loans on the Closing Date, until the following conditions are satisfied or waived:

48

Section 4.01    <u>Closing Date</u>.  On the Closing Date:

(a)The Administrative Agent shall have received a Borrowing Request as required by **<u>Section 2.03</u>** (or a Borrowing Request shall have been deemed given in accordance with the last paragraph of **<u>Section 2.03</u>**).

(b)The representations and warranties set forth in **<u>Article III</u>** hereof shall be true and correct in all material respects as of such date, with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects as of such earlier date).

(c)At the time of and immediately after giving effect to the Closing Date and upon the making of any Loans, no Event of Default or Default shall have occurred and be continuing.

(d)The Administrative Agent (or its counsel) shall have received from each party hereto either (i) a counterpart of this Agreement signed on behalf of such party or (ii) written evidence satisfactory to the Administrative Agent (which may include electronic transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement.

(e)<u>Operating Account</u>.  The Administrative Agent shall receive a notice setting forth the Borrower's deposit account (the "**<u>Operating Account</u>**") to which the Lenders (or the Administrative Agent on their behalf) are authorized by the Borrower to disburse the proceeds of any Borrowings requested or authorized pursuant to this Agreement.

(f)The Administrative Agent shall have received in the case of each Loan Party each of the items referred to in **<u>clauses (i)</u>**, **<u>(ii)</u>**, **<u>(iii)</u>** and **<u>(iv)</u>** below:

(i)a copy of the certificate or articles of incorporation, certificate of limited partnership or certificate of formation, including all amendments thereto, of each Loan Party, certified as of a recent date by the Secretary of State (or other similar official) of the jurisdiction of its organization, and a certificate as to the good standing (to the extent such concept or a similar concept exists under the laws of such jurisdiction) of each such Loan Party as of a recent date from such Secretary of State (or other similar official);

(ii)a certificate of the secretary or assistant secretary or similar officer of each Loan Party dated the Closing Date and certifying:

(A)    that attached thereto is a true and complete copy of the by-laws (or limited partnership agreement, limited liability company agreement or other equivalent governing documents) of such Loan Party as in effect on the Closing Date,

(B)    that attached thereto is a true and complete copy of resolutions duly adopted by the board of directors (or equivalent governing body) of such Loan Party (or its managing general partner or managing member) authorizing the execution, delivery and performance of the Loan Documents to which such Person is a party and, in the case of the Borrower, the borrowings hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect on the Closing Date,

(C)    that the certificate or articles of incorporation, certificate of limited partnership or certificate of formation of such Loan Party has not been amended since the date of

49

the last amendment thereto disclosed pursuant to **clause (i)** above,

(D)    as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of such Loan Party;

(iii)a certificate of another officer as to the incumbency and specimen signature of the Secretary or Assistant Secretary or similar officer executing the certificate pursuant to **clause (ii)** above; and

(iv)a certificate of a Responsible Officer of Holdings or the Borrower certifying that as of the Closing Date (x) all the representations and warranties described in **Section 4.01(b)** are true and correct to the extent set forth therein and (y) that as of the Closing Date, no Default or Event of Default has occurred and is continuing or would result from any Borrowing to occur on the date hereof or the application of the proceeds thereof.

(g)(i) [reserved], (ii) the Administrative Agent shall have received the results of a search of the Uniform Commercial Code (or equivalent) filings made with respect to the Loan Parties and copies of the financing statements (or similar documents) disclosed by such search, (iii) the Administrative Agent shall have received evidence reasonably satisfactory to the Required Lenders that the Liens indicated by such financing statements (or similar documents) are either permitted by **Section 6.02** or have been released (or authorized for release in a manner reasonably satisfactory to the Required Lenders); and (iv) each document (including any Uniform Commercial Code financing statement) required by the Security Documents or under law or reasonably requested by the Administrative Agent (at the direction of the Required Lenders) to be filed, registered or recorded in order to create in favor of the Administrative Agent, for the benefit of itself, the Lenders and the other Secured Parties, a perfected Lien on the Collateral described therein, prior and superior in right to any other Person (other than with respect to Liens expressly permitted by Section 6.02), shall be in proper form for filing, registration or recordation.

(h)Financial Statements.    The Lenders shall have received (i) unaudited interim consolidated financial statements of Holdings and its Subsidiaries for the fiscal quarter ended September 30, 2022, and such financial statements shall not, in the reasonable judgment of the Required Lenders, reflect any material adverse change in the consolidated financial condition of Holdings and its Subsidiaries, as reflected in the most recent annual financial statements of Holdings delivered to the Administrative Agent, other than those events or circumstances customarily resulting from the commencement of the Chapter 11 Cases and (ii) Holding's initial Approved Budget all in form and substance satisfactory to Required Lenders.

(i)[Reserved]

(j)The Administrative Agent shall have received all fees payable thereto or to any Lender on or prior to the Closing Date and, all other amounts due and payable pursuant to the Loan Documents on or prior to the Closing Date, including, to the extent invoiced, reimbursement or payment of all reasonable and documented (in summary format) out-of-pocket expenses (including reasonable and documented fees, charges and disbursements of Ropes & Gray LLP, Polsinelli PC, Seaport Global Securities, LLC and Shipman & Goodwin LLP) required to be reimbursed or paid by the Loan Parties hereunder or under any other Loan Document.

(k)No Material Adverse Effect.

(i)Since the Petition Date, other than those events or circumstances arising from the commencement of the Chapter 11 Cases, there has been no event or circumstance, either individually or in the aggregate, that has or could reasonably be expected to have a Material Adverse Effect.

(ii)Except for actions, suits, investigations, proceedings, claims or disputes stayed by Section 362 of the Bankruptcy Code, no orders, injunctions or pending litigation exists which could reasonably be expected to have a Material Adverse Effect or which challenges this Agreement, the Loan Documents or the credit facilities contemplated hereunder.

(iii)Since the Petition Date, there has been no material increase in the liabilities, liquidated or contingent, of the Borrower and the Subsidiary Guarantors taken as a whole, or material decrease in the assets of the Borrower, the Subsidiary Guarantors taken as a whole.

(iv)Other than those resulting from the commencement of the Chapter 11 Cases, since the Petition Date there shall have been no adverse change in the ability of the Administrative Agent and the Lenders to enforce the Loan Documents and the Obligations of the Borrower and the Subsidiary Guarantors hereunder.

(l)To the extent requested by the Administrative Agent or any Lender, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act and the Beneficial Ownership Regulation.

(m)[reserved].

(n)[reserved].

(o)[reserved].

(p)[reserved].

(q)Security Interest. Subject to the Interim Order, the Required Lenders shall be satisfied that the Loan Documents and the Interim Order shall be effective to create in favor of the Administrative Agent a legal, valid, first priority, perfected and enforceable security interest and Lien upon the Collateral, with the priority set forth in the Interim Order and the terms thereof.

(r)[reserved].

(s)Insolvency Matters – Chapter 11 Cases. (i) The Court shall have entered an Interim Order by no later than three (3) days after the Petition Date; (ii) the Administrative Agent and the Lenders shall have received drafts of the "first day" pleadings for the Chapter 11 Cases, in each case, in form and substance satisfactory to the Required Lenders not later than a reasonable time in advance of the Petition Date for Required Lenders' counsel to review and analyze the same; and (iii) all motions, orders (including the "first day" orders and the Cash Management Order) and other documents to be filed with and submitted to the Court on the Petition Date shall be in form and substance reasonably satisfactory to the Required Lenders, and the Court shall have approved and entered all "first day" orders, including, without limitation, the Cash Management Order.

(t)Other Documents.  The Administrative Agent shall have received such other customary documents as the Administrative Agent, the Required Lenders or their counsel may have reasonably requested prior to the Closing Date.

Each Agent and each Lender, by delivering its signature page to this Agreement and funding a Loan on the Closing Date shall be deemed to have acknowledged receipt of and consented to and approved each Loan Document and each other document required to be approved by any Agent or Lender, as applicable, on the Closing Date.

Section 4.02    <u>Conditions Precedent to Other Loans</u>.  On the date of each Borrowing of any Final Loan:

(a)the Borrower shall have delivered to the Administrative Agent a customary Borrowing Request certifying as to, among other things, that (i) the Loans will be utilized in accordance with the Approved Budget (as updated from time to time pursuant to any Budget Compliance Report), (ii) the principal amount of the requested Loans (together with the outstanding principal amount of all outstanding Loans) does not exceed the Approved Budget (as updated from time to time pursuant to any Budget Compliance Report), and (iii) the Borrower shall apply the proceeds of the Loans only to expenses set forth in the Approved Budget;

(b)the applicable conditions in Section 2.01 shall have been satisfied;

(c)At the time of and immediately after giving effect to such Borrowing and the application of the proceeds thereof, no Default or Event of Default shall have occurred and be continuing (except for any defaults or events of default arising solely as a result of the commencement of the Chapter 11 Cases);

(d)The representations and warranties of each Loan Party set forth in **Article III** of this Agreement or in any other Loan Document shall be true and correct in all material respects (without duplication of any materiality qualifier contained therein) on the date of, and upon giving effect to, such funding or issuance (except for representations and warranties that expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as such earlier date);

(e)The Borrower shall have paid the balance of all fees and expenses then due and payable under this Agreement;

(f)(A) the Final Order shall have been entered in form and substance acceptable to the Administrative Agent and the Required Lenders; (B) the Interim Order or the Final Order, as applicable, shall not have been vacated, stayed, reversed, modified, or amended without the Administrative Agent's (at the direction of the Required Lenders') consent and shall otherwise be in full force and effect; and (C) no motion for reconsideration of the Interim Order or the Final Order, as applicable, shall have been timely filed by a Loan Party of any of their Subsidiaries;

(g)The Loan Parties shall be in compliance with their obligations under Section 5.14; and

(h)With respect to a funding of the Pre-Petition ABL Disputed Amount, a final non-appealable order of the Bankruptcy Order shall have been entered with respect to the whether the Pre-Petition ABL Disputed Amount are due and owing under the Pre-Petition ABL Credit Agreement (the "**Pre-Petition Resolution Date**").

Each request by the Borrower for funding of the Final Loans shall constitute a representation by the Borrower that the conditions in **clauses (b)** through **(g)** above are satisfied on the date of such request and on the date of such funding.

ARTICLE V

Affirmative Covenants

Each of Parent (solely as to **Sections 5.01**, **5.05** and **5.09** as applicable to it) and the Borrower covenants and agrees with each Lender that so long as any Commitments or Obligations (other than contingent obligations as to which no claim or demand for payment has been made, or in the case of indemnification obligations, no notice has been given), the Borrower (and Holdings solely to the extent applicable to it) will, and the Borrower will cause each of the Subsidiaries to:

Section 5.01      Existence; Conduct of Business.

(a)Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect, and except to the extent the failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, the rights, qualifications, permits, franchises, governmental authorizations, Intellectual Property rights, Licenses and permits with respect to the conduct of its business, and maintain all requisite authority to conduct its business in each jurisdiction in which its business is conducted; provided that the foregoing provisions shall not prohibit any merger, amalgamation, consolidation, liquidation or dissolution permitted under Section 6.05.

(b)Except where the failure to do so would not reasonably be expected to have a Material Adverse Effect, do or cause to be done all things necessary to (i) lawfully obtain, preserve, renew, extend and keep in full force and effect the permits, franchises, authorizations, patents, trademarks, service marks, trade names, copyrights, licenses and rights with respect thereto reasonably necessary to the normal conduct of the business of the Borrower and the Subsidiaries and (ii) at all times maintain and preserve all property reasonably necessary to the normal conduct of the business of the Borrower and the Subsidiaries and keep such property in satisfactory repair, working order and condition and from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto in accordance with prudent industry practice (in each case except as expressly permitted by this Agreement).

Section 5.02      Insurance.   Maintain with financially sound and reputable carriers having a financial strength rating of at least A- by A.M. Best Company insurance in such amounts (with no greater risk retention) and against such risks (including, without limitation: loss or damage by fire and loss in transit; theft, burglary, pilferage, larceny, embezzlement, and other criminal activities; business interruption; and general liability) and such other hazards, as is customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations.  All insurance policies required hereunder shall name the Administrative Agent (for the benefit of the Administrative Agent and the Lenders) as an additional insured or as lender loss payee, as applicable, and shall contain lender loss payable clauses or mortgagee clauses, through endorsements in form and substance satisfactory to the Administrative Agent (at the direction of the Required Lenders), which provide that: (a) all proceeds thereunder with respect to any Collateral shall be payable to the Administrative Agent; (b) no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy; and (c) such policy and lender loss payable or mortgagee clauses may be canceled, amended, or terminated only upon at least thirty (30) days (ten (10) days in the case of failure to pay premiums) prior written notice given to the Administrative Agent. All premiums on any such insurance shall be paid when due by such Loan Party, and copies of the policies delivered to the Administrative Agent. If such Loan Party fails to obtain any insurance as required by this Section, the Administrative Agent may obtain such insurance at the Borrower's expense. By purchasing such insurance, the Administrative Agent shall not be

53

deemed to have waived any Default arising from the Loan Party's failure to maintain such insurance or pay any premiums therefor. The Borrower will furnish to the Lenders, upon request of the Administrative Agent, information in reasonable detail as to the insurance so maintained.

Section 5.03    Taxes. Pay and discharge promptly when due all material Taxes, imposed upon it or upon its income or profits or in respect of its property, as well as all lawful claims which, if unpaid, might give rise to a Lien (other than a Lien permitted under **Section 6.02**) upon such properties or any part thereof except to the extent not overdue by more than thirty (30) days or, if more than thirty (30) days overdue (a) the validity or amount thereof shall be contested in good faith by appropriate proceedings, and the Borrower or the affected Subsidiary, as applicable, shall have set aside on its books reserves in accordance with GAAP with respect thereto and (b) in the case of a Tax or claim which has or may become a Lien on any of the Collateral, such contest proceedings conclusively operate to stay the sale of any portion of the Collateral to satisfy such Tax or claim.

Section 5.04    Financial Statements, Reports and Other Information    Furnish to the Administrative Agent (which will promptly furnish such information to the Lenders):

(a) [reserved];

(b) as soon as available, but in any event in accordance with Applicable Law and not later than forty-five (45) days after the end of each fiscal quarter (commencing with the fiscal quarter ending April 1, 2023), a consolidated balance sheet and related statements of operations and cash flows showing the financial position of Holdings and its Subsidiaries as of the close of such fiscal quarter and the consolidated results of its operations during such fiscal quarter and the then-elapsed portion of the fiscal year and setting forth in comparative form the corresponding figures for the corresponding periods of the prior fiscal year, all of which shall be in reasonable detail and which consolidated balance sheet and related statements of operations and cash flows shall be accompanied by customary management's discussion and analysis and certified by a Financial Officer of the Borrower on behalf of the Borrower as fairly presenting, in all material respects, the financial position and results of operations of Holdings and its Subsidiaries on a consolidated basis in accordance with GAAP (subject to normal year-end audit adjustments and the absence of footnotes), supporting schedules reconciling such consolidated balance sheet and related statements of operations and cash flows with the consolidated financial position and results of operations of Holdings or the Borrower, as applicable, for the relevant period (it being understood that the delivery by the Borrower of quarterly reports on Form 10-Q of Holdings and its consolidated Subsidiaries shall satisfy the requirements of this **Section 5.04(b)** to the extent such quarterly reports include the information specified herein);

(c) within thirty (30) days after the end of each month (for each of the first two (2) months of each fiscal quarter), a balance sheet and related statements of operations and cash flows showing the financial position of Holdings and its Subsidiaries as of the close of such month and the consolidated results of its operations during such month, all of which shall be in reasonable detail;

(d) concurrently with any delivery of financial statements under **paragraph (b)** above, a Compliance Certificate certifying that no Default or Event of Default has occurred or, if such a Default or an Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto;

(e) except to the extent otherwise specified, by Thursday of every calendar week prepared as of the close of business on Saturday of the previous week, the following all delivered electronically in a text formatted file acceptable to the Administrative Agent, schedules detailing the Borrower's Inventory, in form satisfactory to the Required Lenders, which Inventory shall be valued

54

in a manner consistent with the audited financial statements of Holdings delivered prior to the date hereof or market,

(f)[reserved];

(g)promptly upon the Administrative Agent's reasonable request:

(ii)copies of invoices issued by the Borrower in connection with any Accounts, credit memos, shipping and delivery documents, and other information related thereto;

(iii)copies of purchase orders, invoices, and shipping and delivery documents in connection with any Inventory purchased by any Loan Party;

(iv)a schedule detailing the balance of all intercompany accounts of the Loan Parties;

(v)copies of all income tax returns filed by any Loan Party with the U.S. Internal Revenue Service or with any foreign equivalent after the Closing Date; and

(vi)additional information relating to the Collateral to the extent available using commercially reasonable efforts, including for the purposes of updating Collateral valuations and collateral audits and reviews of inventory levels and mix (it being agreed that the Borrower shall cooperate with Administrative Agent and the Lenders in connection with the foregoing, including granting access to information and records);

(h)promptly after the same become publicly available, copies of all periodic and other publicly available reports, proxy statements, and other materials filed by Holdings, the Borrower or any of its Subsidiaries with the SEC or any securities exchange, or distributed to its stockholders generally, as applicable and all press releases and other statements made available generally by Holdings or any of its Subsidiaries to the public concerning material developments in the business of Holdings or any of its Subsidiaries;

(i)[reserved];

(j)promptly following a request therefor, (x) such other information regarding the operations, changes in ownership of Equity Interests, business affairs and financial condition of any Loan Party or any Subsidiary, or compliance with the terms of this Agreement, as the Administrative Agent or any Lender may reasonably request, and (y) information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and the Beneficial Ownership Regulation;

(k)[reserved];

(l)promptly following reasonable request therefore from the Administrative Agent, copies of (i) any documents described in Sections 101(f) and/or (j) of ERISA with respect to any Plan, and/or (ii) any notices or documents described in Sections 101(f), (k) and/or (l) of ERISA requested with respect to any Multiemployer Plan; provided, that if any Loan Party or any ERISA Affiliate has not requested such documents or notices from the administrator or sponsor of the applicable Plan or Multiemployer Plan, then, upon reasonable request of the Administrative Agent, the Loan Party(ies) and/or the ERISA Affiliate(s) shall promptly make a request for such documents or notices from such

55

administer or sponsor and the Borrower shall provide copies of such documents and notices to the Administrative Agent promptly after receipt thereof;

(m)promptly, from time to time, such other information regarding the operations, business affairs and financial condition of Holdings, the Borrower or any of its Subsidiaries, or compliance with the terms of any Loan Document, as in each case the Administrative Agent may reasonably request (for itself or on behalf of any Lender); and

(n)documents required to be delivered pursuant to this **Section 5.04** may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which Holdings or the Borrower (or a representative thereof) posts such documents (or provides a link thereto) at www.tuesdaymorning.com; provided that, other than with respect to items required to be delivered pursuant to **Section 5.04(e)** above, Holdings or the Borrower shall promptly notify (which notice may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents at www.tuesdaymorning.com and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents; (ii) on which such documents are delivered by Holdings or the Borrower to the Administrative Agent for posting on behalf of Holdings and the Borrower on IntraLinks, SyndTrak or another relevant secure website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent) provided that the Borrower shall nonetheless deliver electronic versions of such documents to the Administrative Agent; (iii) on which such documents are faxed to the Administrative Agent (or electronically mailed to an address provided by the Administrative Agent); or (iv) with respect to any item required to be delivered pursuant to **Section 5.04(e)** above in respect of information filed by Holdings or its applicable Parent Entity with any securities exchange or with the SEC or any analogous Governmental Authority or private regulatory authority with jurisdiction over matters relating to securities (other than Form 10-Q reports and Form 10-K reports), on which such items have been made available on the SEC website or the website of the relevant analogous governmental or private regulatory authority provided that the Borrower shall nonetheless deliver electronic versions of such documents to the Administrative Agent.

(o)Reports delivered to the Administrative Agent pursuant to this Sections 5.04 are for informational purposes only and the Administrative Agent will not be deemed to have actual or constructive notice of any information contained therein or determinable therefrom, including the Borrower's compliance with its covenants under this Agreement.

Section 5.05    Notices of Material Events.  Furnish to the Administrative Agent (and the Administrative Agent shall make available to each Lender) promptly after any a Responsible Officer obtains knowledge (but in any event within any time period that may be specified below) written notice of the following:

(a)the occurrence of any Default, Event of Default;

(b)any action, suit or proceeding, whether at law or in equity or by or before any Governmental Authority or in arbitration, against Holdings, the Borrower or any of their Subsidiaries would reasonably be expected to have a Material Adverse Effect;

(c)the occurrence of any ERISA Event or Foreign Plan Event that, individually or together with all other ERISA Events or Foreign Plan Events that have occurred, would reasonably be expected to have a Material Adverse Effect;

(d)the filing of any Lien for unpaid taxes in excess of $1,000,000;

(e)[reserved];

(f)[reserved];

(g)any Casualty Event or the commencement of any action or proceeding that could reasonably be expected to result in a Casualty Event,

(h) [reserved];(i) as soon as practicable in advance of filing with the Court or delivering to the Committee appointed in a Chapter 11 Case, if any, or to the U.S. Trustee, as the case may be, the Final Order, all other material proposed orders and pleadings related to (x) the Chapter 11 Cases (all of which must be in form and substance satisfactory to the Required Lenders) and (y) this Agreement and the credit facilities contemplated thereby, and/or any sale contemplated in accordance with the Case Milestones and any Plan of Reorganization and/or any disclosure statement related thereto (all of which must be in form and substance reasonably satisfactory to the Required Lenders) and (ii) substantially simultaneously with the filing with the Court or delivering to the Committee appointed in any Chapter 11 Case, if any, or to the U.S. Trustee, as the case may be, monthly operating reports and all other notices, filings, motions, pleadings or other information concerning the financial condition of the Loan Parties or their Subsidiaries or the Chapter 11 Cases that may be filed with the Court or delivered to the Committee appointed in any Chapter 11 Case, if any, or to the U.S. Trustee; and

(i)any other development specific to Holdings, the Borrower or any of their Subsidiaries that is not a matter of general public knowledge and that has had, or would reasonably be expected to have, a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth the material details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 5.06    <u>Compliance with Laws</u>.  (a) Comply with (x) each Applicable Law applicable to it or its property (including without limitation Environmental Laws), except, in each case, where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect or such compliance is stayed by the Chapter 11 Cases and (y) the Bankruptcy Code, the Bankruptcy Rules, the Orders, and any other order of the Court in all material respects, and (z) subject to the foregoing clause (a)(y), perform in all material respects its obligations under Material Agreements to which it is a party; <u>provided</u> that this **<u>Section 5.06</u>** shall not apply to Environmental Laws, which are the subject of **<u>Section 5.08</u>**, or to laws related to Taxes, which are the subject of **<u>Section 5.03</u>** and (b) maintain in effect and enforce such policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions as have been approved by the Administrative Agent and the Lenders.

Section 5.07    <u>Maintaining Records; Access to Properties and Inspections</u>.

(a)Maintain all financial records in a manner sufficient to permit the preparation of consolidated financial statements in accordance with GAAP.

(b)Permit the Required Lenders, subject (except when an Event of Default exists) to reasonable advance notice to, and reasonable coordination with, the Borrower and normal business hours, to visit and inspect the properties of the Borrower, at the Borrower's expense as provided in **<u>clause (c)</u>** below, inspect, audit and make extracts from the Borrower's corporate, financial or operating records, and discuss with its officers, employees, agents, advisors and independent

accountants (subject to such accountants' customary policies and procedures) the Borrower business, financial condition, assets and results of operations (it being understood that a representative of the Borrower is allowed to be present in any discussions with officers, employees, agent, advisors and independent accountants). No such inspection or visit shall unduly interfere with the business or operations of the Borrower, nor result in any damage to the Property or other Collateral. Neither the Administrative Agent nor any Lender shall have any duty to the Borrower to make any inspection, nor to share any results of any inspection, appraisal or report with the Borrower. The Borrower acknowledges that all inspections, appraisals and reports are prepared by the Administrative Agent and Lenders for their purposes, and the Borrower shall not be entitled to rely upon them. In addition, upon the request of the Required Lenders, not more than once, the Borrower shall conduct a physical count of the Inventory.

(c)Reimburse the Administrative Agent and the Required Lenders for all reasonable and documented out-of-pocket (in summary format) costs and expenses (other than legal fees or costs and expenses which are covered under **Section 9.05**) of the Administrative Agent and the Required Lenders in connection with (i) examinations of the Borrower's books and records or any other financial or Collateral matters as the Administrative Agent (at the direction of the Required Lenders) deems appropriate; and (ii) field examinations and inventory appraisals of Collateral; in each case subject to the limitations on such examinations, audits and appraisals permitted under the preceding paragraph. Subject to and without limiting the foregoing, the Borrower specifically agrees to pay the Administrative Agent's then standard charges for examination activities, including the standard charges of the Administrative Agent's internal appraisal group. This Section shall not be construed to limit the Administrative Agent's right to use third parties for such purposes.

Section 5.08    Compliance with Environmental Laws.

(a)Comply, and make reasonable efforts to cause all lessees and other Persons occupying its properties to comply, with all Environmental Laws applicable to its operations and properties; and obtain and renew all authorizations and permits required pursuant to Environmental Law for its operations and properties, in each case in accordance with Environmental Laws. This **clause (a)** shall be deemed not breached by a noncompliance with the foregoing if, upon learning of such noncompliance, the Borrower and any of its affected Subsidiaries promptly undertake reasonable efforts to eliminate such noncompliance, and such noncompliance and the elimination thereof, in the aggregate with any other noncompliance with any of the foregoing and the elimination thereof, could not reasonably be expected to have a Material Adverse Effect.

(b)Except as could not reasonably be expected to have a Material Adverse Effect, generate, use, treat, store, release, dispose of, and otherwise manage Hazardous Materials in a manner that would not reasonably be expected to result in a material liability to the Borrower or any of the Subsidiaries or to materially affect any Real Property; and take reasonable efforts to prevent any other Person from generating, using, treating, storing, releasing, disposing of, or otherwise managing Hazardous Materials in a manner that could reasonably be expected to result in a material liability to, or materially affect any Real Property.

Section 5.09    Further Assurances; Mortgages.

(a)Execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, Mortgages and other documents and recordings of Liens in stock registries), that may be required under any Applicable Law, or that the Administrative Agent may reasonably request, which may be required by any Applicable Law or which the Administrative Agent may, from

time to time, reasonably request to carry out the terms and conditions of this Agreement and the other Loan Documents and to ensure perfection and priority of the Liens created or intended to be created by the Security Documents, all in form and substance reasonably satisfactory to the Administrative Agent (at the direction of the Required Lenders) and all at the expense of the Loan Parties.

(b)If any asset that has an individual fair market value in an amount greater than $500,000 (as reasonably estimated by the Borrower) is acquired by Holdings, the Borrower or any Subsidiary Guarantor after the Closing Date or owned by an entity at the time it becomes a Subsidiary Guarantor (including, without limitation, as the result of a Division) (in each case other than Excluded Collateral), cause such asset to be subjected to a Lien securing the Obligations and take, and cause the Subsidiary Guarantors to take, such actions as shall be necessary or reasonably requested by the Administrative Agent (at the direction of the Required Lenders)to grant and perfect such Liens, including actions described in **paragraph (a)** of this Section, all at the expense of the Loan Parties.

(c)Subject to Applicable Law, cause each of its Subsidiaries formed or acquired after the date of this Agreement, provided that prior to any such formation or acquisition, such Loan Party shall have received the written consent of the Administrative Agent (at the direction of the Required Lenders) to such formation or acquisition, to become a Loan Party, in each case, by executing a Joinder Agreement.  Upon execution and delivery thereof, each such Person (A) shall automatically become a Guarantor as provided in Article XI hereunder, and thereupon shall have all of the rights, benefits, duties and obligations in such capacity under the Loan Documents and (B) will grant Liens to the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties, in any property of such Loan Party which constitutes Collateral (in each case to the extent required of any Loan Party pursuant to the Loan Documents to which such Loan Party is a party).

(d)(i) Furnish to the Administrative Agent promptly (and in any event within five (5) days) written notice of any change in (A) any Loan Party's corporate or organization name, (B) any Loan Party's organizational form or (C) any Loan Party's organizational identification number; provided that neither Holdings nor the Borrower shall effect or permit any such change unless all filings have been made, or will have been made within any applicable statutory period, under the UCC or otherwise that are required in order for the Administrative Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral to for the benefit of the Secured Parties and (ii) promptly notify (and in any event within five (5) days) the Administrative Agent if any material portion of the Collateral is damaged or destroyed.

Section 5.10    Fiscal Year; Accounting.  In the case of Holdings and the Borrower, (i) unless the Administrative Agent otherwise consents in its sole discretion, cause its fiscal years to end on the dates set forth for such fiscal year on Schedule 1.03 and (ii) prohibit any change to the accounting policies or reporting practices of the Loan Parties, except in accordance with GAAP.

Section 5.11    Appointment .  Upon the request of the Required Lenders, Borrower shall promptly appointment one (1) independent member selected by the Required Lenders to the special committee of the Board of Holdings, which member shall be satisfactory to the Loan Parties.

Section 5.12    Collateral Monitoring and Reporting.

(a)[Reserved].

(b)Records and Schedules of Accounts.  The Borrower shall keep accurate and complete records of its Accounts, including all payments and collections thereon, and shall submit to the Administrative Agent sales, collection, reconciliation and other reports in form satisfactory to the

Required Lenders on a periodic basis (but not more frequently than once a month).

(c)Application of Proceeds; Deficiency.  All amounts deposited in the Operating Account shall be deemed received by the Administrative Agent in accordance with **Section 2.12** and shall, after having been credited to the appropriate Operating Account, be applied (and allocated) by Administrative Agent in accordance with **Section 2.12**.  The Administrative Agent shall require all other cash proceeds of the Collateral to be deposited in the Operating Account. The Administrative Agent will have a perfected security interest in the Operating Account through the Orders. Any such proceeds of the Collateral shall be applied in the order set forth in **Section 2.12** of this Agreement unless a court of competent jurisdiction shall otherwise direct. The balance, if any, after all of the Secured Obligations have been satisfied, shall be deposited by the Administrative Agent into such account as the Loan Parties may reasonably request. The Loan Parties shall remain liable, jointly and severally, for any deficiency if the proceeds of any sale or disposition of the Collateral are insufficient to pay all Secured Obligations, including any attorneys' fees and other expenses incurred by Administrative Agent or any other Secured Party to collect such deficiency.

(d)Administration of Accounts; Control Agreements.

(i)**Schedule 5.12** sets forth all Deposit Accounts, Securities Accounts and Commodities Accounts (including any Excluded Accounts) maintained by the Loan Parties, including all Operating Accounts, as of the Closing Date.  Within ninety (90) days after the Closing Date (or such longer period as the Required Lenders may agree in their reasonable discretion), if requested by the Required Lenders, each Loan Party will make reasonable efforts to provide (or will have provided) to the Administrative Agent a Control Agreement, duly executed on behalf of each financial institution or securities intermediary holding a Deposit Account, Securities Account or Commodities Account, as applicable, of such Loan Party, in each case, other than Excluded Accounts.

(ii)[reserved].

(iii)[reserved].

(iv)The Loan Parties shall comply with the Cash Management Order and the Orders.

Section 5.13    Use of Proceeds.  The proceeds of the Loans will only be used by the Borrower, in each case, strictly in accordance with the Approved Budget, subject to Permitted Variances, actual, reasonable and necessary: (a) ordinary course general corporate and working capital purposes; (b) to fund the costs of administrative of the Chapter 11 Cases, (c) certain fees and expenses of professionals, retained by the Loan Parties, subject to the Carve-Out, (d) payment of all reasonably documented (in summary format) accrued and unpaid transaction costs, fees and expenses with respect to this Agreement, including fees and expenses of professional advisors to the Lenders and the Administrative Agent, (e) repayment in full of the allowed Revolving Obligations and FILO B Obligations (other than Pre-Petition ABL Disputed Amounts and the Pre-Petition Contingent LC Obligations), (f) refinancing of the Bridge Loans, (g) for the Pre-Petition ABL Disputed Amount, upon the Pre-Petition Resolution Date and (h) for the Pre-Petition Contingent LC Obligations.

Section 5.14    Approved Budget.

(a)The use of Loans and other extensions of credit by the Loan Parties under this Agreement and the other Loan Documents shall be limited in accordance with the Approved Budget (subject to variances permitted under this **Section 5.14**) and the terms hereof. The initial Approved

Budget shall depict, on a weekly basis, cash receipts, expenses, and disbursements, net cash flows, inventory receipts, sales and costs of sales at stores being closed and proposed to be closed, Total Cash Receipts, Total Disbursements, Professional Fees, and the other items set forth therein, for the first thirteen (13) week period from the Closing Date and such initial Approved Budget shall be approved by, and in form and substance satisfactory to, the Required Lenders in their sole discretion (it being acknowledged and agreed that the initial Approved Budget attached hereto as Annex A is approved by and satisfactory to the Required Lenders). The Approved Budget shall be updated, modified or supplemented by the Borrower with the written consent of the Required Lenders, and upon the request of the Administrative Agent from time to time, but in any event the Approved Budget shall be updated by the Borrower not less than one time in each four (4) consecutive week period, and each such updated, modified or supplemented budget shall be approved in writing (including by email) by, and shall be in form and substance satisfactory to, the Required Lenders in their sole discretion and no such updated, modified or supplemented budget shall be effective until so approved and once so approved shall be deemed an Approved Budget; provided, however, that in the event the Required Lenders, on the one hand, and the Borrower, on the other hand, cannot agree as to an updated, modified or supplemented budget, then the previous Approved Budget shall remain the Approved Budget until the parties reach agreement and such disagreement shall give rise to an Event of Default once the period covered by the prior Approved Budget has terminated. Each Approved Budget delivered to the Administrative Agent and the Lenders shall be accompanied by such supporting documentation as reasonably requested by the Administrative Agent and the Lenders. Each Approved Budget shall be prepared in good faith based upon assumptions which the Borrower believe to be reasonable.

(b)The Loan Parties covenant and agree that (i) the actual amount of Actual Cash Receipts for the period commencing on the Petition Date and ending on the applicable date of determination, shall not be less than ninety percent (90%) of the amount projected in the "Total Cash Receipts" line item of the Approved Budget for such period and (ii) the actual amount of "Total Disbursements" for any Measurement Period, shall not be more than one hundred and ten percent (110%) of the cumulative amount projected in the "Total Operating Disbursements" and "Total Non-Operating Disbursements" line items of the Approved Budget for such Measurement Period (but, in all cases, excluding all professional fees and solely with respect to week 1, the amounts in the line item "Non-Operating Disbursements"); provided, that in all circumstances, savings in any one Measurement Period may be carried over for use in the subsequent Measurement Periods but such carry-over amount shall be reduced to $0 upon the approval of a new Approved Budget (each, a "**Permitted Variance**").

(c)Administrative Agent and the Lenders (i) may assume that the Loan Parties will comply with the Approved Budget, (ii) shall have no duty to monitor such compliance and (iii) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget. The line items in the Approved Budget for payment of interest, expenses and other amounts to the Administrative Agent and the Lenders are estimates only, and the Loan Parties remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents and the applicable Order regardless of whether such amounts exceed such estimates. Nothing in any Approved Budget shall constitute an amendment or other modification of any Loan Document or other lending limits set forth therein.

(d)Not later than 3:00 p.m. (Local Time) on the Thursday of each week commencing on March 2, 2023 the Loan Parties shall furnish to the Administrative Agent a weekly report (the "**Budget Compliance Report**") that sets forth as of the preceding Saturday of each such week, for the prior week and on a cumulative basis from the Petition Date through the second (2nd) full week after the Petition Date with respect to the first measurement period, through the third (3rd) full week after

the Petition Date with respect to the second measurement period, and through the fourth (4th) full week after the Petition Date for the third measurement period and then on a rolling four (4) week basis at all times thereafter (each such period referred to herein as a "**Measurement Period**"), the actual results for the following line items set forth in the Approved Budget: (i) "Total Cash Receipts" and (ii) "Total Disbursements", all in a form, and shall contain supporting information, reasonably satisfactory to the Required Lenders in their sole discretion.

(e)For all purposes of this **Section 5.14**, for any periods after those reflected in the Approved Budged, all amounts shall be based on the monthly DIP forecast delivered pursuant to **Section 4.01(h)**, modified in a manner reasonably satisfactory to the Required Lenders to be on a weekly basis.

Section 5.15    Case Milestones.  The Loan Parties shall comply with each of the covenants contained on **Schedule 5.15** upon the terms and at the times provided for therein.

Section 5.16    Material Agreements.  The Borrower shall, and shall cause its Subsidiaries, subject to the Bankruptcy Code and applicable orders of the Court, (a) to, perform and observe in all material respects all the terms and provisions of each Material Agreement to be performed or observed by it; and (b) to use commercially reasonable efforts to maintain each such Material Agreement in full force and effect, enforce each such Material Agreement in accordance with its terms, take all such action to such end as may be from time to time requested by the Administrative Agent (at the direction of the Required Lenders) and, upon reasonable request of the Administrative Agent, make to each other party to each such Material Agreement such demands and requests for information and reports or for action as any Loan Party or any of its Subsidiaries is entitled to make under such Material Agreement, and cause each of its Subsidiaries to do so.

Section 5.17    [Reserved].

Section 5.18    Lender Party's Advisors.  The Administrative Agent, on behalf of itself and the Lenders, or the Required Lenders shall be entitled to retain or to continue to retain (either directly or through counsel) one financial advisor to provide advice, analysis and reporting for the benefit of the Administrative Agent and the Lenders. The Loan Parties shall pay all reasonable and documented fees and out-of-pocket expenses of such advisor and all such fees and expenses shall constitute Obligations and be secured by the Collateral. The Loan Parties and their advisors shall grant access to, and make commercially reasonable efforts to cooperate in all respects with, the Administrative Agent, the Lenders, the Lender Parties' advisor, and any other representatives of the foregoing and provide all information that such parties may reasonably request in a timely manner.

Section 5.19    Orders.  Notwithstanding anything herein to the contrary, no portion or proceeds of the Loans or the Collateral, and no disbursements set forth in the Approved Budget, shall be used for the payments or purposes which would violate the terms of the Interim Order and the Final Order or to investigate, commence or prosecute any action, proceeding or objection with respect to or related to the claims, liens or security interest of the Administrative Agent or the Lenders.

Section 5.20    Debtor-In-Possession Obligations.  Comply in a timely manner with its obligations and responsibilities as a debtor-in-possession under the Bankruptcy Code, the Bankruptcy Rules, and any other order of the Court.

Section 5.21    Payment of Obligations.  Subject to the Orders and the terms thereof, pay or discharge material liabilities and obligations, including Taxes, incurred after the Petition Date (but for the avoidance of doubt, Taxes incurred before the Petition Date which are required to be paid in accordance

with the Orders or any other order of the Court shall be permitted to be paid), before the same shall become delinquent or in default (after giving effect to any applicable cure periods), but subject to the Approved Budget (and the Permitted Variances provided for therein with respect to amounts included in the Total Disbursements for any period), except where either (a)(i) the validity or amount thereof is being contested in good faith by appropriate proceedings, or (ii) such Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP, or (b) such liabilities would not result in aggregate liabilities in excess of $1,000,000; provided, however, that each Loan Party will, and will cause each Subsidiary to, remit withholding taxes and other payroll taxes to appropriate Governmental Authorities as and when claimed to be due, notwithstanding the foregoing exceptions.

Section 5.22    Compliance with Terms of Leaseholds.  Except for (a) leases with respect to the Specified Store Closing Sales, (b) as otherwise expressly permitted hereunder or under any applicable order of the Court, (c) where the failure to do so, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, or (d) with respect to obligations arising prior to the Closing Date under Leases of real property to which any Loan Party or any of its Subsidiaries is a party, make all payments and otherwise perform all material obligations in respect of all such Leases, keep such Leases in full force and effect and not allow such Leases to lapse or be terminated or any rights to renew such Leases to be forfeited or cancelled, notify the Administrative Agent of any material default by any party with respect to such leases and cooperate with the Administrative Agent and the Required Lenders in all respects to cure any such default, and cause each of its Subsidiaries to do so.

ARTICLE VI

Negative Covenants

Each of Holdings (solely as to **Section 6.08(a)**) and the other Loan Parties covenants and agrees with each Lender that, so long as any Commitments or Obligations (other than contingent obligations as to which no claim or demand for payment has been made, or, in the case of indemnification obligations, no notice has been given) are outstanding, the Loan Parties will not and will not permit any of its Subsidiaries to (and Holdings as to **Section 6.08(a)**, will not):

Section 6.01    Indebtedness.  Incur, create, assume or permit to exist any Indebtedness, except:

(a)Indebtedness of any Loan Party under the Loan Documents;

(b)the Secured Obligations;

(c)Indebtedness owed to (including obligations in respect of letters of credit or bank guarantees or similar instruments for the benefit of) any Person providing workers' compensation, securing unemployment insurance and other social security laws or regulation, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other similar obligations to the Borrower or any Subsidiary Guarantor;

(d)Indebtedness of the Borrower to any Subsidiary Guarantor and of any Subsidiary Guarantor to the Borrower or any other Subsidiary Guarantor;

(e)Indebtedness in respect of bids, trade contracts (other than for debt for borrowed money), leases (other than Capital Lease Obligations), statutory obligations, surety, stay, customs and appeal bonds, performance, performance and completion and return of money bonds, government contracts, financial assurances and completion guarantees and similar obligations, in each case provided in the ordinary course of business, including those incurred to secure health, safety and

63

environmental obligations in the ordinary course of business (including Indebtedness in respect of letters of credit, bank guarantees or similar instruments in lieu of such items to support the issuance thereof);

(f)the Pre-Petition Obligations; provided the Revolving Obligations and FILO B Obligations shall be terminated and repaid from the proceeds of the Loans (other than the Pre-Petition Contingent LC Obligations and the Pre-Petition ABL Disputed Amount);

(g)Capital Lease Obligations, mortgage financings and purchase money Indebtedness (including any industrial revenue bond, industrial development bond and similar financings) incurred by the Borrower or any Subsidiary Guarantor prior to or within two hundred seventy (270) days after the acquisition, lease, repair or improvement of the respective asset in order to finance such acquisition, lease, repair or improvement, in an aggregate outstanding principal amount that at the time of, and after giving effect to, the incurrence thereof would not exceed $250,000;

(h)Indebtedness not in respect of borrowed money supported by a letter of credit that is permitted hereunder, in a principal amount not to exceed the stated amount of such letter of credit;

(i)Guarantees (i) by the Loan Parties of the Indebtedness described in **Section 6.01(h)**, or (ii) by the Borrower or any Loan Party of any Indebtedness of any other Loan Party permitted to be incurred under this Agreement; provided that no Guarantee by Holdings or any of its Subsidiaries of Indebtedness described in **Section 6.01(h)** shall be permitted unless Holdings or the applicable Subsidiaries, as the case may be, shall have also provided a Guarantee of the Obligations under the Loan Documents on substantially the terms set forth in the applicable Guarantee of such Indebtedness or on terms acceptable to the Administrative Agent (at the direction of the Required Lenders);

(j)Indebtedness consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business, in each case, in accordance with the Approved Budget;

(k)Indebtedness existing on the Closing Date and set forth on **Schedule 6.01**;

(l)Indebtedness arising from agreements providing for indemnification, adjustment of purchase or acquisition price or similar obligations, in each case, incurred or assumed in connection with the disposition of any property in a transaction permitted under **Section 6.05**;

(m)Indebtedness incurred by the Borrower and any Subsidiary Guarantor representing deferred compensation to directors, officers, employees, members of management and consultants of Holdings, any Parent Entity, the Borrower or any Subsidiary Guarantor in the ordinary course of business, in each case, in accordance with the Approved Budget;

(n)Indebtedness in respect of letters of credit, bankers' acceptances supporting trade payables, warehouse receipts or similar facilities entered into in the ordinary course of business;

(o)Indebtedness arising out of the creation of any Lien (other than for Liens securing debt for borrowed money) permitted under **Section 6.02**;

(p)Indebtedness incurred in the ordinary course of business in respect of obligations of the Borrower or any Subsidiary Guarantor to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services;

(q)unfunded pension fund and other employee benefit plan obligations and liabilities incurred in the ordinary course of business to the extent that they are permitted to remain unfunded under Applicable Law

(r)Indebtedness in respect of netting services, overdraft protection and similar arrangements incurred in the ordinary course of business in connection with cash management and deposit accounts; and

(s)all premium (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on Indebtedness described in **paragraphs (a)** through **(q)** above.

Notwithstanding any of the foregoing, no Indebtedness permitted under this **Section 6.01** shall be permitted to have an administrative expense claim status under the Bankruptcy Code senior to or *pari passu* with the superpriority administrative expense claims of the Administrative Agent and the Lenders.

Section 6.02    Liens.  Create, incur, assume or permit to exist any Lien on any property or assets (including Equity Interests, evidences of Indebtedness or other securities of any Person) at the time owned by it or on any income or revenues or rights in respect of any thereof, except:

(a)Liens on property or assets of the Borrower and any Subsidiary Guarantor existing on the Closing Date and set forth on **Schedule 6.02** and any refinancing, modification, replacement, renewal or extension thereof; provided, that the Lien does not extend to any additional property other than after-acquired property that is affixed to or incorporated in the property covered by such Lien and the proceeds and products thereof;

(b)any Lien created under the Loan Documents;

(c)Liens for Taxes, assessments or other governmental charges or levies which are not overdue by more than thirty (30) days or, if more than thirty (30) days overdue, which are being contested in accordance with **Section 5.03**;

(d)landlord's, carriers', warehousemen's, mechanics', materialmen's, repairmen's, construction or other like Liens arising in the ordinary course of business and securing obligations that are not overdue by more than thirty (30) days or, if more than thirty (30) days overdue, (i) which are being contested in accordance with **Section 5.03** or (ii) with respect to which the failure to make payment could not reasonably be expected to have a Material Adverse Effect;

(e)(i) subject to the Order, pledges and deposits made (including to support obligations in respect of letters of credit, bank guarantees or similar instruments to secure) in the ordinary course of business in compliance with the Federal Employers Liability Act or any other workers' compensation, unemployment insurance and other social security laws or regulations and deposits securing premiums or liability to insurance carriers under insurance or self-insurance arrangements in respect of such obligations or otherwise as permitted in **Section 6.01** and (ii) pledges and deposits securing liability for reimbursement or indemnification obligations of (including to support obligations in respect of letters of credit, bank guarantees or similar instruments for the benefit of) insurance carriers in respect of property, casualty or liability insurance to the Borrower or any Subsidiary provided by such insurance carriers;

(f)(i) deposits to secure the performance of bids, trade contracts (other than for debt for borrowed money), leases (other than Capital Lease Obligations), statutory obligations, surety, stay,

65

customs and appeal bonds, performance, performance and completion and return of money bonds, government contracts, financial assurances and completion and similar obligations and similar obligations, including those incurred to secure health, safety and environmental obligations in the ordinary course of business and (ii) obligations in respect of letters of credit or bank guarantees that have been posted to support payment of the items set forth in **clause (i)** of this **Section 6.02(f)**;

(g)zoning restrictions, easements, trackage rights, leases (other than Capital Lease Obligations), licenses, special assessments, rights-of-way, restrictions on use of Real Property and other similar encumbrances incurred in the ordinary course of business that, in the aggregate, do not interfere in any material respect with the ordinary conduct of the business of the Borrower or any Subsidiary;

(h)Liens securing Capital Lease Obligations, mortgage financings, and purchase money Indebtedness or improvements thereto hereafter acquired, leased, repaired or improved by the Borrower or any Subsidiary Guarantor (including the interests of vendors and lessors under conditional sale and title retention agreements); provided that (i) such security interests secure Indebtedness permitted by **Section 6.01**, (ii) such security interests are created, and the Indebtedness secured thereby is incurred, within two hundred seventy (270) days after such acquisition, lease, completion of construction or repair or improvement, (iii) the Indebtedness secured thereby does not exceed the cost of such equipment or other property or improvements at the time of such acquisition or construction, including transaction costs (including any fees, costs or expenses or prepaid interest or similar items) incurred by the Borrower or any Subsidiary Guarantor in connection with such acquisition or construction or material repair or improvement or financing thereof and (iv) such security interests do not apply to any other property or assets of the Borrower or any Subsidiary Guarantor (other than to the proceeds and products of and the accessions to such equipment or other property or improvements but not to other parts of the property to which any such improvements are made); provided, that individual financings otherwise permitted to be secured hereunder provided by one Person (or its affiliates) may be cross collateralized to other such financings provided by such Person (or its affiliates);

(i)Liens securing judgments that do not constitute an Event of Default under **Section 7.01(j)**;

(j)any interest or title of a lessor, sublessor, licensor or sublicensee under any leases, subleases, licenses or sublicenses entered into by the Borrower or any Subsidiary in the ordinary course of business;

(k)Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any Subsidiary Guarantor to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower or any Subsidiary Guarantor, (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any Subsidiary Guarantor in the ordinary course of business, (iv) attaching to commodity trading or other brokerage accounts incurred in the ordinary course of business and (v) encumbering reasonable customary initial deposits and margin deposits;

(l)Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights as to Deposit Accounts, Securities Accounts, or Commodities Accounts or other funds or investments maintained with depository institutions or securities intermediaries arising in the ordinary course of business;

(m) (i) leases, subleases, licenses or sublicenses of property in the ordinary course of business or (ii) rights reserved to or vested in any Person by the terms of any lease, license, franchise, grant or permit held by the Borrower or any Subsidiary Guarantor or by a statutory provision to terminate any such lease, license, franchise, grant or permit or to require periodic payments as a condition to the continuance thereof;

(n) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(o) Liens consisting of an agreement to dispose of any property in a transaction permitted under **Section 6.05**;

(p) Liens arising from precautionary UCC financing statements (or similar filings under other Applicable Law) regarding operating leases or consignment or bailee arrangements;

(q) Liens, solely with respect to the Loan Parties' real estate, securing Indebtedness permitted under **Section 6.01(h)**; provided that any such Liens are granted pursuant to documentation approved by the Required Lenders and in accordance with the Approved Budget;

(r) Liens of the Administrative Agent granted by the Orders or created pursuant to any Loan Document;

(s) Liens (i) arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Borrower or any Subsidiary Guarantor in the ordinary course of business and (ii) arising by operation of law under Article 2 of the UCC;

(t) Liens securing the Pre-Petition Obligations; provided that Liens securing the Revolving Obligations and FILO B Obligations (other than Pre-Petition ABL Disputed Amounts until the funding of any amounts following the Pre-Petition Resolution Date and the Pre-Petition Contingent LC Obligations until the Pre-Petition LC Termination) shall be released in connection with the entry of the Interim Order;

(u) Liens on insurance policies and the proceeds thereof securing the financing of Indebtedness permitted pursuant to **Section 6.01(j)(i)**;

(v) the Adequate Protection Liens;

(w) Liens securing obligations in respect of letters of credit permitted under Section **6.01(c), (e), (h) and (n)**;

(x) Liens, encumbrances and other matters disclosed as exceptions in Schedule B, or insured over by, title insurance policies; and

(y) Other title and survey exceptions as Administrative Agent (at the direction of the Required Lenders) has approved or may approve in writing in Administrative Agent's reasonable discretion which Permitted Encumbrances in the aggregate to done materially and adversely affect the value or use of the property.

The prohibition provided for in this **Section 6.02** specifically includes any effort by any Loan Party, any official committee in any Chapter 11 Case or any other party in interest in the Chapter 11 Cases, as applicable, to prime or create *pari passu* to any claims, Liens or interests of the Administrative Agent and

the Lenders in each case, other than as set forth in the applicable Orders and irrespective of whether such claims, Liens or interests may be "adequately protected."

Section 6.03      [Reserved].

Section 6.04      Investments, Loans and Advances.  Purchase, hold or acquire any Equity Interests, evidences of Indebtedness or other securities of, make or permit to exist any loans or advances to or Guarantees of the obligations of, another Person or make any Acquisition (each, an "**Investment**"), except:

(a)the Transactions;

(b)Investments among the Borrower and Subsidiary Guarantors in accordance with the Approved Budget; provided, that, in each case, if any such Investment is in the form of Indebtedness of a Loan Party, such Investment shall be subordinated to the Secured Obligations on terms reasonably satisfactory to the Administrative Agent;

(c)Permitted Investments;

(d)Investments arising out of the receipt by the Borrower or any Subsidiary of promissory notes and other non-cash consideration for Dispositions permitted under **Section 6.05**;

(e)accounts receivable, notes receivable, security deposits and prepayments arising and trade credit granted in the ordinary course of business and any Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers made in the ordinary course of business;

(f)Investments in existence on the date hereof and described in Schedule 6.04;

(g)Investments resulting from pledges and deposits permitted by **Section 6.02(b)**, **(e), (f) and (t)**;

(h)Guarantees (i) permitted by **Sections 6.01** and (ii) of leases (other than Capital Lease Obligations) or of other obligations not constituting Indebtedness, in each case in the ordinary course of business;

(i)Investments received in connection with the bankruptcy or reorganization of any Person, or settlement of obligations of, or other disputes with or judgments against, or foreclosure or deed in lieu of foreclosure with respect to any Lien held as security for an obligation, in each case in the ordinary course of business;

(j)Investments consisting of Liens permitted under **Section 6.02**;

(k)Investments in the ordinary course of business consisting of (i) endorsements for collection or deposit or (ii) customary trade arrangements with customers, in accordance with the Approved Budget; or

(l)Investments made in the ordinary course of business in connection with obtaining, maintaining or renewing client and customer contracts and loans or advances made to, and guarantees with respect to obligations of, distributors, suppliers, licensors and licensees in the ordinary course of business, in each case, in accordance with the Approved Budget.

68

Section 6.05    <u>Mergers, Consolidations and Dispositions</u>.    Merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or Dispose of (in one (1) transaction or in a series of related transactions) all or any part of its assets (whether now owned or hereafter acquired), or Dispose of any Equity Interests of any Subsidiary of the Borrower (including pursuant to any Division), except that this **<u>Section 6.05</u>** shall not prohibit:

(a)(i) the Disposition of inventory and equipment in the ordinary course of business by the Borrower or any Subsidiary, (ii) the Disposition of surplus, obsolete, used or worn out property, whether now owned or hereafter acquired, in the ordinary course of business by the Borrower or any Subsidiary, (iii) the leasing or subleasing of real property in the ordinary course of business by the Borrower or any Subsidiary or (iv) Dispositions of cash and Permitted Investments, in each case in the ordinary course of business and in accordance with the Approved Budget;

(b)if at the time thereof and immediately after giving effect thereto no Event of Default shall have occurred and be continuing, (i) the merger of any Subsidiary of Holdings (which shall either be (A) newly formed expressly for the purpose of such transaction and which owns no assets, (B) Intermediate Holdings or (C) a Subsidiary of the Borrower) into the Borrower in a transaction in which the Borrower is the surviving or resulting entity or the surviving or resulting Person expressly assumes the obligations of the Borrower in a manner reasonably satisfactory to the Required Lenders (for the avoidance of doubt, the Borrower shall not be permitted to consummate a Division), (ii) the merger or consolidation of any Subsidiary with or into any other Subsidiary; <u>provided</u> that in any such merger or consolidation involving any Subsidiary Guarantor, a Subsidiary Guarantor shall be the surviving or resulting Person or such transaction shall be an Investment permitted by **<u>Section 6.04</u>**, (iii) the liquidation or dissolution of any Subsidiary (other than the Borrower) or change in form of entity of any Subsidiary if the Borrower determines in good faith that such liquidation, dissolution or change in form is in the best interests of the Borrower and is not disadvantageous to the Lenders, or (iv) the merger of Parent and Intermediate Holdings (or the dissolution or consolidation of Intermediate Holdings) or;

(c)the Specified Store Closing Sales;

(d)Dispositions of receivables in the ordinary course of business (i) not as part of an accounts receivables financing transaction or (ii) in connection with the collection, settlement or compromise thereof in a bankruptcy or similar proceeding;

(e)licensing and cross-licensing arrangements involving any technology or other Intellectual Property of the Borrower or any Subsidiary Guarantor in the ordinary course of business;

(f)[Reserved]

(g)[Reserved;]

(h)Dispositions of property subject to casualty or condemnation proceeding (including in lieu thereof) upon receipt of the Net Proceeds therefor;

(i)Dispositions of property in the ordinary course of business consisting of the abandonment of Intellectual Property rights which, in the reasonable good faith determination of the Borrower, are not material to the conduct of the business of the Borrower and the Subsidiaries;

(j)Dispositions of the Real Property and related assets in the ordinary course of business in connection with relocation activities for directors, officers, employees, members of

69

management, or consultants of the Borrower and the Subsidiaries;

(k)the expiration of any option agreement in respect of real or personal property;

(l)any Subsidiary of the Borrower may consummate a merger, dissolution, liquidation or consolidation, the purpose of which is to effect a Disposition otherwise permitted under this **Section 6.05**; or

(m)Dispositions in connection with the outsourcing of services in the ordinary course of business.

Section 6.06    <u>Dividends and Distributions</u>.  Declare or pay, directly or indirectly, any dividend or make any other distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, with respect to any Equity Interests of the Borrower (other than dividends and distributions on such Equity Interests payable solely by the issuance of additional Equity Interests of the Borrower) or directly or indirectly redeem, purchase, retire or otherwise acquire for value any Equity Interests of the Borrower or set aside any amount for any such purpose (other than through the issuance of additional Equity Interests of the Person redeeming, purchasing, retiring or acquiring such shares) (a "**Restricted Payment**"); provided, however, that the Borrower may make Restricted Payments as shall be necessary to allow Holdings (or any Parent Entity) (i) to pay operating expenses in the ordinary course of business and other corporate overhead, legal, accounting and other professional fees and expenses (including, without limitation, those owing to third parties plus any customary indemnification claims made by directors, officers, employees, members of management and consultants of Holdings (or any Parent Entity) attributable to the ownership or operations of Holdings, the Borrower and the Subsidiaries), and (ii) to pay franchise or similar taxes and other fees and expenses required in connection with the maintenance of its existence and its ownership of the Borrower and in order to permit Holdings to make payments (other than cash interest payments) which would otherwise be permitted to be paid by the Borrower under **Section 6.07(b)**, in each case, in accordance with the Approved Budget.

Section 6.07    <u>Transactions with Affiliates</u>.  No Loan Party will, nor will it permit any Subsidiary to enter into, renew, extend or be a party to any transaction of any kind with any Affiliate of any Loan Party, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to the Loan Parties or such Subsidiary as would be obtainable by the Loan Parties or such Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate, provided that the foregoing restriction shall not apply to (a) a transaction between or among any Loan Parties, (b) a transaction between or among any Subsidiaries that are not Loan Parties, (c) Investments permitted under **Section 6.04**, (d) transactions, arrangements, reimbursements and indemnities permitted between or among such parties under this Agreement, (e) the payment of reasonable fees and costs to directors, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers and employees of the Loan Parties or any of their Subsidiaries in accordance with the Approved Budget, (f) the Borrower and its Subsidiaries may provide cash management and corporate overhead services to the Subsidiaries of the Borrower, or (g) those transactions existing as of the date hereof and set forth on Schedule 6.07.

Section 6.08    <u>Business of Holdings, the Borrower and the Subsidiaries</u>.  Notwithstanding any other provisions hereof, engage at any time in any business or business activity other than:

(a)in the case of Holdings, (i) ownership and acquisition of Equity Interests in Intermediate Holdings or the Borrower, as applicable, together with activities directly related thereto, (ii) performance of its obligations under and in connection with the Loan Documents and the other agreements contemplated hereby and thereby, (iii) actions incidental to the consummation of the

Transactions (including the payment of Transaction Costs), (iv) the incurrence of and performance of its obligations related to Indebtedness and Guarantees incurred by Holdings after the Closing Date and that are related to the other activities referred to in, or otherwise permitted by, this **Section 6.08(a)**, (v) actions required by law to maintain its existence, (vi) the payment of taxes and other customary obligations, (vii) the issuance of Equity Interests and (viii) any transaction permitted in this **Article VI** (including guaranteeing Indebtedness or obligations of the Borrower and its Subsidiaries) and, in all cases, activities incidental to its maintenance and continuance and to the foregoing activities, or

(b)in the case of the Borrower and any Subsidiary, any business or business activity conducted by any of them on the Closing Date and any business or business activities incidental or related thereto, or any business or activity that is reasonably similar thereto or a reasonable extension, development or expansion thereof or ancillary thereto.

Notwithstanding anything to the contrary contained in herein, Holdings shall not sell, dispose of, grant a Lien on or otherwise transfer its Equity Interests in Intermediate Holdings or the Borrower, as applicable (other than (i) Liens created by the Security Documents, or (ii) Liens arising by operation of law that would be permitted under **Section 6.02**).

Section 6.09    Limitation on Modification of Indebtedness; Modification of Certificate of Incorporation, By-Laws and Certain Other Agreements; etc.

(a)Amend or modify in any manner materially adverse to the Lenders, or grant any waiver or release under or terminate in any manner (if such granting or termination shall be materially adverse to the Lenders), (i) the articles or certificate of incorporation or by-laws or limited liability company operating agreement of Holdings, the Borrower or any of the Subsidiary Guarantors or (ii) any documents relating to any Material Indebtedness (provided that immaterial amendments of an administrative, mechanical, ministerial or technical nature may be made so long as contemporaneous notice thereof is given to the Administrative Agent), other than with the prior written consent of the Required Lenders; or

(b)Permit the Borrower or any Subsidiary to enter into any agreement or instrument that by its terms restricts (i) the payment of dividends or distributions or the making of cash advances to (or the repayment of cash advances from) the Borrower or any Subsidiary or (ii) the granting of Liens on Collateral pursuant to the Security Documents, in each case other than those arising under any Loan Document, except, in each case, restrictions existing by reason of:

(i)restrictions imposed by Applicable Law;

(ii)restrictions in the Pre-Petition Loan Documents;

(iii)customary provisions contained in leases, subleases, licenses or sublicenses of Intellectual Property and other similar agreements entered into in the ordinary course of business;

(iv)customary provisions restricting subletting or assignment of any lease governing a leasehold interest;

(v)customary provisions restricting assignment of any agreement entered into in the ordinary course of business;

(vi)customary restrictions and conditions contained in any agreement relating to any Disposition permitted under **Section 6.05** pending the consummation of such Disposition;

71

(vii)customary restrictions and conditions contained in the document relating to any Lien, so long as (A) such Lien is permitted under **Section 6.02** and such restrictions or conditions relate only to the specific asset subject to such Lien and the proceeds and products thereof, and (B) such restrictions and conditions are not created for the purpose of avoiding the restrictions imposed by this **Section 6.09**;

(viii)customary net worth provisions contained in the Real Property leases entered into by Subsidiaries of the Borrower, so long as the Borrower has determined in good faith that such net worth provisions could not reasonably be expected to impair the ability of the Borrower and its Subsidiaries to meet their ongoing obligations;

(ix)restrictions in the Orders.

Section 6.10    Financial Covenants.

(a)Minimum Inventory. The Loan Parties shall deliver a report on or prior to the 15th Business Day of each month confirming that for the prior fiscal month the Loan Parties maintained a minimum of $30 million worth of Eligible Inventory.

(b)Loan-to-Value Ratio. With respect to any calendar week, Loan-to-Value Ratio for such week shall not exceed 65.0%.

(c) Lease Renegotiation. The Loan Parties shall make commercially reasonable efforts to renegotiate the DC leases in consultation with Required Lenders.

Section 6.11    Use of Proceeds.  The Borrower will not request any Borrowing, and the Borrower shall not use, and shall procure that Holdings, its Subsidiaries and its or their respective directors, officers, employees and agents shall not use directly or indirectly, the proceeds of any Borrowing (a) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws or any Sanctions, (b) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or (c) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

Section 6.12    Orders.  Notwithstanding anything to the contrary herein, no Loan Party shall use any portion or proceeds of the Loans or the Collateral, or disbursements set forth in the Approved Budget, for payments or purposes that would violate the terms of the Order and the Final Order.

Section 6.13    Prepayments of Other Debt.  Other than pursuant to an order of the Court and in accordance with the Approved Budget, directly or indirectly, voluntarily purchase, redeem, defease or prepay any principal of, premium, if any, interest or other amount payable in respect of any Indebtedness prior to its scheduled maturity, other than (i) the Obligations, (ii) the Pre-Petition Term Loans and the Pre-Petition FILO C Convertible Notes that converted to Roll-Up Loans, (iii) any payments in respect of accrued payroll and related expenses as of the commencement of the Chapter 11 Cases in accordance with the Approved Budget and (iv) the Bridge Loans.

Section 6.14    Reclamation of Claims. No Loan Party shall enter into any agreement to return any of its Inventory to any of its its creditors for application against any pre-petition Indebtedness, pre-petition trade payables or other pre-petition claims under Section 546(c) of the Bankruptcy Code or allow any creditor to take any setoff or recoupment against any of its pre-

petition Indebtedness, pre-petition trade payables or other pre-petition claims based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement, setoff or recoupment, the aggregate amount applied to pre-petition Indebtedness, pre-petition trade payables and other pre-petition claims subject to all such agreements, setoffs and recoupments since the Petition Date would exceed $1,000,000.

Section 6.15    <u>Insolvency Proceeding Claims</u>.  No Loan Party shall incur, create, assume, suffer to exist or permit any other superpriority administrative claim which is *pari passu* with or senior to the claim of the Administrative Agent or the Lenders against the Loan Parties.

Section 6.16    <u>Bankruptcy Actions</u>.  No Loan Party shall seek, consent to, or permit to exist, without the prior written consent of the Required Lenders, any order granting authority to take any action that is prohibited by the terms of this Agreement, the Orders or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement, the Orders or any of the other Loan Documents.

Section 6.17    <u>Subrogation</u>.  No Loan Party shall assert any right of subrogation or contribution against any other Loan Party.

Section 6.18    <u>Modification of Engagement Letter</u>.   The Loan Parties shall not amend, supplement or modify, or permit the amendment, the supplementing or modification of, any provision of the Borrower Financial Advisor Engagement Letter in any manner that is adverse in any material respect to the interest of the Administrative Agent or the Lenders without the consent of the Required Lenders.

ARTICLE VII

Events of Default

Section 7.01    <u>Events of Default</u>.  In case of the happening of any of the following events (each, an "**Event of Default**"):

(a) any representation, warranty or certification made or deemed made by or on behalf of any Loan Party or any Subsidiary in, or in connection with, this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any other Loan Document or any amendment or modification hereof or thereof or waiver hereunder or thereunder (including, without limitation, any Budget Compliance Report or Compliance Certificate), shall prove to have been false or misleading in any material respect when made or deemed made;

(b) default shall be made in the payment of any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise;

(c) default shall be made in the payment of any interest on any Loan or in the payment of any Fee or any other amount (other than an amount referred to in **paragraph (b)** above) due under any Loan Document, when and as the same shall become due and payable;

(d) default shall be made in the due observance or performance by Holdings, the Borrower or any of the Subsidiaries of any covenant, condition or agreement contained in

73

**Sections 5.01**, **5.02**, **5.04**, **5.05**, **5.06**, **5.07**, **5.13**, **5.14**, **5.15**, **5.16**, **5.17**, **5.18**, **5.19**, **5.20**, **5.21** or in **Article VI**;

(e)default shall be made in the due observance or performance by Holdings, the Borrower or any of the Subsidiaries of any covenant, condition or agreement contained in any Loan Document (other than those specified in **paragraphs (b)**, **(c)** and **(d)** above) and such failure shall continue unremedied for a period of 10 days after the earlier of a Responsible Officer's knowledge of such breach or notice thereof from the Administrative Agent if such breach relates to terms or provisions of any other Section of this Agreement;

(f)except for defaults occasioned by the filing of the Chapter 11 Cases or entry into this Agreement or resulting from obligations with respect to which the Bankruptcy Code prohibits any Loan Party or any Subsidiary from complying or permits any Loan Party or Subsidiary not to comply (i) any event or condition occurs that (A) results in any Material Indebtedness becoming due prior to its scheduled maturity or (B) enables or permits (with all applicable grace periods having expired) the holder or holders any Material Indebtedness or any trustee or agent on its or their behalf to cause any such Material Indebtedness become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity, (ii) Holdings, the Borrower or any Loan Party fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) and such payment is not made within any applicable grace period in respect of any Material Indebtedness (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement);

(g)there shall have occurred a Change in Control;

(h)[reserved];

(i)[reserved];

(j)there is entered against Holdings, the Borrower or any Subsidiary one (1) or more final judgments or orders for the payment of money aggregating in excess of $1.0 million (to the extent not covered by third-party insurance as to which the insurer has been notified of such judgment and does not deny coverage), which judgments are not subject to the Automatic Stay for a period of twenty (20) consecutive days, or any action shall be legally taken by a judgment creditor to levy upon assets or properties of Holdings, the Borrower or any Subsidiary to enforce any such judgment;

(k)(i) an ERISA Event and/or a Foreign Plan Event shall have occurred, (ii) a trustee shall be appointed by a United States district court to administer any Plan(s) or (iii) any Loan Party or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that it has incurred or will be assessed Withdrawal Liability to such Multiemployer Plan and such Person does not have reasonable grounds for contesting such Withdrawal Liability or is not contesting such Withdrawal Liability in a timely and appropriate manner; and in each case in **clauses (i)** through **(iii)** above, such event or condition, together with all other such events or conditions, if any, could reasonably be expected to have a Material Adverse Effect;

(l)(i) any Loan Document or any material provision of any Loan Document shall for any reason cease to be, or shall be asserted in writing by Holdings, the Borrower or any Subsidiary not to be, a legal, valid and binding obligation of any party thereto, (ii) except as permitted by the terms of any Security Document, (A) any Security Document shall for any reason fail to create a valid security interest in any Collateral purported to be covered thereby, or (B) the Orders, any Security Document shall for any reason (other than pursuant to the terms thereof) cease to create a valid and

74

perfected or recorded Lien on and security interest in any portion of the Collateral purported to be covered thereby, or such Lien or other security interest shall cease to have the status and priority provided in the Orders or (iii) the Loan Guaranty shall fail to remain in full force or effect or any action shall be taken to discontinue or to assert the invalidity or unenforceability of the Loan Guaranty, or any Subsidiary Guarantor shall deny that it has any further liability under the Loan Guaranty to which it is a party, or shall give notice to such effect;

(m) [reserved];

(n) [reserved];

(o) the failure of the Loan Parties to obtain the Final Order from the Court not later than thirty five (35) days after the date of entry of the Interim Order;

(p) the Loan Parties shall fail to meet timely any Case Milestone, deliver timely any report or information, or meet timely any other deadline under the Interim Order or the Final Order;

(q) the occurrence of any of the following in the Chapter 11 Cases; provided that, notwithstanding anything in the Loan Documents to the contrary, it shall not be an Event of Default if: (i) the Bankruptcy Court permits the repayment of the Pre-Petition ABL Disputed Amounts (in whole or in part) to the respective Pre-Petition ABL Lenders, or such fees are otherwise permitted to be paid in the course of the Chapter 11 Cases or (ii) the Bankruptcy Court does not approve (in any manner) the Roll-Up Loans or such loans are not otherwise permitted in the course of the Chapter 11 Cases:

(i) the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by any of the Loan Parties or any Subsidiary, or any Person claiming by or through any Loan Party or any Subsidiary, in the Chapter 11 Cases: (A) to obtain additional financing under Section 364(c) or Section 364(d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (B) to grant any Lien other than Liens permitted pursuant to **Section 6.02** upon or affecting any Collateral; (C) except as provided in the Interim Order or Final Order, as the case may be, to use cash collateral of the Administrative Agent and the other Secured Parties under Section 363(c) of the Bankruptcy Code without the prior written consent of the Required Lenders; or (D) any other action or actions materially adverse to the Administrative Agent and Lenders, as a whole, or their rights and remedies hereunder, under any other Loan Documents, or their interest in the Collateral;

(ii) (A) the filing of any plan of reorganization, sale order or disclosure statement attendant thereto, or any direct or indirect amendment to such plan, sale order or disclosure statement, by a Loan Party that does not propose to indefeasibly repay in full in cash the Secured Obligations or by any other Person to which the Administrative Agent and the Lenders do not consent, or any of the Loan Parties or their Subsidiaries shall seek, support or fail to contest in good faith the filing or confirmation of any such plan or entry of any such order, (B) the entry of any order terminating any Loan Party's exclusive right to file a plan of reorganization, or (C) the expiration of any Loan Party's exclusive right to file a plan of reorganization;

(iii) the entry of an order in any of the Chapter 11 Cases confirming a plan of reorganization that (A) is not reasonably acceptable to the Required Lenders, or (B) does not contain a provision for termination of the Commitments and indefeasible repayment in full in cash of all of the Secured Obligations on or before the effective date of such plan or plans;

(iv) (A) the entry of an order amending, supplementing, staying, vacating or

75

otherwise modifying the Loan Documents or the Interim Order or the Final Order without the written consent of the Required Lenders or the filing of a motion by the Loan Parties or its Affiliates for reconsideration with respect to the Interim Order or the Final Order, or the Interim Order or the Final Order shall otherwise not be in full force and effect without the prior written consent of the Administrative Agent and the Required Lenders in their sole discretion, or (B) any Loan Party or any Subsidiary shall fail to comply with the Orders in any material respect; or

(v)the payment of, or application for authority to pay, any pre-petition claim without Required Lenders' prior written consent unless (x) in accordance with the Approved Budget; or (y) pursuant to an Order of the Court and in the case of clause (y) the aggregate amount of all payments made thereunder shall not exceed $1,000,000; or

(vi)the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the Administrative Agent, any Lender or any of the Collateral; or

(vii)(A) the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of a trustee receiver or an examiner in the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Loan Parties; or (B) the sale without the Required Lenders' consent of all or substantially all of the Loan Parties' assets either through a sale under Section 363, through a confirmed plan of reorganization in the Chapter 11 Cases or otherwise that does not result in payment in full in cash of all of the Secured Obligations at the closing of such sale or initial payment of the purchase price or effectiveness of such plan, as applicable; or

(viii)entry of an order for the dismissal or conversion to Chapter 7 of any Loan Party's bankruptcy case; the appointment of a bankruptcy trustee, examiner or other fiduciary with decision making authority except with the express written consent of the Administrative Agent (at the direction of the Required Lenders); the granting of any other superpriority administrative expense claim or the entry of an order granting relief from the Automatic Stay (if not in favor of the Administrative Agent) except with the express written consent of the Administrative Agent; any Loan Party shall attempt to vacate or modify the Interim Order or the Final Order over the objection of the Administrative Agent (at the direction of the Required Lenders); or any Loan Party shall institute any proceeding or investigation or support same by any other person who seeks to challenge the status and/or validity of the liens of the Administrative Agent (as security for the Lenders); or

(ix)any Loan Party shall file a motion seeking, or the Court shall enter an order granting, relief from or modifying the Automatic Stay involving assets with an aggregate value in excess of $250,000 (A) to allow any creditor (other than the Administrative Agent) to execute upon or enforce a Lien on any Collateral not approved by the Required Lenders, (B) approving any settlement or other stipulation not approved by the Required Lenders with any secured creditor of any Loan Party providing for payments as adequate protection or otherwise to such secured creditor, (C) with respect to any Lien on or the granting of any Lien on any Collateral not approved by the Required Lenders to any federal, state or local environmental or regulatory agency or authority, which in either case involves a claim that would have a Material Adverse Effect on the Loan Parties or their estates (taken as a whole) or more or (D) to permit other actions that would have a Material Adverse Effect on the Loan Parties or their estates (taken as a whole); or

(x)the commencement of a suit or an action (but not including a motion for standing to commence a suit or an action) against either the Administrative Agent or any Lender and, as to any suit or action brought by any Person other than a Loan Party or a Subsidiary, officer or employee of a Loan Party, the continuation thereof without dismissal for thirty (30) days after service thereof on either the Administrative Agent or such Lender, that asserts or seeks by or on behalf of a Loan Party, any state or

federal environmental protection or health and safety agency, any official committee in any Chapter 11 Case or any other party in interest in any of the Chapter 11 Cases, a claim or any legal or equitable remedy that would (x) have the effect of invalidating, subordinating or challenging any or all of the Secured Obligations or Liens of the Administrative Agent or any Lender under the Loan Documents to any other claim, or (y) have a Material Adverse Effect on the rights and remedies of the Administrative Agent or any Lender under any Loan Document or the collectability of all or any portion of the Secured Obligations; or

(xi) the entry of an order in the Chapter 11 Cases avoiding or permitting recovery of any portion of the payments made on account of the Secured Obligations; or

(xii) the failure of any Loan Party to perform any of its material obligations under, or the occurrence of an event of default under or as defined in, the Interim Order, the Final Order or any order of the Court approving any Plan of Reorganization, a Section 363 Sale, or to perform in any material respect its material obligations under any order of the Court approving bidding procedures; or

(xiii) the existence of any claims or charges, or the entry of any order of the Court authorizing any claims or charges, other than in respect of this Agreement and the other Loan Documents, or as otherwise permitted under the applicable Loan Documents or permitted under the Orders, entitled to superpriority administrative expense claim status in any Chapter 11 Case pursuant to Section 364(c)(1) of the Bankruptcy Code pari passu with or senior to the claims of the Administrative Agent and the Secured Parties under this Agreement and the other Loan Documents, or there shall arise or be granted by the Court (A) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code or (B) any Lien on the Collateral having a priority senior to or pari passu with the Liens and security interests granted herein, except, in each case, as expressly provided in the Loan Documents or in the Orders then in effect (but only in the event specifically consented to by the Administrative Agent (at the direction of the Required Lenders)), whichever is in effect; or

(xiv) the Orders shall cease to create a valid and perfected Lien on the Collateral or to be in full force and effect, shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, in the case of modification or amendment, without prior written consent of Administrative Agent; or

(xv) an order in the Chapter 11 Cases shall be entered charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Administrative Agent and the Secured Parties, or the commencement of other actions that is materially adverse to Administrative Agent, the Secured Parties or their respective rights and remedies under the Loan Documents in any of the Chapter 11 Cases or inconsistent with any of the Loan Documents; or

(xvi) if the Final Order does not include a waiver, in form and substance satisfactory to the Required Lenders, of the right to surcharge the Collateral under Section 506(c) of the Bankruptcy Code; or

(xvii) an order of the Court shall be entered denying or terminating use of cash collateral by the Loan Parties; or

(xviii) an order materially adversely impacting the rights and interests of the Administrative Agent and the Lenders, as determined by the Required Lenders, shall have been entered by the Court; or

(xix) any Loan Party shall challenge, support or encourage a challenge of any

77

payments made to the Administrative Agent or any Lender with respect to the Secured Obligations; or

(xx)other than the Specified Store Closing Sales, any Loan Party or any person on behalf of any Loan Party shall file any motion seeking authority to consummate a sale of assets of the Loan Parties or the Collateral to the extent having a value in excess of $2,000,000 outside the ordinary course of business and not otherwise permitted hereunder and without the Administrative Agent's consent (at the direction of the Required Lenders); or

(xxi)any Loan Party shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition Indebtedness or payables other than payments (A) in respect of accrued payroll and related expenses as of the commencement of the Chapter 11 Cases, (B) in respect of certain creditors as may be reasonably acceptable to the Required Lenders and (C) permitted under this Agreement, in each case, to the extent authorized or required by one or more "first day" or "second day" orders or any of the Orders (or other orders with the consent of the Administrative Agent (at the direction of the Required Lenders)) and consistent with the Approved Budget; or

(xxii)if, unless otherwise approved by the Required Lenders, an order of the Court shall be entered providing for a change of venue with respect to any of the Chapter 11 Cases and such order shall not be reversed or vacated within ten (10) days; or

(xxiii)any Loan Party or any Subsidiary thereof shall file any motion or other request with the Court seeking (A) to grant or impose, under Section 364 of the Bankruptcy Code or otherwise, liens or security interests in any DIP Collateral (as defined in the Orders), whether senior, equal or subordinate to the Administrative Agent's liens and security interests; or (B) to modify or affect any of the rights of the Administrative Agent or the Lenders under the Orders or the Loan Documents and related documents by any plan of reorganization confirmed in the Chapter 11 Cases or subsequent order entered in the Chapter 11 Cases; or

(xxiv)[reserved]; or

(xxv)any Loan Party or any Subsidiary thereof shall take any action in support of any matter set forth in this clause (q) or any other Person shall do so and such application is not contested in good faith by the Loan Parties and the relief requested is granted in an order that is not stayed pending appeal;

then, and in every such event, and at any time thereafter during the continuance of such event, subject to the Orders and the terms thereof and notwithstanding the provisions of Section 362 of the Bankruptcy Code and without notice, application or motion, hearing before, or order of the Court, the Administrative Agent may, and at the request of the Required Lenders shall (subject to Article VIII), by notice to the Borrower, take any or all of the following actions, at the same or different times: (i) terminate the Commitments, whereupon the Commitments shall terminate immediately, but without affecting the Administrative Agent's Liens or the Secured Obligations, (ii) declare the Loans then outstanding to be due and payable in whole, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding, (iii) [reserved], (iv) declare that the application of the Carve-Out has occurred through the delivery of a Carve-Out Trigger Notice (as defined in the Orders) to the Borrower, (v) subject to the Remedies Notice Period, direct any or all of the Loan Parties to sell or otherwise dispose of any or all of the Collateral on terms and conditions acceptable to the Administrative Agent

(acting at the direction of the Required Lenders) pursuant to Section 363, Section 365 and other applicable provisions of the Bankruptcy Code (and, without limiting the foregoing, direct any Loan Party to assume and assign any lease or executory contract included in the Collateral to the Administrative Agent's designees in accordance with and subject to Section 365 of the Bankruptcy Code); and/or (vi) subject to the Remedies Notice Period, (A) exercise on behalf of itself and the Secured Parties all rights and remedies available to it and the Secured Parties under the Loan Documents or Applicable Law or (B) take any and all actions described in the Orders, including, without limitation, those actions specified in the Orders after the occurrence of any Event of Default.

At any hearing during the Remedies Notice Period to contest the enforcement of remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred, and the Loan Parties hereby waive their right to and shall not be entitled to seek relief, including, without limitation, under Section 105 of the Bankruptcy Code, to the extent that such relief would in way impair or restrict the rights and remedies of the Administrative Agent or the Secured Parties, as set forth in this Agreement, the applicable Order or other Loan Documents. It is agreed and understood that the Administrative Agent (acting at the direction of the Required Lenders) may not charge default interest pursuant to this Agreement during such time as the occurrence of such Event of Default is being contested during the Remedies Notice Period but once determined that such Event of Default exists, the Administrative Agent may charge default interest pursuant to this Agreement retroactively to cover the period from which the Event of Default exists through the date of determination.

The Automatic Stay shall terminate, and the Administrative Agent may exercise rights and remedies in accordance with the Loan Documents and Applicable Law.  Notwithstanding the foregoing, the Lenders shall not be obligated to provide any Loans at any time a default or an Event of Default has occurred.

The Administrative Agent (together with its agents, representatives and designees) is hereby granted an irrevocable, non-exclusive license or other right to use, license or sub-license (without payment of royalty or other compensation to any Person) any or all Intellectual Property of the Loan Parties, computer hardware and software, trade secrets, brochures, customer lists, promotional and advertising materials, labels, packaging materials and other property, in advertising for sale, marketing, selling, collecting, completing manufacture of, or otherwise exercising any rights or remedies with respect to, any Collateral, in each case, after the occurrence and during the continuance of an Event of Default, subject to the rights, remedies and priorities under the Orders. The Administrative Agent (together with its agents, representatives and designees) is hereby granted a non-exclusive right to have access to, and a rent-free right to use, any and all owned or leased locations (including, without limitation, warehouse locations, distribution centers and Store locations) for the purpose of arranging for and effecting the sale or disposition of Collateral, including the production, completion, packaging and other preparation of such Collateral for sale or disposition, and to engage in bulk sales of Collateral, which rights shall be subject to the Orders. It is further understood and agreed that the Administrative Agent and its representatives (and persons employed on their behalf) may continue to operate, service, maintain, process and sell the Collateral, subject to the Orders. Upon the occurrence and the continuance of an Event of Default and the exercise by the Administrative Agent or Lenders of their rights and remedies under this Agreement and the other Loan Documents, the Loan Parties shall assist the Administrative Agent and Lenders in effecting a sale or other disposition of the Collateral upon such terms as are reasonably acceptable to the Administrative Agent, subject to the Orders.

Section 7.02    Allocation.  Notwithstanding anything herein to the contrary, upon the occurrence and during the continuance of an Event of Default, monies to be applied to the Secured Obligations, whether arising from payments by the Loan Parties, realization on Collateral, setoff or otherwise, shall be allocated as follows:

(a)first, to payment of that portion of the Obligations constituting fees, indemnities,

expenses (including extraordinary expenses) and other amounts, owing to the Administrative Agent in its capacity as such;

(b)second, to payment of that portion of the Obligations constituting indemnities, expenses, and other amounts (other than principal, interest and fees) payable to the Lenders, ratably among them in proportion to the amounts described in this **clause second** payable to them;

(c)[reserved];

(d)third, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans (other than the Roll-Up Loans) and other Obligations (other than Obligations on account of the Roll-Up Loans), and fees ratably among the Lenders in proportion to the respective amounts described in this **clause third** payable to them;

(e)fourth, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Roll-Up Loans and other Obligations on account of the Roll-Up Loans, and fees ratably among the Lenders in proportion to the respective amounts described in this **clause fourth** payable to them;

(f)[reserved];

(g)[reserved];

(h)[reserved]; and

(i)last, the balance, if any, after all of the Obligations have been paid in full, to the Loan Parties or as otherwise required by Law.

Amounts shall be applied to each category of Secured Obligations set forth above until Full Payment thereof and then to the next category. If amounts are insufficient to satisfy a category, they shall be applied on a pro rata basis among the Secured Obligations in the category. If a Secured Party fails to deliver such calculation within five days following request by the Administrative Agent, the Administrative Agent may assume the amount to be distributed is zero. The allocations set forth in this **Section 7.02** are solely to determine the rights and priorities of the Administrative Agent and the Secured Parties as among themselves, and may, except as set forth in the next sentence, be changed by agreement among them without the consent of any Loan Party. If any monies remain after distribution to all of the categories above, such monies shall be returned to the Borrower.

ARTICLE VIII

The Agents

Section 8.01    Appointment, Authority and Duties of the Administrative Agent.

(a)Appointment and Authority. Each Secured Party hereby irrevocably appoints and designates Cantor Fitzgerald Securities as the Administrative Agent under all Loan Documents and Cantor Fitzgerald Securities hereby accepts such appointments. The Administrative Agent may, and each Secured Party authorizes the Administrative Agent to, enter into all Loan Documents to which the Administrative Agent is intended to be a party and accept all Security Documents, for the benefit of Secured Parties. Each Secured Party agrees that any action taken by the Administrative Agent or Required Lenders in accordance with the provisions of the Loan Documents, and the exercise by the

Administrative Agent or Required Lenders of any rights or remedies set forth therein, together with all other powers reasonably incidental thereto, shall be authorized by and binding upon all Secured Parties.  Without limiting the generality of the foregoing, the Administrative Agent shall have the sole and exclusive authority to (a) act as the disbursing and collecting agent for the Lenders with respect to all payments and collections arising in connection with the Loan Documents; (b) execute and deliver as the Administrative Agent each Loan Document, including any intercreditor or subordination agreement, and accept delivery of each Loan Document from any Loan Party or other Person; (c) act as collateral agent for Secured Parties for purposes of perfecting and administering Liens under the Loan Documents, and for all other purposes stated therein; (d) manage, supervise or otherwise deal with Collateral; and (e) take any Enforcement Action or otherwise exercise any rights or remedies with respect to any Collateral under the Loan Documents, Applicable Law or otherwise.  No Secured Party shall have any right individually to take any Enforcement Action or otherwise exercise any rights or remedies with respect to any Collateral under the Loan Documents, Applicable Law or otherwise. The duties of the Administrative Agent shall be ministerial and administrative in nature, and the Administrative Agent shall not have a fiduciary relationship with any Secured Party, Participant or other Person, by reason of any Loan Document or any transaction relating thereto, whether or not a Default or Event of Default shall have occurred or be continuing

(b)Duties.  The Administrative Agent shall not have any duties except those expressly set forth in the Loan Documents.  The conferral upon the Administrative Agent of any right shall not imply a duty to exercise such right, unless instructed to do so by Required Lenders in accordance with this Agreement, together with indemnity or security satisfactory to the Administrative Agent. The rights, privileges and immunities of the Administrative Agent as set forth in this Agreement shall be automatically incorporated by reference to the other Loan Documents, whether or not expressly stated therein

(c)Agent Professionals.  The Administrative Agent may perform its duties through agents and employees.  The Administrative Agent may consult with and employ Agent Professionals, and shall be entitled to act upon, and shall be fully protected in any action taken in good faith reliance upon, any advice given by an Agent Professional.

(d)Instructions of Required Lenders.  The rights and remedies conferred upon the Administrative Agent under the Loan Documents may be exercised without the necessity of joinder of any other party, unless required by Applicable Law.  The Administrative Agent may request instructions from Required Lenders or other Secured Parties with respect to any act (including the failure to act) in connection with any Loan Documents, and may seek assurances to its satisfaction from Secured Parties of their indemnification obligations against all Claims that could be incurred by the Administrative Agent in connection with any act. In the Administrative Agent's sole discretion, such instructions may be delivered by e-mail from the Required Lenders (including through their counsel, who as of the date hereof is Ropes & Gray LLP). The Administrative Agent shall be entitled to refrain from any act until it has received such instructions or assurances, and the Administrative Agent shall not incur liability to any Lender by reason of so refraining.  Instructions of Required Lenders shall be binding upon all Secured Parties, and no Secured Party shall have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent acting or refraining from acting in accordance with the instructions of Required Lenders.  Notwithstanding the foregoing, instructions by and consent of specific Lenders or Secured Parties shall be required to the extent provided in **Section 9.08(b)**.  In no event shall the Administrative Agent be required to take any action that, in its opinion, is contrary to Applicable Law or any Loan Documents or could subject any Agent Indemnitee to personal liability.

Section 8.02    Agreements Regarding Collateral and Field Examination Reports.

(a) <u>Possession of Collateral</u>.  The Administrative Agent and Secured Parties appoint each Lender as agent (for the benefit of Secured Parties) for the purpose of perfecting Liens in any Collateral held or controlled by such Lender, to the extent such Liens are perfected by possession or control.  If any Lender obtains possession or control of any Collateral, it shall notify the Administrative Agent thereof and, promptly upon the Administrative Agent's request, deliver such Collateral to the Administrative Agent or otherwise deal with it in accordance with the Administrative Agent's instructions.

(b) <u>Reports</u>.  The Administrative Agent shall promptly forward to each Lender, when complete, copies of any field audit, examination or appraisal report prepared for the Administrative Agent with respect to any Loan Party or Collateral ("**Report**").  Each Lender agrees (i) that the Administrative Agent does not make any representation or warranty as to the accuracy or completeness of any Report, and shall not be liable for any information contained in or omitted from any Report; (ii) that the Reports are not intended to be comprehensive audits or examinations, and that the Administrative Agent or any other Person performing any audit or examination will inspect only specific information regarding the Collateral and will rely significantly upon the Borrower's books and records as well as upon representations of the Borrower's officers and employees; and (iii) to keep all Reports confidential in accordance with **Section 9.16** and not to distribute or use any Report in any manner other than administration of the Loans and other Obligations.  Each Lender shall indemnify and hold harmless the Administrative Agent and any other Person preparing a Report from any action such Lender may take as a result of or any conclusion it may draw from any Report, as well as from any Claims arising as a direct or indirect result of the Administrative Agent furnishing a Report to such Lender.

Section 8.03    <u>Reliance By the Administrative Agent</u>.  The Administrative Agent shall be entitled to rely, and shall not incur any liability in relying, upon any certification, notice or other communication (including those by telephone, telex, telegram, telecopy or e-mail) believed by it to be genuine and correct and to have been signed, sent or made by the proper Person, and upon the advice and statements of Agent Professionals.  The Administrative Agent shall have a reasonable and practicable amount of time to act upon any instruction, notice or other communication under any Loan Document, and shall not be liable for any such delay in acting.

Section 8.04    <u>Action Upon Default</u>.  The Administrative Agent shall not be deemed to have knowledge of any Default or Event of Default, or of any failure to satisfy any conditions in **Article IV**, unless it has received written notice from the Borrower or Required Lenders specifying the occurrence and nature thereof.  If any Lender acquires knowledge of a Default, Event of Default or failure of such conditions, it shall promptly notify the Administrative Agent and the other Lenders thereof in writing.  Each Secured Party agrees that, except with the written consent of the Required Lenders, it will not take any Enforcement Action, accelerate Obligations, or exercise any right that it might otherwise have under Applicable Law to credit bid at foreclosure sales, UCC sales or other similar dispositions of Collateral or to assert any rights relating to any Collateral.

Section 8.05    <u>Payments Received by Defaulting Lender</u>.  If a Defaulting Lender obtains a payment or reduction of any Obligation, it shall immediately turn over the amount thereof to the Administrative Agent for application under **Section 2.15** and it shall provide a written statement to the Administrative Agent describing the Obligation affected by such payment or reduction.  No Lender shall set off against any Operating Account without the prior consent of the Administrative Agent.

Section 8.06    <u>Limitation on Responsibilities of the Agents</u>.  The Administrative Agent shall not be liable to any Secured Party for any action taken or omitted to be taken under the Loan Documents, except for losses to the extent caused by the Administrative Agent's gross negligence or willful misconduct.  The

82

Agents do not assume any responsibility for any failure or delay in performance or any breach by any Loan Party, Lender or other Secured Party of any obligations under the Loan Documents.  The Agents do not make any express or implied representation, warranty or guarantee to Secured Parties with respect to any Secured Obligations, Collateral, Loan Documents or Loan Party.  No Agent Indemnitee shall be responsible to Secured Parties for any recitals, statements, information, representations or warranties contained in any Loan Documents; the execution, validity, genuineness, effectiveness or enforceability of any Loan Documents; the genuineness, enforceability, collectability, value, sufficiency, location or existence of any Collateral, or the validity, extent, perfection or priority of any Lien therein; the validity, enforceability or collectability of any Secured Obligations; or the assets, liabilities, financial condition, results of operations, business, creditworthiness or legal status of any Loan Party or Account Debtor. Any reference in the Agreement or the other Loan Documents in any matter being in form and/or substance satisfactory to the Administrative Agent shall be deemed to refer to the Administrative Agent acting at the direction of the Required Lenders.  No Agent Indemnitee shall have any obligation to any Secured Party to ascertain or inquire into the existence of any Default or Event of Default, the observance by any Loan Party of any terms of the Loan Documents, or the satisfaction of any conditions precedent contained in any Loan Documents. The Administrative Agent shall not be responsible or liable to the Lenders or any other Secured Parties for any failure to monitor or maintain any portion of the Collateral or for the perfection of any Lien on the Collateral. Each party to this Agreement acknowledges and agrees that the Administrative Agent shall have no obligations to file financing statements, amendments to financing statements, or continuation statements, or to perfect or maintain the perfection of any Lien on the Collateral. In no event shall any Agent be responsible or liable for any failure or delay in the performance of their obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, future changes in applicable law or regulation, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that such Agent shall use commercially reasonable efforts consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

Section 8.07    Successor Administrative Agent and Co-Agents.

(a)Resignation; Successor Administrative Agent.  Subject to the appointment and acceptance of a successor Administrative Agent as provided below, the Administrative Agent may resign at any time by giving at least 30 days written notice thereof to Lenders and the Borrower.  Upon receipt of such notice, Required Lenders shall have the right, to appoint a successor Administrative Agent and (provided no Event of Default exists under **Sections 7.01(b)** (with respect to the Borrower only)) is subject to the approval of the Borrower.  If no successor agent is appointed prior to the date that is 30 days from the effective date of the resignation of the Administrative Agent, then the Administrative Agent may appoint a successor agent.  Upon acceptance by a successor Administrative Agent of an appointment to serve as the Administrative Agent hereunder, such successor Administrative Agent shall thereupon succeed to and become vested with all the powers and duties of the retiring Administrative Agent without further act, and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder but shall continue to have the benefits of the indemnification set forth in **Sections 8.14 and 9.05**.  Notwithstanding any Administrative Agent's resignation, the provisions of this **Section 8.07** shall continue in effect for its benefit with respect to any actions taken or omitted to be taken by it while the Administrative Agent.  Any successor to Cantor Fitzgerald Securities by merger or acquisition of stock or this loan shall continue to be the Administrative Agent hereunder without further act on the part of the parties hereto, unless such successor resigns as provided above.

(b)[Reserved].

Section 8.08    <u>Due Diligence and Non-Reliance</u>.  Each Lender acknowledges and agrees that it has, independently and without reliance upon the Agents or any other Lenders, and based upon such documents, information and analyses as it has deemed appropriate, made its own credit analysis of each Loan Party and its own decision to enter into this Agreement and to fund Loans.  Each Secured Party has made such inquiries as it feels necessary concerning the Loan Documents, Collateral and Loan Parties.  Each Secured Party acknowledges and agrees that the other Secured Parties have made no representations or warranties concerning any Loan Party, any Collateral or the legality, validity, sufficiency or enforceability of any Loan Documents or Secured Obligations.  Each Secured Party will, independently and without reliance upon any other Secured Party, and based upon such financial statements, documents and information as it deems appropriate at the time, continue to make and rely upon its own credit decisions in making Loans, and in taking or refraining from any action under any Loan Documents.  Except for notices, reports and other information expressly required to be furnished to or expressly requested by a Lender, the Administrative Agent shall have no duty or responsibility to provide any Secured Party with any notices, reports or certificates furnished to the Administrative Agent by any Loan Party or any credit or other information concerning the affairs, financial condition, business or properties of any Loan Party (or any of its Affiliates) which may come into possession of the Agents and their respective Affiliates.

Section 8.09    <u>Remittance of Payments and Collections</u>.

(a)<u>Remittances Generally</u>.  All payments by any Lender to the Administrative Agent shall be made by the time and on the day set forth in this Agreement, in immediately available funds.  If no time for payment is specified, payment shall be made by Lender not later than 2:00 p.m. (Local Time) on such day.  Payment by the Administrative Agent to any Secured Party shall be made by wire transfer, in the type of funds received by the Administrative Agent.  Any such payment shall be subject to the Administrative Agent's right of offset for any amounts due from such payee under the Loan Documents.

(b)<u>Failure to Pay</u>.  If any Secured Party fails to pay any amount when due by it to the Administrative Agent pursuant to the terms hereof, such amount shall bear interest from the due date until paid at the rate determined by the Administrative Agent as customary in the banking industry for interbank compensation.  In no event shall Borrower be entitled to receive credit for any interest paid by a Secured Party to the Administrative Agent, nor shall any Defaulting Lender be entitled to interest on any amounts held by the Administrative Agent pursuant to **Section 2.15**.

(c)<u>Recovery of Payments</u>.  If the Administrative Agent pays any amount to a Secured Party in the expectation that a related payment will be received by the Administrative Agent from a Loan Party and such related payment is not received, then the Administrative Agent may recover such amount from each Secured Party that received it.  If the Administrative Agent determines at any time that an amount received under any Loan Document must be returned to a Loan Party or paid to any other Person pursuant to Applicable Law or otherwise, then, notwithstanding any other term of any Loan Document, the Administrative Agent shall not be required to distribute such amount to any Lender.  If any amounts received and applied by the Administrative Agent to any Secured Obligations are later required to be returned by the Administrative Agent pursuant to Applicable Law, each Lender shall pay to the Administrative Agent, on demand, such Lender's Pro Rata share of the amounts required to be returned.

Section 8.10    <u>Survival</u>.  This **Article VIII** shall survive Full Payment of the Obligations.  Other than **Sections 8.01**, **8.04** and **8.07**, this **Article VIII** does not confer any rights or benefits upon Borrower or any other Person.  As between Borrower and Administrative Agent, any action that Administrative Agent may take under any Loan Documents or with respect to any Obligations shall be conclusively presumed to have been authorized and directed by Secured Parties.<u>Withholding Tax</u>.  To the extent required by any

Applicable Law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax.  Without limiting or expanding the provisions of **Section 2.11**, each Lender shall indemnify and hold harmless the Administrative Agent against, within 10 days after written demand therefor, any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel Administrative Agent) incurred by or asserted against the Administrative Agent by the IRS or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold Tax from amounts paid to or for the account of any Lender for any reason (including, without limitation, because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding Tax ineffective).  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this **Section 8.11**.  The agreements in this **Section 8.11** shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

Section 8.12    Indemnification.  The Lenders agree to indemnify each Agent in its capacity as such (to the extent not reimbursed by Holdings or the Borrower and without limiting the obligation of Holdings or the Borrower to do so), each in an amount equal to its pro rata share (based on its Commitments hereunder (or if such Commitments shall have expired or been terminated, in accordance with the respective principal amounts of its applicable outstanding Loans)) thereof, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against such Agent in any way relating to or arising out of, the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing; provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from such Agent's gross negligence or willful misconduct.  The agreements in this **Section 8.12** shall survive the payment of the Loans and all other amounts payable hereunder, or the earlier resignation or removal of the Administrative Agent.

Section 8.13    Certain ERISA Matters.

(a)Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)such Lender is not using "plan assets" (within the meaning of the Plan Asset Regulations) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments or this Agreement,

(ii)the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts),

85

PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement,

(iii)(A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement, or

(iv)such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)In addition, unless either (1) **sub-clause (i)** in the immediately preceding **clause (a)** is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with **sub-clause (iv)** in the immediately preceding **clause (a)**, such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that the Administrative Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related hereto or thereto).

Section 8.14    Erroneous Payments.

(a)Each Lender hereby agrees that (i) if any Agent notifies such Lender that such Agent has determined in its sole discretion that any funds received by such Lender from such Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Lender (whether or not known to such Lender) (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, a "Erroneous Payment") and demands the return of such Erroneous Payment (or a portion thereof), such Lender shall promptly, but in no event later than one Business Day thereafter, return to such Agent the amount of any such Erroneous Payment (or portion thereof) as to which a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender to the date such amount is repaid to such Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by such Agent in accordance with banking industry rules on interbank compensation from time to time in effect and (ii) to the extent permitted by applicable law, such Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives, any claim, counterclaim, defense or right of setoff or recoupment with respect to any demand, claim or counterclaim by such Agent for the return of any Erroneous Payments received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine. A notice of any Agent to any Lender under this clause (a) shall be conclusive, absent manifest error.

86

(b)Without limiting immediately preceding clause (a), each Lender hereby further agrees that if it receives an Erroneous Payment from any Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by such Agent (or any of its Affiliates) with respect to such Erroneous Payment (an "Erroneous Payment Notice"), (y) that was not preceded or accompanied by an Erroneous Payment Notice, or (z) that such Lender otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), in each case, an error has been made (and that it is deemed to have knowledge of such error at the time of receipt of such Erroneous Payment) with respect to such Erroneous Payment, and to the extent permitted by applicable law, such Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by such Agent for the return of any Erroneous Payments received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine. Each Lender agrees that, in each such case, it shall promptly (and, in all events, within one Business Day of its knowledge (or deemed knowledge) of such error) notify such Agent of such occurrence and, upon demand from such Agent, it shall promptly, but in all events no later than one Business Day thereafter, return to such Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender to the date such amount is repaid to such Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by such Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(c)The Borrower and each other Loan Party hereby agrees that (x) in the event an Erroneous Payment (or portion thereof) is not recovered from any Lender that has received such Erroneous Payment (or portion thereof) for any reason, the Agents shall be subrogated to all the rights of such Lender with respect to such amount and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party; except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by such Agent from the Borrower or any other Loan Party for the purpose of making such Erroneous Payment.

(d)Each party's obligations under this Section 8.14 shall survive the resignation or replacement of the Agent, the termination of the Commitments or the repayment, satisfaction or discharge of all Obligations (or any portion thereof).

Section 8.15    Flood Laws.  The Administrative Agent may, in its sole discretion, adopt internal policies and procedures that address requirements placed on federally regulated lenders under the National Flood Insurance Reform Act of 1994 and related legislation (the "**Flood Laws**").  The Administrative Agent will post on the applicable electronic platform (or otherwise distribute to each Lender in the syndicate) documents that it receives in connection with the Flood Laws.  However, the Administrative Agent reminds each Lender and Participant in the facility that, pursuant to the Flood Laws, each federally regulated Lender (whether acting as a Lender or Participant in the facility) is responsible for assuring its own compliance with the flood insurance requirements.

ARTICLE IX

Miscellaneous

Section 9.01    Notices.

(a)Notices and other communications provided for herein shall be in writing and shall

87

be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax or other electronic transmission, (including by ".pdf" or ".tif") pursuant to the terms of this Agreement, as follows:

(i) if to any Loan Party, to Tuesday Morning, Inc., 6250 LBJ Freeway, Dallas, Texas 75240, Attention: Andrew Berger, Electronic Address: aberger@tuesdaymorning.com, with a copy to Munsch Hardt Kopf & Harr, P.C., 500 N. Akard Street, Suite 3800, Dallas, TX 75201, Attention: Walter A. Buchanan, Electronic Address: wbuchanan@munsch.com;

(ii) if to the Administrative Agent, to Cantor Fitzgerald Securities, 110 E. 59th Street, New York, NY 10022, Attention:  Michael Bennett (Tuesday Morning Corporation), Electronic Address: Michael.Bennett@cantor.com, with a copy to Cantor Fitzgerald Securities, 900 West Trade, Suite 725, Charlotte, NC 28202, Attention:  B. Young (Tuesday Morning), Electronic Address: BYoung@cantor.com, with a copy (which shall not constitute notice) to: Shipman & Goodwin LLP, One Constitution Plaza, Hartford, CT 06103, Attn: N. Plotkin (Tuesday Morning), Electronic Address: NPlotkin@goodwin.com;

(iii) if to a Lender, to it at the address, fax number or electronic address set forth on **Schedule 2.01** or in the Assignment and Acceptance pursuant to which such Lender becomes a party hereto.

(b) Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to **Article II** unless otherwise agreed by the Administrative Agent and the applicable Lender.  Each of the Administrative Agent and the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided, further, that approval of such procedures may be limited to particular notices or communications.

(c) All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service, sent by fax or (to the extent permitted by **paragraph (b)** above) electronic means or on the date five (5) Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this **Section 9.01** or in accordance with the latest unrevoked direction from such party given in accordance with this **Section 9.01**.

(d) Any party hereto may change its address or fax number for notices and other communications hereunder by notice to the other parties hereto.

Section 9.02    Survival of Agreement.  All representations and warranties made by the Loan Parties herein and in the other Loan Documents shall be considered to have been relied upon by the Lenders and shall survive the making of the Loans and the execution and delivery of the Loan Documents, and shall continue in full force and effect until the Maturity Date.  Without prejudice to the survival of any other agreements contained herein, obligations for taxes, costs, indemnifications, reimbursements, damages and other contingent liabilities contained herein (including pursuant to **Sections 2.11** and **9.05**) shall survive the payment in full of the principal and interest hereunder, and the termination of the Commitments or this Agreement, limited in the manner set forth herein.

Section 9.03    Binding Effect.  This Agreement shall become effective when it shall have been

executed by Holdings, the Borrower and the Administrative Agent and when the Administrative Agent shall have received copies hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of Holdings, the Borrower, the Administrative Agent and each Lender and their respective permitted successors and assigns.

Section 9.04    <u>Successors and Assigns</u>.

(a)The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) except as otherwise permitted by **<u>Section 6.05</u>** the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this **<u>Section 9.04</u>**.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person, Participants (to the extent provided in **<u>paragraph (c)</u>** of this **<u>Section 9.04</u>**), and, to the extent expressly contemplated hereby, the Related Parties of each of the Agents and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)Subject to the conditions set forth in **<u>clause (ii)</u>** below, any Lender may assign to one (1) or more Eligible Assignees (other than to any natural person) all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans at the time owing to it) (provided, however, that pro rata assignments shall not be required and each assignment shall be of a uniform, and not varying, percentage of all rights and obligations under and in respect of any applicable Loan and any related Commitment) with the prior written consent (such consent not to be unreasonably withheld or delayed) of:

(i)the Borrower, <u>provided</u> that no consent of the Borrower shall be required (i) if an Event of Default has occurred and is continuing, (ii) if such assignment is to a Lender, an Affiliate of a Lender or a Related Fund in respect of a Lender and (iii) in connection with any initial syndication of the Loans by the Administrative Agent or in connection with the syndication of the Loans and Commitments to the Pre-Petition Term Lenders or Pre-Petition FILO C Noteholders;

(ii)the Administrative Agent, <u>provided</u> that no consent of the Administrative Agent shall be required if such assignment is to a Lender, an Affiliate of a Lender or a Related Fund in respect of a Lender; and

(iii)[reserved].

(c)Assignments shall be subject to the following additional conditions:

(i)except in the case of an assignment to a Lender, an affiliate of a Lender or Related Fund or an assignment of the entire remaining amount of the assigning Lender's Commitments or Loans, the amount of the Commitments or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1.0 million, unless the Borrower otherwise consents, <u>provided</u> that such amounts shall be aggregated in respect of each Lender and its Affiliates or Related Funds, if any;

(ii)the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance together with a processing and recordation fee of $3,500; and

89

(iii)the Eligible Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire and all applicable tax forms.

(d)Subject to acceptance and recording thereof pursuant to **clause (f)** below and subject to **clause (k)** below, from and after the effective date specified in each Assignment and Acceptance the Eligible Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of **Sections  2.11** and **9.05** as well as any Fees accrued for its account and not yet paid).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this **Section 9.04** shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with **paragraph (c)** of this **Section 9.04**.

(e)The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amount (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender (with respect to any entry related to such Lender's Loans), at any reasonable time and from time to time upon reasonable prior notice.

(f)Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an Eligible Assignee (subject to **clause (f)**), the Eligible Assignee's completed Administrative Questionnaire (unless the Eligible Assignee shall already be a Lender hereunder) and any applicable tax forms, and any written consent to such assignment required by **clause (i)** above, the Administrative Agent shall accept such Assignment and Acceptance and record the information contained therein in the Register.  No assignment, whether or not evidenced by a promissory note, shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this **clause (f)**.

(g)Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one (1) or more banks or other entities (a "**Participant**") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); <u>provided</u> that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement and the other Loan Documents; <u>provided</u> that such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that requires the consent of each Lender directly affected thereby pursuant to **Section 9.04(a)(i)** or **clauses (i)** through **(vi)** of the first proviso to **Section 9.08(b)**.  Subject to **paragraph (h)** of this **Section 9.04**, the Borrower agrees that each Participant shall be entitled to the

90

benefits of **Sections 2.11** (subject to the requirements and limitations with respect thereto it being understood that the documentation required under **Section 2.11(e)** shall be delivered to the participating Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to **paragraph (b)** of this **Section 9.04**.  To the extent permitted by law, each Participant also shall be entitled to the benefits of **Section 9.06** as though it were a Lender, provided such Participant shall be subject to **Section 2.12(d)** as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "**Participant Register**"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or its other obligations under any Loan Document) except to the extent that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(h) A Participant shall not be entitled to receive any greater payment under **Section 2.11** than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, except to the extent such entitlement to receive a greater payment results from a change in Applicable Law that occurs after the Participant acquired the participation. A Participant shall not be entitled to the benefits of **Section 2.11** to the extent such Participant fails to comply with **Section 2.11(e)** as though it were a Lender (it being understood that the documentation required under **Section 2.11(e)** shall be delivered to the participating Lender).

(i) Any Lender may at any time, without the consent of or notice to the Administrative Agent or the Borrower, pledge or assign a security interest in all or any portion of its rights under this Agreement (other than to a natural person) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this **Section 9.04** shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee (including any Eligible Assignee) for such Lender as a party hereto.

(j) The Borrower, upon receipt of written notice from the relevant Lender, agrees to issue Notes to any Lender requiring Notes to facilitate transactions of the type described in **paragraph (d)** above.

(k) If any assignment or participation under this **Section 9.04** is made (or attempted to be made) to the extent the Borrower's consent is required under the terms of this **Section 9.04**, to any other Person without the Borrower's consent, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, (A) terminate the Commitments of such Lender and repay all obligations of the Borrower owing to such Lender relating to the Loans and participations held by such Lender or participant as of such termination date (in the case of any participation in any Loan, to be applied to such participation), or (B) require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in this **Section 9.04**), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such

assignment); provided that (i) such Lender shall have received payment of an amount equal to the lesser of par or the amount such Lender paid for such Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts), (ii) [reserved], and (iii) such assignment shall otherwise comply with this **Section 9.04** (provided that no registration and processing fee referred to in this **Section 9.04** shall be owing in connection with any assignment pursuant to this paragraph). Each Lender hereby grants to the Administrative Agent an irrevocable power of attorney (which power is coupled with an interest) to execute and deliver, on behalf of such Lender, as assignor, any Assignment and Acceptance necessary to effectuate any assignment of such Lender's interests hereunder to an assignee as contemplated hereby in the circumstances contemplated by this **Section 9.04(k)**. Nothing in this **Section 9.04(k)** shall be deemed to prejudice any rights or remedies the Borrower may otherwise have at law or equity.

(l)If the Borrower wishes to replace all of the Loans or Commitments with ones having different terms, it shall have the option, with the consent of the Administrative Agent and subject to at least three (3) Business Days' advance notice to the Lenders, instead of prepaying the Loans or reducing or terminating the Commitments to be replaced to (i) require the Lenders to assign the Loans or Commitments to the Administrative Agent or its designees and (ii) amend the terms thereof in accordance with **Section 9.08**. Pursuant to any such assignment, all Loans or Commitments to be replaced shall be purchased at par (allocated among the Lenders in the same manner as would be required if such Loans were being optionally prepaid or such Commitments were being optionally reduced or terminated by the Borrower), accompanied by payment of any accrued interest and fees thereon and any amounts owing pursuant to **Section 9.05(b)**. By receiving such purchase price, the Lenders shall automatically be deemed to have assigned the Loans or Commitments pursuant to the terms of the form of Assignment and Acceptance attached hereto as **Exhibit A**, and accordingly no other action by such Lenders shall be required in connection therewith. The provisions of this **paragraph (l)** are intended to facilitate the maintenance of the perfection and priority of existing security interests in the Collateral during any such replacement.

Section 9.05    Expenses; Indemnity.

(a)The Borrower agrees to pay promptly upon demand therefor (together with backup documentation supporting such request) (i) all reasonable and documented (in summary format) expenses (including Other Taxes) incurred by the Agents and the Lenders in connection with the preparation of this Agreement and the other Loan Documents, or by the Agents in connection with the syndication of the Commitments or the administration of this Agreement (including expenses incurred in connection with due diligence and initial and ongoing Collateral examination to the extent incurred with the reasonable prior approval of the Borrower and the reasonable and documented (in summary format) fees, disbursements and charges for no more than one (1) outside counsel for the Agents, outside counsel for the Lenders (taken as a whole) and, if necessary one (1) local counsel in each material jurisdiction where Collateral is located for such Persons, taken as a whole) or in connection with the administration of this Agreement and any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the Transactions hereby contemplated shall be consummated) and (ii) all reasonable and documented (in summary format) expenses incurred by the Agents or any Lender in connection with the enforcement or protection of their rights in connection with this Agreement and the other Loan Documents, in connection with the Loans made hereunder (but limited, in the case of legal fees and expenses, to the actual reasonable and documented (in summary format) fees, charges and disbursements of Polsinelli PC, Ropes & Gray LLP and Shipman & Goodwin LLP and, if reasonably necessary (x) the reasonable and documented (in summary format) fees, charges and disbursements of one (1) local counsel per relevant local jurisdiction and (y) in the

case of an actual or potential conflict of interest, the reasonable and documented (in summary format) fees, charges and disbursements of one (1) additional counsel to all affected Persons, taken as a whole).

(b)The Borrower agrees to indemnify, on a joint and several basis, the Administrative Agent, each Lender and each of their respective Affiliates, successors and assigns and the directors, trustees, officers, employees, advisors, controlling Persons and agents of each of the foregoing (each such Person being called an "**Indemnitee**") against, and to hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and reasonable and documented (in summary format) costs and related expenses (including reasonable and documented (in summary format) documented fees, charges and disbursements of Polsinelli PC, Ropes & Gray LLP and Shipman & Goodwin LLP and, if necessary, one (1) local counsel in each relevant local jurisdiction to the Agents, taken as a whole, in each relevant jurisdiction, in the case of an actual or potential conflict of interest, and one (1) additional counsel to all affected Indemnitees, taken as a whole) incurred by or asserted against any Indemnitee arising out of, relating to, or as a result of (i) the execution or delivery of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto and thereto of their respective obligations thereunder or the consummation of the Transactions (including the payment of the Transaction Costs) and the other transactions contemplated hereby, (ii) the use of the proceeds of the Loans or (iii) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto, provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or costs or related expenses (x) are determined by a judgment of a court of competent jurisdiction to have resulted by reason of the gross negligence, bad faith or willful misconduct of, or material breach by, such Indemnitee (other than a material breach by the Administrative Agent acting in its capacity as such or in connection with the initial syndication of the Loans), (y) arise out of any claim, litigation, investigation or proceeding brought by such Indemnitee (or its Related Parties) against another Indemnitee (or its Related Parties) (other than any claim, litigation, investigation or proceeding brought by or against the Administrative Agent, acting in its capacity as Administrative Agent) that does not involve any act or omission of the Borrower or any of its Subsidiaries and arises out of disputes among the Lenders and/or their transferees.  The Borrower shall not be liable for any settlement of any proceeding referred to in this **Section 9.05** effected without the Borrower's written consent (such consent not to be unreasonably withheld or delayed); provided, however, that the Borrower shall indemnify the Indemnitees from and against any loss or liability by reason of such settlement if the Borrower was offered the right to assume the defense of such proceeding and did not assume such defense or such proceeding was settled with the written consent of the Borrower, subject to, in each case, the Borrower's right in this **Section 9.05** to claim an exemption from such indemnity obligations.  The Borrower shall indemnify the Indemnitees from and against any final judgment for the plaintiff in any proceeding referred to in this **Section 9.05**, subject to the Borrower's right in this **Section 9.05** to claim an exemption from such indemnity obligations.  The Borrower shall not, without the prior written consent of any Indemnitee, effect any settlement of any pending or threatened proceeding in respect of which such Indemnitee is a party and indemnity could have been sought hereunder by such Indemnitee unless such settlement (i) includes an unconditional release of such Indemnitee (and its Related Parties) from all liability or claims that are the subject matter of such proceeding and (ii) does not include a statement as to or an admission of fault, culpability or a failure to act by or on behalf of any Indemnitee (or its Related Parties).  To the extent permitted by Applicable Law, each party hereto hereby waives for itself (and, in the case of the Borrower, for each other Loan Party) any claim against any Loan Party, any Lender, any Administrative Agent, any Lender Party, and their respective affiliates, directors, employees, attorneys, agents or sub-agents, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection

with, as a result of, or in any way related to, this Agreement or any Loan Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and each party hereto (and in the case of the Borrower on behalf of each other Loan Party) hereby waive, release and agree not to sue upon any such claim or any such damages, whether or not accrued and whether or not known or suspected to exist in its favor; provided that nothing contained in this sentence shall limit the Borrower's indemnity obligations to the extent such special, indirect, consequential or punitive damages are included in any third party claim in connection with which such indemnified Person is entitled to indemnification hereunder.  The provisions of this **Section 9.05** shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Obligations, the resignation or removal of the Administrative Agent, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent or any Lender.  All amounts due under this **Section 9.05** shall be payable on written demand therefor accompanied by reasonable documentation with respect to any reimbursement, indemnification or other amount requested.

(c)Except as expressly provided in **Section 9.05(a)** with respect to Other Taxes, which shall not be duplicative with any amounts paid pursuant to **Section 2.11**, this **Section 9.05** shall not apply to Taxes other than Taxes arising from a non-Tax claim.

(d)Notwithstanding the foregoing paragraphs in this **Section 9.05**, if it is found by a final, non-appealable judgment of a court of competent jurisdiction in any such action, proceeding or investigation that any loss, claim, damage, liability or cost or related expense of any Indemnitee has resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee (or any of its Related Parties) or a material breach of the Loan Documents by such Indemnitee (or any of its Related Parties) (other than a material breach by the Administrative Agent acting in its capacity as such), such Indemnitee will repay such portion of the reimbursed amounts previously paid to such Indemnitee under this **Section 9.05** that is attributable to expenses incurred in relation to the set or omission of such Indemnitee which is the subject of such finding.

Section 9.06     Right of Set-off.  If an Event of Default shall have occurred and be continuing, upon the written consent of the Administrative Agent or the Required Lenders, each Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender Bank to or for the credit or the account of Holdings, the Borrower or any Subsidiary Guarantor (and such Lender will provide prompt notice to such Loan Party) against any of and all the obligations of Holdings or the Borrower now or hereafter existing under this Agreement or any other Loan Document held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or such other Loan Document and although the obligations may be unmatured.  The rights of each Lender under this **Section 9.06** are in addition to other rights and remedies (including other rights of set-off) that such Lender may have.

Section 9.07     Applicable Law.   EXCEPT TO THE EXTENT SUPERSEDED BY THE BANKRUPTCY CODE, THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

Section 9.08     Waivers; Amendment.

(a)No failure or delay of the Administrative Agent or any Lender in exercising any

94

right or power hereunder or under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by Holdings, the Borrower or any other Loan Party therefrom shall in any event be effective unless the same shall be permitted by **paragraph (b)** below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice or demand on Holdings, the Borrower or any other Loan Party in any case shall entitle such Person to any other or further notice or demand in similar or other circumstances.

(b) Subject to **Section 2.11(b)**, neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except (A) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by Holdings, the Borrower and the Required Lenders and (B) in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by each party thereto and the Administrative Agent and consented to by the Required Lenders; provided, however, that no such agreement shall:

(i) decrease or forgive the principal amount of, or extend the final maturity date of, or decrease the rate of interest on, any Loan without the prior written consent of each Lender directly and adversely affected thereby; provided, that (x) consent of Required Lenders shall not be required for any waiver, amendment or modification contemplated by this **clause (i)**, and (y) that waiver or reduction of a post-default increase in interest shall be effective with the consent of the Required Lenders (and shall not require the consent of each directly and adversely affected Lender),

(ii) increase the Commitment of any Lender,

(iii) [reserved],

(iv) except to the extent necessary to give effect to the express intentions of this Agreement (including **Section 9.04**), which, in respect of any amendment or modification to effect such express intentions, shall be effective with the consent of the Required Lenders, amend or modify any provision of **Section 2.12** of this Agreement in a manner that would by its terms alter the pro rata sharing of payments required thereby, without the prior written consent of each Lender,

(v) amend or modify the provisions of **Section 7.02**, **Sections 9.08(a)**, **(b)** or **(c)** or reduce the voting percentage set forth in the definition of "Required Lenders" without the prior written consent of each Lender directly and adversely affected thereby,

(vi)(x) release all or substantially all the Collateral (it being understood that a transaction permitted under **Section 6.05** shall not constitute a release of all or substantially all of the Collateral), or release all or substantially all of the value of the Guarantees (except as otherwise permitted herein (including in connection with a transaction permitted under **Section 6.05**) or in the other Loan Documents) under the Security Documents, unless, in the case of a Subsidiary Guarantor, all or substantially all the Equity Interests of such Subsidiary Guarantor is sold or otherwise disposed of in a transaction permitted by this Agreement, without the prior written consent of each Lender or (y) subordinate the Liens of the Administrative Agent under the Security Documents with respect to all or substantially all of the Collateral or subordinate the Obligations hereunder, without the prior written consent of each Lender,

(vii) [reserved], or

95

(viii)[reserved],

provided, further, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder without the prior written consent of the Administrative Agent acting as such at the effective date of such agreement.  Each Lender shall be bound by any waiver, amendment or modification authorized by this **Section 9.08** and any consent by any Lender pursuant to this **Section 9.08** shall bind any successor or assignee of such Lender.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that (x) the Commitments of such Lender may not be increased or extended without the consent of such Lender and (y) the principal and accrued and unpaid interest of such Lender's Loans shall not be reduced or forgiven without the consent of such Lender.

(c)Without the consent of the Agents or Lender, the Loan Parties and the Administrative Agent may (in their respective sole discretion, or shall, to the extent required by any Loan Document) enter into any amendment, modification or waiver of any Loan Document, or enter into any new agreement or instrument, to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the Secured Parties, or as required by local law to give effect to, or protect any security interest for the benefit of the Secured Parties, in any property or so that the security interests therein comply with Applicable Law; provided, that the Borrower shall provide a certificate of a Responsible Officer stating that such documents are authorized and permitted pursuant to the Loan Documents.

(d)Notwithstanding anything to the contrary contained in this **Section 9.08** or any Loan Document, (i) the Borrower and the Administrative Agent may, without the input or consent of any other Lender, effect amendments to this Agreement and the other Loan Documents as may be necessary in the reasonable opinion of the Borrower and the Administrative Agent to effect the provisions of **Sections 2.15** or **9.04(f)**, (ii) if the Administrative Agent and the Borrower have jointly identified an obvious error or any error or omission of a technical nature, in each case, in any provision of the Loan Documents, then the Administrative Agent and the Borrower shall be permitted to amend such provision and (iii) guarantees, collateral security documents and related documents executed by Holdings or Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be amended, supplemented or waived without the consent of any Lender if such amendment, supplement or waiver is delivered in order to (x) comply with local law or advice of local counsel, (y) cure ambiguities, omissions, mistakes or defects or (z) cause such guarantee, collateral security document or other document to be consistent with this Agreement and the other Loan Documents. Notwithstanding the foregoing, the Administrative Agent shall be entitled to seek consent of the Required Lenders before taking any action authorized pursuant to this **clause (d)**.

Section 9.09    Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the applicable interest rate on any Loan, together with all fees and charges that are treated as interest under Applicable Law (collectively, the "**Charges**"), as provided for herein or in any other document executed in connection herewith, or otherwise contracted for, charged, received, taken or reserved by any Lender shall exceed the maximum lawful rate (the "**Maximum Rate**") that may be contracted for, charged, taken, received or reserved by such Lender in accordance with Applicable Law, the rate of interest payable hereunder, together with all Charges payable to such Lender shall be limited to the Maximum Rate, provided that such excess amount shall be paid to such Lender on subsequent payment dates to the extent not exceeding the legal limitation.

Section 9.10    Entire Agreement.  This Agreement and the other Loan Documents constitute the entire contract between the parties relative to the subject matter hereof.  Any previous agreement among or

representations from the parties or their Affiliates with respect to the subject matter hereof is superseded by this Agreement and the other Loan Documents. Nothing in this Agreement or in the other Loan Documents, expressed or implied, is intended to confer upon any party other than the parties hereto and thereto, and their respective successors and assigns permitted hereunder, any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.

Section 9.11    WAIVER OF JURY TRIAL.  EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER LOAN DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS.  EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS **SECTION 9.11** AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOANS MADE HEREUNDER.  IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

Section 9.12    Severability.  In the event any one (1) or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.  The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 9.13    Counterparts.  This Agreement may be executed in two (2) or more counterparts, each of which shall constitute an original but all of which, when taken together, shall constitute but one (1) contract, and shall become effective as provided in **Section 9.03**.  Delivery of an executed counterpart to this Agreement by facsimile transmission or other electronic transmission (including by ".pdf" or ".tif") shall be as effective as delivery of a manually signed original.

Section 9.14    Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

Section 9.15    Jurisdiction; Consent to Service of Process.

(a)Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any New York State court or federal court of the

97

United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State court, or to the extent permitted by law, in such federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that any Lender, the Administrative Agent may otherwise have to bring any action or proceeding relating to this Agreement or the other Loan Documents against Holdings, the Borrower or any Loan Party or their properties in the courts of any jurisdiction.

(b)Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in any New York State or federal court. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)Each of the parties hereto agrees that service of all process in any such proceeding in any such court may be made by registered or certified mail, return receipt requested at its address provided in **Section 9.01** agrees that service as so provided in is sufficient to confer personal jurisdiction over the applicable credit party in any such proceeding in any such court, and otherwise constitutes effective and binding service in every respect; and agrees that agents and lenders retain the right to serve process in any other manner permitted by law or to bring proceedings against any credit party in the courts of any other jurisdiction.

Section 9.16    Confidentiality. Each of the Lenders and each of the Agents agrees that it shall maintain in confidence any information relating to Holdings, the Borrower and the other Loan Parties furnished to it by or on behalf of Holdings, the Borrower or the other Loan Parties (other than information that (a) has become generally available to the public other than as a result of a disclosure by any such party, (b) was already in possession on a non-confidential basis for a person not known to the recipient to be bound by confidentiality obligations to Parent or any Subsidiary thereof or has been independently developed by such Lender or such Agent without violating this **Section 9.16** or relying on any such information, (c) was available to such Lender or such Agent from a third party having, to such Person's knowledge, no obligations of confidentiality to Holdings, the Borrower or any other Loan Party) and shall not reveal the same other than to its directors, trustees, officers, employees and advisors with a need to know or to any Person that approves or administers the Loans on behalf of such Lender (so long as each such Person shall have been instructed to keep the same confidential in accordance with this **Section 9.16** and such Lender and such Agent shall be responsible for its Affiliates' compliance with this **Section 9.16** except to the extent such Affiliate shall sign a written confidentiality agreement in favor of the Borrower), except:  (i) to the extent necessary to comply with law or any legal process or the requirements of any Governmental Authority, self-regulatory authorities (including the National Association of Insurance Commissioners) or of any securities exchange on which securities of the disclosing party or any affiliate of the disclosing party are listed or traded (in which case such Lender or such Agent will promptly notify the Borrower, in advance, to the extent permitted by Applicable Law or the rules governing the process requiring such disclosure (except with respect to any routine or ordinary course audit or examination conducted by bank accountants or any governmental bank regulatory authority exercising examination or regulatory authority) and shall use its commercially reasonable efforts to ensure that any such information so disclosed is accorded confidential treatment), (ii) as part of the reporting or review procedures to, or

examinations by, Governmental Authorities or self-regulatory authorities, including the National Association of Insurance Commissioners or the National Association of Securities Dealers, Inc., (iii) to its parent companies, affiliates, auditors, assignees, transferees and participants (so long as each such Person shall have been instructed to keep the same confidential in accordance with provisions not less restrictive than this **Section 9.16** and such Lender and such Agent shall be responsible for its Affiliates' compliance with this **Section 9.16**), (iv) in order to enforce its rights under any Loan Document in a legal proceeding (in which case it shall use commercially reasonable efforts to ensure that any such information so disclosed is accorded confidential treatment), (v) to any pledgee under **Section 9.04(d)** or any other existing or prospective assignee of, or existing or prospective Participant in, any of its rights under this Agreement (so long as such Person shall have been instructed to keep the same confidential in accordance with this **Section 9.16** or other provisions at least as restrictive as this **Section 9.16**), and (vi) with the consent of the Borrower.  In addition, each Agent and each Lender may disclose the existence of this Agreement and the information about this Agreement to market data collectors, similar services providers to the lending industry, and service providers to the Agents and the Lenders in connection with the administration and management of this Agreement and the other Loan Documents to which a Lender Party is a party.

Section 9.17    Release of Liens and Guarantees.  In the event that any Loan Party conveys, sells, assigns, transfers or otherwise disposes of any assets or all or any portion of any of the Equity Interests or assets of any Subsidiary Guarantor to a Person that is not (and is not required to become) a Loan Party in each case in a transaction expressly permitted **Section 6.05**, the Administrative Agent shall promptly (and the Lenders hereby authorize the Administrative Agent to) take such action and execute any such documents as may be reasonably requested by Holdings or the Borrower and at the Borrower's expense to release any Liens created by any Loan Document in respect of such Equity Interests or assets, and, in the case of a disposition of the Equity Interests of any Subsidiary Guarantor in a transaction expressly permitted by **Section 6.05**, terminate such Subsidiary Guarantor's obligations under its Guarantee.  Any representation, warranty or covenant contained in any Loan Document relating to any such Equity Interests, asset or subsidiary of Holdings shall no longer be deemed to be made once such Equity Interests or asset is so conveyed, sold, leased, assigned, transferred or disposed of.  The Administrative Agent shall be entitled to received, and may conclusively rely on, a certificate from a Responsible Officer of the Borrower stating that such release and requested documents comply with the terms of the Loan Documents.

Section 9.18    USA PATRIOT Act.  Each Lender hereby notifies the Loan Parties that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the USA PATRIOT Act.

Section 9.19    Marshalling; Payments Set Aside.  Neither any Agent nor any Lender shall be under any obligation to marshal any assets in favor of any Loan Party or any other Person or against or in payment of any or all of the Obligations.  To the extent that any Loan Party makes a payment or payments to the Administrative Agent or the Lenders (or to the Administrative Agent, on behalf of the Lenders), or any Agent or the Lenders enforce any security interests or exercise their rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

Section 9.20    Obligations Several; Independent Nature of Lenders' Rights.  The obligations of Lenders hereunder are several and no Lender shall be responsible for the obligations or Commitment of

any other Lender hereunder.  Nothing contained herein or in any other Loan Document, and no action taken by Lenders pursuant hereto or thereto, shall be deemed to constitute Lenders as a partnership, an association, a joint venture or any other kind of entity.  The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and each Lender shall be entitled to protect and enforce its rights arising out hereof and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

Section 9.21    Electronic Execution of Assignments.    The words "execution," "signed," "signature," and words of like import in any assignment agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 9.22    Acknowledgements.    Each of Loan Party hereby acknowledges and agrees that (a) no fiduciary, advisory or agency relationship between the Loan Parties and the Lender Parties is intended to be or has been created in respect of any of the transactions contemplated by this Agreement or the other Loan Documents, irrespective of whether the Lender Parties have advised or are advising the Loan Parties on other matters, and the relationship between the Lender Parties, on the one hand, and the Loan Parties, on the other hand, in connection herewith and therewith is solely that of creditor and debtor, (b) the Lender Parties, on the one hand, and the Loan Parties, on the other hand, have an arm's length business relationship that does not directly or indirectly give rise to, nor do the Loan Parties rely on, any fiduciary duty to the Loan Parties or their affiliates on the part of the Lender Parties, (c) the Loan Parties are capable of evaluating and understanding, and the Loan Parties understand and accept, the terms, risks and conditions of the transactions contemplated by this Agreement and the other Loan Documents, (d) the Loan Parties have been advised that the Lender Parties are engaged in a broad range of transactions that may involve interests that differ from the Loan Parties' interests and that the Lender Parties have no obligation to disclose such interests and transactions to the Loan Parties, (e) the Loan Parties have consulted their own legal, accounting, regulatory and tax advisors to the extent the Loan Parties have deemed appropriate in the negotiation, execution and delivery of this Agreement and the other Loan Documents, (f) each Lender Party has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by it and the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Loan Parties, any of their affiliates or any other Person, (g) none of the Lender Parties has any obligation to the Loan Parties or their affiliates with respect to the transactions contemplated by this Agreement or the other Loan Documents except those obligations expressly set forth herein or therein or in any other express writing executed and delivered by such Lender Party and the Loan Parties or any such affiliate and (h) no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lender Parties or among the Loan Parties and the Lender Parties.

Section 9.23    Lender Action.    Notwithstanding anything to the contrary contained herein or in any other Loan Document, (i) the authority to enforce rights and remedies hereunder and under the other Security Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent for the benefit of the Lenders, (ii) no Secured Party shall have any right individually to realize upon any of the Collateral under any Security Document or to enforce the Guarantee, it being understood and agreed that all powers, rights and remedies under the Security Documents may be exercised solely by the Administrative Agent for the benefit of the Secured Parties in accordance with the terms thereof and (iii) in the event of a foreclosure by the Administrative Agent on any of the Collateral

100

pursuant to a public or private sale, the Administrative Agent or any Lender may be the purchaser of any or all of such Collateral at any such sale and the Administrative Agent, as agent for and representative of the Lenders (but not any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing), shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold in any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any Collateral payable by the Administrative Agent at such sale.

Section 9.24    Judgment Currency.  If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document in one currency into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase the first currency with such other currency on the Business Day preceding that on which final judgment is given.  The obligation of the Borrower in respect of any such sum due from it to the Administrative Agent or any Lender hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "**Judgment Currency**") other than that in which such sum is denominated in accordance with the applicable provisions of this Agreement (the "**Agreement Currency**"), be discharged only to the extent that on the Business Day following receipt by the Administrative Agent or such Lender, as the case may be, of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent or such Lender, as the case may be, may in accordance with normal banking procedures purchase the Agreement Currency with the Judgment Currency.  If the amount of the Agreement Currency so purchased is less than the sum originally due to the Administrative Agent or any Lender from the Borrower in the Agreement Currency, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or such Lender, as the case may be, against such loss.  If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent or any Lender in such currency, the Administrative Agent or such Lender, as the case may be, agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under Applicable Law).

Section 9.25    Acknowledgement and Consent to Bail-In of EEA Financial Institutions.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

Section 9.26    <u>Force Majeure</u>. In no event shall the Administrative Agent be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services, it being understood that the Administrative Agent shall use reasonable best efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

ARTICLE X<br>
Collateral

Section 10.01    <u>Grant of Security Interest</u>.  As security for all Secured Obligations, each Loan Party hereby collaterally assigns and grants to the Administrative Agent, for the benefit of the Secured Parties, a continuing security interest with the priority set forth in the applicable Order, in all property and assets of such Loan Party, whether now owned or existing or hereafter acquired or arising, regardless of where located, including property subject to avoided liens, real and personal, tangible and intangible, including:

(a) all Accounts;

(b) all Chattel Paper;

(c) all Copyrights, Patents, Trademarks and Licenses;

(d) all Documents;

(e) all Equipment;

(f) all Fixtures;

(g) all General Intangibles;

(h) all Goods;

(i) all Instruments;

(j) all Inventory;

(k) all Investment Property;

(l) all cash or cash equivalents;

(m) all letters of credit, Letter-of-Credit Rights and Supporting Obligations;

(n) all Deposit Accounts with any bank or other financial institution (including all cash, cash equivalents, financial assets, negotiable instruments and other evidence of payment, and other funds on deposit therein or credited thereto);

(o) all Commodity Accounts (including any and all commodity contracts and all funds and other property held therein or credited thereto);

102

(p) all Equity Interests;

(q) all Securities Accounts (including any and all Investment Property held therein or credited thereto);

(r) all accessions to, substitutions for and replacements, proceeds (including Stock Rights), insurance, insurance proceeds and products of the foregoing, together with all books and records, customer lists, credit files, computer files, programs, printouts and other computer materials and records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing; and

(s) all Commercial Tort Claims;

(t) all other personal property of such Loan Party, including, subject to entry of the Final Order, proceeds from any Avoidance Actions (but not the actions thereunder).

All of the foregoing, together with (x) the "Collateral" as defined in the Orders and (y) all presently owned or after-acquired Real Property and improvements thereon and leases on Real Property, is herein collectively referred to as the "Collateral"; provided that the Collateral shall in no event include the Excluded Collateral.  It being understood that "Collateral" hereunder shall include all such "Collateral" irrespective of whether any such property was excluded from "Collateral" (as defined in the Pre-Petition ABL Credit Agreement or Pre-Petition Term Credit Agreement) pursuant to the Pre-Petition Loan Documents.

Section 10.02    Perfection of Security Interest.

(a)    Notwithstanding the perfection of any security interest granted hereunder pursuant to the Orders, to the fullest extent permitted by Applicable Law, the Administrative Agent may file or authorize the filing of one or more financing statements or Mortgages disclosing the Liens under this Agreement on the Collateral.

(b)    In the event that a motion for dismissal from any of the Chapter 11 Cases is filed with respect to any Subsidiary and Equity Interests of such Subsidiary are owned by a Loan Party, and to the extent the capital stock of such Subsidiary is in certificated form, such Loan Party shall promptly deliver upon request by the Administrative Agent, all certificates or instruments at any time representing or evidencing such capital stock in such Subsidiary to the Administrative Agent, and shall be in suitable form for transfer by delivery, or shall be accompanied by instruments of transfer or assignment, duly executed in blank, all in form and substance sufficient to transfer such instruments to the Administrative Agent (or otherwise reasonably satisfactory to the Administrative Agent).  The Administrative Agent shall have the right, at any time, after the occurrence and during the continuance of an Event of Default, to transfer to or to register in the name of the Administrative Agent or its nominee any capital stock in such wholly-owned Subsidiary.

Section 10.03    The Administrative Agent's and Lenders' Rights, Duties, and Liabilities.  The Loan Parties assume all responsibility and liability arising from or relating to the use, sale, or other disposition of the Collateral.  The Secured Obligations shall not be affected by any failure of the Secured Parties to take any steps to perfect the Liens under this Agreement or to collect or realize upon the Collateral, nor shall loss of or damage to the Collateral release any Loan Party from any of the Secured Obligations.  Nothing in this Agreement shall be interpreted as giving the Administrative Agent responsibility for or any duty concerning the validity, perfection, priority or enforceability of the Liens granted hereunder or giving the Administrative Agent any obligation to take any action to procure or maintain such validity, perfection,

103

priority or enforceability, including, without limitation, any duty to file any financing statements, amendments, continuation statements, Mortgages or other documents to perfect or maintain the perfection of the security interest granted hereunder.

Section 10.04    <u>Rights in Respect of Investment Property</u>.    Subject to any order of the Court (including the Order), after the occurrence and during the continuance of an Event of Default (i) the Administrative Agent at the direction of the Required Lenders may, upon written notice to the relevant Loan Party, transfer or register in the name of the Administrative Agent or any of its nominees, for the benefit of the Secured Parties, any or all of the Collateral consisting of all of the issued and outstanding Equity Interests of the Loan Parties now owned or hereafter acquired, Investment Property, the proceeds thereof (in cash or otherwise), and all liens, security, rights, remedies and claims of any Loan Party with respect thereto (as used in this **<u>Section 10.04</u>** collectively, the "**<u>Pledged Collateral</u>**") held by the Administrative Agent hereunder, and the Administrative Agent or its nominee may thereafter, after written notice to the applicable Loan Party, exercise all voting and corporate rights at any meeting of any corporation, partnership, or other business entity issuing any of the Pledged Collateral and any and all rights of conversion, exchange, subscription, or any other rights, privileges, or options pertaining to any of the Pledged Collateral as if it were the absolute owner thereof, including the right to exchange any and all of the Pledged Collateral upon the merger, amalgamation, consolidation, reorganization, recapitalization, or other readjustment of any corporation, partnership, or other business entity issuing any of such Pledged Collateral or upon the exercise by any such issuer or the Administrative Agent of any right, privilege or option pertaining to any of the Pledged Collateral, and in connection therewith, to deposit and deliver any and all of the Pledged Collateral with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as it may determine, all without liability except to account for property actually received by it, but the Administrative Agent shall have no duty to exercise any of the aforesaid rights, privileges or options, and the Administrative Agent shall not be responsible for any failure to do so or delay in so doing, (ii) to the extent permitted under Applicable Law, after the Administrative Agent's giving of the notice specified in clause (i) of this **<u>Section 10.04</u>**, all rights of any Loan Party to exercise the voting and other consensual rights which it would otherwise be entitled to exercise and to receive the dividends, interest and other distributions which it would otherwise be authorized to receive and retain thereunder shall be suspended until such Event of Default shall no longer exist, and all such rights shall, until such Event of Default shall no longer exist, thereupon become vested in the Administrative Agent which shall thereupon have the sole right to exercise such voting and other consensual rights and to receive and hold as Pledged Collateral such dividends, interest, and other distributions (provided that any such Pledged Collateral the Administrative Agent shall collect shall promptly be returned to each applicable Loan Party after such Event of Default is cured or waived to the extent such Pledged Collateral was not applied to repay the Secured Obligations), and (iii) each Loan Party shall promptly execute and deliver (or cause to be executed and delivered) to the Administrative Agent all such proxies and other instruments that the Administrative Agent or a Lender may reasonably request for the purpose of enabling the Administrative Agent to exercise the voting and other rights which it is entitled to exercise pursuant to this **<u>Section 10.04</u>** and to receive the dividends, interest, and other distributions which it is entitled to receive and retain pursuant to this **<u>Section 10.04</u>**.

Section 10.05    <u>Remedies</u>.

(a)    Each Loan Party recognizes that the Administrative Agent may be unable to effect a public sale of any or all of the Collateral that constitutes securities to be sold by reason of certain prohibitions contained in the laws of any jurisdiction outside the United States or in applicable federal, provincial, territorial or state securities laws but may be compelled to resort to one or more private sales thereof to a restricted group of purchasers who will be obliged to agree, among other things, to acquire such Collateral to be sold for their own account for investment and not with a view to the distribution or resale thereof.

Each Loan Party acknowledges and agrees that any such private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall, to the extent permitted by law, be deemed to have been made in a commercially reasonable manner.  Unless required by Applicable Law, the Administrative Agent shall not be under any obligation to delay a sale of any of such Collateral to be sold for the period of time necessary to permit the issuer of such securities to register such securities under the laws of any jurisdiction outside the United States or under any applicable federal, provincial, territorial or state securities laws, even if such issuer would agree to do so.  Each Loan Party further agrees to do or cause to be done, to the extent that such Loan Party may do so under Applicable Law, all such other acts and things as the Administrative Agent may reasonably request to make such sales or resales of any portion or all of such Collateral or other property to be sold valid and binding and in compliance with any and all Applicable Laws at the Loan Parties' expense.  Each Loan Party further agrees that a breach of any of the covenants contained in this **Section 10.05(a)** will cause irreparable injury to the Secured Parties for which there is no adequate remedy at law and, as a consequence, agrees that each covenant contained in this **Section 10.05(a)** shall be specifically enforceable against such Loan Party, and each Loan Party hereby waives and agrees, to the fullest extent permitted by law, not to assert as a defense against an action for specific performance of such covenants that (i) such Loan Party's failure to perform such covenants will not cause irreparable injury to the Secured Parties or (ii) the Secured Parties have an adequate remedy at law in respect of such breach.

(b)     Subject to the terms of the Order, if an Event of Default has occurred and is continuing, the Administrative Agent shall have for the benefit of the Secured Parties, in addition to all other rights of the Secured Parties, the rights and remedies of a secured party under the UCC, and without limiting the generality of the foregoing, the Administrative Agent shall be empowered and entitled to: (i) take possession of, foreclose on and/or request a receiver of the Collateral and keep it on any Loan Party's premises at any time, at no cost to the Secured Parties, or remove any part of it to such other place or places as the Administrative Agent may desire, or the Loan Parties shall, upon the Administrative Agent's or the Required Lender's demand, at the Loan Parties' cost, assemble the Collateral and make it available to the Administrative Agent at a place reasonably convenient to the Administrative Agent; (ii) exercise of set-off rights on deposits (other than, for the avoidance of doubt, with respect to Excluded Accounts); (iii) sell and deliver any Collateral at public or private sales, for cash, upon credit or otherwise, at such prices and upon such terms as the Administrative Agent deems advisable, in its sole discretion (at the direction of the Required Lenders), and may postpone or adjourn any sale of the Collateral by an announcement at the time and place of sale or of such postponed or adjourned sale; (iv) hold, lease, develop, manage, operate, control and otherwise use the Collateral upon such terms and conditions as may be reasonable under the circumstances (making such repairs, alterations, additions and improvements and taking other actions, from time to time, as may be reasonably necessary or desirable), exercise all such rights and powers of each Loan Party with respect to the Collateral, whether in the name of such Loan Party or otherwise, including without limitation the right to make, cancel, enforce or modify leases, obtain and evict tenants, and demand, sue for, collect and receive all rents, in each case, in accordance with the standards applicable to the Administrative Agent under the Loan Documents, and (v) take any other reasonable actions, as may be reasonably necessary or desirable, in connection with the Collateral (including preparing for the disposition thereof), and all actual, reasonable, out-of-pocket fees and expenses incurred in connection therewith shall be borne by the Loan Parties.  Promptly following written demand from the Administrative Agent following an occurrence and during the continuance of an Event of Default, the applicable Loan Party shall direct the grantor or licensor of, or the contracting party to, any property agreement with respect to any property to recognize and accept the Administrative Agent, for the benefit of and on behalf of the Secured Parties, as the party to such agreement for any and all purposes as fully as it would recognize and accept such Loan Party and the performance of such Loan Party thereunder and, in such event, without further notice or demand and at such Loan Party's sole cost and expense, the Administrative Agent, for the benefit of and on behalf of

105

the Secured Parties, may exercise all rights of such Loan Party arising under such agreements. Without in any way requiring notice to be given in the following manner, each Loan Party agrees that any notice by the Administrative Agent of sale, disposition or other intended action hereunder or in connection herewith, whether required by the UCC or otherwise, shall constitute reasonable notice to such Loan Party if such notice is mailed at the time of sale, by registered or certified mail, return receipt requested, postage prepaid, or is delivered personally against receipt, at least five (5) Business Days prior to such action to the Loan Parties' address specified in or pursuant to **Section 9.01**. If any Collateral is sold on terms other than payment in full at the time of sale, no credit shall be given against the Secured Obligations until the Administrative Agent or the Lenders receive payment, and if the buyer defaults in payment, the Administrative Agent may resell the Collateral. In the event the Administrative Agent seeks to take possession of all or any portion of the Collateral by judicial process, each Loan Party irrevocably waives (to the extent permitted by Applicable Law): (A) the posting of any bond, surety or security with respect thereto which might otherwise be required; (B) any demand for possession prior to the commencement of any suit or action to recover the Collateral; and (C) any requirement that the Administrative Agent retain possession and not dispose of any Collateral until after trial or final judgment. Each Loan Party agrees that the Administrative Agent has no obligation to preserve rights to the Collateral or marshal any Collateral for the benefit of any Person. The Administrative Agent is hereby granted a license or other right to use, without charge, each Loan Party's labels, patents, copyrights, name, trade secrets, trade names, trademarks and advertising matter, or any similar property, in completing production of, advertising or selling any Collateral, and each such Loan Party's rights under all licenses and all franchise agreements shall inure to the Administrative Agent's benefit for such purpose. The Administrative Agent will return any excess to the applicable Loan Party and the Loan Parties shall remain liable for any deficiency.

Section 10.06    <u>Administrative Agent's Appointment as Attorney-in-Fact, etc.</u>.

(a)    Each Loan Party hereby irrevocably constitutes and appoints the Administrative Agent and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable (until the Termination Date) power and authority in the place and stead of such Loan Party and in the name of such Loan Party or in its own name, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Agreement, and, without limiting the generality of the foregoing, each Loan Party hereby gives the Administrative Agent the power and right, on behalf of such Loan Party, without notice to or assent by such Loan Party, to do any or all of the following:

(i)    in the name of such Loan Party or its own name, or otherwise, take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any Account or Contract or with respect to any other Collateral and file any claim or take any other action or proceeding in any court of law or equity or otherwise deemed reasonably appropriate by the Administrative Agent for the purpose of collecting any and all such moneys due under any Account or Contract or with respect to any other Collateral whenever payable;

(ii)    pay or discharge Taxes and Liens levied or placed on or threatened against the Collateral, effect any repairs or any insurance called for by the terms of this Agreement and pay all or any part of the premiums therefor and the costs thereof;

(iii)    execute, in connection with any sale provided for in this Agreement, any endorsements, assignments or other instruments of conveyance or transfer with respect to the

106

Collateral; and

(iv)    (1) direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due or to become due thereunder directly to the Administrative Agent or as the Administrative Agent shall direct; (2) ask or demand for, collect, and receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral; (3) sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications, notices and other documents in connection with any of the Collateral; (4) commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any portion thereof and to enforce any other right in respect of any Collateral; (5) defend any suit, action or proceeding brought against such Loan Party with respect to any Collateral; (6) settle, compromise or adjust any such suit, action or proceeding and, in connection therewith, give such discharges or releases as the Administrative Agent may deem reasonably appropriate; and (7) generally, sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Administrative Agent were the absolute owner thereof for all purposes, and do, at the Administrative Agent's option and such Loan Party's expense, at any time, or from time to time, all acts and things which the Administrative Agent deems reasonably necessary to protect, preserve or realize upon the Collateral and the Secured Parties' security interests therein and to effect the intent of this Agreement, all as fully and effectively as such Loan Party might do.

Anything in this **Section 10.06** to the contrary notwithstanding, the Administrative Agent agrees that it will not exercise any rights under the power of attorney provided for in this **Section 10.06** unless an Event of Default shall have occurred and be continuing.

(b)    If an Event of Default has occurred and is continuing and if any Loan Party fails to perform or comply with any of its agreements contained herein, the Administrative Agent, at its option, but without any obligation so to do, may perform or comply, or otherwise cause performance or compliance, with such agreement; provided, however, if a Default has occurred and is continuing, and if any Loan Party fails to perform or comply with any of its agreements contained herein, the Administrative Agent, at its option, but without any obligation so to do, may perform or comply, or otherwise cause performance or compliance.

(c)    Each Loan Party hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.  All powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until the Termination Date.

Section 10.07    Duty of Administrative Agent.  The Administrative Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under Section 9-207 of the UCC or otherwise, shall be to deal with it in the same manner as the Administrative Agent deals with similar property for its own account.  Neither the Administrative Agent, nor any other Secured Party nor any of their respective officers, directors, partners, employees, agents, attorneys and other advisors, attorneys-in-fact or affiliates shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any Loan Party or any other person or to take any other action whatsoever with regard to the Collateral or any part thereof.  The powers conferred on the Secured Parties hereunder are solely to protect the Secured Parties' interests in the Collateral and shall not impose any duty upon any Secured Party to exercise any such powers. The Secured Parties shall be accountable only for amounts that they actually receive as a result of the exercise of such powers, and neither they nor any of their officers,

directors, partners, employees, agents, attorneys and other advisors, attorneys-in-fact or affiliates shall be responsible to any Loan Party for any act or failure to act hereunder, except from their own gross negligence or willful misconduct.

Section 10.08    <u>Execution of Financing Statements</u>.  Each Loan Party acknowledges that pursuant to Section 9-509(b) of the UCC and any other Applicable Law, each Loan Party authorizes the Administrative Agent to file or record financing or continuation statements, and amendments thereto, and other filing or recording documents or instruments with respect to the Collateral, in such form and in such offices as the Administrative Agent (at the direction of the Required Lenders) reasonably determines appropriate to perfect or maintain the perfection of the security interests of the Administrative Agent under this Agreement.  Each Loan Party agrees that such financing statements may describe the collateral in the same manner as described in the Security Documents or as "all assets" or "all personal property," whether now owned or hereafter existing or acquired, words of similar effect or such other description as the Administrative Agent, in its sole judgment, reasonably determines is necessary or advisable.    A photographic or other reproduction of this Agreement shall be sufficient as a financing statement or other filing or recording document or instrument for filing or recording in any jurisdiction.

Section 10.09    <u>Authority of Administrative Agent</u>.  Each Loan Party acknowledges that the rights and responsibilities of the Administrative Agent under this Agreement with respect to any action taken by the Administrative Agent or the exercise or non-exercise by the Administrative Agent of any option, voting right, request, judgment or other right or remedy provided for herein or resulting or arising out of this Agreement shall, as between the Administrative Agent and the other Secured Parties, be governed by this Agreement and by such other agreements with respect thereto as may exist from time to time among them, but, as between the Administrative Agent and the Loan Parties, the Administrative Agent shall be conclusively presumed to be acting as agent for the Secured Parties with full and valid authority so to act or refrain from acting, and no Loan Party shall be under any obligation, or entitlement, to make any inquiry respecting such authority.

Section 10.10    <u>Appointment of Co-Collateral Agents</u>.  At any time or from time to time, in order to comply with any Applicable Law, the Administrative Agent may appoint another bank or trust company or one of more other persons, either to act as co-agent or agents on behalf of the Secured Parties with such power and authority as may be reasonably necessary for the effectual operation of the provisions hereof and which may be specified in the instrument of appointment (which may, in the discretion of the Administrative Agent, include provisions for indemnification and similar protections of such co-agent or separate agent).

ARTICLE XI

Guaranty

Section 11.01    <u>Guaranty; Limitation of Liability</u>.

(a)    Each Guarantor, jointly and severally, hereby absolutely, unconditionally and irrevocably guarantees the performance and punctual payment when due, whether at scheduled maturity or on any date of a required prepayment or by acceleration, demand or otherwise, of all Secured Obligations of each other Loan Party now or hereafter existing under or in respect of the Loan Documents, whether direct or indirect, absolute or contingent, and whether for principal, interest, premiums, fees, indemnities, contract causes of action, costs, expenses or otherwise (such Secured Obligations being the "**Guaranteed Obligations**"), and agrees to pay any and all reasonable out-of-pocket expenses (including reasonable out-of-pocket fees and expenses of counsel to the extent reimbursable pursuant to **<u>Section 9.05</u>** but excluding allocated costs of in-house counsel) incurred by the Administrative Agent in enforcing any rights under this Guaranty or any

other Loan Document.  Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by any other Loan Party to the Administrative Agent or any Lender under or in respect of the Loan Documents but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization, winding-up or similar proceeding involving such other Loan Party.

(b)      Each Guarantor hereby unconditionally and irrevocably agrees that in the event any payment shall be required to be made to the Administrative Agent or any Lender under this Guaranty, such Guarantor will contribute, to the maximum extent permitted by law, such amounts to each other Guarantor so as to maximize the aggregate amount paid to the Administrative Agent and the Lenders under or in respect of the Loan Documents.

Section 11.02   Guaranty Absolute. Each Guarantor guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Administrative Agent or any Lender with respect thereto.  The Secured Obligations of each Guarantor under or in respect of this Guaranty are independent of the Guaranteed Obligations or any other Secured Obligations of any other Loan Party under or in respect of the Loan Documents, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce this Guaranty, irrespective of whether any action is brought against the Borrower or any other Loan Party or whether the Borrower or any other Loan Party is joined in any such action or actions.  The liability of each Guarantor under this Guaranty shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to, any or all of the following:

(a)      any lack of validity or enforceability of any provision under this Agreement, any Loan Document or any agreement or instrument relating thereto;

(b)      any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations or any other Secured Obligations of any other Loan Party under or in respect of the Loan Documents, or any other amendment or waiver of or any consent to departure from any Loan Document, including any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Loan Party or otherwise;

(c)      any taking, exchange, release or non-perfection of any Collateral, or any taking, release or amendment or waiver of, or consent to departure from, any other guaranty, for all or any of the Guaranteed Obligations;

(d)      any manner of application of Collateral, or proceeds thereof, to all or any of the Guaranteed Obligations, or any manner of sale or other disposition of any Collateral for all or any of the Guaranteed Obligations or any other Secured Obligations of any Loan Party under the Loan Documents or any other assets of any Loan Party;

(e)      any change, restructuring or termination of the corporate structure or existence of any Loan Party;

(f)      any failure of the Administrative Agent or any Lender to disclose to any Loan Party any information relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Loan Party now or hereafter known to the Administrative Agent or such Lender, as the case may be (each Guarantor waiving any duty on the part of the Administrative Agent and the Lenders to disclose such information);

(g)      the failure of any other Person to execute or deliver this Guaranty or the release or reduction of liability of any Guarantor or surety with respect to the Guaranteed Obligations; or

(h)      any other circumstance (including any statute of limitations) or any existence of or reliance on any representation by the Administrative Agent or any Lender that might otherwise constitute a defense available to, or a discharge of, any Loan Party or any other guarantor or surety, in its capacity as a guarantor or surety (other than payment or performance).

This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by the Administrative Agent or any Lender or any other Person, for whatever reason, all as though such payment had not been made.

Section 11.03    Waivers and Acknowledgments.

(a)      Each Guarantor hereby unconditionally and irrevocably waives (to the extent permitted by Applicable Law) any right to revoke this Guaranty and acknowledges that this Guaranty is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

(b)      Each Guarantor hereby unconditionally and irrevocably waives (to the extent permitted by Applicable Law) (i) any defense arising by reason of any claim or defense based upon an election of remedies by the Administrative Agent or any Lender that in any manner impairs, reduces, releases or otherwise adversely affects the subrogation, reimbursement, exoneration, contribution or indemnification rights of such Guarantor or other rights of such Guarantor to proceed against any of the other Loan Parties, any other guarantor or any other Person or any Collateral and (ii) any defense based on any right of set-off or counterclaim against or in respect of the Secured Obligations of such Guarantor hereunder.

(c)      Each Guarantor acknowledges that the Administrative Agent may, to the extent permitted by Applicable Law and the Order, without notice to or demand upon such Guarantor and without affecting the liability of such Guarantor under this Guaranty, foreclose under any Loan Document by non-judicial sale, and each Guarantor hereby waives (to the extent permitted by Applicable Law) any defense to the recovery by the Administrative Agent and the Lenders against such Guarantor of any deficiency after such non-judicial sale and any defense or benefits that may be afforded by Applicable Law.

(d)      Each Guarantor hereby unconditionally and irrevocably waives any duty on the part of the Administrative Agent or any Lender to disclose to such Guarantor any matter, fact or thing relating to the business, condition (financial or otherwise), operations, performance, properties or prospects of any other Loan Party or any of its Subsidiaries now or hereafter known by the Administrative Agent or such Lender, as the case may be.

(e)      Each Guarantor acknowledges that it will receive substantial direct and indirect benefits from the financing arrangements contemplated by the Loan Documents and that the waivers set forth in **Section 9.08** and this **Section 11.03** are knowingly made in contemplation of such benefits.

Section 11.04    Subrogation.  Each Guarantor hereby unconditionally and irrevocably agrees not to exercise any rights that it may now have or hereafter acquire against the Borrower or any other Loan Party that arise from the existence, payment, performance or enforcement of such Guarantor's Obligations under or in respect of this Guaranty or any other Loan Document, including any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Administrative Agent or any Lender against the Borrower or any other Loan Party, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including the

right to take or receive from the Borrower or any other Loan Party, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations (other than inchoate indemnity obligations and similar obligations that survive the termination of this Agreement) and all other amounts payable under this Guaranty (other than inchoate indemnity obligations and similar obligations that survive the termination of this Agreement) shall have been paid in full in cash and the Commitments shall have expired or been terminated.  If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the later of (a) the payment in full in cash of the Guaranteed Obligations and all other amounts payable under this Guaranty (other than inchoate indemnity obligations and similar obligations that survive the termination of this Agreement) and (b) the Termination Date, such amount shall be received and held in trust for the benefit of the Administrative Agent and the Lenders, shall be segregated from other property and funds of such Guarantor and shall forthwith be paid or delivered to the Administrative Agent in the same form as so received (with any necessary endorsement or assignment) to be credited and applied to the Guaranteed Obligations and all other amounts payable under this Guaranty, whether matured or unmatured, in accordance with the terms of the Loan Documents, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this Guaranty thereafter arising.  If (i) any Guarantor shall make payment to the Administrative Agent of all or any part of the Guaranteed Obligations, (ii) all of the Guaranteed Obligations and all other amounts payable under this Guaranty (other than inchoate indemnity obligations and similar obligations that survive the termination of this Agreement) shall have been paid in full in cash and (iii) the Termination Date shall have occurred, the Administrative Agent and the Lenders will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment made by such Guarantor pursuant to this Guaranty.

Section 11.05   Continuing Guaranty; Assignments.  This Guaranty is a continuing guaranty and shall (a) remain in full force and effect until the payment in full in cash of the Guaranteed Obligations (other than inchoate indemnity obligations and similar obligations that survive the termination of this Agreement) and all other amounts payable under this Guaranty (other than inchoate indemnity obligations and similar obligations that survive the termination of this Agreement) and the termination or expiration of all Commitments, (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Administrative Agent and the Lenders and their respective successors, transferees and assigns.  Without limiting the generality of clause (c) of the immediately preceding sentence, any Eligible Assignee that has been assigned or transferred all or any portion of a Lender's Loans, Commitments or rights and obligations under this Agreement in accordance with **Section 9.04**, shall thereupon become vested with all the benefits granted to such transferring Lender under this Guaranty.  No Guarantor shall have the right to assign its rights hereunder or any interest herein or delegate any of its duties, liabilities or obligations hereunder or under any other Loan Document without the prior written consent of the Required Lenders, except as otherwise permitted hereby.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first written above.

**BORROWER:**                              **TUESDAY MORNING, INC.**

By:      _____
Name:
Title:

**GUARANTORS:**                        **TUESDAY MORNING CORPORATION**

By:      _____
Name:
Title:

**TMI HOLDINGS, INC.**

By:      _____
Name:
Title:

**FRIDAY MORNING, LLC**
By:   Tuesday Morning, Inc., as Sole Member

By:      _____
Name:
Title:

**DAYS OF THE WEEK, INC.**

By:      _____
Name:
Title:

**NIGHTS OF THE WEEK, INC.**

By:      _____
Name:
Title:

**TUESDAY MORNING PARTNERS, LTD.**
By:      Days of the Week, Inc., as General Partner

By:      _____
Name:
Title:

[Signature Page to DIP Credit Agreement – Tuesday Morning]

**CANTOR FITZGERALD SECURITIES**,
as Administrative Agent and as Lender

By: _____
     Name:
     Title:

[Signature Page to DIP Credit Agreement – Tuesday Morning]

<u>SCHEDULE 2.01</u>

COMMITMENTS AND PRO RATA SHARES

| **Lender** | **Commitment** | **Percentage** |
|---|---|---|
| Cantor Fitzgerald Securities | $51,500,000.00 | 100.00% |
| **Total** | $51,500,000.00 | 100.000000000% |