**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | § § § § § § § | Chapter 11 |
| | | Case No. 23-90001 |
| **Tuesday Morning Corporation, *et al.*,** | | Joint Administration Requested |
| **Debtors.** | | |

**DECLARATION OF DANIELLE M. BALDINELLI IN SUPPORT OF
THE OBJECTION OF WELLS FARGO BANK, NATIONAL ASSOCIATION**

I, Danielle M. Baldinelli, being duly sworn, depose and say:

1. I am a Managing Director at Wells Fargo Bank, National Association ("Wells Fargo"). I submit this declaration in support of Wells Fargo's first day objections.

2. Wells Fargo is the administrative agent and collateral agent under a senior secured pre-petition credit facility (the "Pre-Petition ABL Credit Agreement") entered into between Tuesday Morning Corporation and related companies ("Tuesday Morning") and certain lenders including Wells Fargo (the "ABL Lenders"). A true and correct copy of the Pre-Petition ABL Credit Agreement (as amended and restated) is attached as Exhibit A, consisting of the Second Amendment to the Pre-Petition ABL Credit Agreement and the restated form of the Pre-Petition ABL Credit Agreement attached as Annex A thereto.

3. My role at Wells Fargo includes managing Wells Fargo's activities in connection with the Pre-Petition ABL Credit Agreement and the relationship with Tuesday Morning and its advisers.

### *Tuesday Morning's Prior Bankruptcy*

4. In May 2020, Tuesday Morning previously filed for bankruptcy protection in this Court. *See* Case No. 20-31476-hdh11.

5. In that earlier case, Tuesday Morning informed this Court that it would restructure by closing poorly-performing stores. *See, e.g.,* Case No. 20-31476, Docket No. 23 (Declaration of Barry Folse) at ¶ 46 ("As part of their analysis, the Debtors and their advisors have conducted a company-wide review of operational and sales performance and have identified an initial list of 133 locations that are relatively less productive. Through these Chapter 11 Cases, the Debtors intend to liquidate the existing inventory and other assets at less productive locations through store closing sales"). Tuesday Morning used a professional liquidator to assist with the store closing sales.

6. Tuesday Morning also advised the Court that it pursued strategic alternatives, including a sale of all or some of its assets. *See, e.g.,* Case No. 20-31476, Docket No. 1495 (Amended Disclosure Statement), p. 47 ("The Debtors and their professionals… engaged in an extensive marketing process to solicit offers from prospective buyers interested in purchasing substantially all of the Debtors' assets…").

7. Ultimately, Tuesday Morning's prior bankruptcy did not result in the sale of the business. *See id.*, p. 48 (confirming that "the Debtors would be pursuing a plan instead of a sale of substantially all of their assets").

8. Tuesday Morning emerged from its first bankruptcy proceeding on December 31, 2020, which is just over only two years ago.

### *Tuesday Morning's Tumultuous 2022 and Early 2023*

9. In May 2022, Tuesday Morning entered into the Pre-Petition ABL Credit Agreement with the ABL Lenders.

10. In mid-2022, Tuesday Morning hired an investment banker, Piper Sandler to conduct a search for a new equity investment in Tuesday Morning.

11. In the second half of 2022, Tuesday Morning experienced significant financial difficulties and management departures.

12. In the summer of 2022, Tuesday Morning encountered serious liquidity issues. Due to Tuesday Morning's deteriorating financial condition, lack of liquidity, and need for capital, Wells Fargo began preparations for a potential Tuesday Morning Chapter 11 filing in August 2022.

13. In August 2022, Wells Fargo and other ABL Lenders also worked cooperatively with Tuesday Morning and potential investors in connection with potential "rescue financing".

14. On September 20, 2022, Tuesday Morning entered into a series of transactions pursuant to which it received a total of approximately $35 million in new capital, including through investments by individuals who were at time in senior management positions (and in some cases still are) at Tuesday Morning. *See* Tuesday Morning Form 8-K filing with the U.S. Securities and Exchange Commission (the "SEC") (9/9/22).

15. Despite the infusion of additional capital, Tuesday Morning continued to struggle and suffered from a lack of liquidity.

16. On November 4, 2022, Tuesday Morning announced that the employment of each of its Chief Executive Officer, Chief Operating Officer, and Interim Chief Financial Officer would immediately terminate. *See* Tuesday Morning Form 8-K filing with the SEC (11/04/22).

17. In November 2022, Tuesday Morning missed an extended deadline to file its 10-Q with the SEC. On November 17, 2022, Tuesday Morning reported in an SEC filing that "the

Company determined a material weakness exists in its internal control over financial reporting… Specifically, the Company has concluded that it did not maintain a sufficient complement of personnel with appropriate accounting knowledge, experience and training to oversee the application of certain manual process controls or to maintain adequate segregation of duties." *See* Tuesday Morning Form 12b-25/A filing with the SEC (11/17/22).

18. In or around December 2022, Tuesday Morning announced that it had directed Piper Sandler, its investment banker, to seek a strategic buyer of Tuesday Morning's business.

19. On December 23, 2022, Tuesday Morning de-listed itself from the Nasdaq stock market.

20. On January 5, 2023, Tuesday Morning announced the resignation of its Principal Accounting Officer. *See* Tuesday Morning Form 8-K filing with the SEC (1/5/23).

21. On January 29, 2023, Tuesday Morning announced the resignation of a member of its Board of Directors, which board member represented the largest investor in the September 2022 convertible debt investment. *See* Tuesday Morning Form 8-K filing with the SEC (1/29/23).

### *Tuesday Morning's Pre-Petition Restructuring Efforts*

22. Tuesday Morning's holiday sales did not meet expectations, which intensified Tuesday Morning's liquidity issues in January 2023.

23. On January 9, 2023, Wells Fargo sent a "Notice of Default And Reservation Of Rights" (a true and correct copy of which is attached as Exhibit B) to Tuesday Morning, which specified certain events of default under the Pre-Petition ABL Credit Agreement, including as a result of Tuesday Morning conducting a significant number of unauthorized, non-ordinary course store closing sales.

24. In January 2023, Tuesday Morning replaced its financial advisor, retaining BDO Consulting Group, LLC ("BDO") to serve as its new restructuring and financial advisor.

25. Haynes & Boone, LLP ("Haynes & Boone"), Tuesday Morning's longtime outside law firm, served as restructuring counsel to Tuesday Morning.

26. In January and early February 2023, the ABL Lenders (and its financial adviser, Berkeley Research Group LLC ("BRG")) worked cooperatively with Tuesday Morning, BDO, and Haynes & Boone to explore potential solutions to Tuesday Morning's liquidity issues. In those discussions, the ABL Lenders relied on their deep experience in the retail sector.

27. On January 19, 2023, Tuesday Morning entered into a Consulting Agreement with a professional liquidator, Gordon Brothers Retail Partners, LLC (the "Liquidation Consultant"), pursuant to which Tuesday Morning would conduct store closing sales, with the assistance of the Liquidation Consultant, in order to maximize the value of the inventory at those stores.

28. In mid-January 2023, Tuesday Morning announced a plan to close approximately 70 of its under-performing stores and to conduct store closing sales at those stores, with the assistance of the Liquidation Consultant.

29. On January 26, 2023, after other strategic initiatives had faltered, Tuesday Morning announced a plan to close all of its stores, with the assistance of the Liquidation Consultant, and to undertake an orderly liquidation of Tuesday Morning's business.

30. As part of this process, Tuesday Morning explored the possibility of a bankruptcy filing to assist with Tuesday Morning's orderly liquidation and to maximize a recovery for all stakeholders.

31. Throughout January 2023 and early February 2023, the ABL Lenders, Tuesday Morning, and their advisers worked tirelessly to structure and document a debtor-in-possession

credit facility to be provided by the ABL Lenders, which would fund an orderly liquidation of Tuesday Morning's assets.

32. On February 6, 2023, Wells Fargo and Tuesday Morning entered into a "Fee Capitalization Letter" (a true and correct copy of which is attached as Exhibit C), which capitalized to principal of the applicable loans under the Pre-Petition ABL Credit Agreement certain outstanding fees and premiums that would otherwise become due and payable as a result of an acceleration of the credit facilities under the Pre-Petition ABL Credit Agreement based on the then-existing event of default.

33. In early February 2023, the ABL Lenders and Tuesday Morning agreed in principle to a debtor-in-possession credit facility with the key terms listed in Appendix A to this declaration.

34. The ABL Lenders and BRG worked cooperatively with Tuesday Morning and BDO to develop and agree on a financial model and budget for Tuesday Morning in connection with the ABL debtor-in-possession financing and an orderly liquidation of Tuesday Morning's assets. In the early morning of February 8, 2023, Tuesday Morning's counsel at Haynes & Boone emailed Wells Fargo's counsel (a true and correct copy of which is attached as Exhibit D) attaching a "final" DIP budget summary.

35. On February 7, 2023, Tuesday Morning's counsel, Haynes & Boone, announced to Wells Fargo's counsel by email (a true and correct copy of which is attached as Exhibit E) that the special committee of Tuesday Morning's Board of Directors (the "Special Committee") with authority over Tuesday Morning's insolvency arrangements had approved a bankruptcy filing to take place on February 8, 2023. I understand that the Special Committee's February 7 bankruptcy filing approval was premised on debtor-in-possession financing from the ABL Lenders in the manner negotiated between the parties.

36. On February 7, 2023, Wells Fargo—following consultation with Tuesday Morning's counsel at Haynes & Boone and in anticipation of a bankruptcy filing overnight—sent a "Notice Of Default And Acceleration" (a true and correct copy of which is attached as <u>Exhibit F</u>) to Tuesday Morning.

### *Tuesday Morning's Abrupt Reversal And Termination Of Key Advisors*

37. On February 8, 2023, at the direction of the Special Committee, Tuesday Morning abruptly and surprisingly reversed its decision to file for bankruptcy using debtor-in-possession financing from the ABL Lenders.

38. Moreover, Tuesday Morning announced that it intended to pursue a bankruptcy process that: (a) uses debtor-in-possession financing from an alternative group of lenders, including certain existing term lenders (such financing, the "<u>Alternative DIP Financing</u>") and (b) focuses on searching for a strategic sale of its assets—a process pursued during Tuesday Morning's prior bankruptcy proceedings and in efforts led by Piper Sandler—rather than executing an orderly liquidation of all stores.

39. I am not aware of any signed letter of intent or asset purchase agreement entered into by Tuesday Morning with any party involving the sale of all or any portion of Tuesday Morning's assets.

40. On February 8, 2023, Wells Fargo advised Tuesday Morning by letter (a true and correct copy of which is attached as <u>Exhibit G</u>) of its objections to the Special Committee's decision to reverse course.

41. On February 8, 2023, Wells Fargo also advised certain potential alternative lenders to Tuesday Morning that their participation in any debtor-in-possession financing would violate the terms of an Intercreditor Agreement, which forbids parties from sponsoring debtor-in-

possession financing over the objection of the ABL Lenders. A true and correct copy of the notice is attached as Exhibit H. On February 14, we subsequently learned that Tuesday Morning's Alternative DIP Financing would also be syndicated to certain holders of its pre-petition convertible notes in violation of a Subordination Agreement with respect to such convertible notes. True and correct copies of (i) the Intercreditor Agreement with the pre-petition term lenders and the First Amendment to the Intercreditor Agreement are attached as Exhibits I and J and (ii) the Subordination Agreement with the holders of the pre-petition convertible notes is attached as Exhibit K.

42. On February 10, 2023, Tuesday Morning fired its restructuring and financial advisor, BDO. I am not aware whether Tuesday Morning has hired any replacement financial adviser. Neither Tuesday Morning nor its counsel has announced to Wells Fargo the engagement of a replacement financial advisor.

43. On February 10, 2023, Haynes & Boones resigned from serving as Tuesday Morning's counsel.

44. In my experience, it is exceptionally unusual for a debtor's key advisors to all resign or to be fired in the days before a bankruptcy filing.

45. On February 10, 2023, Wells Fargo again advised Tuesday Morning by letter (a true and correct copy of which is attached as Exhibit L) of its objections to the abrupt decision to reverse strategy.

46. On February 12, 2023, we learned that Tuesday Morning had terminated the involvement of the Liquidation Consultant in connection with the store closing sales and that Tuesday Morning intended to conduct store closing sales on its own, without the assistance of a

professional liquidator and in further breach of the Pre-Petition ABL Credit Agreement. A true and correct copy of that notice is attached as Exhibit M.

47. We also learned that Tuesday Morning's store employees were directed by Tuesday Morning's management to reject any "augment inventory" supplied by the Liquidation Consultant, pursuant to the Consulting Agreement, for the purpose of ensuring that the inventory mix in Tuesday Morning's stores is sufficient to attract customers and maximize sales, following weeks during which Tuesday Morning's suppliers have declined to deliver new inventory to Tuesday Morning.

48. In my experience, it is highly unusual and detrimental for a retail company to conduct large-scale store closing sales without the assistance of a professional liquidator. Tuesday Morning itself used a professional liquidation consultant to close its stores during its 2020 bankruptcy proceeding.

**APPENDIX A**

| Term | Summary |
|---|---|
| **Facilities:** | Revolving Facility in a principal amount of $40,000,000, with $15,000,000 available for issuance of Letters of Credit.<br><br>FILO B Facility in a principal amount of $10,939,218. |
| **Roll-up Provisions:** | Outstandings under the Pre-Petition Revolving Facility to be repaid with collections for the period from the Closing Date until the Final Financing Order entry date.<br><br>On the Final Financing Order entry date, outstanding obligations under the Pre-Petition Revolving Facility will be refinanced with DIP Revolving Loans or will other otherwise constitute DIP Revolving Obligations.<br><br>On the Final Financing Order entry date, outstanding obligations under the Pre-Petition FILO B Facility will be refinanced with DIP FILO B Loans or will other otherwise constitute DIP FILO B Obligations.<br><br>Interest will accrue on the applicable Pre-Petition Obligations from the Petition Date through the Final Financing Order entry date at the Default Rate—2.00% *per annum* in excess of the rates otherwise applicable to the Pre-Petition Obligations, as described below. |
| **Agent:** | Wells Fargo Bank, National Association ("Wells Fargo"). |
| **FILO B Documentation Agent:** | 1903P Loan Agent, LLC. |
| **Lenders:** | Revolving Facility: Wells Fargo and Bank of America, N.A.<br><br>FILO B Facility: 1903 Partners, LLC. |
| **Revolving Facility Interest Rates and Fees:** | DIP Revolving Facility: Base Rate, plus 5.25% *per annum*.<br><br>Pre-Petition Revolving Facility: Base Rate, plus 2.25% *per annum*, plus a Default Rate of 2.00% *per annum*.<br><br>An arrangement fee of $100,000, payable in cash to Wells Fargo, at closing.<br><br>An upfront fee of 2.00% of the principal amount of Revolving Commitments (anticipated to be $800,000), payable in cash, for the benefit of the Revolving Lenders, at closing.<br><br>A collateral monitoring fee of $50,000/month, payable to Wells Fargo, at closing and on first day of each month until payment in full. |

| | |
|---|---|
| **FILO B Facility Interest Rates and Fees:** | DIP FILO B Facility: Base Rate, plus 13.00% *per annum*. |
| | Pre-Petition FILO B Facility: Base Rate, plus 8.00% *per annum*, plus a Default Rate of 2.00% *per annum*. |
| | A FILO B consent fee of $295,000, payable to the FILO B Lenders, by being capitalized to / paid with FILO B Loans upon entry of the Final Financing Order. |
| | A FILO B collateral monitoring fee of $8,500/month, payable to the FILO B Documentation Agent, at closing and on first day of each month until payment in full. |
| **DIP Default Rates:** | Revolving Facility: A rate equal to 2.00% *per annum* in excess of the rate otherwise applicable to Revolving Loans. |
| | FILO B Facility: A rate equal to 2.00% *per annum* in excess of the rate otherwise applicable to FILO B Loans. |
| **Revolving Borrowing Base:** | (a) 90% of Eligible Credit Card Receivables, plus |
| | (b) 90% of the appraised NOLV of the value (lower of cost or market) of Eligible Inventory, minus |
| | (c) any FILO B Deficiency Reserve,[1] minus |
| | (d) a reserve in the amount of the Carve Out, minus |
| | (e) customary ABL availability reserves established by Wells Fargo in it "Permitted Discretion. |
| | As to eligible categories, eligibility criteria to be consistent with Pre-Petition Credit Agreement. |
| **FILO B Borrowing Base:** | 90% of the appraised NOLV of the value (lower of cost or market) of Eligible Inventory. |
| | As to eligible categories, eligibility criteria to be consistent with Pre-Petition Credit Agreement. |
| **Budget Covenants** | Tuesday Morning required to perform in accordance with an Approved Budget, subject to weekly testing (commencing on Thursday of the second full week following the Petition Date) on a rolling four-week basis, as follows:<br>• Actual Cash Receipts not to be less than 90% of Budgeted Cash Receipts<br>• Actual Total Disbursements not to exceed 110% of Budgeted Total Disbursements; and<br>• Actual Debtor Professional Fee Amounts not to exceed 115% of Budgeted Professional Fee Amounts. |

---

[1] A reserve in the amount by which the principal amount of the FILO B Outstandings (other than capitalized amounts) exceeds the FILO B Borrowing Base.

| **Minimum Availability Covenant:** | Tuesday Morning shall not permit Availability[2], at any time, to be less than the $4.0 million, reflecting relief from Pre-Petition Credit Agreement's minimum Availability covenant equal to greater of (a) $7.5 million and (b) 7.5% of the Revolving Loan Cap (determined without giving effect to any FILO B Deficiency Reserve). |
|---|---|
| **Representations and Warranties and Covenants:** | Usual and customary to debtor-in-possession credit facilities provided with retail industry borrowers. |
| **Events of Default:** | Usual and customary to debtor-in-possession credit facilities provided with retail industry borrowers, including an event of default if Tuesday Morning shall fail to conduct all store closing sales, with the assistance of (and in cooperation with) a nationally recognized, professional liquidation consultant. |

---

[2] The result, if positive, of (a) the lesser of (i) the Revolving Commitments and (ii) the Revolving Borrowing Base (the "Revolving Loan Cap") minus (b) Aggregate Revolving Exposure (including Pre-Petition Revolving Exposure).

\* \* \*

I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 15, 2023

_D.M. M. Baldinelli_
Name: Danielle M. Baldinelli