Phillip Lamberson – SBT #00794134
Annmarie Chiarello – SBT #24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Phone:  (214) 745-5400
Fax:     (214) 745-5390
E-mail:  plamberson@winstead.com
E-mail:  achiarello@winstead.com

Kevin J. Simard (*pro hac vice* pending)
Jonathan D. Marshall  (*pro hac vice* pending)
Jean-Paul Jaillet (*pro hac vice* pending)
Jacob S. Lang (*pro hac vice* pending)
**CHOATE, HALL & STEWART LLP**
Two International Place
Boston, Massachusetts 02110
Telephone:  (617) 248-5000
Facsimile:   (617) 248-4000
E-mail:  ksimard@choate.com
E-mail:  jmarshall@choate.com
E-mail:  jjaillet@choate.com
E-mail:  jslang@choate.com

**ATTORNEYS FOR WELLS FARGO BANK,
NATIONAL ASSOCIATION**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **Tuesday Morning Corporation,** *et al.*,[1] | § | **Case No. 23-90001** |
| | § | |
| **Debtors.** | § | **Joint Administration Requested** |
| | § | |
| | § | **Re: Docket No. 36** |

**OBJECTION OF WELLS FARGO BANK, NATIONAL ASSOCIATION
TO MOTION SEEKING ENTRY OF AN INTERIM
ORDER (I) AUTHORIZING DEBTORS TO
(A) USE CASH COLLATERAL ON A LIMITED BASIS
AND (B) OBTAIN POSTPETITION FINANCING ON A SECURED,
SUPERPRIORITY BASIS, (II) GRANTING ADEQUATE PROTECTION,
(III) SCHEDULING A FINAL HEARING, AND (IV) GRANTING RELATED RELIEF**

Wells Fargo Bank, National Association ("Wells Fargo"), in its capacity as

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Tuesday Morning Corporation (8532) ("TM Corp."); TMI Holdings, Inc. (6658) ("TMI Holdings"); Tuesday Morning, Inc. (2994) ("TMI"); Friday Morning, LLC (3440) ("FM LLC"); Days of the Week, Inc. (4231) ("DOTW"); Nights of the Week, Inc. (7141) ("NOTW"); and Tuesday Morning Partners, Ltd. (4232) ("TMP"). The location of the Debtors' service address is 6250 LBJ Freeway, Dallas, TX 75240.

---

administrative agent and collateral agent under the Prepetition ABL Credit Agreement,[2] on behalf of itself and the other Prepetition ABL Lenders, by and through its counsel, respectfully submits this objection (the "Objection") to the *Motion Seeking Entry of an Interim Order (I) Authorizing Debtors to (A) Use Cash Collateral on a Limited Basis and (B) Obtain Postpetition Financing on a Secured, Superpriority Basis, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief*, Docket No. 36 (the "DIP Motion"; and the financing package proposed therein, the "Term DIP Proposal").  In support of its Objection, Wells Fargo submits the *Declaration of Danielle M. Baldinelli in Support of the Objection of Wells Fargo Bank, National Association* (the "Baldinelli Declaration").  In further support of its Objection, Wells Fargo respectfully states as follows:

## PRELIMINARY STATEMENT

1.      After spending weeks negotiating with the ABL Lenders to provide DIP financing of a liquidating plan (the "ABL DIP Proposal") that was carefully vetted by the Debtors' longstanding legal counsel, Haynes & Boone, and nationally-recognized financial advisors, BDO USA LLP, and approved by a special committee of the board of directors of the Debtors (the "Special Committee"), the Debtors decided to reject the ABL DIP Proposal, seeking approval instead of the Term DIP Proposal agented by Cantor Fitzgerald Securities for syndication to the Prepetition Term Loan Lenders and Prepetition FILO C Noteholders (collectively, the "Subordinated Creditors").

2.      The Debtors seek interim approval of the Term DIP Proposal and use of cash collateral, *without* the advice of their longstanding legal counsel and without their well-known

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Interim DIP Order.

**OBJECTION OF WELLS FARGO BANK, NATIONAL ASSOCIATION TO MOTION SEEKING ENTRY OF AN INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) USE CASH COLLATERAL ON A LIMITED BASIS AND (B) OBTAIN POSTPETITION FINANCING ON A SECURED, SUPERPRIORITY BASIS, (II) GRANTING ADEQUATE PROTECTION, (III) SCHEDULING A FINAL HEARING, AND (IV) GRANTIING RELATED RELIEF**

financial advisor, both of which resigned and/or were terminated days ago when the Debtors jettisoned the ABL DIP Proposal.  Rather, with brand new counsel and no financial advisor at all, the Debtors ask this Court to approve a purported $51.5 million Term DIP Proposal based on a budget that:

a.  was prepared internally by financial staff with no stated restructuring experienced;

b.  is unsupported by any inventory roll-forward analysis demonstrating the starting or ending values of the collateral that supposedly will support adequate protection liens;

c.  only requires the DIP Lenders to fund $25 million of new money during the first two months of the case, (i) $3.17 million of which will be used to repay the so-called prepetition Bridge Loan, (ii) $4.16 million of which will be used to pay DIP Interest and Fees, (iii) leaving a mere $17.67 million of liquidity[3] before the DIP Lenders pay their expenses; moreover, **all but $100,000 of the proposed $25 million interim advance** would be repaid to the DIP Lenders within the first four weeks of these Cases;

d.  during the five-month budget period, requires the DIP Lenders to infuse only an additional $10 million for a total of $35 million, but only after virtually all of the initial $25 million funding has been repaid;

---

[3] As discussed a length herein, the heart of the Prepetition ABL Lenders' Objection is that, despite being characterized as a "refinancing" of the Prepetition ABL Obligations, the Term DIP Proposal leaves significant obligations unpaid and not adequately protected.  As of the Petition Date, the principal amount of the Prepetition ABL Obligations exceeds $28 million.  It comes as no surprise then that the Term DIP Proposal leaves so many of those obligations unpaid—it simply does not provide enough liquidity to the estates.

**OBJECTION OF WELLS FARGO BANK, NATIONAL ASSOCIATION TO MOTION SEEKING ENTRY OF AN INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) USE CASH COLLATERAL ON A LIMITED BASIS AND (B) OBTAIN POSTPETITION FINANCING ON A SECURED, SUPERPRIORITY BASIS, (II) GRANTING ADEQUATE PROTECTION, (III) SCHEDULING A FINAL HEARING, AND (IV) GRANTIING RELATED RELIEF                                                    Page 3 of 30**

e.   does not show *any* paydown of over $18 million of prepetition senior secured debt during the 20 week budget period (but does show the Debtors' professionals and others receiving $3.4 million during the first four weeks);

f.   nonsensically shows the Debtors generating more cash from liquidating 262 stores than the Debtors, only a week ago, projected to generate in a full-chain 462 store liquidation under the ABL DIP Proposal; and

g.   which supposedly adequately protects approximately $14.7 million of prepetition senior secured debt with replacement liens *without any* showing whatsoever that there would be sufficient collateral to support those liens.

Put simply, the Term DIP Proposal is entirely illusory.

3.      The Debtors would have this Court believe that the DIP Facility is being used to refinance the Pre-Petition ABL Obligations.  Upon that premise, the Debtors seek authority to allow the DIP Lenders to prime the ABL Priority Collateral (as defined in the ABL / Term Subordination Agreement), and do so without providing the Prepetition ABL Lenders any demonstrated Adequate Protection.[4]  But what the Term DIP Proposal actually proposes is to pick and choose those components of the Prepetition ABL Lenders' Claim the DIP Lenders either are willing to pay or have adequate funding to pay.  For those portions of the claim that the

---

[4] The prepetition liens held by the Prepetition Term Loan Lenders and Prepetition Convertible Noteholders on the ABL Priority Collateral likewise are being primed through a proposed "roll-up" of certain Prepetition Term Loans and Pre-Petition FILO C Convertible Notes.

---

**OBJECTION OF WELLS FARGO BANK, NATIONAL ASSOCIATION TO MOTION SEEKING ENTRY OF AN INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) USE CASH COLLATERAL ON A LIMITED BASIS AND (B) OBTAIN POSTPETITION FINANCING ON A SECURED, SUPERPRIORITY BASIS, (II) GRANTING ADEQUATE PROTECTION, (III) SCHEDULING A FINAL HEARING, AND (IV) GRANTIING RELATED RELIEF**                                    **Page 4 of 30**

Term DIP Proposal leaves behind—portions of the principal of the Prepetition ABL Lenders' Claim constituting capitalized fees, Pre-Petition Contingent LC Obligations (as defined in the Term DIP Proposal), and the Prepetition ABL Lenders' indemnity obligations—such amounts either are extinguished or subject to substantial risk of non-payment. This is not a refinancing of the Prepetition ABL Obligations.

4.      Putting aside the fact that the Term DIP Proposal does not address payment of the indemnity obligations of the Prepetition ABL Lenders (which, as discussed below, will be material), the Debtors propose to selectively repay Pre-Petition ABL Obligations without providing adequate protection for the Unpaid ABL Obligations (as defined herein). As noted above, the DIP Lenders are repaying themselves all but $100,000 within four (4) weeks of advancing an initial $25 million, and yet they have decided not to fully repay the Prepetition ABL Lenders' Claim or provide sufficient adequate protection to the Prepetition ABL Lenders.

5.      The proposal before the Court fails to satisfy the important, and heavy, evidentiary burden that is required when a debtor requests authority to receive post-petition financing under Section 364(d) of the Bankruptcy Code. In such circumstances, a debtor must prove: "first, that the proposed financing is an exercise of sound and reasonable business judgment; second, that no alternative financing is available on any other basis; third, that the financing is in the best interests of the estate and its creditors; and, as a corollary to the first three points, that no better offers, bids, or timely proposals are before the Court."[5]

6.      Here, the Debtors cannot meet *any* of these prerequisites, let alone (as required) *all* of them. ***First***, the circumstances that both preceded and followed the Debtors' acceptance of

_____

[5] *In re Premier Entm't Biloxi, LLC*, Case No. 06-50975, 2007 Bankr. LEXIS 3939, at *7 (Bankr. S.D. Miss. Feb. 2, 2007) (citations omitted).

the Term DIP Proposal belie that the Debtors exercised sound and reasonable business judgment. There was a point in time, days ago, when, after weeks of negotiation and deliberation, the Debtors, with the advice of their established advisors, did exercise sound and reasonable business judgment in approving the filing of a bankruptcy petition and pursuit of a liquidation plan supported by DIP financing from the Prepetition ABL Lenders. Such financing would have satisfied the Debtors' secured debts and, based upon the budget approved by the Debtors' advisors, kept the Debtors administratively solvent and provided a potential distribution to unsecured creditors. The Debtors then reversed themselves and (i) revoked their approval to file the bankruptcy and execute on the ABL DIP Proposal, (ii) pivoted to a risky proposal advanced by one or more of their Prepetition Term Loan Lenders, (iii) lost their longstanding bankruptcy counsel, who resigned abruptly on the eve of bankruptcy, (iv) fired their financial advisor with no apparent replacement, (v) ceased store closing sales that were in process and were maximizing value for all of the Debtors' stakeholders and terminated their liquidation consultant, and (vi) instead, filed the petition seeking approval of the Term DIP Proposal without the apparent support of any other stakeholder.

7.      The Debtors' approval of the Term DIP Proposal contravenes sound and reasonable business judgment for at least the following reasons:

- The Term DIP Proposal, not proposed or approved by any financial advisor, sets the stage for protracted litigation between the DIP Lenders and Prepetition ABL Lenders and adds substantial additional expenses that were not contemplated by the ABL DIP Proposal and related budget that the Special Committee previously approved. First, the Term DIP Proposal does *not* refinance the Pre-Petition ABL Obligations as the DIP Motion purports. Instead, it

leaves multiple components of the Prepetition ABL Lenders' Claim unpaid and shifts onto the Pre-Petition ABL Lenders the risk of non-payment.  Second, the Term DIP Proposal will never be funded without violating the terms of the Subordination Agreements (as defined below) that govern the relationship among the Prepetition ABL Lenders and Subordinated Creditors.  Once the Debtors are subject to an insolvency proceeding, the Subordinated Creditors cannot support, provide or consent to any DIP financing that is not supported by the Pre-Petition ABL Creditors. The prohibitions survive until the Pre-Petition ABL Obligations are indefeasibly paid in full (which, as discussed, they will not be under the Term DIP Proposal).  The DIP Loan is being syndicated to the Subordinated Creditors.  Those lenders therefore must choose whether to (a) participate in the DIP Loan and violate the Subordination Agreements or (b) not participate and have their prepetition positions primed.

- To the extent the DIP Lenders—or any other party—seeks to challenge some portion of the Prepetition ABL Lenders' Claim, they can do so during the customary challenge period that follows entry of the Interim Order.  But there is no justification for using this Court to secure a discount on paying in full the Prepetition ABL Lenders' Claim by arbitrarily refusing to pay a portion of the principal of the loans that the DIP Lenders dispute.  Without adequate protection for those disputed fees, the risk shifts onto the Prepetition ABL Lenders to collect the amounts they are entitled to today when they prevail on any dispute with the DIP Lenders. Under these facts and the law, there is no basis for the Prepetition ABL Lenders to be primed.

- The crux of the Term DIP Proposal is that the Debtors be permitted to undertake a process to locate a buyer for some of their assets.  However, the entire premise is faulty where, as here, the Debtors have been seeking a buyer for their assets, both with and without the

assistance of an investment banker, since at least September 2022.   No other interest was

demonstrated, and the process ultimately led nowhere.   Now, the Debtors enter these Cases with

no sign of a buyer in hand, asking the Court to find that a go forward plan, this time, will be

different, all while placing all risk of this gambit on the Prepetition ABL Lenders and other

creditors.

8.      Under these facts, the Court should not find that entry into the Term DIP Proposal

constitutes a sound exercise of the Debtors' business judgment.   Moreover, the Term DIP

Proposal is conditioned on the granting of priming liens *without* demonstrating the provision of

adequate protection to existing prepetition secured creditors.

9.      ***Second***, there *is* an alternative financing available that would eliminate these

litigation risks, mounting costs, and administrative insolvency.   Indeed, mere days ago, the

Special Committee resolved to enter into the ABL DIP Proposal, a carefully vetted financing

arrangement with Wells Fargo and the other Prepetition ABL Lenders.   On February 8, the

morning of what would have been the filing of these Cases, the Special Committee abruptly

revoked its resolution in order to explore the Term DIP Proposal.

10.     ***Third***, the transactions contemplated under the ABL DIP Proposal, and not the

proposal currently before the Court, are the ones that would maximize value, adequately protect

any primed prepetition secured creditors and, therefore, are in the best interests of the Debtors'

estates.   The ABL DIP Proposal is premised on a full-chain liquidation of all of the Debtors'

stores (the "Orderly Liquidation"), the approach the Prepetition ABL Lenders believe has the

support of substantially all of the Debtors' lenders, except those seeking to provide a priming

DIP.   The Orderly Liquidation, along with the ABL DIP Proposal, provide that the Debtors'

**OBJECTION OF WELLS FARGO BANK, NATIONAL ASSOCIATION TO MOTION SEEKING ENTRY
OF AN INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) USE CASH COLLATERAL ON A
LIMITED BASIS AND (B) OBTAIN POSTPETITION FINANCING ON A SECURED, SUPERPRIORITY
BASIS, (II) GRANTING ADEQUATE PROTECTION, (III) SCHEDULING A FINAL HEARING, AND
(IV) GRANTIING RELATED RELIEF                                              Page 8 of 30**

estates will remain administratively solvent throughout the course of these Cases. Moreover, the ABL DIP Proposal eliminates the litigation risk and attendant costs that accompany adoption of the Term DIP Proposal. And the ABL DIP Proposal does not foreclose any party (including the DIP Lenders) from making a bid for certain stores or merchandise notwithstanding the Orderly Liquidation.

11.     In short, the ABL DIP Proposal would maximize value for *all* of the Debtors' constituents and preserves optionality, while the Term DIP Proposal would destroy value—for all stakeholders, not just the Prepetition ABL Lenders—and sets these Cases on a path where the only certainty is unnecessary litigation and substantial expenses for the estates.[6] By contrast, the Term DIP Proposal provides for more expensive financing, execution risk and potential administrative insolvency all in order to permit the Debtors to attempt to preserve its business without having a stalking horse bidder for its assets despite its efforts trying to find one for months. Indeed, according to the financial analysis undertaken by the ABL DIP Lenders' financial advisor, under the Term DIP Proposal, net recoveries to the Debtors' estates would decrease significantly. Moreover, the Debtors cannot show that there are no better offers, bids, or timely proposals are before the Court. The ABL DIP Proposal remains a viable and less expensive alternative.

---

[6] Of course, it is no wonder the DIP Lenders are willing to provide the DIP Term Proposal. After funding $25 million, the DIP Lenders would pay themselves $4.16 million in fees upon closing, have the prepetition Bridge Loan repaid (despite such loan ranking junior to all of the Debtors' other prepetition debt), and recover all but $100,000 of their initial advance within four (4) weeks of making it.

**OBJECTION OF WELLS FARGO BANK, NATIONAL ASSOCIATION TO MOTION SEEKING ENTRY OF AN INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) USE CASH COLLATERAL ON A LIMITED BASIS AND (B) OBTAIN POSTPETITION FINANCING ON A SECURED, SUPERPRIORITY BASIS, (II) GRANTING ADEQUATE PROTECTION, (III) SCHEDULING A FINAL HEARING, AND (IV) GRANTIING RELATED RELIEF                    Page 9 of 30**

12.    For the reasons set forth in this Objection and as will be shown at the hearing, the ABL DIP Proposal is far superior to the proposal for which the DIP Motion seeks approval.  The DIP Motion should be denied.

## BACKGROUND

### I.  Prepetition Claim Documents.

13.    As set forth more fully in the Debtors' declarations in support of their first day motions and the DIP Motion, the Debtors are party to a number of Prepetition Credit Agreements.  Those agreements include the Prepetition ABL Credit Agreement, under which the Debtors are in default, owing an outstanding principal amount, secured by all of the Debtors' current and future property, of approximately $28,708,239.14, including the face value of outstanding Letters of Credit.

### II.  Negotiation and Adoption of the ABL DIP Proposal, Resolution to File Bankruptcy, and Revocation of Same.

14.    The Prepetition ABL Lenders have worked constructively with the Debtors and their advisors, over the past several months to support the Debtors' pursuit of strategic initiatives to improve its business and financial performance, including in connection with an out-of-court restructuring and recapitalization transaction consummated in September 2022.  Among other initiatives, the Prepetition ABL Lenders supported a consignment agreement that the Debtors entered into late last year that, had the Debtors not terminated it, would have generated more proceeds for the benefit of all of the Debtors' stakeholders.  More recently, in January 2023, the Debtors sought—and the Prepetition ABL Lenders agreed—to commence the Orderly Liquidation.  It became apparent relatively soon thereafter that the Debtors would be unable to

**OBJECTION OF WELLS FARGO BANK, NATIONAL ASSOCIATION TO MOTION SEEKING ENTRY OF AN INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) USE CASH COLLATERAL ON A LIMITED BASIS AND (B) OBTAIN POSTPETITION FINANCING ON A SECURED, SUPERPRIORITY BASIS, (II) GRANTING ADEQUATE PROTECTION, (III) SCHEDULING A FINAL HEARING, AND (IV) GRANTIING RELATED RELIEF**      **Page 10 of 30**

complete the Orderly Liquidation and maximize value for its stakeholders absent a bankruptcy filing.

15.     Consequently, for approximately the past six weeks, the Prepetition ABL Lenders have worked constructively with the Debtors and their advisors, including their longstanding bankruptcy counsel, their financial advisor, and their liquidation consultant, all of whom either resigned or were terminated on the eve of this filing, to structure the ABL DIP Proposal so that the Debtors could complete the Orderly Liquidation for the benefit of all of their stakeholders. Those good faith negotiations resulted in the Debtors and Prepetition ABL Lenders agreeing to the terms of the ABL DIP Proposal, including the budget tied to that proposal that would have repaid the Debtors' secured indebtedness and administrative expenses with a potential distribution to general unsecured creditors.

16.     On February 7, 2023, now-resigned bankruptcy counsel for the Debtors, Haynes & Boone, announced to counsel to Wells Fargo that the Special Committee had adopted one or more resolutions authorizing the Debtors to file bankruptcy petitions on February 8, 2023 and, on such date, to enter into the ABL DIP Proposal (the "February 8 Resolution").    Baldinelli Declaration ¶ 35.

17.     Upon information and belief, the Special Committee subsequently received a prior iteration of the Term DIP Proposal (the "Original Term DIP Proposal"), which proposed abandoning an orderly liquidation in favor of an expensive and high-risk go forward plan unsupported by asset purchase agreement or even a letter of intent.    Indeed, the prior few months demonstrated that the Debtors lack the financial wherewithal to continue as a going concern, and the Term DIP Proposal would not alter that.

**OBJECTION OF WELLS FARGO BANK, NATIONAL ASSOCIATION TO MOTION SEEKING ENTRY OF AN INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) USE CASH COLLATERAL ON A LIMITED BASIS AND (B) OBTAIN POSTPETITION FINANCING ON A SECURED, SUPERPRIORITY BASIS, (II) GRANTING ADEQUATE PROTECTION, (III) SCHEDULING A FINAL HEARING, AND (IV) GRANTIING RELATED RELIEF                                    Page 11 of 30**

18.     Nevertheless, the Special Committee abruptly revoked the February 8 Resolution. Baldinelli Declaration ¶ 37.

19.     Upon information and belief, on February 9, 2023, the Special Committee reconvened and declined to adopt any resolutions to file for bankruptcy and enter into either the ABL DIP Proposal or Term DIP Proposal.

20.     On February 10, 2023, the Special Committee again reconvened and, upon information and belief, refused to adopt any resolution authorizing a bankruptcy or entering into a debtor-in-possession financing proposal.  Instead, the Special Committee chose to halt the Orderly Liquidation despite the value maximization that the full-chain liquidation was providing the Debtors' stakeholders.

21.     The Special Committee also terminated its financial advisor, without any replacement identified, and replaced its longstanding insolvency counsel to the Debtors, who resigned that same day.  Baldinelli Declaration ¶¶ 42-43.

22.     On February 12, 2023, the Debtors terminated their agreement with Gordon Brothers Retail Partners, who the Debtors had retained to liquidate their stores for the benefit of all of the Debtors' stakeholders.  As of the date hereof, the Debtors appear to be liquidating certain of their stores without the expertise of any liquidation consultant.  Baldinelli Declaration ¶ 46.

23.     Finally, in the early morning hours of February 14, 2023, the Debtors commenced these Cases after having retained new counsel only days prior to the filing and appearing to have failed to retain a replacement financial advisor.  Based on these facts, the Term DIP Proposal that is currently before the Court necessarily is the product of chaos and is lacking in any sound

**OBJECTION OF WELLS FARGO BANK, NATIONAL ASSOCIATION TO MOTION SEEKING ENTRY OF AN INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) USE CASH COLLATERAL ON A LIMITED BASIS AND (B) OBTAIN POSTPETITION FINANCING ON A SECURED, SUPERPRIORITY BASIS, (II) GRANTING ADEQUATE PROTECTION, (III) SCHEDULING A FINAL HEARING, AND (IV) GRANTIING RELATED RELIEF                                                                    Page 12 of 30**

business judgment.  It also, as set forth below, deprives prepetition secured creditors of adequate protection and violates the terms of the Subordination Agreements, and the Prepetition ABL Lenders' Claim will not be paid in full upon entry of the Interim Order under the proposal before the Court.

### III.   The Term DIP Proposal's Priming of Prepetition Liens without Adequate Protection.

24.      Under the Term DIP Proposal, the "Pre-Petition ABL Disputed Amounts" will not be paid in connection with repayment of the Prepetition ABL Lenders' Claim, nor will the Pre-Petition Contingent LC Obligations.   Additionally, the Debtors are obligated under the Prepetition ABL Credit Agreement to indemnify the Prepetition ABL Lenders for all costs fees and expenses incurred in connection with enforcing or protecting their rights under the Prepetition ABL Credit Agreement and related loan documents, or any related claim, litigation, investigation or proceeding.  Such indemnification obligations are secured under the Prepetition ABL Credit Agreement and related loan documents (the "Secured Indemnity Obligations" and, together with the Pre-Petition ABL Disputed Amounts and Pre-Petition Contingent LC Obligations, the "Unpaid ABL Obligations").  The Term DIP Proposal seeks to extinguish the Secured Indemnity Obligations.   It provides that the so-called "Prepetition-ABL Disputed Amounts" will only be paid upon the DIP Lenders' consent or final Order of the Court.  And that proposal secures the Pre-Petition Contingent LC Obligations with a first-priority lien on inventory alone (rather than all assets, which currently is the case and was what the Prepetition ABL Lenders expected to remain the case when they issued Letters of Credit).  Each of these refusals to fund portions of the Prepetition ABL Lenders' Claim independently shows why that claim is not being paid in full.

**OBJECTION OF WELLS FARGO BANK, NATIONAL ASSOCIATION TO MOTION SEEKING ENTRY
OF AN INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) USE CASH COLLATERAL ON A
LIMITED BASIS AND (B) OBTAIN POSTPETITION FINANCING ON A SECURED, SUPERPRIORITY
BASIS, (II) GRANTING ADEQUATE PROTECTION, (III) SCHEDULING A FINAL HEARING, AND
(IV) GRANTIING RELATED RELIEF                                        Page 13 of 30**

25.     As an initial matter, the DIP Lenders—whether new-money lenders or Subordinated Creditors—have no standing to challenge the Unpaid ABL Obligations. Either the DIP Lenders are Subordinated Creditors who are prohibited by the Subordination Agreements from objecting to the Prepetition ABL Lenders' Claim, or they are not parties to any of the transactions between the Debtors and the Prepetition ABL Lenders.

26.     Regardless, the Subordination Agreements (defined below) require that the "ABL Obligations" be satisfied in full prior to the Subordinated Creditors proposing or providing debtor-in-possession financing. The "ABL Obligations," as defined in the ABL / Term Subordination Agreement (defined below),[7] include, among other things, "all principal of and interest (including without limitation any Post-Petition Interest) and premium (if any) on all loans made pursuant to the ABL Agreement or any ABL DIP Financing by the ABL Creditors . . . in each case whether or not allowed or allowable in an Insolvency Proceeding." But the Term DIP Proposal seeks to prime (and, in the case of the Secured Indemnity Obligations, extinguish entirely) the Unpaid ABL Obligations rather than pay in full the Prepetition ABL Lenders' Claim.

27.     Additionally, the Term DIP Proposal does not grant a first-priority lien on the Secured Indemnity Obligations. It seeks to extinguish those obligations.[8] The threat of the Prepetition ABL Lenders needing to collect on the Secured Indemnity Obligations is far from

---

[7] As discussed below, the Subordinated Creditors are party to separate subordination agreements with the Prepetition ABL Agent. To avoid unnecessary duplication, this Objection focuses primarily on provisions of the ABL / Term Subordination Agreement; however, there are substantially similar provisions contained in the Convertible Notes Subordination Agreement.

[8] *See* Term DIP Proposal, at § 6.01(f) ("[T]he Revolving Obligations and FILO B Obligations shall be terminated and repaid from the proceeds of the [DIP] Loans (other than the Pre-Petition Contingent LC Obligations and the Pre-Petition ABL Disputed Amount)[.]"

theoretical.  The Term DIP Proposal contemplates the DIP Lenders (or Debtors) challenging the so-called "Pre-Petition ABL Disputed Amounts" during the bankruptcy.  If approved by the Court, the Term DIP Proposal guarantees that there will be protracted litigation between the Prepetition ABL Lenders and DIP Lenders.  The Prepetition ABL Lenders are entitled to have their fees and expenses paid by the Debtors during such litigation, regardless of the outcome, as these are secured "Obligations" under the Prepetition ABL Credit Agreement.

28.      Finally, the Debtors propose to provide the Pre-Petition Contingent LC Obligations with a first-priority lien on *inventory* (not ABL Priority Collateral) and without any roll-forward analysis projecting the value of that inventory.  If a Letter of Credit is drawn during this case, the Term DIP Proposal would require that the Prepetition ABL Agent look to *unliquidated* inventory to satisfy amounts drawn under that Letter of Credit.  Aside from being nonsensical, that is further evidence that this so-called "refinancing" is anything but that.  As is the case with the DIP Lenders' refusal to fund the other Unpaid ABL Obligations, it also violates the Prepetition ABL Credit Agreement.  Under that agreement, the Prepetition ABL Obligations are only "Paid in Full" upon, among other things, "in the case of contingent reimbursement obligations with respect to Letters of Credit . . . (i) the receipt of Cash Collateral on terms and conditions reasonably satisfactory to the Administrative Agent. . . or (ii) or a back-up letter of credit payable to the Administrative Agent. . . in either case, in an amount equal to 105% of the outstanding LC Obligations as of the date of such payment."  Granting the Prepetition ABL Lenders a lien on the Pre-Petition Contingent LC Obligations *on inventory* (or, for that matter, the Prepetition ABL Obligations) fails to pay in full the Prepetition ABL Obligations.

**OBJECTION OF WELLS FARGO BANK, NATIONAL ASSOCIATION TO MOTION SEEKING ENTRY OF AN INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) USE CASH COLLATERAL ON A LIMITED BASIS AND (B) OBTAIN POSTPETITION FINANCING ON A SECURED, SUPERPRIORITY BASIS, (II) GRANTING ADEQUATE PROTECTION, (III) SCHEDULING A FINAL HEARING, AND (IV) GRANTIING RELATED RELIEF**                                                    **Page 15 of 30**

29.     The proponents of the Term DIP Proposal have failed to satisfy Section 364(d) for purposes of priming the Prepetition ABL Lenders' first-priority lien on the ABL Priority Collateral with respect to such indemnity obligations.  Instead, the Term DIP Proposal provides that the "Lien securing the Revolving Obligations and the FILO B Obligations (other than Pre-Petition ABL Disputed Amounts until the funding of any amounts following the Pre-Petition Resolution Date and the Pre-Petition Contingent LC Obligations until the Pre-Petition LC Termination) **_shall be released_** in connection with the entry of the Interim Order."[9]

## IV.     The Term DIP Proposal Requires the Subordinated Creditors to Either Violate the Subordination Agreements or Have Their Prepetition Claims Primed.

30.     In addition to the Prepetition Credit Agreements between the Debtors and the Prepetition Lenders, the Prepetition ABL Lenders and the Debtors are party to (i) that certain Intercreditor and Subordination Agreement, dated as of May 9, 2022, by and among the Prepetition ABL Agent and the Prepetition Term Loan Representative (as may be amended from time to time, the "ABL / Term Subordination Agreement"); and (ii) that certain Intercreditor and Subordination Agreement, dated as of September 20, 2022, by and among the Prepetition ABL Agent and the Prepetition Convertible Notes Agent (as may be amended from time to time, the "ABL / Convertible Notes Subordination Agreement" and, together with the ABL / Term Subordination Agreement, the "Subordination Agreements").

31.     The Subordination Agreements govern, among other things, the relative rights and priorities regarding the Prepetition ABL Lenders and the Subordinated Creditors.  Certain provisions of the Subordination Agreements are relevant to this Objection:

---

[9] Term DIP Proposal, at 6.02(t) (emphasis supplied).

**OBJECTION OF WELLS FARGO BANK, NATIONAL ASSOCIATION TO MOTION SEEKING ENTRY OF AN INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) USE CASH COLLATERAL ON A LIMITED BASIS AND (B) OBTAIN POSTPETITION FINANCING ON A SECURED, SUPERPRIORITY BASIS, (II) GRANTING ADEQUATE PROTECTION, (III) SCHEDULING A FINAL HEARING, AND (IV) GRANTIING RELATED RELIEF                           Page 16 of 30**

- Section 5.2(b) of the ABL / Term Subordination Agreement[10] restricts the Prepetition Term Loan Lenders from offering any debtor-in-possession financing to which the Prepetition ABL Lenders do not consent.  That provision provides that:

> If any Loan Party becomes subject to any Insolvency Proceeding at any time prior to the ABL Obligations Payment Date, ***the Term Loan Secured Parties shall not propose, support or consent*** to any debtor-in-possession financing for, or consent to any use of ABL Cash Collateral by, any Loan Party, in each case, that ***was not proposed, supported or consented to by the ABL Secured Parties***.

> (emphasis supplied).

> For the avoidance of doubt, the Prepetition ABL Lenders do not consent to the Term DIP Proposal absent payment in full of the Prepetition ABL Lenders' Claim.

- Section 8 of the ABL / Term Subordination Agreement provides an option for the Prepetition Term Loan Lenders to purchase the Prepetition ABL Lenders' Claim and, in so doing, stand in the shoes of the Prepetition ABL Lenders (a "Purchase Option").  That provision provides, in part, that:

> Upon the occurrence and during the continuance of a Purchase Option Trigger Event, ***all or a portion of the Term Loan Secured Parties***, acting as a single group, shall have the option at any time upon five (5) Business Days' prior written notice to the ABL Representative to purchase all of the ABL Obligations from the ABL Secured Parties. Such notice from such Term Loan Secured Parties to the ABL Representative shall be irrevocable. (emphasis added).

32.    "Purchase Option Trigger Event" includes, among other things, "the acceleration of the ABL Obligations prior to the scheduled maturity date[.]"

33.    Wells Fargo, on behalf of itself and the other Prepetition ABL Lenders, accelerated the Prepetition ABL Lenders' Claim on February 7, 2023.  Baldinelli Declaration ¶

---

[10] The passages cited herein are from the ABL / Term Subordination Agreement that govern the relationship between the Prepetition ABL Lenders and the Prepetition Term Loan Lenders.  As noted above, for the sake of brevity, this Objection does not cite to analogous provisions under the ABL / Convertible Notes Subordination Agreements.

36.  The Prepetition Term Loan Lenders failed to exercise their Purchase Option prior to the filing of these Cases.

34.  The Term DIP Proposal makes clear that "participation in the Loans will be offered to the Pre-Petition Term Lenders and the Pre-Petition FILO C Noteholders" and that such lenders must "notify the Administrative Agent in writing no later than three (3) Business Days following the Closing Date and fund its portion of the Loans within one (1) Business Day thereafter."  Participating Subordinated Creditors will have the opportunity to "roll-up" a portion of their debt into the DIP Facility, while those who choose not to participate do not.[11]  The Term DIP Proposal therefore presents each Subordinated Creditor with a Hobson's choice—either participate in the Term DIP Proposal, and open itself up to litigation risk as a consequence of violating the Subordination Agreements, or don't, and have its prepetition debt claim primed by those parties who choose to participate.

## OBJECTION

**I.  Standards Governing the Debtors' Motion to Approve the Term DIP Proposal.**

35.  While a debtor ordinarily has discretion in making a business judgment as to what is the most favorable financing available, that discretion is not unlimited.  At the very least, the Debtors must exercise their judgment in a rational and reasonable manner, and the Court should not defer to the Debtors' business judgment decisions if they are "clearly erroneous, made arbitrarily, are in breach of the officers' and directors' fiduciary duty to the corporation, are

---

[11] *See* Interim DIP Order, at 3.

**OBJECTION OF WELLS FARGO BANK, NATIONAL ASSOCIATION TO MOTION SEEKING ENTRY OF AN INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) USE CASH COLLATERAL ON A LIMITED BASIS AND (B) OBTAIN POSTPETITION FINANCING ON A SECURED, SUPERPRIORITY BASIS, (II) GRANTING ADEQUATE PROTECTION, (III) SCHEDULING A FINAL HEARING, AND (IV) GRANTIING RELATED RELIEF                                     Page 18 of 30**

made on the basis of inadequate information or study, are made in bad faith or are in violation of the Bankruptcy Code." [12]

36.     The business judgment of the Debtors, however, is not the only consideration. When a debtor proposes to prime a secured creditor's prepetition liens in collateral, section 364(d) of Bankruptcy Code requires the debtor to provide the secured creditor with adequate protection of its interests in that collateral.[13] "Priming is extraordinary relief requiring a strong showing that the loan to be subordinated is adequately protected."[14] Priming is "to be invoked only in the most compelling and extraordinary circumstances," and "[i]t is available only . . . when credit is unavailable elsewhere."[15] "[T]he purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy."[16] Adequate

---

[12] *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (citing *In re United Artists Theatre Co. v.* Walton, 315 F.3d 217, 233 (3d Cir. 2003); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985); *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317, (9th Cir. BAP 1992)); *see also In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[A] court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

[13] *See* 11 U.S.C. § 364(d); *Resolution Tr. Corp. v. Swedeland Dev. Grp. (In re Swedeland Dev. Grp.)*, 16 F.3d 552, 564 (3d Cir. 1994) ("A debtor has the burden to establish that the holder of the lien to be subordinated has adequate protection.").

[14] *In re LTAP US, LLLP*, No. 10-14125(KG), 2011 Bankr. LEXIS 667, at *9 (Bankr. D. Del. Feb. 18, 2011)

[15] *In re Dunckle Assocs., Inc.*, 19 B.R. 481, 485 (Bankr. E.D. Pa. 1982).

[16] *Swedeland*, 16 F.3d at 564 (quoting *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987)).

---

protection "should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing."[17]

37.      Further, courts routinely enforce, and, therefore, are loathe to abrogate, the rights of parties to subordination agreements in bankruptcy cases.[18]

## II.      <u>The Debtors Have Not Carried Their Burden</u>.

38.      All of the foregoing principles mandate denial of the Term DIP Proposal.  The Term DIP Proposal was wrought from chaos, unsupported by any financial advisor or analysis, is facially inadequate and nonsensical, is not in the best interests of the estates, primes prepetition secured creditors without providing adequate protection and violates the Subordination Agreements.  This is especially true when viewed through the lens of the alternative ABL DIP Proposal, as courts are instructed to do.[19]

39.      The Debtors fail for a number of reasons to carry their burden of showing why the Term DIP Proposal—either standing alone or when compared to the ABL DIP Proposal—is in the best interests of the estate:

- **<u>The Term DIP Proposal Does Not Adequately Protect Prepetition Lenders</u>**.

The Term DIP Proposal seeks to prime—or effectively extinguish—the Unpaid ABL

---

[17] *Id.*

[18] *See e.g.*, *In re Sanchez Energy Corp.*, Case No. 19-34508, 2023 Bankr. LEXIS 73, at *19 n.14 (Bankr. S.D. Tex. Jan. 11, 2023); *Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund Ltd.*, 419 B.R. 585, 595 (Bankr. S.D.N.Y. 2009); *In re Erickson Ret. Cmtys., LLC*, 425 B.R. 309, 317 (Bankr. N.D. Tex. 2010) (enforcing intercreditor agreement that prohibited junior creditors from exercising rights prior to senior creditors being paid in full).

[19] *See Premier Entm't Biloxi*, 2007 Bankr. LEXIS 3939, at *7 (debtor must prove "that no better offers, bids, or timely proposals are before the Court").

**OBJECTION OF WELLS FARGO BANK, NATIONAL ASSOCIATION TO MOTION SEEKING ENTRY OF AN INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) USE CASH COLLATERAL ON A LIMITED BASIS AND (B) OBTAIN POSTPETITION FINANCING ON A SECURED, SUPERPRIORITY BASIS, (II) GRANTING ADEQUATE PROTECTION, (III) SCHEDULING A FINAL HEARING, AND (IV) GRANTIING RELATED RELIEF                                                  Page 20 of 30**

Obligations.  "Before a priming lien can be granted, Section 364(d)(1) requires that the trustee

(or debtor-in-possession) be unable to obtain such credit otherwise and that the interest being

primed be adequately protected."[20]   The Term DIP Proposal does not provide the Prepetition

ABL Lenders with any demonstrated adequate protection with respect to any of the Unpaid ABL

Obligations:

- o  The Debtors assert that a portion, but not all, of the Unpaid ABL
     Obligations will receive priority replacement liens, but provide zero
     analysis or support that there will be sufficient inventory to support those
     liens.  In the absence of such support, the proposed priority replacement
     liens are nothing of the sort.

- o  Moreover, even if there were a basis for not repaying that portion of the
     Prepetition ABL Lenders' Claim constituting capitalized prepetition
     fees—and, to be clear, the Debtors have offered no justification—the
     Interim Order provides that such amounts will be funded only upon
     consent from the DIP Lenders or Court Order.  Putting aside the lack of
     justification, the Prepetition ABL Lenders will be forced to bear the risk
     that there will be sufficient assets to pay these amounts at an undetermined
     point in the future once the issue is litigated.

- o  Likewise, under the Term DIP Proposal, the Pre-Petition Contingent LC
     Obligations are secured by a first-priority lien on *inventory*.  Many of

---

[20] *RCD Invs. No. 4, Ltd. v. Foothill Capital Corp. (In re GDH Int'l, Inc.)*, Nos. 00-45647-
BJH-11, 00-4185, 2001 Bankr. LEXIS 2230 at * 13 n. 4 (Bankr. N.D. Tex. Apr. 2, 2001).

**OBJECTION OF WELLS FARGO BANK, NATIONAL ASSOCIATION TO MOTION SEEKING ENTRY
OF AN INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) USE CASH COLLATERAL ON A
LIMITED BASIS AND (B) OBTAIN POSTPETITION FINANCING ON A SECURED, SUPERPRIORITY
BASIS, (II) GRANTING ADEQUATE PROTECTION, (III) SCHEDULING A FINAL HEARING, AND
(IV) GRANTIING RELATED RELIEF                                          Page 21 of 30**

these Letters of Credit have expiration dates extending well beyond when the Debtors' milestones predict these Cases will conclude, when it's possible that inventory will not be available to liquidate to satisfy obligations under the Letters of Credit. There is no reason the Prepetition ABL Lenders should bear this risk.[21]

o   Finally, the Interim DIP Order provides that all Revolving Obligations and FILO B Obligations will be terminated upon entry of the Interim Order (other than the Pre-Petition Contingent LC Obligations and the Pre-Petition ABL Disputed Amount).[22] That means that the Secured Indemnity Obligations—which should have a first-priority lien on ABL Priority Collateral until the indefeasible payment in full of the Prepetition ABL Obligations—will be extinguished. To be clear, those obligations will be material if the Term DIP Proposal is approved. The Term DIP Proposal thus falls far short of either repaying in full, in cash the Prepetition ABL Lenders' Claim or providing sufficient adequate protection for such claim.

---

[21] The Original Term DIP Proposal delivered to the Prepetition ABL Lenders on February 8 recognized that payment in full of the Prepetition ABL Obligations meant cash collateralization of the Letters of Credit. The Term DIP Proposal filed with the DIP Motion reversed course, introducing the concept that granting the Prepetition ABL Lenders replacement liens on inventory provides sufficient adequate protection. This is further evidence that the DIP Lenders are either unable or unwilling to fund an adequately sized DIP Facility.

[22] Notwithstanding the proposal in the DIP Motion that the FILO B Obligations be retired upon entry of the Interim DIP Order, the waterfall under the Prepetition ABL Credit Agreement provides that all Letters of Credit must be cash collateralized prior to repayment of the FILO B Obligations. The Term DIP Proposal grants the FILO Obligations priority in violation of the terms of the Prepetition ABL Credit Agreement and related loan documents.

- **The Term DIP Proposal Is Not Feasible**.  The Term DIP Proposal permits the Debtors to undertake a process to locate a buyer for some of its assets.  However, the Debtors have been seeking a buyer for their assets since late 2022, but that process led nowhere.  Now, the Debtors enter this Chapter 11 in a state of disorder and with no sign of a buyer in hand, asking the Court nevertheless to approve the expensive financing of a speculative, high-risk gambit.

- **Approving the Term DIP Proposal would abrogate fundamental rights of the Prepetition ABL Lenders under the Subordination Agreements**.  As set forth in Point III below, the Term DIP Proposal requires the Subordinated Creditors to either violate the Subordination Agreements, or have their prepetition claims primed by the DIP Loans.  Structuring the facility this way ensures that—unless a non-Subordinated Creditor funds the entirety of the DIP Facility—litigation amongst the Debtors' DIP Lenders and Prepetition Lenders is sure to ensue.  Such litigation will come at the expense of the estates.

- **The Term DIP Proposal increases expenses that the estates may not be able to satisfy**.  In addition to not repaying in full in cash the entirety of the Prepetition ABL Lenders' Claim—as the Subordination Agreements require—the Term DIP Proposal potentially would increase administrative expenses and increase the risk of administrative insolvency.  As will be shown at the DIP hearing, the delay in the bankruptcy filing, cost of rent for remaining stores, increased professional fees (not only for the Prepetition Term Loan Lenders, but for all parties who incur litigation expenses, including the Prepetition ABL Lenders and DIP Lenders), and other administrative fees threaten to result in a shortfall under the Term DIP Proposal versus a *surplus* under the ABL DIP Proposal.

**OBJECTION OF WELLS FARGO BANK, NATIONAL ASSOCIATION TO MOTION SEEKING ENTRY OF AN INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) USE CASH COLLATERAL ON A LIMITED BASIS AND (B) OBTAIN POSTPETITION FINANCING ON A SECURED, SUPERPRIORITY BASIS, (II) GRANTING ADEQUATE PROTECTION, (III) SCHEDULING A FINAL HEARING, AND (IV) GRANTIING RELATED RELIEF                                              Page 23 of 30**

- **The Term DIP Proposal injects unnecessary risk into these Cases**.  As set forth more fully in the Baldinelli Declaration, the Debtors, along with a number of the parties associated with the Term DIP Proposal, have been attempting to resuscitate the Debtors' business for an extended period of time.  Those attempts have failed.  The Prepetition ABL Lenders have supported the Debtors as they and their stakeholders explored restructuring alternatives that have been tested and failed.  The Term DIP Proposal revives those alternatives at the expenses of certainty for the estates and all of the Debtors' stakeholders.  Additionally, the ABL DIP Proposal does not foreclose any of the transactions that parties to the Term DIP Proposal hope will materialize.  If the Prepetition Term Loan Lenders and other interested parties are actually able to secure funding for a going concern sale of a subset of the Debtors' stores, they are free to do so under the terms of the ABL DIP Proposal and Orderly Liquidation.  But the Prepetition ABL Lenders and, until last week, the Debtors, understand that hope is not a plan.  The Term DIP Proposal requires that the Debtors identify a stalking horse bidder and file a sale procedures motion by February 24, 2023.  Unless the Debtors have already identified a stalking horse bidder, they must do so in nine (9) days' time or risk defaulting under the Term DIP Proposal.  Absent a concrete going concern transaction emerging, the only way to maximize value for *all* stakeholders is through the Orderly Liquidation.

- **The Term DIP Proposal ensures continued litigation among the parties**.  In addition to the execution risks associated with the Term DIP Proposal, and for the reasons noted above, approval of the DIP Motion will spur protracted and costly litigation among the Debtors' and nearly all (if not all) of their pre- and post-petition lenders.  The Debtors' estates will bear the costs of that litigation in the form of indemnity obligations to their many lenders, along with

fees and expenses generated by the Debtors and Committee.  The Debtors' estates also will bear the attendant risk in executing on the transactions contemplated by the Term DIP Proposal.

## III.   The Court Should Not Approve the DIP Motion Because the Term DIP Proposal Will Require the Subordinated Creditors to Violate the Subordination Agreements.

40.    "[T]he Bankruptcy Code   recognizes   and enforces intercreditor agreements."[23] The Interim DIP Order acknowledges that the Subordination Agreements are binding and enforceable under Section 510(a) of the Bankruptcy Code.[24]  Courts interpret this provision to mean that "plainly worded contracts establishing priorities and limiting obstructionist, destabilizing and wasteful behavior should be enforced and creditor expectations should be appropriately fulfilled."[25]  Recognizing this, courts within this jurisdiction have enforced subordination agreements that limit the actions a subordinated creditor may take prior to a senior creditor having its claim satisfied in full.[26]

41.    As discussed above, the Subordinated Creditors are prohibited from proposing, consenting to, or supporting any DIP financing that the Prepetition ABL Lenders do not consent to, which includes the Term DIP Proposal.  However, the terms of that proposal provide that the DIP Facility will be syndicated to the Subordinated Creditors upon closing.  Participating will

---

[23] *Sanchez Energy Corp.,* 2023 Bankr. LEXIS 73, at *19 n.14.

[24] Interim Order, at ¶ 18.

[25] *Ion Media Networks, Inc.*, 419 B.R. at 595.

[26] *Erickson Ret. Cmtys., LLC*, 425 B.R. at 317 (Bankr. N.D. Tex. 2010) (enforcing intercreditor agreement that prohibited junior creditors from exercising rights prior to senior creditors being paid in full).

**OBJECTION OF WELLS FARGO BANK, NATIONAL ASSOCIATION TO MOTION SEEKING ENTRY OF AN INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) USE CASH COLLATERAL ON A LIMITED BASIS AND (B) OBTAIN POSTPETITION FINANCING ON A SECURED, SUPERPRIORITY BASIS, (II) GRANTING ADEQUATE PROTECTION, (III) SCHEDULING A FINAL HEARING, AND (IV) GRANTIING RELATED RELIEF                                                    Page 25 of 30**

result in a violation of the Subordination Agreements by each participating Subordinated Creditor. Failing to participate means those Subordinated Creditors will be primed.

42.    The Subordinated Creditors are prohibited from even offering the Term DIP Proposal until occurrence of the "ABL Obligations Payment Date" (as defined in the ABL / Term Subordination Agreement).[27]    The "ABL Obligations Payment Date" only occurs once, among other triggering events, "the ABL Obligations (other than those that constitute Unasserted Contingent Obligations) have been indefeasibly paid in full in cash (or cash collateralized or defeased in accordance with the terms of the ABL Documents)[.]"

43.    The Term DIP Proposal attempts to sidestep the obligation of the Subordinated Creditors, in their capacity as prospective DIP Lenders,[28] to repay in full in cash all "ABL Obligations" by characterizing portions of the Prepetition ABL Lenders' Claim as disputed fees. Regardless of how the Term DIP Proposal seeks to characterize that portion of the Prepetition ABL Lenders' Claim, those amounts have been capitalized as principal and therefore must be repaid to trigger the occurrence of the "ABL Obligations Payment Date."

44.    The DIP Lenders no doubt will tell the Court that they seek to challenge that portion of the Prepetition ABL Lenders' Claim that the Term DIP Proposal characterizes as "Pre-

_____

[27] Once again, for the sake of brevity, the provisions of the ABL / Term Subordination Agreement are cited herein, and the ABL / Convertible Notes Subordination Agreement are not, given the substantial overlap among the two documents with respect to the relevant provisions.

[28] The Term DIP Proposal lists Cantor Fitzgerald Securities as the administrative agent and collateral agent.  Schedule 2.01 of the Term DIP Proposal lists only Cantor Fitzgerald Securities as the sole lender, holding 100% of the Commitments.  However, the recitals make clear that "participation in the Loans will be offered to the Pre-Petition Term Lenders and the Pre-Petition FILO C Noteholders" and that such lenders must "notify the Administrative Agent in writing no later than three (3) Business Days following the Closing Date and fund its portion of the Loans within one (1) Business Day thereafter."

Petition ABL Disputed Amounts." The Subordination Agreements do not permit the Subordinated Creditors who are DIP Lenders to delay satisfaction in full of the "ABL Obligations" simply because they want to avoid paying them (or perhaps lack the liquidity to do so). On the contrary, the definition of "ABL Obligations" under the ABL / Term Subordination Agreement includes, among other things, "all principal of and interest (including without limitation any Post-Petition Interest) and premium (if any) on all loans made pursuant to the ABL Agreement or any ABL DIP Financing by the ABL Creditors . . . in each case *whether or not allowed or allowable in an Insolvency Proceeding*."

45.    Even if the DIP Lenders successfully challenged that portion of the principal of the Prepetition ABL Lenders' Claim constituting capitalized fees, those Subordinated Creditors who become DIP Lenders still must pay those amounts in order to trigger the "ABL Obligations Payment Date." They have not done so and, indeed, have told the Court that they do not intend to do so, both with respect to the so-called Pre-Petition ABL Disputed Amounts and the Pre-Petition Contingent LC Obligations.

46.    Furthermore, as discussed above, the Term DIP Proposal also fails to account for the Secured Indemnity Obligations. Solely to the extent the Court grants the DIP Motion and approves the Term DIP Proposal, the Prepetition ABL Lenders should be entitled to receive first priority liens attaching to ABL Priority Collateral until such time as the Prepetition ABL Lenders' Claim has been indefeasibly paid in full in cash. Furthermore, the Prepetition ABL Lenders are entitled to monthly payment of their fees and expenses that are incurred in connection with these Cases consistent with the terms of the Prepetition ABL Credit Agreement.

**OBJECTION OF WELLS FARGO BANK, NATIONAL ASSOCIATION TO MOTION SEEKING ENTRY OF AN INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) USE CASH COLLATERAL ON A LIMITED BASIS AND (B) OBTAIN POSTPETITION FINANCING ON A SECURED, SUPERPRIORITY BASIS, (II) GRANTING ADEQUATE PROTECTION, (III) SCHEDULING A FINAL HEARING, AND (IV) GRANTIING RELATED RELIEF**          **Page 27 of 30**

47.     In sum, the Term DIP Proposal will violate the Subordination Agreements to the extent any Subordinated Creditor becomes a DIP Lender because it: (i) does not repay in full in cash the entirety of the Prepetition ABL Lenders' Claim, (ii) fails to cash collateralize the Pre-Petition Contingent LC Obligations, and (iii) does not provide the Prepetition ABL Lenders' the indemnification that they are owed under the Prepetition ABL Credit Agreement.

48.     The Subordinated Creditors had a Purchase Option.  They could have paid the Prepetition ABL Lenders' Claim in full in cash and, in so doing, released themselves of the Subordination Agreements' restrictions on becoming a DIP Lender.  If they believed that a portion of the Prepetition ABL Lenders' Claim was subject to disgorgement, they or an estate representative could have brought a challenge in bankruptcy prior to the deadline for doing so that is standard in DIP orders.  They did not do that.  Instead, they saw an opportunity to try and save money by refusing to pay a portion of the Prepetition ABL Lenders' Claim under the pretext of a future challenge.  Executing that strategy has resulted in those DIP Lenders that are or will become Subordinated Creditors violating the Subordination Agreements.  And it has resulted in a proposal that is inferior to the ABL DIP Proposal.  Approving the Term DIP Proposal will not maximize value and is not in the best interests of the estate.  For these reasons and those that will be developed at the hearing, the DIP Motion should be denied.

## CONCLUSION

**WHEREFORE,** Wells Fargo respectfully requests that the Court: (i) sustain this Objection, (ii) deny the relief requested in the DIP Motion; and (iii) grant Wells Fargo such other and further relief as is proper and equitable.

Dated: February 15, 2023

**OBJECTION OF WELLS FARGO BANK, NATIONAL ASSOCIATION TO MOTION SEEKING ENTRY OF AN INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) USE CASH COLLATERAL ON A LIMITED BASIS AND (B) OBTAIN POSTPETITION FINANCING ON A SECURED, SUPERPRIORITY BASIS, (II) GRANTING ADEQUATE PROTECTION, (III) SCHEDULING A FINAL HEARING, AND (IV) GRANTIING RELATED RELIEF                                      Page 28 of 30**

Respectfully submitted,

Kevin J. Simard
(*pro hac vice* pending)
Jonathan D. Marshall
(*pro hac vice* pending)
Jean-Paul Jaillet
(*pro hac vice* pending)
Jacob S. Lang
(*pro hac vice* pending)
**CHOATE, HALL & STEWART LLP**
Two International Place
Boston, Massachusetts 02110
Telephone:  (617) 248-5000
Facsimile:  (617) 248-4000
E-mail:  ksimard@choate.com
E-mail:  jmarshall@choate.com
E-mail:  jjaillet@choate.com
E-mail:  jslang@choate.com

-AND-

By:  */s/ Annmarie Chiarello*
Phillip Lamberson
Texas Bar No. 00794134
Annmarie Chiarello
Texas Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone:  (214) 745-5400
Facsimile:  (214) 745-5390
E-mail:  plamberson@winstead.com
E-mail:  achiarello@winstead.com

**ATTORNEYS FOR WELLS FARGO
BANK, NATIONAL ASSOCIATION**

## CERTIFICATE OF SERVICE

I hereby certify that on February 15, 2023, the foregoing document was electronically mailed to the parties registered or otherwise entitled to receive electronic notices in this case pursuant to the Electronic Filing Procedures in this District.

*/s/ Annmarie Chiarello*
One of Counsel