**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Tuesday Morning Corporation, *et al.*,[1] | § | Case No. 23-90001 |
| | § | |
| Debtors. | § | Joint Administration Requested |

### DECLARATION OF ANDREW T. BERGER IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST-DAY MOTIONS

Pursuant to 28 U.S.C. § 1746, I, Andrew T. Berger, hereby declare under penalty of perjury:

### Introduction

1.      I am the Chief Executive Officer of Tuesday Morning Corporation and each of its direct and indirect subsidiaries (collectively, the "Debtors," "Tuesday Morning" or the "Company").

2.      On February 14, 2023 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division, commencing the above-captioned cases (the "Chapter 11 Cases").

3.      Through these Chapter 11 Cases, the Debtors intend to maximize the value of their estates through either a sale process or a chapter 11 plan of reorganization. The purpose of these Chapter 11 Cases is to preserve the going-concern value of the Company, which is made possible through debtor-in-possession financing provided by Invictus Global Management, LLC (the "Invictus DIP Facility").

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Tuesday Morning Corporation (8532) ("TM Corp."); TMI Holdings, Inc. (6658) ("TMI Holdings"); Tuesday Morning, Inc. (2994) ("TMI"); Friday Morning, LLC (3440) ("FM LLC"); Days of the Week, Inc. (4231) ("DOTW"); Nights of the Week, Inc. (7141) ("NOTW"); and Tuesday Morning Partners, Ltd. (4232) ("TMP"). The location of the Debtors' service address is 6250 LBJ Freeway, Dallas, TX 75240.

4.      Founded in 1974, the Debtors operate under the trade name "Tuesday Morning" and are one of the original "off-price" retailers specializing in providing unique home and lifestyle goods at bargain values through both in-store and online sales. The Company employs thousands of people at its store locations across thirty-nine states. In the twelve-month period ending July 2, 2022, the Company generated net sales of approximately $749.8 million, resulting in a gross profit of approximately $191.8 million.

5.      Tuesday Morning is a company that continues to persevere through adversity. In response to the impacts of the COVID-19 pandemic, the Company filed its prior chapter 11 bankruptcy cases in the Northern District of Texas in May 2020. Through the prior bankruptcy cases, the Company was able to exit unprofitable leases, recapitalize its balance sheet, pay creditors in full, and emerge as a going concern. The Company emerged from the prior bankruptcy cases pursuant to a confirmed plan of reorganization, which became effective in December 2020.

6.      Following the Company's emergence from bankruptcy in December 2020, the Company has experienced various operational challenges, including industry-wide challenges, supply chain disruptions, and increased supply chain costs.

7.      In the weeks and months leading up to the Petition Date, I, along with the Company's management team, the Company's board of directors, and Company's professionals, have worked around the clock to explore strategic alternatives for the Company.

8.      The Debtors, with the assistance of their restructuring advisors, determined that although a substantial subset of the Debtors' stores remain profitable, the Debtors' revenue and profitability as a whole are currently insufficient to support their debt service, working capital, and capital expenditure requirements under the current capital structure and business model.

9.      As set forth in more detail in the Debtors' debtor-in-possession financing motion, the Debtors solicited proposals and vigorously explored the possibility of potential restructuring alternatives. The Debtors' efforts ultimately culminated in two competing debtor-in-possession financing proposals: one from the Debtors' Prepetition ABL Lenders (the "ABL DIP Facility"), which required immediately commencing a company-wide liquidation, and the Invictus DIP Facility, which, among other things, provides the Debtors with an opportunity to reorganize or pursue a bankruptcy sale process under chapter 11.

10.      During the weeks leading up to the Company's bankruptcy filing, the Prepetition ABL Lenders took certain actions which limited the ability of the Company to continue as a going concern. Specifically, the Prepetition ABL Lenders increased the Company's reserve requirements on multiple occasions from approximately $10 million to $30 million.  The reserve requirements effectively eliminated the Company's operating liquidity and required the Company to commence store closing sales.  Pre-petition, the Prepetition ABL Lenders terminated and accelerated the Prepetition ABL Facility. Through these acts, the Prepetition ABL Lenders took money that the Debtors needed to operate and to purchase inventory to support ongoing sales operations. In connection with the closing of stores, the Prepetition ABL Lenders insisted that the Company retain Gordon Brothers Retail Partners, LLC ("Gordon Brothers") to assist the Company in implementing a full-chain liquidation. On or about January 19, 2023, certain of the Debtors entered into a very expensive Consulting Agreement with Gordon Brothers, which was amended on or about February 2, 2023.  The store closing sales commenced at various store locations on January 19, 2023.

11.      Under immense timing pressure stemming from the ongoing store closing sales and the Debtors' liquidity constraints, the Debtors engaged in simultaneous negotiations regarding the

terms and final documentation of the Invictus DIP Facility to maximize the value of their estates. After extensive negotiations, the Debtors finalized the terms of the final documentation of the Invictus DIP Facility in the hours immediately preceding the filing of the chapter 11 petitions.

12.     After evaluating alternatives, a special, independent committee of the Debtors' board of directors, in consultation with the Debtors' advisors, determined that filing chapter 11 with the Invictus DIP Facility is the best and most efficient path to maximize a return for the Debtors and their estates.

## **Background**

13.     My name is Andrew T. Berger. On November 7, 2022, I began my role as the Chief Executive Officer ("CEO") of Tuesday Morning Corporation ("TM Corp."), I have served as a director of TM Corp. since September 28, 2022. I have over two decades of experience in investment analysis, investment management, and business management and consulting.

14.     From 1998 through 2002, I served as an Equity Analyst for Value Line, Inc. Since 2002, I have served as President of Walker's Manual, Inc., an investment publisher that was transformed into a business consulting company in 2008.

15.     I have also served as a director of Autoscope Technologies Corporation (including its predecessor, "Image Sensing Systems, Inc.") since October 2015, as Executive Chair of Autoscope since June 2016, and as Chief Executive Officer of Autoscope from April 2021 through November 2022. Prior to my appointment as Chief Executive Officer, I was Chair of the Nominating and Corporate Governance Committee and a member of the Audit Committee and Compensation Committee of Autoscope.

16.     From May 2017, I was Chief Executive Officer of Cosi, Inc. (and from August 2022 through November 2022, Chief Executive Officer of its successor, Cosi Restaurant Holdings,

LLC), a fast-casual restaurant chain that operates and franchises domestic and international restaurants. In 2020, Cosi, Inc. filed for Chapter 11 protection under the federal bankruptcy laws and emerged in August 2022.

17.    From January 2020 through October 2021, I served on the board of directors of Rocky Mountain Chocolate Factory, Inc., and international franchisor, confectionary manufacturer, and retail operator.

18.    I am also the Managing Member of AB Value Management LLC, which serves as the General Partner of AB Value Partners, LP.

19.    Since my appointment as CEO of TM Corp., I have become familiar with the Debtors' business operations, business and financial affairs, and books and records. Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and their advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition. I am authorized to submit this Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

20.    In addition to this Declaration, the Debtors filed the *Declaration of Dell Young in Support of Debtors' Chapter 11 Petitions and First-Day Motions* (the "Young Declaration"), which summarizes the relief requested in, and provides the evidentiary basis for, the First Day Motions.

21.    This Declaration has been organized into three main sections as follows:

- Part I describes the Debtors' historical background and business operations;

- Part II describes the Debtors' prepetition corporate and capital structure; and

- Part III describes the circumstances and events leading to the filing of these Chapter 11 Cases and the Debtors' restructuring efforts.

I.     **THE COMPANY'S HISTORY AND BUSINESS OPERATIONS**

A.     **History**

22.     Tuesday Morning was founded in Dallas, Texas in 1974 by Lloyd Ross. Under the original business model, Mr. Ross purchased leftover inventory from name-brand manufacturers and retailers and then sold it from a single warehouse in Dallas in a "garage-sale" format. The first such sale was conducted on a Tuesday morning, because Mr. Lloyd considered that to be the first positive part of the week, and the name stuck even as the business grew beyond its original warehouse format. The business quickly expanded from the Tuesday morning "garage sale" format to a "pop-up shop" format with four six-week sales a year, to the establishment of the first permanent Tuesday Morning store location in 1979.

23.     By 1984, the company had grown to 57 stores and was taken public for the first time. In 1997, the company expanded to 315 locations and was acquired in a private acquisition by Madison Dearborn. In addition to its stores, the Debtors also operate a primary distribution facility in Dallas, Texas (the "Distribution Center"). The Debtors' corporate offices (the "Corporate Offices") are also located in Dallas, Texas.

24.     Below is a timeline reflecting certain of the Company's achievements:



**An idea to provide extraordinary value to dedicated, loyal and enthusiastic customers hunting for a deal has developed over 45 years from a single pop-up shop to <u>one of the largest off-price home retailers in the United States</u>**

25.     In response to the impacts of the COVID-19 pandemic, the Company filed its prior chapter 11 bankruptcy cases in the Northern District of Texas on May 27, 2020, which were jointly administered under Case No. 20-31476. As discussed in more detail below, in December 2020, the Company emerged from the prior bankruptcy cases as a going concern pursuant to a confirmed plan of reorganization that resulted in all creditors being paid in full.

**B.    The Debtors' Business Operations**

26.     The Debtors operate one of the premier off-price retailers in the U.S. and specialize in selling high-quality products at prices generally below the prices in department stores, specialty shops, and online retailers. The Debtors' in-store inventory generally falls within the following key categories: upscale home textiles, home furnishings, housewares, gourmet food, toys, and seasonal décor. The Debtors' revenues come from direct in-store sales and an online platform, with

most of the revenue resulting from the brick-and-mortar stores. As of the Petition Date, the Debtors operate 464 stores in 39 states.

### i.    The Debtors' Business Model

27.    The Debtors' business model is focused on making opportunistic inventory purchases from various sources including manufacturers, closeout sellers, and other retailers, and re-selling the inventory at discount prices. The Debtors are known in the industry as a reliable outlet for manufacturers, distributors, and other retailers who need to sell excess inventory resulting from manufacturing overruns, bankruptcies, order cancellations, or other unanticipated circumstances. The Debtors also direct-order certain of their products from manufacturers or secondary distributors.

28.    Through creative sourcing, the Debtors offer high-quality goods to their customers at discounted prices. The Debtors' ability to consistently provide their customers with high quality products at bargain prices has allowed the Debtors to establish a loyal customer base. In recent years, the Debtors have worked to improve the in-store experience for customers by offering a clean, simple, no-frills environment.

### ii.    The Debtors' Supply and Distribution Chain

29.    The Debtors have historically sourced approximately 80% of their inventory from U.S. vendors and the remaining 20% from foreign vendors. As an off-price retailer, the majority of the Debtors' inventory acquisitions are opportunistic. The Debtors have, however, cultivated long-standing relationships with many key vendors. The Debtors also direct source a smaller percentage of their inventory from certain vendors. The Debtors' expert merchant team is responsible for keeping and maintaining relationships with key vendors and related parties.

30.     Once inventory is purchased, the Debtors rely on their distribution chain to facilitate inventory deliveries in a timely and cost-effective manner. In addition to the Debtors' Distribution Center, the Debtors also contract with various third-party logistics providers that provide transportation and warehousing services, including various pool-point locations throughout the United States.

### iii.     The Debtors' Peak Sales and Distribution Seasons

31.     The Debtors' peak sales season generally occurs in the quarter ending in December. During the peak selling season, the Debtors typically experience strong revenues that substantially exceed the Debtors' fixed and variable costs. The Debtors also have a peak distribution season, which typically spans from June through November. During the peak distribution season, the Debtors are focused on sourcing, shipping, and warehousing key inventory to supply the increased customer demand during the peak selling season.

### iv.     The Debtors' Cost Structure

32.     The Debtors' cost structure is comprised of certain fixed and variable costs. The Debtors' largest expense categories are employee-related costs, inventory costs, the costs of shipping and delivering inventory, and costs associated with the Debtors' real estate leases and similar arrangements. Other key expense categories include taxes, advertising, insurance, and other miscellaneous items. Due to the seasonal nature of the retail industry, the Debtors' costs fluctuate in certain key categories depending on the time of year.

### a.     Employee-Related Costs

33.     The Debtors employ approximately 1,477 individuals on a full-time basis and approximately 4,448 individuals on a part time basis. The majority of the Debtors' employees work at the Debtors' stores and approximately 600 employees work at the Distribution Center and

the Debtors' corporate office. During the Debtors' peak sales season in November and December, the Debtors have historically increased their employee headcount. Similarly, during the peak distribution season the Debtors have historically increased their employee headcount. The Debtors satisfy these seasonal needs by hiring a combination of part-time employees and temporary staff that are typically sourced through staffing agencies.

34.     In addition to paying employee wages and salaries, the Debtors also contribute to several employee benefit plans providing medical, dental, vision, and other ancillary benefits to qualifying employees. The Debtors' payroll and other benefit obligations for their employees constitute one of the Debtors' largest expense categories.

35.     In connection with the Chapter 11 Cases, the Debtors recently undertook efforts to reduce their employee headcount at their stores, the Distribution Center, and the Corporate Offices.

### b.     *Lease-Related Expense*

36.     One of the Debtors' largest expense categories is the cost of leasing the stores, the Distribution Center, and the Corporate Offices.[2]

### c.     *Inventory and Distribution Costs*

37.     Other than employee-related costs and lease expenses, historically, the Debtors' most significant expenses have been the costs of acquiring and transporting inventory.

## II.     THE DEBTORS' PREPETITION CORPORATE AND CAPITAL STRUCTURE

### A.     The Debtors' Corporate Structure and Common Stock

38.     A brief summary of the operations of each of the Debtors is attached hereto as **Exhibit A**. The common stock in Debtor Tuesday Morning Corporation is traded on the OTC market under the symbol "TUEM." The Debtor's common stock was voluntarily delisted from

---

[2] During the 2020 Restructuring, the Debtors completed a sale-leaseback of their Dallas Distribution Center and the Corporate Offices, which provided part of the exit financing for the 2020 Restructuring.

NASDAQ in January 2023. Below is an organizational chart that reflects the corporate structure of the Debtors.

### B.     The Debtors' Key Assets

39.     The Debtors' principal balance sheet assets are inventory and equipment. The Debtors' other assets include cash, furniture, intellectual property, and other miscellaneous property. Because most of the Debtors' customer transactions are contemporaneous transactions using cash, check, and debit or credit cards, the Debtors do not have significant accounts receivable



aside from credit card receivables. The Debtors also have certain net operating losses ("NOLs") and other tax credits.

C.    **The Debtors' Funded Debt Obligations**

40.    The Debtors' funded debt obligations are comprised of the Prepetition ABL Secured Indebtedness, the Prepetition Term Loan Lenders' Secured Indebtedness, and the Prepetition Convertible Note Secured Indebtedness (each as defined below).

i.    *Prepetition ABL Secured Indebtedness*

41.    Tuesday Morning, Inc., as lead borrower, and each of the remaining Debtors, as guarantors, Wells Fargo Bank, N.A. as administrative agent, for itself and on behalf of the other lenders (the "Prepetition ABL Agent"), and 1903P Loan Agent, LLC, as FILO B documentation agent (the "FILO B Documentation Agent" and together with the Prepetition ABL Agent and lenders, the "Prepetition ABL Lenders"), are parties to the Prepetition ABL Credit Agreement dated as of May 9, 2022, and as amended from time to time (the "Prepetition ABL Credit Agreement") and all notes, security agreements, assignments, pledges, mortgages, deeds of trust, guaranties, forbearance agreements, letters of credit, and other instruments or documents executed in connection therewith or related thereto (collectively the "Prepetition ABL Claim Documents"). The Prepetition ABL Credit Agreement provided for a senior secured asset based revolving credit facility in an amount up to $110,000,000, including the issuance of $25,000,000 of letters of credit (collectively, the "Prepetition ABL Credit Facility").

42.    As of the Petition Date, the Debtors believe that the approximate aggregate amount owed to the Prepetition ABL Agent and the Prepetition ABL Lenders pursuant to the Prepetition ABL Claim Documents is $998,105.14 in revolving credit loans with the outstanding principal amount of $928,715.14 and accrued interest of approximately $69,390.00 (the "Prepetition Revolving Obligations"); (ii) FILO B Obligations (as defined in Prepetition ABL Credit Agreement) in the amount of $7,422,050.00 with the outstanding principal amount of

$7,375,000.00 and accrued interest of approximately $47,050.00 (the "Prepetition FILO B Obligations" and, together with the Prepetition Revolving Obligations, collectively, the "Pre-Petition ABL Obligations"); *provided, however*, that the Pre-Petition FILO B Prepayment Premium, the Pre-Petition Revolving Facility Early Termination Fee, and the $1,228,940 FILO B Consent Fee (collectively the "Pre-Petition ABL Disputed Amounts") are not included in the Pre-Petition ABL Obligations; *provided further* that the Pre-Petition ABL Obligations do not include the "Pre-Petition LC Obligations," which is defined as the issued and outstanding letters of credit, which Pre-Petition LC Obligations in the amount of $14,590,671 as of the Petition Date shall be adequately protected by the LC Adequate Protection Liens.

43.     By notice dated February 7, 2023, the Prepetition ABL Lenders accelerated the Debtors' obligations under the Prepetition ABL Credit Facility and terminated the Debtors' ability to make further borrowings to finance operations.

### ii.        *Prepetition Term Loan Lenders' Secured Indebtedness*

44.     Tuesday Morning, Inc., as lead borrower, and each of the remaining Debtors, as guarantors, Alter Domus (US) LLC, as administrative agent, for itself and on behalf of the other lenders (the "Prepetition Term Loan Representative" and together with the other term loan lenders, the "Prepetition Term Loan Lenders"), are parties to that certain Prepetition Term Loan Agreement dated as of December 31, 2020 and as amended from time to time (the "Prepetition Term Loan Credit Agreement"), which provided for a term loan facility in an amount up to $25,000,000 (the "Prepetition Term Loan Facility").

45.     As of the Petition Date, the Debtors believe the Prepetition Term Loan Representative and the Prepetition Term Loan Lenders are owed in an aggregate amount approximately $24,474,459.00 under the Prepetition Term Loan Claim Documents and applicable

law (the "Prepetition Term Loan Lenders' Secured Indebtedness," and together with all post-Petition Date interest, fees, costs, and charges allowed or allowable to the Prepetition Term Loan Representative and the Prepetition Term Loan Lenders on such claim pursuant to section 506(b) of the Bankruptcy Code, collectively the "Prepetition Term Loan Lenders' Claim").

### iii.    Prepetition Convertible Note Secured Indebtedness

46.    On September 20, 2022, Tuesday Morning Corporation and TASCR Ventures CA, LLC, as FILO C Collateral Agent for the FILO C secured parties (collectively the "FILO C Secured Parties" and together with the Prepetition ABL Lenders and Prepetition Term Loan Lenders, the "Prepetition Lenders") executed that certain Note Purchase Agreement (the "Convertible Note Purchase Agreement").

47.    As of the Petition Date, the Debtors believe that they owe the Prepetition Convertible Notes Agent and the Prepetition Convertible Noteholders an approximate aggregate amount equal to $21,183,000.00, consisting of (i) a series of junior secured convertible notes in the outstanding principal amount of $7,742,479  (the "FILO C Notes"); (ii) a series of junior secured convertible notes in the approximate outstanding amount of $10,353,021 (the "JSC Notes"); and (i) a series of junior secured convertible notes in the approximate outstanding amount of $3,087,500 (the "Management JSC Notes" and, together with the FILO C Notes and the JSC Notes, collectively, the "Prepetition Convertible Notes") for unpaid principal, plus any and all interest, fees, costs, expenses, charges, and other claims, debts or obligations of the Debtors to the Prepetition Convertible Notes Agent and the Prepetition Convertible Noteholders that have accrued as of the Petition Date under the Prepetition Convertible Note Documents and applicable law on account of such junior secured convertible notes (the "Prepetition Convertible Note Secured Indebtedness" and together with all post-Petition Date interest, fees, costs, and charges allowed or

allowable to the Prepetition Convertible Notes Agent and the Prepetition Convertible Noteholders on such claim pursuant to section 506(b) of the Bankruptcy Code, collectively the "Prepetition Convertible Noteholders' Claim" and, together with the Prepetition ABL Lenders' Claim and the Prepetition Term Loan Lenders' Claim, the "Prepetition Lenders' Claims").

48.     The Pre-Petition ABL Obligations Prepetition, the Convertible Note Secured Indebtedness Prepetition, and the Term Loan Lenders' Secured Indebtedness shall be collectively referred to herein as the "Prepetition Secured Indebtedness".

49.     Attached hereto is a creditor summary.

### iv.     Subordination Agreements

50.     The Prepetition ABL Agent is party to: (i) that certain Intercreditor and Subordination Agreement, dated as of May 9, 2022, by and among the Prepetition ABL Agent and the Prepetition Term Loan Agent (as may be amended from time to time, the "ABL / Term Subordination Agreement"); and (ii) that certain Intercreditor and Subordination Agreement, dated as of September 20, 2022, by and among the Prepetition ABL Agent and the Prepetition Convertible Notes Agent (as may be amended from time to time, the "ABL / Convertible Notes Subordination Agreement").  The Prepetition Term Loan Representative is party to: (i) the ABL / Term Subordination Agreement; (ii) that certain Term Loan / FILO C Convertible Notes Intercreditor and Subordination Agreement, dated as of September 20, 2022, by and among the Prepetition Term Loan Representative and the Prepetition Convertible Notes Agent in its capacity as the FILO C Collateral Agent (as defined therein) (as may be amended from time to time, the "Term / FILO C Subordination Agreement"); and (iii) that certain Term Loan / Junior Secured Convertible Notes Intercreditor and Subordination Agreement, dated as of September 20, 2022, by and among the Prepetition Term Loan Representative and the Prepetition Convertible Notes

Agent in its capacity as the JSC Collateral Agent (as defined therein) (as may be amended from time to time, the "Term / JSC Subordination Agreement" and, together with the ABL / Term Subordination Agreement, the ABL Convertible Notes Subordination Agreement and the Term / FILO C Subordination Agreement, collectively, the "Subordination Agreements"). The proposed DIP Facility provides that, upon payment in full of the Pre-Petition ABL Obligations, the respective rights of the Prepetition ABL Agent and Prepetition Term Loan Representative shall no longer be governed by the ABL / Term Subordination Agreement. Additionally, upon payment in full of the Prepetition Pre-Petition ABL-Obligations, the respective rights of the Prepetition ABL Agent and the Prepetition Convertible Notes Agent shall no longer be governed by the ABL / Convertible Notes Subordination Agreement.

### v.       The Prepetition Lenders' Collateral

51.     The Prepetition Lenders assert that the Prepetition Secured Indebtedness is secured by perfected liens and security interests, subject to the terms of the Subordination Agreements, and as more fully set forth in the Prepetition Claim Documents, in substantially all of the Debtors' assets, including, without limitation, all accounts, inventory, equipment, general intangibles and all Collateral (as such term is defined in the applicable Prepetition Claim Documents) wherever located and now owned or at any time hereafter acquired or in which such Debtor now has or at any time in the future may acquire any right, title, or interest (collectively, the "Prepetition Lenders' Collateral").

## III.   EVENTS   LEADING   TO   BANKRUPTCY   AND   PREPETITION RESTRUCTURING INITIATIVES

### A.   Events Leading to Bankruptcy

52.     During the Company's prior bankruptcy cases in 2020, the Company developed a plan of reorganization with broad-based support. The plan monetized certain assets, existing

lenders provided exit financing, and certain investors provided additional liquidity through $25 million in subordinated notes and a $40 million backstopped rights offering. The Debtors also negotiated a $70.25 million sale-leaseback transaction of their owned real estate, which consisted of the Distribution Center and Corporate Offices. Allowed claims, including allowed general unsecured claims, were paid in full, with interest, and equity was reinstated, subject to dilution from the rights offering contemplated in the plan. Through the prior bankruptcy cases, the Company was able to exit unprofitable leases, recapitalize its balance sheet, pay creditors in full, and emerge as a going concern. The Company emerged from the prior bankruptcy cases pursuant to a confirmed plan of reorganization, which became effective in December 2020.

53.     On February 9, 2021, the Debtors received proceeds of approximately $40 million upon the closing of the rights offering contemplated by the Debtors' plan of reorganization; however, following the Debtors' exit from bankruptcy, the Debtors faced numerous challenges. The Debtors' business and financial performance are driven by in-person sales at their store locations, and the costs of procuring inventory and transporting such inventory to the stores. The Debtors' financial performance has been negatively impacted by reduced foot traffic in stores, significant supply-chain disruptions, and increased supply chain costs. As a result, the Debtors' liquidity position has continued to deteriorate over time.

### B.     Prepetition Restructuring Initiatives

54.     In May 2022, the Debtors experienced a significant deterioration in their financial condition and liquidity. In response, the Company engaged in an extensive process to obtain additional financing to support the Company's needs. Through such efforts, the Debtors negotiated

and entered into the Prepetition ABL Credit Facility, which replaced the Debtors' existing ABL credit facility.

55.     Following the Debtors entry into the Prepetition ABL Credit Facility in May 2022, the Debtors engaged Piper Sandler to initiate a strategic process to solicit financing to fully fund the Debtors' business plan, which was focused on improving the functionality of the Debtors' Distribution Center and reducing logistics costs.

56.     Piper Sandler began such outreach efforts in June 2022 and contacted a range of equity investors, credit funds, commercial banks, and strategic players. Throughout the summer of 2022, the Debtors, in consultation with Piper Sandler, and Haynes and Boone, LLP ("Haynes and Boone"), received and negotiated proposals from various parties. Such efforts eventually culminated in the Note Purchase Agreement in September 2022. The Note Purchase Agreement resulted in $35 million in convertible debt financing, as described above.

57.     Although the Debtors improved their liquidity position through such financing efforts, the Debtors' financial position quickly deteriorated in the months leading up to the Petition Date. The Debtors engaged Haynes and Boone, LLP, BDO, and Piper Sandler to advise them in exploring various strategic alternatives. The Debtors, with the assistance of their advisors, determined that although a substantial subset of the Debtors' stores remain profitable, the Debtors' revenue and profitability as a whole are insufficient to support their debt service, working capital, and capital expenditure requirements and that the Debtors would therefore require additional sources of financing. Left with no other alternative, the Debtors began to consider a chapter 11 process and began engaging in restructuring discussions with their prepetition lenders.

58.     Throughout January 2023, the Debtors, with the assistance of their advisors, undertook a marketing process to solicit proposals to raise additional capital, including non-bankruptcy related financing as well as debtor-in-possession financing and/or sale of the Company.

59.     The Debtors' efforts ultimately culminated in two competing debtor-in-possession financing proposals: the ABL DIP Facility, which required immediately commencing a company-wide liquidation, and the Invictus DIP Facility, which, among other things, provides the Debtors with an opportunity to pursue either a bankruptcy sale process or to reorganize under chapter 11.

60.     The Prepetition ABL Lenders required that the Debtors enter into a consulting agreement dated as of January 19, 2023, as amended February 2, 2023, with Gordon Brothers (the "Consulting Agreement"), to liquidate merchandise at the Debtors' stores and liquidate furniture, fixtures, and equipment at the stores, the Distribution Center, and the Debtors' Corporate Office.

61.     In January 2023, the Debtors received notices of default under the Prepetition ABL Credit Agreement, Prepetition Term Loan Credit Agreement, and the Prepetition Convertible Note Purchase Agreement and the Prepetition ABL Lenders put in place various reserve requirements under the Prepetition ABL Credit Facility.  Additionally, by notice dated February 7, 2023, the Prepetition ABL Lenders accelerated the Debtors' obligations under the Prepetition ABL Credit Facility and terminated the Debtors' ability to make further borrowings to finance operations.

62.     The Company has too many stores and stores in unprofitable locations. These stores are in the process of being closed and approximately 200 will remain open.  Supply chain problems are being addressed and it is contemplated that cost savings will result from the fact that it is likely that Tuesday Morning Corporation will no longer be a publicly held company.  With funding by Invictus, Tuesday Morning Corporation and its affiliated entities have the capability to be profitable companies.

63.     The Prepetition ABL Lenders have been fully collateralized.  In my opinion there was no legitimate reason for the Prepetition ABL Lenders to increase reserves from approximately $10 million to $30 million and deprive the Company of operating funds or demand that the Company liquidate and fire hundreds of employees.

64.     There was no legitimate reason for the Prepetition ABL Lenders to require the Company to enter into an onerous contract with Gordon Brothers which provides for the Company to take enhancement inventory from Gordon Brothers at minimal compensation to the detriment of the Company.  The Company has filed a motion to reject that contract.

65.     If the Invictus DIP Facility is approved, the Prepetition ABL Obligations will be shortly paid in full, the Company intends to rapidly replace its letters of credit currently with Wells Fargo with those of a replacement bank, close its accounts at Wells Fargo and open new accounts at another bank.

66.     Given the favorable position of the Prepetition ABL Lenders, payment of their legitimate claims is not in doubt if the Invictus DIP Facility is approved.  If the Company had been forced to liquidated under the terms of the ABL DIP Facility proposed by the Prepetition ABL Lenders, such lenders would collectively have received many millions of dollars in fees and enhanced inventory sales.  In addition, they would have received releases from the consequences of their prior conduct and payment of their makewhole and other disputed claims.

67.     The Company and its advisors diligently sought out sources of funding a Chapter 11 case and determined that the Invictus DIP Facility was the best financing option available to it.

68.     The Company and its advisors have prepared a budget which is realistic and provides for the ongoing operations of the Debtors.  The forecast as reflected in the budget shows positive cash flow.  Additionally, the Invictus DIP Facility provides adequate protection to a

secured creditor to the extent there is any diminution in value of the creditor's interest in collateral resulting from the Invictus DIP Facility.  As a going concern with approximately 200 profitable stores I believe that the Company will be an attractive acquisition candidate.

69.     Under immense timing pressure stemming from the ongoing store closing sales and the Debtors' liquidity constraints, the Debtors engaged in simultaneous negotiations regarding the terms and final documentation of the Invictus DIP Facility to maximize the value of their estates. After extensive negotiations, the Debtors finalized the terms of the final documentation of the Invictus DIP Facility in the hours immediately preceding the filing of the chapter 11 petitions.

70.     After evaluating alternatives, a special, independent committee of the Debtors' board of directors, in consultation with the Debtors' advisors, determined that filing the Chapter 11 Cases with the Invictus DIP Facility is the best and most efficient way to maximize a return for the Debtors, their estates, and creditors.

71.     With the Invictus DIP funding, the closing of unprofitable stores and other operational improvements already under way, I believe the Debtors can be a viable, successful company

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

Declaration is true and correct.


Dated: February 15, 2023                    By: /s/ *Andres T. Berger*
                                            Name: Andrew T. Berger
                                            Title: Chief Executive Officer

**<u>EXHIBIT A</u>**

# Tuesday Morning Creditor Summary

## Creditor Details

| Creditor | Tranche | Pre-Petition Amount | Pre-Petition Collateral | Post-Petition Amount | Post-Petition Collateral |
|---|---|---|---|---|---|
| Invictus Global Management | DIP Loan | • N/A | • N/A | • $51.5M | • 1st Lien Priority on all Assets of the Company subject to the Adequate Protection liens. |
| Wells Fargo and Gordon Brothers | ABL and FILO B | • $0.9M ABL<br>• $7.4M FILO B<br>• $14.6M Contingent LC Claim<br>• $5.8M Disputed Makewhole<br>• Contingent Indemnity | • 1st Lien Priority on ABL Priority Collateral<br>• 2nd Lien Priority on Term Loan Priority Collateral | • $14.6M Contingent LC Claim<br>• $5.8M Disputed Makewhole<br>• Contingent Indemnity | • Retain Prepetition Liens (subject to DIP liens) plus Adequate Protection Liens for Diminution in Value |
| REV and Ayon | FILO C | • $7.7M | • 2nd Lien Priority on ABL Priority Collateral<br>• 3rd Lien Priority on Term Loan Priority Collateral | • $7.7M | • Retain Prepetition Liens (subject to DIP liens) plus Adequate Protection Liens for Diminution in Value |
| Term Loan holders | Term Loan | • $24.5M | • 1st Lien Priority on Term Loan Priority Collateral<br>• 3rd Lien Priority ABL Priority Collateral | • $24.5M | • Retain Prepetition Liens (subject to DIP liens) plus Adequate Protection Liens for Diminution in Value |
| REV, Ayon and Mgmt. | Junior Convertible Notes | • $21.2M | • 4th Lien Priority on ABL Priority Collateral<br>• 4th Lien Priority on Term Loan Priority Collateral | • $21.2M | • Retain Prepetition Liens (subject to DIP liens) plus Adequate Protection Liens for Diminution in Value |

## Collateral Details

| ABL Primary Collateral | Term Loan Primary Collateral |
|---|---|
| Inventory, A/R, Intangibles | FF&E, IP |