

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed April 28, 2023**

_____

**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Tuesday Morning Corporation, *et al.*,[1] | § | Case No. 23-90001 |
| | § | |
| Debtors. | § | Jointly Administered |

### ORDER APPROVING (I) THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (II) THE AGREEMENT, AND (III) GRANTING RELATED RELIEF

Upon consideration of the *Motion of Debtors for Entry of (I) an Order (A) Approving Bid Procedures in Connection with the Potential Sale of Certain of the Debtors' Assets, (B) Scheduling an Auction and Sale Hearing, (C) Approving the Form and Manner of Notice Thereof, (D) Authorizing the Debtors to Designate a Stalking Horse Purchaser, (E) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (F) Granting Related Relief; and*

---

[1]     The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Tuesday Morning Corporation (8532) ("TM Corp."); TMI Holdings, Inc. (6658) ("TMI Holdings"); Tuesday Morning, Inc. (2994) ("TMI"); Friday Morning, LLC (3440) ("FM LLC"); Days of the Week, Inc. (4231) ("DOTW"); Nights of the Week, Inc. (7141) ("NOTW"); and Tuesday Morning Partners, Ltd. (4232) ("TMP"). The location of the Debtors' service address is 6250 LBJ Freeway, Dallas, Texas 75240.

*(II) an Order (A) Approving the Sale of Certain the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief* (the "**Sale Motion**") [Docket No. 271] of the above-captioned debtors and debtors in possession (the "**Debtors**"), which requests an order (this "**Sale Order**") that, among other things, authorizes and approves the sale, assignment, transfer, conveyance and delivery of certain of the Debtors' assets, with such sale being free and clear of any and all liens, encumbrances and claims of any nature; and this Court having entered the *Order (I) Approving Bid Procedures in Connection with the Potential Sale of Certain of the Debtors' Assets, (II) Scheduling an Auction and a Sale Hearing, (III) Approving the Form and Manner of Notice Thereof, (IV) Authorizing the Debtors to Designate a Stalking Horse Purchaser, (V) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief* on March 20, 2023 [Docket No. 558]; and this Court having reviewed and considered the Sale Motion and any objections thereto; and this Court having heard statements of counsel and the evidence presented in support of the relief requested by the Debtors in the Sale Motion at a hearing before this Court on April 27, 2023 (the "**Sale Hearing**"); and upon the full record of these Chapter 11 Cases, including the Sale Hearing; and it appearing that no other notice need be given; and it further appearing the legal and factual bases set forth in the Sale Motion and the record made at the Sale Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause therefor:

THE COURT FINDS AND DETERMINES THAT:

## **The Transaction**

A.    On April 24, 2023, the Debtors and Hilco Merchant Resources, LLC ("**Hilco**" or

the "**Purchaser**")[2] entered into an Asset Purchase Agreement (together with all related agreements, schedules and exhibits thereto, including the Agency Agreement in substantially the form annexed thereto as Exhibit "A", collectively the "**Agreement**"), pursuant to which, subject to customary conditions to closing (including the entry of this Sale Order), (i) the Debtors have agreed to (x) sell, transfer, convey and assign to Purchaser (or at Purchaser's sole election to a Designated Purchaser), the APA Assets and Assumed Liabilities, and (y) appoint Hilco as its exclusive agent for purposes of conducting the Store Closing Sales in accordance with the terms of the Agency Agreement, and (ii) Purchaser (or where applicable a Purchaser Designee) will assume certain Assumed Liabilities (as set forth in and as limited by Section 2.4 of the Asset Purchase Agreement).

## Jurisdiction, Final Order, and Statutory Predicates

B.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the District Court's Miscellaneous Order No. 33, *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* dated August 3, 1984.

D.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

---

[2]    Terms used and not defined herein have the meanings given in the Agreement or the Sale Motion, as the context makes applicable.

E.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

F.      The bases for the relief requested in the Sale Motion are sections 105(a), 363, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), Bankruptcy Rules 2002, 6004, 9007, and 9014, and Section E of the Complex Case Procedures.

G.      This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds there is no just reason for delay in the implementation of this Sale Order, and waives any stay and expressly directs entry of judgment as set forth herein.

## Retention of Jurisdiction

H.      It is necessary and appropriate for the Court to retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the Agreement, including its related documents, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned by the Debtors to the Purchaser (or to a Designated Purchaser, as may be applicable), and to adjudicate, if necessary, any and all disputes involving the Debtors concerning or relating in any way to, or affecting, the Sale or the other transactions contemplated in the Agreement, and related documents.

## Corporate Authority; Consents and Approvals

I.      Each of the Debtors has, to the extent necessary or applicable, (a) the full corporate power and authority to execute and deliver the Agreement and all other documents contemplated thereby, (b) all corporate authority necessary to consummate the transactions contemplated by the Agreement (including for the avoidance of doubt, the conduct of the Store Closing Sales in

accordance with the Agency Agreement), and (c) taken all corporate action necessary to authorize and approve the Agreement and the consummation of the transactions contemplated thereby. The Sale and the Agreement (including for the avoidance of doubt, the conduct of the Store Closing Sales in accordance with the Agency Agreement) have been duly and validly authorized by all necessary corporate action. No consents or approvals, other than those expressly provided for in the Agreement and this Sale Order, are required for the Debtors to consummate the Sale, the Agreement, or the other transactions contemplated thereby.

### Notice of Sale, Auction, Sale Hearing, Agreement, and Proposed Assumption and Assignment

J.      Actual written notice of the Sale Motion, the Sale, the Auction, the Agreement, the Sale Hearing, and the transactions contemplated thereby, and a reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein, has been afforded to all known interested entities and parties, including, without limitation, the following entities and parties: (a) the U.S. Trustee; (b) counsel to the Official Committee of Unsecured Creditors (the "**Committee**"); (c) counsel to the Prepetition Secured Lender; (d) the Internal Revenue Service; (e) all state and local taxing authorities with an interest in the APA Assets; (f) all governmental agencies with an interest in the Sale and transactions proposed thereunder; (g) all parties known or reasonably believed to have asserted an Interest in the APA Assets; (h) the Contract Counterparties; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002.

K.      In accordance with the provisions of the Bid Procedures Order, the Debtors have served notice upon Contract Counterparties of the relevant Cure Amounts.  Service of such notice was good, sufficient, and appropriate under the circumstances, and no further notice need be given in respect of establishing a Cure Amount for the Contracts.  Subject to the right to supplement a

Cure Amount objection set forth below, each of the Contract Counterparties has had an adequate opportunity to object to the Cure Amounts set forth in the notice.

L.      As evidenced by the affidavits of service previously filed with the Court, proper, timely, adequate, and sufficient notice of the Sale Motion, the Sale, the Auction, the Agreement, the Sale Hearing, and the transactions contemplated thereby has been provided in accordance with the Bid Procedures Order and Bankruptcy Code sections 105(a), and 363 and Bankruptcy Rules 2002, 6004, 6006, 9007, 9008, and 9014. The notices described herein were good, sufficient, and appropriate under the circumstances, and provided all interested parties with timely and proper notice of the Sale, the Auction, and the Sale Hearing, and no other or further notice of the Sale Motion, the Sale, the Auction, the Agreement, or the Sale Hearing is or shall be required.

M.      A reasonable opportunity to object and be heard with respect to the Sale, the Agreement and the Sale Motion, and the relief requested therein, has been afforded to all interested persons and entities.

N.      The disclosures made by the Debtors concerning the Sale Motion, the Agreement, the Auction, the Sale Hearing, and the Sale were good, complete, and adequate.

O.      The Debtors have articulated good and sufficient reasons for this Court to grant the relief requested in the Sale Motion.

## **Auction**

P.      The Debtors conducted the Auction on **April 19-20, 2023** in connection with, and have otherwise complied in all respects with, the Bid Procedures Order. The Auction process set forth in the Bid Procedures Order afforded a full, fair, and reasonable opportunity for any entity to make a higher or otherwise better offer to purchase the APA Assets. The Auction was duly noticed and conducted in a non-collusive, fair, and good faith manner, and a reasonable opportunity was given to any interested party to make a higher or otherwise better offer for the Debtors' assets at

the Auction. The Auction was transcribed and the transcript of the Auction was introduced into evidence at the Sale Hearing. At the conclusion of the Auction, the Debtors determined, in the exercise of their good faith business judgment, that the Purchaser submitted the highest or otherwise best bid for the APA Assets and, accordingly, the Purchaser was determined to be the Successful Bidder for the APA Assets.

### Good Faith of Purchaser

Q.      As demonstrated by the representations of counsel and other evidence proffered or adduced at the Sale Hearing, the Debtors and their advisors marketed the Debtors' assets, including the APA Assets, to secure the highest and best offer. The terms and conditions set forth in the Agreement are fair, adequate, and reasonable, including the amount of the Purchase Price, which is found to constitute reasonably equivalent and fair value.

R.      The Purchaser is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, managers, controlling shareholders, or other insider of the Debtors exist between the Purchaser and the Debtors.

S.      The Debtors and the Purchaser extensively negotiated the terms and conditions of the Agreement in good faith and at arm's length. The Purchaser (or a Designated Purchaser, where applicable) is purchasing the Acquired Assets and has entered into the Agreement in good faith and is a good faith buyer within the meaning of Bankruptcy Code section 363(m), and is therefore entitled to the full protection of that provision, and otherwise has proceeded in good faith in all respects in connection with this proceeding in that, *inter alia*: (i) the Purchaser recognized the Debtors were free to deal with any other party interested in purchasing the Debtors' assets; (ii) the Purchaser agreed to subject its bid to competitive bidding at the Auction; (iii) all payments to be

made by the Purchaser and other agreements or arrangements entered into by the Purchaser in connection with the Sale have been disclosed; (iv) the Purchaser has not violated Bankruptcy Code section 363(n) by any action or inaction; (v) no common identity of directors or controlling stockholders exists between the Purchaser and the Debtors; and (vi) the negotiation and execution of the Agreement was at arm's length and in good faith.

T.      Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Agreement to be avoided under Bankruptcy Code section 363(n). The Debtors and the Purchaser were represented by their own respective counsel and other advisors during such arm's length negotiations in connection with the Agreement and the Sale.

U.      No party has objected to the Sale, the Agreement, or the Auction on the grounds of fraud or collusion.

V.      Accordingly, the Purchaser is purchasing the Acquired Assets in good faith and is a good-faith buyer within the meaning of Bankruptcy Code section 363(m), and shall otherwise deal with the Designated Assets in a manner that is consistent with the terms of the Agreement, including, for the avoidance of doubt, the Agency Agreement. The Purchaser is therefore entitled to all of the protections afforded under Bankruptcy Code section 363(m).

### **Highest and Best Offer**

W.      The Debtors conducted a sale process in accordance with, and have otherwise complied in all respects with, the Bid Procedures Order. The sale process set forth in the Bid Procedures Order afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Debtors' assets. The Auction was duly noticed in a non-collusive, fair, and good-faith manner, and a reasonable opportunity was given to any

interested party to make a higher and better offer for the Debtors' assets, including the APA Assets, at the Auction.

X.      The Agreement constitutes the highest or otherwise best offer for the APA Assets, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. The Debtors' determination that the Agreement constitutes the highest or otherwise best offer for the APA Assets constitutes a valid and sound exercise of the Debtors' business judgment.

Y.      The Agreement represents a fair and reasonable offer to purchase the Acquired Assets (including, for the avoidance of doubt, the conduct of the Store Closing Sales in accordance with the Agency Agreement) under the circumstances of these Chapter 11 Cases. No other entity or group of entities has offered to purchase the APA Assets for greater overall value to the Debtors' estates than the Purchaser.

Z.      Approval of the Sale Motion and the Agreement and the consummation of the transactions contemplated thereby are in the best interests of the Debtors, their estates, their creditors, and other parties in interest.

AA.     The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale of the APA Assets, including the conduct of the Store Closing Sales in accordance with the Agency Agreement, prior to, and outside of, a plan of reorganization.

BB.     Entry of an order approving the Agreement and all the provisions thereof (including, for the avoidance of doubt, the conduct of the Store Closing Sales in accordance with the Agency Agreement) is a necessary condition precedent to Purchaser's consummation of the Sale, as set forth in the Agreement.

## No Fraudulent Transfer or Merger

CC.    The consideration provided by the Purchaser pursuant to the Agreement (a) is fair and reasonable, (b) is the highest or best offer for the APA Assets, and (c) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and under the laws of the United States, any state, territory, possession, or the District of Columbia.

DD.    Neither the Purchaser nor its past, present, and future subsidiaries, parents, divisions, affiliates, agents, representatives, insurers, attorneys, successors and assigns, nor any of its nor their respective directors, managers, officers, employees, shareholders, members, agents, representatives, attorneys, contractors, subcontractors, independent contractors, owners, insurance companies, or partners (collectively, the "**Purchaser Parties**") is a mere continuation of the Debtors or their estates, and there is no continuity of enterprise between Purchaser (including, without limitation, any Designated Purchaser) and the Debtors. Purchaser is not holding itself out to the public as a continuation of the Debtors or their respective estates. Neither Purchaser nor any Designated Purchaser is a successor to the Debtors or their estates, and the Sale does not amount to a consolidation, merger, or *de facto* merger of the Purchaser (or any other Designated Purchaser) and the Debtors.

## Validity of Transfer

EE.    The Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any of its states, territories, or possessions, or the District of Columbia. Neither the Debtors nor the Purchaser are entering into the transactions contemplated by the Agreement fraudulently, for the purposes of statutory and common law fraudulent conveyance and fraudulent transfer claims.

FF.    The Debtors are the sole and lawful owner of the APA Assets. Subject to Bankruptcy Code section 363(f) (addressed below), (x) the transfer of the Acquired Assets (and with respect to the Designated Assets, the conduct of the Store Closing Sale) to the Purchaser will be, as of the Initial Closing Date (and each subsequent Closing Date), a legal, valid, and effective transfer of the Acquired Assets, which transfer vests or will vest the Purchaser with all right, title, and interest of the Debtors to the Acquired Assets, and will be free and clear of (i) all liens (including any liens as that term is defined in section 101(37) of the Bankruptcy Code) and Encumbrances (as defined in the Agreement) relating to, accruing, or arising any time prior to the Initial Closing Date (collectively, the "**Liens**"), and (ii) all debts (as that term is defined in section 101(12) of the Bankruptcy Code) arising under, relating to, or in connection with any act of the Debtors or claims (as that term is defined in section 101(5) of the Bankruptcy Code), liabilities, obligations, demands, guaranties, options in favor of third parties, rights, contractual commitments, restrictions, interests, mortgages, hypothecations, charges, indentures, loan agreements, instruments, collective bargaining agreements, leases, licenses, deeds of trusts, security interests or similar interests, conditional sale or other title retention agreements and other similar impositions, restrictions on transfer or use, pledges, judgments, claims for reimbursement, contribution, indemnity, exoneration, infringement, products liability, alter ego liability, suits, defenses, credits, allowances, options, limitations, causes of action, choses in action, rights of first refusal or first offer, rebate, chargeback, credit, or return, proxy, voting trust or agreement or transfer restriction under any shareholder or similar agreement or encumbrance, easements, rights of way, encroachments, Liabilities (as defined in the Agreement), and matters of any kind and nature, whether arising prior to or subsequent to the Petition Date, whether known or unknown, legal or equitable, mature or unmatured, contingent or noncontingent, liquidated or unliquidated,

asserted or unasserted, whether imposed by agreement, understanding, law, equity, or otherwise (including, without limitation, rights with respect to Claims (as defined below) and Liens (A) that purport to give any party a right or option to effect a setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, any of the Debtors' or the Purchaser's interests in the APA Assets, or any similar rights, if any, or (B) in respect of taxes, restrictions, rights of first refusal, charges of interests of any kind or nature, if any, including without limitation, any restriction of use, voting, transfer, receipt of income, or other exercise of any attribute of ownership) collectively, as defined in this clause (ii), the "**Claims**" and, together with the Liens and other interests of any kind or nature whatsoever, the "**Interests**"), relating to, accruing or arising any time prior to the entry of this Sale Order, with the exception of the Assumed Liabilities and the Permitted Encumbrances (each as defined in the Agreement for conveyance purposes) to the extent set forth in the Agreement, and any covenants set forth in the Agreement, and (y) the sale of the Designated Assets to the ultimate purchaser(s) thereof as provided in the Agreement, including, without limitation, the Agency Agreement, will be free and clear of all Interests.

GG.    For the avoidance of doubt, the terms "Liens" and "Claims," as used in this Sale Order, include, without limitation, rights with respect to any Liens and Claims:

(a)    that purport to give any party a right of setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit-sharing interest, right of first refusal, purchase or repurchase writer option, or termination of, any of the Debtors' or the Purchaser's interest in the APA Assets, or any similar rights; or

(b)    in respect of taxes, restrictions, rights of first refusal, charges of interest of any kind and nature, if any, and including, without limitation, any restriction of use, voting, transfer, receipt of income, or other exercise of any of the attributes of ownership relating to, accruing, or arising at any time prior to the Initial Closing Date, with the exception of Permitted Encumbrances and Assumed Liabilities that are expressly assumed by the Purchaser pursuant to the Agreement.

### Section 363(f) Is Satisfied

HH.    The conditions of Bankruptcy Code section 363(f) have been satisfied in full; therefore, the Debtors may (i) sell the Acquired Assets free and clear of any Interests in the property (other than any Permitted Encumbrances and Assumed Liabilities) and (ii) sell the Designated Assets through the conduct of the Store Closing Sales in accordance with the Agreement, including the Agency Agreement.

II.    The Purchaser would not have entered into the Agreement, and would not consummate the transactions contemplated thereby, including the conduct of the Store Closing Sales in accordance with the Agency Agreement, if the Sale of the APA Assets and the assumption of any Assumed Liabilities by the Purchaser were not free and clear of all Interests, other than Permitted Encumbrances and the Assumed Liabilities, or if the Purchaser would, or in the future could, be liable for any of such Interests (other than the Permitted Encumbrances and the Assumed Liabilities). Unless otherwise expressly included in the Permitted Encumbrances or the Assumed Liabilities, the Purchaser shall not be responsible for any Interests against the Debtors, their estates, or any of the APA Assets, including in respect of the following: (a) any labor or employment agreement; (b) all mortgages, deeds of trust, and other security interests; (c) intercompany loans

and receivables among the Debtors and any of their affiliates (as defined in Bankruptcy Code section 101(2)); (d) any other environmental, employee, workers' compensation, occupational disease, or unemployment- or temporary disability-related claim, including, without limitation, claims that might otherwise arise under or pursuant to (i) the Employee Retirement Income Security Act of 1974, as amended, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the Worker Adjustment and Retraining Notification Act of 1988, (vii) the Age Discrimination and Employee Act of 1967 and the Age Discrimination in Employment Act, as amended, (viii) the Americans with Disabilities Act of 1990, (ix) the Consolidated Omnibus Budget Reconciliation Act of 1985, (x) state discrimination laws, (xi) the unemployment compensation laws or any other similar state laws, or (xii) any other state or federal benefits or claims relating to any employment with the Debtors or their predecessor, if any, (xiii) Claims or Liens arising under any Environmental Law with respect to the Debtors' business, Excluded Liabilities, the APA Assets, the Excluded Assets, or any assets owned or operated by the Debtors or any corporate predecessor of the Debtors, at any time prior to the Initial Closing Date, (xiv) any bulk sales or similar law, (xv) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, and (xvi) any statutory or common-law bases for successor liability.

JJ.     The Debtors may sell the APA Assets free and clear of all Interests in such property of any entity other than the Debtors' estates, including, without limitation, any Liens and Claims against the Debtors, their estates, or any of the Assets (other than the Permitted Encumbrances and Assumed Liabilities) because, in each case, one or more of the standards set forth in Bankruptcy Code section 363(f)(1)-(5) has been satisfied. Those holders of Interests in the APA Assets,

including, without limitation, holders of Liens and Claims against the Debtors, their estates, or any of the Assets, who did not object, or who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented pursuant to Bankruptcy Code section 363(f)(2). All other holders of Interests (except to the extent such Interests are Permitted Encumbrances or Assumed Liabilities) are adequately protected by having their Interests, if any, in each instance against the Debtors, their estates, or any of the Assets, attached to the net proceeds of the Sale received by the Debtors ultimately attributable to the APA Assets in which such party alleges an Interest, in the same order of priority, with the same validity, force, and effect that such Interests had prior to the Sale, subject to any claims, causes of action and defenses the Debtors and their estates and the Committee may possess with respect thereto.

### Cure Amounts, Contracts and Leases

KK.    For the avoidance of doubt, no Leases or Contracts are being assumed or assigned under this Sale Order.  Notwithstanding anything to the contrary in this Sale Order or the Agreement, the Debtors' obligations to counterparties of unexpired leases pursuant to section 365(d)(3) of the Bankruptcy Code through the effective date of assumption and assignment or rejection of such leases shall not be affected or modified by this Sale Order or the Agreement.

LL.    To the extent any Contract Counterparty failed to timely object to its Cure Amount, such Contract Counterparty is deemed to have consented to such Cure Amount and waived any other defaults under the Contract(s).  With respect to any Contract Counterparty that filed a timely objection to Cure Amount, if any such Contract Counterparty's Contract or Lease is proposed to be assumed or assigned pursuant to a future order of the Court, such Contract Counterparty may supplement its objection solely to the extent such supplemental Cure Amount arose after the date of the Contract Counterparty's objection and was not a known or knowable default arising on or

before April 7, 2023 and subject to assertion; <u>provided that</u> all of the Debtors' rights to object to such supplemental Cure Amount are expressly reserved.  Except as set forth above with respect to Cure Amounts, the rights of all Contract Counterparties as they relate to the assumption and assignment of any Contracts or Leases are reserved, including objections to adequate assurance, and any disputes with respect thereto shall be resolved pursuant to further order of this Court.  All rights of Debtors to dispute objections to assumption and assignment of any Contract or Lease are expressly reserved.

### Sound Business Purpose for the Sale

MM.   Good and sufficient reasons for approval of the Agreement and the Sale have been articulated. The relief requested in the Sale Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.

NN.   The Debtors have demonstrated both (a) good, sufficient, and sound business purposes and justifications for approving the Agreement and (b) compelling circumstances for the sale outside the ordinary course of business, pursuant to Bankruptcy Code section 363(b) before, and outside of, a plan of reorganization, in that, among other things, the immediate consummation of the Agreement and Sale to the Purchaser is necessary and appropriate to maximize the value of the Debtors' estates, and the Agreement and the Sale will provide the means for the Debtors to maximize distributions to creditors.

### Compelling Circumstances for an Immediate Sale

OO.   To maximize the value of the APA Assets, it is essential the Sale of the APA Assets occur promptly. Therefore, time is of the essence in effectuating the Agreement and consummating the Sale. As such, the Debtors and the Purchaser intend to close the Sale of the APA Assets, including the commencement of the Store Closing Sales, as soon as reasonably practicable. The Debtors have demonstrated compelling circumstances and a good, sufficient and sound business

purpose and justification for immediate approval and consummation of the Agreement.
Accordingly, there is sufficient cause to waive the stay provided in Bankruptcy Rules 6004(h).

PP.    Given all of the circumstances of these Chapter 11 Cases and the adequacy and fair
value of the Purchase Price under the Agreement, the proposed Sale of the APA Assets constitutes
a reasonable and sound exercise of the Debtors' business judgment and should be approved.

QQ.    The consummation of the Agreement is legal, valid, and properly authorized under
all applicable provisions of the Bankruptcy Code, including, without limitation Bankruptcy Code
sections 105(a), 363(b), 363(f), and 363(m), and all of the applicable requirements of such sections
have been complied with in respect of the transaction.

RR.    The Sale does not constitute a *sub rosa* or *de facto* chapter 11 plan for which
approval has not been sought without the protections a disclosure statement would afford, as it
does not and does not propose to: (i) impair or restructure existing debt of, or equity interests in,
the Debtors; (ii) impair or circumvent voting rights with respect to any future plan proposed by the
Debtors; (iii) circumvent chapter 11 plan safeguards, such as those set forth in Bankruptcy Code
sections 1125 and 1129; or (iv) classify claims or equity interests, compromise controversies, or
extend debt maturities. Accordingly, the Sale neither impermissibly restructures the rights of the
Debtors' creditors, nor impermissibly dictates a liquidating chapter 11 plan for the Debtors.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED
THAT:

### **General Provisions.**

1.    **Relief Granted.** The relief requested in the Sale Motion and the transactions
contemplated thereby and by the Agreement, including, without limitation, the conduct of the Store
Closing Sales, are approved for the reasons set forth in this Sale Order and on the record of the
Sale Hearing, which is incorporated herein as if fully set forth in this Sale Order.

2.      **Objections Overruled.** Except solely with respect to timely filed objections to assumption and assignment of Contracts and Leases, including any Cure Amounts, all objections, statements, and reservations of rights to the Sale Motion and the relief requested therein that have not been withdrawn, waived, or settled by announcement to the Court during the Sale Hearing or by stipulation filed with the Court, including, without limitation, any and all reservations of rights included in such objections or otherwise, are hereby denied and overruled on the merits, with prejudice. Those parties who did not object, or withdrew their objections, to the Sale Motion are deemed to have consented pursuant to Bankruptcy Code section 363(f)(2).

3.      **Prior Findings and Conclusions Incorporated.** This Court's findings of fact and conclusions of law set forth in the Bid Procedures Order are incorporated herein by reference.

4.      **Sale Order and Agreement Binding on All Parties.** This Sale Order including, without limitation, the provisions approving the Agreement and the transactions contemplated therein, shall be binding in all respects upon all creditors of and holders of equity interests in the Debtors (whether known or unknown), agents, trustees and collateral trustees, holders of Interests in, against, or on the APA Assets, or any portion thereof, all Contract Counterparties and any other non-debtor parties to any contracts with the Debtors, all successors and assigns of the Debtors, and any subsequent trustees appointed in the Chapter 11 Cases or upon a conversion of the Chapter 11 Cases to one or more cases under chapter 7 of the Bankruptcy Code and shall not be subject to rejection or unwinding. Nothing in any chapter 11 plan confirmed in the Chapter 11 Cases, the confirmation order confirming any such chapter 11 plan, any order approving the wind down or dismissal of the Chapter 11 Cases, or any order entered upon the conversion of the Chapter 11 Cases to one or more cases under chapter 7 of the Bankruptcy Code or otherwise shall conflict with or derogate from the provisions of the Agreement or this Sale Order.

## Approval of the Agreement

5.     **Agreement Approved.** The Agreement and all other ancillary documents, including the Agency Agreement, and all of the terms and conditions thereof, are hereby approved.

6.     **Authorization to Consummate Transactions.** Pursuant to Bankruptcy Code sections 363(b) and (f), the Debtors are authorized, empowered, and directed to use their reasonable best efforts to take any and all actions necessary or appropriate to (a) consummate the Sale pursuant to and in accordance with the terms and conditions of the Agreement, (b) close the Sale as contemplated in the Agreement and this Sale Order, and (c) execute and deliver, perform under, consummate, implement, and fully close the Agreement, together with additional instruments and documents that may be reasonably necessary or desirable to implement the Agreement and the Sale.

## Transfer of the Assets

7.     **Transfer of the Assets Authorized.** Pursuant to Bankruptcy Code sections 105(a), 363(b), and 363(f),the Debtors are authorized and directed to (a) take any and all actions necessary or appropriate to perform, consummate, implement, and close the Sale in accordance with the terms and conditions set forth in the Agreement and this Sale Order, and (b) take all further actions and execute and deliver the Agreement and other related ancillary transaction documents and any and all additional instruments and documents that may be necessary or appropriate to implement the Agreement and the other related documents and consummate the Sale in accordance with the terms thereof, all without further order of the Court. On the applicable Closing Date, all of the Debtors' right, title, and interest in and to, and possession of, the Acquired Assets shall be immediately vested in the Purchaser (or its designee). Such transfer shall constitute a legal, valid, enforceable, and effective transfer of the Acquired Assets.

8.      **Surrender of Assets by Third Parties.** All persons and entities that are in possession of some or all of the APA Assets on the Initial Closing Date are directed to surrender possession of such APA Assets to the Purchaser or its designee at the Closing. On the Initial Closing Date, each of the Debtors' creditors are authorized and directed to execute such documents and take such other actions as may be reasonably necessary to release their Interests in the APA Assets, if any, as such Interests may have been recorded or may otherwise exist, which Interests shall attach to the proceeds of the sale in accordance with paragraph 31 hereof. All persons are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with, or which would be inconsistent with, the ability of the Debtors to sell and transfer the APA Assets in accordance with the terms of the Agreement and this Sale Order.

9.      **Sale of the Designated Assets; Conduct of Store Closing Sales**. Upon Closing, Purchaser, as Debtors' exclusive agent under the Agency Agreement, is authorized and directed to sell the Designated Assets in accordance with the terms of the Agency Agreement and the Store Closing Guidelines, the terms of which are hereby approved.

10.     Subject to the restrictions set forth in this Sale Order, the Sale Guidelines and any Side Letters (defined below), the Debtors and the Purchaser, as Debtors' agent, are hereby authorized, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to take any and all actions as may be necessary or desirable to implement the Agency Agreement and the Store Closing Sales, and each of the transactions contemplated by the Agency Agreement, and any actions taken by the Debtors and the Purchaser, as Debtors' agent, necessary or desirable to implement the Agency Agreement and/or the Store Closing Sales prior to the date of this Sale Order, are hereby approved and ratified.

11.     The Sale Guidelines are approved in their entirety.

12.     All entities that are presently in possession of some or all of the Designated Assets in which the Debtors hold an interest that are or may be subject to the Agency Agreement or this Sale Order hereby are directed to surrender possession of such Designated Assets to the Debtors or the Purchaser, as Debtors' agent.

13.     Neither the Debtors nor the Purchaser, as Debtors' agent, nor any of their officers, employees, or Purchaser, as Debtors' agent, shall be required to obtain the approval of any third party, including (without limitation) any Governmental Unit (as defined under section 101(27) of the Bankruptcy Code) or landlord, to conduct the Store Closing Sales and to take the related actions authorized herein.

14.     All newspapers and other advertising media in which the Store Closing Sales may be advertised and all landlords are directed to accept this Sale Order as binding authority so as to authorize the Debtors and the Purchaser, as Debtors' agent, to conduct the Store Closing Sales and store closings pursuant to the Agency Agreement, including, without limitation, to conduct and advertise the sale of the Designated Assets in the manner contemplated by and in accordance with this Sale Order, the Sale Guidelines, and the Agency Agreement.

15.     The Purchaser, as Debtors' agent, is authorized to supplement the Merchandise in the Store Closing Sales with Additional Agent Goods. The Additional Agent Goods shall be purchased by the Purchaser as part of the Store Closing Sales and delivered to the closing stores at the Purchaser's sole expense (including as to labor, freight, and insurance relative to shipping such Additional Agent Goods to the closing stores). Sales of Additional Agent Goods shall be run through the Debtors' cash register systems; provided, however, that the Debtors shall assist with marking, and the Purchaser shall mark the Additional Agent Goods using either a "dummy" SKU or department number or in such other manner so as to distinguish the sale of Additional Agent

Goods from the sale of Merchandise. The Purchaser, as Debtors' agent, and Debtors shall cooperate to ensure that the Additional Agent Goods are marked in such a way that a reasonable consumer could identify the Additional Agent Goods from the Merchandise.

16.     All transactions relating to the Additional Agent Goods are, shall be construed as, and are acknowledged by the Debtors to be, a true consignment from Purchaser under Article 9 of the Uniform Commercial Code (the "**UCC**") and not a consignment for security purposes. At all times and for all purposes, the Additional Agent Goods and their proceeds shall be the exclusive property of the Purchaser (other than the sharing of such proceeds with the Debtors provided for in the Agreement), and no other person or entity (including, without limitation, the Debtors, or any third person claiming a security interest in the Debtors' property, including any of the Debtors' secured lenders) shall have any claim against any of the Additional Agent Goods or the proceeds thereof. The Additional Agent Goods shall at all times remain subject to the exclusive control of the Purchaser. The Debtors shall, at Purchaser's sole cost and expense, insure the Additional Agent Goods and, if required, promptly file any proofs of loss with regard thereto.

17.     The Purchaser is hereby granted a first-priority security interest and lien upon Additional Agent Goods and the proceeds therefrom, which security interest shall be deemed perfected without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that the Purchaser is hereby authorized to deliver any notices and file any financing statements and amendments thereof under the applicable UCC identifying the Purchaser's interest in the Additional Agent Goods (and any proceeds thereof) as consigned goods thereunder and the Debtors as the consignee therefor, and the Purchaser's security interest in such Additional Agent Goods).

18.    The Debtors and Purchaser, as Debtors' agent, are hereby authorized to take such actions as may be necessary and appropriate to implement the Agency Agreement and to conduct the Store Closing Sales without necessity of further order of this Court as provided in the Agency Agreement and the Sale Guidelines (subject to any Side Letters), including, but not limited to, advertising the sale as a "store closing sale", "sale on everything", "everything must go", "going-out-of-business", or similar-themed Store Closing Sales as contemplated in the Sale Guidelines through the posting of signs (including the use of exterior banners at non-enclosed mall closing locations, and at enclosed mall closing locations to the extent the applicable closing location entrance does not require entry into the enclosed mall common area), use of sign-walkers, A-frames, and other street signage, as contemplated in the Sale Guidelines.

19.    Except as expressly provided in the Agency Agreement and the Sale Guidelines, the sale of the Merchandise, Additional Agent Goods, and other Designated Assets shall be conducted by the Debtors and the Purchaser, as Debtors' agent, notwithstanding any restrictive provision of any lease, sublease, restrictive covenant, or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Store Closing Sales (including the sale of the Merchandise, Additional Agent Goods, and FF&E), and abandonment of assets, or "going dark" provisions shall not be enforceable in conjunction with the Store Closing Sales.  Breach of any such provisions in these Chapter 11 Cases in conjunction with the Store Closing Sales shall not constitute a default under a lease or provide a basis to terminate the lease; *provided* that the Store Closing Sales are conducted in accordance with the terms of this Sale Order, any Side Letter, and the Sale Guidelines. The Debtors and/or Purchaser, as Debtors' agent, and landlords of the Closing Stores are authorized to enter into agreements ("**Side Letters**") between themselves modifying the Sale Guidelines without further order of the Court, and such Side Letters shall be binding as among

the Debtors, the Purchaser, as Debtors' agent, and any such landlords. In the event of any conflict

between the Sale Guidelines, the Agency Agreement, any Side Letter, and this Sale Order, the

terms of such Side Letter shall control.  If there is a dispute between the Debtors, the Purchaser,

and/or a landlord regarding the terms of a Side Letter between such parties or the Debtors, the

Purchaser, and/or a landlord reach an impasse in their negotiations of the terms of a side Letter,

either the Debtors, the Purchaser, or the landlord may seek an emergency hearing before this Court

on no less than three (3) business days' notice, subject to the Court's availability.

   20.  Except as expressly provided for herein or in the Sale Guidelines, no person or

entity, including, but not limited to, any landlord, licensor, service providers, utilities, or creditors,

shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder

consummation of the Store Closing Sales or the sale of Merchandise, Additional Agent Goods, or

FF&E, or the advertising and promotion (including the posting of signs and exterior banners or the

use of sign-walkers) of such Store Closing Sales, and all such parties and persons of every nature

and description, including, but not limited to, any landlord, licensor, service providers, utilities,

and creditors and all those acting for or on behalf of such parties, are prohibited and enjoined from

(a) interfering in any way with, obstructing, or otherwise impeding, the conduct of the Store

Closings, and/or (b) instituting any action or proceeding in any court (other than in the Bankruptcy

Court) or administrative body seeking an order or judgment against, among others, the Debtors,

the Purchaser, as Debtors' agent, or the landlords at the closing locations that might in any way

directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the

Store Closing Sales or sale of the Merchandise, Additional Agent Goods, or FF&E or other

liquidation sales at the closing locations and/or seek to recover damages for breach(es) of

covenants or provisions in any lease, sublease, license, or contract based upon any relief authorized herein.

21.    In accordance with and subject to the terms and conditions of the Agency Agreement, the Purchaser, as Debtors' agent, shall have the right to use the closing stores and all related closing store services, furniture, fixtures, equipment and other assets of the Debtors for the purpose of conducting the Store Closing Sales, free of any interference from any entity or person, subject to compliance with the Sale Guidelines (as modified by any Side Letters) and this Sale Order.

22.    The Debtors and/or the Purchaser, as Debtors' agent (as the case may be) are authorized and empowered to transfer Designated Assets among, and into, the closing stores in accordance with the Sale Guidelines, as applicable.  The Purchaser, as Debtors' agent, is authorized to sell the Debtors' FF&E (that is an APA Asset) and may abandon any remaining property, including any closing store signage or furniture, fixtures and equipment (including, but not limited to, machinery, rolling stock, office equipment and personal property, and conveyor systems and racking), in each case, as provided for and in accordance with the terms of the Agency Agreement, the Sale Guidelines, and any Side Letter.

23.    Notwithstanding anything herein, all state and federal laws relating to implied warranties for latent defects shall be complied with and are not superseded by the sale of said goods or the use of the terms "as is" or "final sales."  The Debtors or Purchaser, as their agent, shall accept return of any goods purchased during the store closings that contain a defect which the lay consumer could not reasonably determine was defective by visual inspection prior to purchase for a full refund; *provided*, that the consumer must return the merchandise within the applicable time period of their purchase, the consumer must provide a receipt for the purchase to

the Debtors, and the asserted defect must in fact be a "latent" defect, which goods shall not be resold by the Debtors.

24.     Nothing in this Sale Order, the Agency Agreement, the Sale Guidelines, or any Side Letter releases, nullifies, or enjoins the enforcement of any liability to a Governmental Unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) to which any entity would be subject as the owner, lessor, lessee, or operator of the property after the date of entry of this Sale Order.  Nothing contained in this Sale Order, the Agency Agreement, or the Sale Guidelines, or any Side Letter shall in any way: (a) diminish the obligation of any entity to comply with environmental laws; or (b) diminish the obligations of the Debtors to comply with environmental laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code. Except as otherwise provided herein and as set forth in the Agreement, the store closings and the Store Closing Sales shall not be exempt from laws of general applicability, including, without limitation, public health and safety, criminal, tax, (including, but not limited to, the collection of Sales Taxes), labor, employment, environmental, antitrust, fair competition, traffic and consumer protection laws, including consumer laws regulating deceptive practices and false advertising, consumer protection, the sale of gift certificates, layaway programs, return of goods, express or implied warranties of goods, and "weights and measures" regulation and monitoring (collectively, "**General Laws**").  Nothing in this Sale Order, the Agency Agreement, the Sale Guidelines, or any Side Letter shall alter or affect obligations to comply with all applicable federal safety laws and regulations.  Nothing in this Sale Order shall be deemed to bar any Governmental Unit (as such term is defined in section 101(47) of the Bankruptcy Code) from enforcing General Laws in the applicable non-bankruptcy forum, subject to the Debtors' and Purchaser's rights to

assert in that forum or before this Court, that any such laws are not in fact General Laws or that

such enforcement is impermissible under the Bankruptcy Code or this Sale Order.

Notwithstanding any other provision in this Sale Order, no party waives any rights to argue any

position with respect to whether the conduct was in compliance with this Sale Order and/or any

applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code.

Nothing in this Sale Order shall be deemed to have made any rulings on any such issues.

25.    To the extent that the sale of Designated Assets and/or Additional Agent Goods is

subject to any Liquidation Sale Laws (defined below), including any federal, state or local statute,

ordinance, rule, or licensing requirement directed at regulating "going out of business," "store

closing," or similar inventory liquidation Store Closing Sales, or bulk sale laws, laws restricting

safe, professional and non-deceptive, customary advertising such as signs, banners, signage, and

use of sign-walkers solely in connection with the sale of the Designated Assets or Additional Agent

Goods, including ordinances establishing license or permit requirements, waiting periods, time

limits or bulk sale restrictions that would otherwise apply to the sale of the Designated Assets or

Additional Agent Goods, the Dispute Resolution Procedures in this section shall apply and the

Dispute Resolution Procedures shall control over any Side Letters:

(a)    Provided that the Store Closing Sales are conducted in accordance with this Sale
Order, and the Sale Guidelines, the Debtors, the Purchaser, as Debtors' agent, and
the Debtors' landlords, shall be deemed to be in compliance with any requirements
of all county, parish, or municipal or other local government (hereinafter referred
to as "**Local**") and State requirements governing the conduct of the Store Closing
Sales of the Designated Assets, including but not limited to Local statutes,
regulation and ordinances establishing licensing or permitting requirements,
waiting periods or time limits, or bulk sale restrictions that would otherwise apply
to the Store Closing Sales of the Designated Assets (collectively, the "**Liquidation
Sale Laws**") of any state or local Governmental Unit (as defined in Bankruptcy
Code section 101(27)); *provided*, that the term "Liquidation Sale Laws" shall be
deemed not to include any public health or safety laws of any state (collectively,
"**Safety Laws**"), and the Debtors and the Purchaser, as Debtors' agent, shall
continue to be required to comply, as applicable, with such Safety Laws and

General Laws, subject to any applicable provision of the Bankruptcy Code and federal law, and nothing in this Order shall be deemed to bar Governmental Units (as defined in section 101(27) of the Bankruptcy Code) or public officials from enforcing Safety Laws or General Laws.

(b)     Within five (5) business days after entry of this Sale Order, the Debtors will serve by first-class mail, copies of this Sale Order, the Agency Agreement, and the Sale Guidelines on the following: (a) the Attorney General's office for each state where the Store Closing Sales are being held; (b) the county consumer protection agency or similar agency for each county where the Store Closing Sales are being held; (c) the division of consumer protection for each state where the Store Closing Sales are being held; and (d) the landlords for the closing stores (collectively, the "**Dispute Notice Parties**").

(c)     To the extent that there is a dispute arising from or relating to the Store Closing Sales, this Sale Order, the Agency Agreement, or the Sale Guidelines, which dispute relates to any Liquidation Sale Laws (a "**Reserved Dispute**"), the Bankruptcy Court shall retain exclusive jurisdiction to resolve the Reserved Dispute. Within ten (10) days following entry of this Sale Order, any Governmental Unit may assert that a Reserved Dispute exists by sending a notice (the "**Dispute Notice**") explaining the nature of the dispute to: (a) counsel to the Debtors, Munsch Hardt Kopf & Harr, P.C., 500 N. Akard Street, Suite 3800, Dallas, Texas 75201, c/o Deborah Perry and Julian Vasek; (b) on behalf of Hilco Merchant Resources, LLC, (i) One Northbrook Place, 5 Revere Drive, Suite 206, Northbrook, IL 60062, Fax: 847-849-0859, Attn: Hilco Merchant Resources, LLC c/o Ian S. Fredericks and Kellen Grant and (ii) Riemer & Braunstein LLP, Times Square Tower, Suite 2506, Seven Times Square, New York, New York, Fax: 212-719-0140, Attn: Steven Fox; and (c) applicable Landlord. If the Debtors and the Governmental Unit are unable to resolve the Reserved Dispute within 15 days after service of the notice, the Governmental Unit may file a motion with the Bankruptcy Court requesting that the Bankruptcy Court resolve the Reserved Dispute (a "**Dispute Resolution Motion**").

(d)     In the event that a Dispute Resolution Motion is filed, nothing in this Sale Order shall preclude the Debtors, a landlord, or any other interested party from asserting (A) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (B) that neither the terms of the Sale Order nor the conduct of the Debtors pursuant to the Sale Order, violates such Liquidation Sale Laws. Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of the Sale Order or to limit or interfere with the Debtors' or the Purchaser, as Debtors' agent, ability to conduct or to continue to conduct the Store Closing Sales pursuant to the Sale Order absent further order of the Bankruptcy Court. Upon the entry of the Sale Order, the Bankruptcy Court grants authority for the Debtors and the Purchaser, as Debtors' agent, to conduct the Store Closing Sales pursuant to the terms of the Sale Order, the Agency Agreement, and the Sale Guidelines (as may be modified by Side Letters) and to take all actions reasonably

related thereto or arising in connection therewith. The Governmental Unit will be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code. Nothing in the Sale Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

(e)   If, at any time, a dispute arises between the Debtors and/or the Purchaser, as Debtors' agent, and a Governmental Unit as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in the Sale Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions of subparagraphs (iv) and (v) above by serving a notice to the other party and proceeding thereunder in accordance with those paragraphs. Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo.*

26.   Subject to paragraphs 24 and 25 above, each and every federal, state, or local agency, departmental, or Governmental Unit with regulatory authority over the Store Closing Sales and all newspapers and other advertising media in which the Store Closing Sales are advertised shall consider this Sale Order as binding authority that no further approval, license, or permit of any Governmental Unit shall be required, nor shall the Debtors or the Purchaser, as Debtors' agent, be required to post any bond, to conduct the Store Closing Sales.

27.   Provided that the Store Closing Sales are conducted in accordance with the terms of this Sale Order, the Agency Agreement, and the Sale Guidelines (as may be modified by Side Letters) and in light of the provisions in the laws that exempt court-ordered store closing sales from their provisions, the Debtors and Purchaser, as Debtors' agent, shall be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct the Store Closing Sales in accordance with the terms of this Sale Order and the Sale Guidelines (as may be modified by Side Letters) without the necessity of further showing compliance with any such Liquidation Sale Laws.

28.    Nothing in this Sale Order, the Agency Agreement, the Sale Guidelines, or any Side Letter releases, nullifies, or enjoins the enforcement of any liability to a Governmental Unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) to which any entity would be subject as the owner, lessor, lessee, or operator of the property after the date of entry of this Sale Order.  Nothing contained in this Sale Order, the Agency Agreement, the Sale Guidelines, or any Side Letter shall in any way: (a) diminish the obligation of any entity to comply with environmental laws; or (b) diminish the obligations of the Debtors to comply with environmental laws consistent with their rights and obligations as debtors in possession under the Bankruptcy Code.

29.    To the extent the Debtors are subject to any state Fast Pay Laws in connection with the store closings, the Debtors shall be presumed to be in compliance with such laws to the extent, in applicable states, such payroll payments are made by the later of: (a) the Debtors' next regularly scheduled payroll; and (b) seven (7) calendar days following the termination date of the relevant employee, and in all such cases consistent with, and subject to, any previous orders of this Court regarding payment of same.

30.    Notwithstanding any subsequent appointment of any trustee, party, entity, or other fiduciary under any section of the Bankruptcy Code, and as to such trustee, party, entity, or other fiduciary, the provisions of this Sale Order and the terms and provisions of the Agency Agreement, and any actions taken pursuant hereto or thereto shall survive the entry of any order that may be entered confirming or consummating any plan(s) of the Debtors or converting the Debtors' cases from chapter 11 to chapter 7, and the terms and provisions of the Agency Agreement, as well as the rights and interests granted pursuant to this Sale Order and the Agency Agreement, shall continue in these or any superseding cases and shall be binding upon the Debtors, the Purchaser,

as Debtors' agent, and their respective successors and permitted assigns, including any trustee or other fiduciary hereafter appointed as a legal representative of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code, and the Purchaser, as Debtors' agent, and any such trustee shall be and hereby are authorized to perform under the Agency Agreement upon the appointment of such trustee without the need for further order of this Court.

31.     **Transfer Free and Clear of Interests.** Upon the Debtors' receipt of the Purchase Price, and other than Permitted Encumbrances and Assumed Liabilities specifically set forth in the Agreement, the transfer of the Acquired Assets to the Purchaser and the sale of the Designated Assets shall be free and clear of all Interests of any kind or nature whatsoever, including, without limitation, (a) successor or successor-in-interest liability, (b) Claims in respect of the Excluded Liabilities, and (c) any and all Contracts not assumed and assigned to the Purchaser pursuant to the terms of the Agreement, provided that all such Interests, including the Interests of the Texas Taxing Authorities, hereby automatically attach to the proceeds received by the Debtors ultimately attributable to the APA Assets against, or in, which such Interests are asserted, subject to the terms thereof, with the same validity, force, and effect, and in the same order of priority, which such Interests have against the APA Assets immediately prior to the Closing of the Sale, subject to any rights, claims, and defenses that the Debtors or their estates, as applicable, may possess with respect thereto.  If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing Encumbrances against or in the APA Assets shall not have delivered to the Debtors prior to the Closing of the Sale in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction or releases of all Encumbrances that the person or entity has with respect to such APA Assets, then only with regard to the APA Assets subject to the Agreement and this Sale Order, the

Debtors are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the APA Assets.

32.    **Legal, Valid, and Marketable Transfer with Permanent Injunction.** The transfer of the Acquired Assets to the Purchaser pursuant to the Agreement constitutes a legal, valid, and effective transfer of good and marketable title of the Acquired Assets, and vests, or will vest, the Purchaser with all right, title, and interest to the Acquired Assets, free and clear of all Interests except as otherwise expressly stated as obligations of the Purchaser under the Agreement. All Persons holding interests or claims of any kind or nature whatsoever against the Debtors or the Acquired Assets, the operation of the Acquired Assets prior to the Closing Date, the Auction or the Sale are hereby and forever barred, estopped, and permanently enjoined from asserting against the Purchaser, its successors or assigns, its property, or the Acquired Assets, any claim, interest or liability existing, accrued, or arising prior to the Closing.

33.    **Recording Offices and Releases of Interests.** On the Closing Date, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete assignment, conveyance, and transfer of the Acquired Assets or a bill of sale transferring good and marketable title of the Acquired Assets to the Purchaser. This Sale Order is and shall be effective as a determination that, on the Closing Date, all Interests of any kind or nature whatsoever existing as to the APA Assets prior to the Closing, other than Permitted Encumbrances and Assumed Liabilities, or as otherwise provided in this Sale Order, shall have been unconditionally released, discharged, and terminated, and that the conveyances described herein have been affected. This Sale Order is and shall be binding upon and govern the acts of all persons, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments,

secretaries of state, federal and local officials, and all other persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement. Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement. A certified copy of this Sale Order may be: (a) filed with the appropriate clerk; (b) recorded with the recorder; and/or (c) filed or recorded with any other governmental agency to act to cancel any Interests against the APA Assets, other than the Permitted Encumbrances and Assumed Liabilities.

34.    **Cancellation of Third-Party Interests.** If any person or entity which has filed statements or other documents or agreements evidencing Interests on or in all or any portion of the APA Assets (other than with respect to Permitted Encumbrances or Assumed Liabilities) has not delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Interests which such person or entity has or may assert with respect to all or a portion of the APA Assets, the Debtors and the Purchaser are authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the APA Assets. Notwithstanding the foregoing, the provisions of this Sale Order authorizing the transfer of the APA Assets free and clear of all Interests (except only for Permitted Encumbrances and Assumed Liabilities) shall be self-executing, and it shall not be, or be deemed, necessary for

any person or entity to execute or file releases, termination statements, assignments, consents, or other instruments in order for the provisions of this Sale Order to be implemented.

**Cure Amounts**

35.    Except for a Contract Counterparty who has filed a timely objection to the Cure Amount by the applicable deadline (a "**Contract Objection**"), such counterparty is deemed to have consented to such Cure Amount.  The provisions of this Sale Order shall be effective and binding upon Contract Counterparties to the extent set forth herein, and in accordance with the Bid Procedures.

**Prohibition of Actions Against the Purchaser**

36.    **No Successor Liability.** Except for the Permitted Encumbrances and Assumed Liabilities set forth in the Agreement, or as otherwise expressly provided for in this Sale Order or the Agreement, the Purchaser shall not have any liability or other obligation of the Debtors arising under or related to any of the APA Assets. Without limiting the generality of the foregoing, and except as otherwise expressly provided herein or in the Agreement, the Purchaser shall not be liable for any Claims against the Debtors or any of their predecessors or affiliates, and the Purchaser shall have no successor or vicarious liabilities of any kind or character, including, without limitation, under any theory of antitrust, environmental, successor, or transfer reliability, labor law, *de facto* merger, mere continuation, or substantial continuity, whether known or unknown as of the Closing Date, now existing, or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, without limitation, liabilities on account of warranties, intercompany loans, receivables among the Debtors and their affiliates, environmental liabilities, and any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of any of the APA Assets prior to the Closing.

34

37.    Other than as expressly set forth in the Agreement, no Purchaser Party shall have any responsibility for (a) any liability or other obligation of the Debtors or related to the APA Assets or (b) any claims against the Debtors or any of their predecessors or affiliates. Except as expressly provided in the Agreement with respect to the Purchaser, no Purchaser Party shall have any liability whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations (as defined herein, "**Successor or Transferee Liability**") based, in whole or in part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor, or transferee liability, de facto merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including, without limitation, liabilities on account of (a) any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the APA Assets or the Assumed Liabilities prior to the Initial Closing Date or in respect of pre-Closing periods or (b) any plan, agreement, practice, policy, or program, whether written or unwritten, providing for pension, retirement, health, welfare, compensation, or other employee benefits which is or has been sponsored, maintained, or contributed to by any Debtor or with respect to which any Debtor has any liability, whether or not contingent, including, without limitation, any "multiemployer plan" (as defined in Section 3(37) of ERISA) or "pension plan" (as defined in Section 3(2) of ERISA) to which any Debtor has at any time contributed, or had any obligation to contribute. Except to the extent expressly included in the Assumed Liabilities with respect to the Purchaser or as otherwise expressly set forth in the Agreement, no Purchaser Party shall have any liability or obligation under any applicable law, including, without limitation, (a)

the WARN Act, 29 U.S.C. §§ 2101 *et seq.*, (b) the Comprehensive Environmental Response Compensation and Liability Act, (c) the Age Discrimination and Employment Act of 1967 (as amended), (d) the Federal Rehabilitation Act of 1973 (as amended), (e) the National Labor Relations Act, 29 U.S.C. §§ 151 *et seq.*, or (f) any foreign, federal, state, or local labor, employment or environmental law, by virtue of the Purchaser's purchase of the Acquired Assets, or assumption of the Assumed Liabilities. Without limiting the foregoing, no Purchaser Party shall have any liability or obligation with respect to any environmental liabilities of the Debtors or any environmental liabilities associated with the APA Assets except to the extent they are Assumed Liabilities set forth in the Agreement.

38. **Actions Against the Purchaser Enjoined.** Except with respect to Permitted Encumbrances and Assumed Liabilities set forth in the Agreement, or as otherwise permitted by the Agreement or this Sale Order, all persons and entities, including, without limitation, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, litigation claimants, and other creditors, holding Interests of any kind or nature whatsoever against, or in, all or any portion of the APA Assets, arising under, out of, in connection with, or in any way relating to, the Debtors, the APA Assets, the operation of the Debtors' business prior to the Initial Closing Date, or the transfer of the Designated Assets or the Acquired Assets to the Purchaser, hereby are forever barred, estopped, and permanently enjoined from asserting against the Purchaser, or any of its affiliates, successors, or assigns, or their property or the APA Assets, such persons' or entities' Interests in and to the APA Assets, including, without limitation, the following actions against the Purchaser or its affiliates, or their successors, assets, or properties: (a) commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding; (b) enforcing, attaching,

collecting, or recovering in any manner any judgment, award, decree, or other order; (c) creating,

perfecting, or enforcing any Lien or other Claim; (d) asserting any set off, right of subrogation, or

recoupment of any kind; (e) commencing or continuing any action, in any manner or place, that

does not comply or is inconsistent with the provisions of this Sale Order or other orders of this

Court, or the agreements or actions contemplated or taken in respect thereof; or (f) revoking,

terminating, or failing or refusing to transfer or renew any license, permit, or authorization to

operate any of the APA Assets or conduct any of the business operated with the APA Assets.

## **Other Provisions**

39.    **Licenses**. To the maximum extent permitted by applicable law, and in accordance

with the Agreement, the Purchaser (or its designee) shall be authorized, as of the Closing, to

operate under any license, permit, registration, and governmental authorization or approval

(collectively, the "**Licenses**") of the Debtors with respect to the APA Assets. To the extent the

Purchaser (or its designee) cannot operate under any Licenses in accordance with the previous

sentence, such Licenses shall be in effect while the Purchaser (or its designee), with assistance

from the Debtors, works promptly and diligently to apply for and secure all necessary government

approvals for new issuance of Licenses to the Purchaser (or its designee). The Debtors shall, at

Purchaser's sole cost, maintain the Licenses in good standing to the fullest extent allowed by

applicable law for the Purchaser's benefit until equivalent new Licenses are issued to the Purchaser

(or its designee).

40.    **State of Texas**.  Nothing in this Order or related documents discharges, releases,

precludes, or enjoins: (i) any liability to any Texas "governmental unit" as defined in 11 U.S.C. §

101(27) ("**Texas Governmental Unit**") that is not a "claim" as defined in 11 U.S.C. § 101(5)

("**Claim**"); (ii) any Claim of a Texas Governmental Unit arising on or after the Closing Date; (iii)

any liability to a Texas Governmental Unit under police and regulatory statutes or regulations that

any entity would be subject to as the owner or operator of property after the Closing Date; or (iv) any liability to a Texas Governmental Unit on the part of any Person other than the Debtors. Nor shall anything in this Order or related documents enjoin or otherwise bar a Texas Governmental Unit from asserting or enforcing, outside this Court, any liability described in the preceding sentence.

41.    Further, nothing in this Order or related documents authorizes the transfer or assignment of any Texas governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Order or related documents shall relieve any entity from any obligation to address or comply with information requests or inquiries from any Texas Governmental Unit. Nothing in this Order or related documents shall affect any setoff or recoupment rights of any Texas Governmental Unit. Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

42.    **Effective Immediately.** For cause shown, pursuant to Bankruptcy Rules 6004(h) and 7062(g), this Sale Order shall not be stayed and shall be effective immediately upon entry, and the Debtors and the Purchaser are authorized to close the Sale and related transactions immediately upon entry of this Sale Order. The Debtors and the Purchaser may consummate the Agreement at any time after entry of this Sale Order by waiving any and all closing conditions set forth in the Agreement that have not been satisfied and by proceeding to close the Sale and related transactions without any notice to the Court, any pre-petition or post-petition creditor of the Debtors and/or any other party in interest.

43.     **Access to Books and Records.** Following the Initial Closing Date, the Debtors shall have, and the Purchaser shall provide, reasonable access to their books and records, to the extent they are included in the Acquired Assets transferred to the Purchaser as part of the Sale as set forth in the Agreement.

44.     **Bulk Sales Law.** No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

45.     **Agreement Approved in Entirety.** The failure specifically to include any particular provision of the Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Agreement be authorized and approved in its entirety.

46.     **Further Assurances**. From time to time, as and when requested, all parties shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as the requesting party may reasonably deem necessary or desirable to consummate the Sale, including such actions as may be necessary to vest, perfect, or confirm or record or otherwise in the Purchaser its right, title, and interest in and to the Acquired Assets.

47.     **Modifications to Agreement.** The Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, in a writing signed by such parties, without further order of this Court, provided any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates

48.   **Standing.** The transactions authorized herein shall be of full force and effect, regardless of any Debtors' lack of good standing in any jurisdiction in which such Debtor is formed or authorized to transact business.

49.   **Authorization to Effect Order.** The Debtors are authorized to take all actions necessary to effect the relief granted pursuant to this Sale Order in accordance with the Sale Motion.

50.   **Automatic Stay.** The automatic stay pursuant to Bankruptcy Code section 362 is hereby modified, lifted, and annulled with respect to the Debtors and the Purchaser to the extent necessary, without further order of this Court, to (a) allow the Purchaser to deliver any notice provided for in the Agreement and (b) allow the Purchaser to take any and all actions permitted under the Agreement in accordance with the terms and conditions thereof. The Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Agreement or any other Sale-related document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence, *provided*, *however*, that this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

51.   **No Other Bids.** No further bids or offers for the APA Assets shall be considered or accepted by the Debtors after the date hereof unless the Sale to the Purchaser is not consummated or otherwise does not occur in accordance with the Agreement or its related documents.

52.   **Order to Govern.** To the extent this Sale Order is inconsistent with any prior order entered or pleading filed in these Chapter 11 Cases, the terms of this Sale Order shall govern. To the extent there are any inconsistencies between the terms of this Sale Order and the Agreement

(including all ancillary documents executed in connection therewith), the terms of this Sale Order shall govern.

53.     **Standing**. The Purchaser has standing to seek to enforce the terms of this Sale Order.

54.     **Retention of Jurisdiction**. This Court shall retain exclusive jurisdiction with respect to the terms and provisions of this Sale Order and the Agreement.

55.     **Turnover of Proceeds of Acquired Assets and Designated Assets**. Notwithstanding anything to the contrary in that certain (i) "*Final Order (I) Authorizing Debtors to (A) Use Cash Collateral on a Limited Basis and (B) Obtain Postpetition Financing on a Secured, Superpriority Basis, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief*" (Dkt. No. 771, the "**Final DIP Order**") and/or (ii) *Settlement and Assignment Agreement*, dated April 11, 2023 (the "**Assignment Agreement**"), between and among 1903P Loan Agent, LLC ("**1903P**") and Invictus Special Situations Master I, L.P. ("**ISSM I**") and Invictus Global Management, LLC ("**IGM**" and, collectively with ISSM I, "**Invictus**"), from and after the Initial Closing Date any and all proceeds of any Acquired Asset or Designated Asset, including, but not limited to, any proceeds realized and attributable to Purchaser from the conduct of the Store Closing Sales, (x) received by the Debtors, 1903P and/or Invictus, as the context makes applicable, shall be held in trust for the exclusive benefit of Purchaser, and (y) shall, not later than one (1) business day after said party has or should have had actual knowledge, or has received written notice (which may be by email), of its receipt of such proceeds, be turned over to Purchaser by wire transfer of immediately available funds to an account designated in writing by Purchaser and in accordance with wire transfer instructions provided by Purchaser.

56.     **Agency Agreement Expenses**.  Any amounts funded to the Debtors under the Agency Agreement in respect of expenses to be paid by Debtors are not, and will not be deemed, sale proceeds and no Interest will attach to such amounts.

57.     **Use of Sale Proceeds**. All sale proceeds received by the Debtors under the Agreement shall be maintained in a segregated account pending further order of this Court; *provided*, *however*, that through and including May 13, 2023, the Debtors are hereby authorized and directed to pay all expenses and other amounts (i) required to be paid under the Hilco Agency Agreement or as otherwise required in the Debtors' business judgment to comply with their fiduciary duty to preserve the value of the estates; (ii) due and payable to Governmental Units (as defined by the Bankruptcy Code) or as otherwise required by law, and (iii) pursuant to the *Agreed Order Regarding Debtors' Weekly Borrowing Request* dated April 26, 2023.  Notwithstanding the foregoing, in no event shall the Debtors pay any expenses not identified in or in excess of the amounts set forth in the budget attached to the Final DIP Order, nor shall they pay any amounts in excess of the relevant budgeted amounts.  For the avoidance of doubt, there shall be no new inventory purchased from the date of this Order forward.

58.     **Sharing of Information**.  The Debtors shall provide the Notice Parties, on a confidential basis and for professionals' eyes only, (i) with a weekly cash flow statement by electronic mail, and (ii) any reports required to be provided to them by Hilco pursuant to the Agreement.

59.     **Final DIP Order**.  For the avoidance of doubt, except as expressly provided herein, nothing in this Sale Order alters, changes or otherwise modifies the Final DIP Order or any party's rights thereunder.

60.     **Texas Taxing Authorities**.  The Texas Taxing Authorities reserve rights to object

to any further distribution of Sale proceeds that does not provide for the payment of 2023 ad

valorem taxes.

**# # # End of Order # # #**

## Exhibit A

**The Agreement**

ASSET PURCHASE AGREEMENT

Between

TUESDAY MORNING CORPORATION,
TMI HOLDINGS, INC.,
TUESDAY MORNING, INC.,
FRIDAY MORNING, LLC,
DAYS OF THE WEEK, INC.,
NIGHTS OF THE WEEK, INC.,
TUESDAY MORNING PARTNERS, LTD.,


as the Sellers,


and


HILCO MERCHANT RESOURCES, LLC,


Dated as of [April 24], 2023

**TABLE OF CONTENTS**

ARTICLE 1. DEFINITIONS..........................................................................................................1
    1.1    Definitions..............................................................................................................1
    1.2    Interpretation..........................................................................................................9

ARTICLE 2. PURCHASE AND SALE OF ACQUIRED ASSETS...........................................10
    2.1    Purchase of the Acquired Assets........................................................................10
    2.2    Excluded Assets...................................................................................................11
    2.3    Assumed Liabilities. ............................................................................................12
    2.4    Excluded Liabilities. ...........................................................................................13
    2.5    Assumed Contracts and Leases; Cure Amounts.  .................................................13

ARTICLE 3. CONSIDERATION ..............................................................................................13
    3.1    Consideration. .....................................................................................................13
    3.2    Deposit.................................................................................................................13
    3.3    Purchase Price Escrow. .......................................................................................13
    3.4    Purchase Price Allocation. ..................................................................................14

ARTICLE 4. CLOSING .............................................................................................................17
    4.1    Closing. ...............................................................................................................17
    4.2    The Sellers' Deliveries. .......................................................................................17
    4.3    The Purchaser's Deliveries. .................................................................................18
    4.4    Taxes. ..................................................................................................................18

ARTICLE 5. REPRESENTATIONS AND WARRANTIES OF THE SELLERS......................19
    5.1    Organization. .......................................................................................................19
    5.2    Authorization. ......................................................................................................20
    5.3    Governmental Authority Authorizations and Other Consents.............................20
    5.4    Noncontravention.................................................................................................20
    5.5    Litigation.............................................................................................................21
    5.6    Compliance with Laws; Permits..........................................................................21
    5.7    Title to Acquired Assets......................................................................................22
    5.8    Validity of Contracts...........................................................................................22
    5.9    Environmental Matters.........................................................................................22
    5.10    Financial Advisors. .............................................................................................23

ARTICLE 6. REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ...............23
    6.1    Organization........................................................................................................23
    6.2    Authorization.......................................................................................................23
    6.3    Noncontravention. ...............................................................................................24
    6.4    Solvency; Availability of Funds. .........................................................................24

ARTICLE 7. PRE-CLOSING COVENANTS ...........................................................................24

i

| | | |
|---|---|---|
| 7.1 | Conduct of Business. | 24 |
| 7.2 | Consummation of Transaction. | 25 |
| 7.3 | Bankruptcy Case. | 26 |
| 7.4 | Notice of Noncompliance. | 26 |
| 7.5 | Update of Disclosure Schedules. | 26 |
| 7.6 | Employees. | 26 |

ARTICLE 8. POST-CLOSING COVENANTS ...................................................27

| | | |
|---|---|---|
| 8.1 | Further Assurances | 27 |
| 8.2 | Access to Records After the Closing. | 27 |
| 8.3 | Insurance. | 28 |

ARTICLE 9. CONDITIONS .............................................................................28

| | | |
|---|---|---|
| 9.1 | Conditions to Each Party's Obligations. | 28 |
| 9.2 | Conditions to Obligations of the Sellers. | 28 |
| 9.3 | Conditions to Obligations of the Purchaser. | 29 |

ARTICLE 10. NO SURVIVAL; "AS IS/WHERE IS" SALE ...............................30

| | | |
|---|---|---|
| 10.1 | No Survival of Representations and Warranties. | 30 |
| 10.2 | "AS IS/WHERE IS" SALE. | 30 |

ARTICLE 11. TERMINATION .........................................................................30

| | | |
|---|---|---|
| 11.1 | Termination of Agreement. | 30 |
| 11.2 | Effect of Termination. | 31 |

ARTICLE 12. MISCELLANEOUS PROVISIONS ............................................31

| | | |
|---|---|---|
| 12.1 | Expenses. | 31 |
| 12.2 | Public Announcements. | 31 |
| 12.3 | Amendment; Waiver. | 32 |
| 12.4 | Notices. | 32 |
| 12.5 | Succession and Assignment. | 33 |
| 12.6 | Governing Law. | 33 |
| 12.7 | Consent to Jurisdiction. | 33 |
| 12.8 | WAIVER OF JURY TRIAL. | 34 |
| 12.9 | Entire Agreement. | 34 |
| 12.10 | Severability. | 35 |
| 12.11 | No Third Party Beneficiaries. | 35 |
| 12.12 | Exhibits, Appendices and Schedules. | 35 |
| 12.13 | Counterparts. | 35 |

ii

## EXHIBITS

Exhibit A ........................................................................................................ Agency Agreement
Exhibit B ................................................................................................................ Bill of Sale
Exhibit C ……………………………………………………….... Sale Approval Order
Exhibit D .................................................................. Assignment and Assumption Agreement
Exhibit E ………………………………………….. Intellectual Property Assignment Agreement

## APPENDICES

Appendix I ......................................................................................... Sellers Knowledge Group
Appendix II …………………………………………………… Assumed Contracts and Leases
Appendix III .......................................................................... Required Consents and Approvals
Appendix IV.............................................................................................................Required Permits

## DISCLOSURE SCHEDULES

Schedule 1.1............................................................................................................... Files
Schedule 1.1(a) ................................................................................................ Store List
Schedule 1.1(b) …………………………………………………………Specified Store List
Schedule 2.2(l)……………………………………………………… Undrawn Letters of Credit
Schedule 3.5(h) ............................................................................ Cost Factor Threshold
Schedule 5.2 ............................................................................................... Authorization
Schedule 5.3 .................................................................................................... Consents
Schedule 5.4........................................................................................... Noncontravention
Schedule 5.5........................................................................................................ Litigation
Schedule 5.6(a) ...................................................................... Compliance with Laws
Schedule 5.6(b) ................................................................................................... Permits
Schedule 5.6I .......................................................................... Operation Permits
Schedule 5.7........................................................................................................ Title
Schedule 5.9(a) ............................................................... Environmental Law Compliance
Schedule 5.9(b) ............................................................... Environmental Law Liabilities
Schedule 8.4............................................................................................................ Names

iii

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT, dated as of April 24, 2023, is made by and between Tuesday Morning Corporation, TMI Holdings, Inc., Tuesday Morning, Inc., Friday Morning, LLC, Days of the Week, Inc., Nights of the Week, Inc., and Tuesday Morning Partners, Ltd. (the "**Sellers**"), as sellers, Hilco Merchant Resources, LLC ("**Hilco**"), and one or more entities designated (each a "**Designated Purchaser**" and collectively, the "**Designated Purchasers**") as purchaser(s) by Hilco.

### P R E A M B L E

WHEREAS, the Sellers are an off-price retailer of unique home and lifestyle merchandise;

WHEREAS, on February 14, 2023 (the "**Petition Date**"), the Sellers filed voluntary petitions for relief under Chapter 11 of title 11 of the United States Code, §§ 101, *et seq*. (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**"), and those cases have been consolidated for procedural purposes and are being administered jointly as Case No. 23-90001 (the "**Bankruptcy Case**");

WHEREAS, the Sellers have determined that a prompt disposition of the Acquired Assets and Designated Assets (each as defined below and, collectively, the "**APA Assets**") is necessary in order to preserve the value inherent in the APA Assets for the benefit of its creditors;

WHEREAS, upon the terms and subject to the conditions set forth herein and pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, Sellers desire to sell, transfer and assign to Designated Purchaser all of the Acquired Assets (as defined below), and Hilco desires (i) designate for sale by Agent the Designated Assets pursuant to the Agency Agreement (the "**Store Closing Sale**"), (ii) to designate the purchase, acquisition and assumption from Sellers by one or more Designated Purchasers some or all of the Acquired Assets and Assumed Liabilities (as defined below), and (iii) consummate such other transactions as are contemplated by this Asset Purchase Agreement, together with the Agency Agreement, appendices, exhibits and schedules attached hereto (collectively, the "**Agreement**"), with all such transactions in (i)-(iii) referred to as the "**Proposed Transaction**";

NOW, THEREFORE, in consideration of the foregoing and of the representations, warranties, covenants and agreements made herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

### ARTICLE 1.  DEFINITIONS

1.1   <u>Definitions</u>.  The following words and terms as used in this Agreement shall have the following meanings:

"**Agent**" means Hilco together any Person to which Hilco syndicates the Store Closing Sale.

"**Acquired Assets**" has the meaning specified in Section 2.2.

"**Action**" means any demand, claim, action, suit or proceeding, arbitral action, inquiry, criminal prosecution or investigation by or before any Governmental Authority.

"**Affiliate**" (and, with a correlative meaning, "*affiliated*") means, with respect to any Person, any other Person that directly, or through one or more intermediaries, controls or is controlled by or is under common control with such Person, including any Subsidiary of such Person. As used in this definition, "*control*" (and, with correlative meanings, "*controlled by*" and "*under common control with*") means possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or other ownership interests, by Contract or otherwise).

"**Agency Agreement**" means the agency agreement substantially in the form of **Exhibit A**.

"**Agreement**" has the meaning specified in the Preamble.

"**Allocation Schedule**" means the schedule of Merchandise in the Distribution Center and the Stores to which such Merchandise should be distributed, which schedule shall be agreed upon by Hilco and the Sellers prior to the Initial Closing Date.

"**Allocation Statement**" has the meaning specified in Section 3.4.

"**Alternative Transaction**" means a sale transaction between the Sellers and a Person other than Hilco.

"**APA Assets**" means the Acquired Assets and the Designated Assets

"**Assignment and Assumption Agreement**" has the meaning specified in Section 4.2(b).

"**Assumed Contracts and Leases**" has the meaning specified in Section 2.1(a).

"**Assumed Liabilities**" has the meaning specified in Section 2.3.

"**Bankruptcy Case**" has the meaning specified in the Preamble.

"**Bankruptcy Code**" has the meaning specified in the Preamble.

"**Bankruptcy Court**" has the meaning specified in the Preamble.

"**Bill of Sale**" means the bill of sale transferring to the Designated Purchaser the Acquired Assets, substantially in the form of **Exhibit B**.

"**Books and Records**" means business records of the Sellers (in any form or medium), including all books, ledgers, files, reports, plans, records, manuals, sales and credit records, books of account, financial records, invoices, supplier lists, billing records, engineering records, drawings, blueprints, schematics, studies, surveys, reports, advertising and sales material, customer lists, customer records, test records, financing records, and personnel and payroll records, in each case to the extent they are related to the Business or the APA Assets, other than

2

(a) any Bankruptcy Court filings or documents relating to or necessary for winding up of the Sellers and the administration of the Bankruptcy Case, (b) any materials about employees, disclosure of which would violate an employee's reasonable expectation of privacy, (c) any materials that are subject to attorney-client privilege, (d) any documents reasonably necessary for purposes of the prosecution, settlement or enforcement by the Sellers of the Retained Rights of Action, or (e) any documents primarily relating to the Excluded Assets or the Excluded Liabilities (such items described in (a) through (e), the "**Retained Books and Records**").

"**Business**" means the Sellers' business of owning and operating retail stores for the sale of off-price home and lifestyle merchandise.

"**Business Day**" means a day other than a Saturday, Sunday or other day on which the Federal Reserve Bank of New York is closed for business.

"**Business Permits**" has the meaning specified in Section 5.6(b).

"**Cash**" means all cash and cash equivalents, on hand or in banks, register cash, petty cash, certificates of deposit, bank or savings and loan accounts and U.S. government securities of any kind or nature.

"**Closing**" and "**Closing Date**" have the meanings specified in Section 4.1.

"**Closing Stores**" means the Stores designated by Hilco to close pursuant to the Agency Agreement.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Confirmed Closing Cash Balance**" means the aggregate amount of the Sellers' Cash in the Stores as of the Closing Date as determined by a physical count conducted on the Initial Closing Date.

"**Contract**" means any written contract, agreement, indenture, note, bond instrument, lease (including any real property lease), license or other document or arrangement, undertaking, practice or authorization that is binding on any Person or property under applicable Law.

"**Cure Amounts**" means all amounts necessary to cure all defaults, if any (including, if applicable, any stub period rents), under the Assumed Contracts and Leases and to pay all actual or pecuniary losses that have resulted from such defaults under the Assumed Contracts and Leases.

"**Cost Factor Threshold**" means the aggregate Cost Value of the Merchandise as a percentage of the aggregate Retail Price of the Merchandise, such percentage being not greater than 45.0%.

"**Cost Value**" means the lower of (i) the lower of (x) the actual cost of such item and (y) the lowest cost of such item as reflected in the File and (ii) the Retail Price; provided, however, that notwithstanding the foregoing, with respect to each item of Defective Merchandise for which the parties are able to agree upon a "Cost Value", the "Cost Value" shall be such agreed upon amount.

3

"**Defective Merchandise**" means any item of Merchandise that is defective or otherwise not saleable in the Ordinary Course because it is worn, scratched, broken, faded, torn, mismatched, tailored, or affected by other similar defects rendering it not of the quality of other similar items of Merchandise, but can be sold to customers at a reduced price.

"**Deposit**" means $2,281,500 deposited by Hilco into the account designated by the Sellers with the last four digits of the account being 8648 on April 6, 2023 and the additional $928,500 deposited by Hilco into the same account on April 20, 2023, which shall be held by the Sellers in escrow pursuant to the Bankruptcy Court's Order Approving Bid Procedures [dkt 558], and, subject to the terms and conditions of this Agreement, to be credited against the Purchase Price at Closing.

"**Designated Assets**" has the meaning specified in Section 2.1.

"**Designated Purchaser**" and "**Designated Purchasers**" have the meaning specified in the introductory paragraph and one such Designated Purchaser may be Christmas Trees Shops, LLC.  In addition, "Designated Purchaser" could also include Agent itself if so designated by Agent.

"**Designation Rights Period**" means the period commencing on the Closing Date and ending at 11:59 pm Eastern time on the date that is 60 days thereafter.

"**Designated Store(s)**" means one or more Stores designated by Agent for transfer to a Designee.

"**Disclosure Schedules**" has the meaning specified in the introductory paragraph of Article 5.

"**Distribution Center**" means Sellers' distribution facility located at 14303 / 14601 / 14603 / 14621 / 14639 Inwood Rd., Addison, TX and 4404 S. Beltwood Pkwy., Farmer's Branch, TX (Location Nos. 0003, 7052, 7056).

"**Distribution Center Merchandise**" means items of Inventory that (1)(i) are located in the Distribution Center as of the Initial Closing Date or (ii) are in transit to the Stores from the Distribution Center as of the Initial Closing and (2) arrive at the Stores no later than fourteen (14) days after the Initial Closing Date in accordance with the Allocation Schedule.

"**Effective Time**" has the meaning specified in Section 4.1.

"**Estimated Merchandise Value**" has the meaning specified in Section 3.5.

"**Environmental Laws**" means any applicable Laws of any Governmental Authority: (i) imposing obligations, Liability, or standards of conduct with regard to releases or threatened releases to soil, surface water, groundwater, air or any other environmental media of any hazardous waste, hazardous material, pollutant, contaminant or other such substance or compound, including toxic substances, asbestos containing materials, polychlorinated biphenyls (PCB), lead, hazardous waste, petroleum or any refined product or fraction or derivative thereof (collectively, "**Hazardous Substances**"); (ii) governing the use, treatment, storage, disposal,

4

transport or handling of Hazardous Substances; (iii) imposing obligations, Liability, or standards of conduct with regard to pollution or the protection of the environment or human health or safety or (iv) imposing obligations, Liability, or standards of conduct with regard to the health and safety of employees, contractors, or other individuals. Such Environmental Laws shall include the Resource Conservation and Recovery Act, the Comprehensive Environmental Response, Compensation and Liability Act, the Emergency Planning and Community Right-to-Know Act, the Clean Air Act, the Clean Water Act, the Safe Drinking Water Act and the Toxic Substances Control Act and all other applicable Laws pertaining to Hazardous Substances, the environment, human health or safety.

"**Escrow Agent**" means a Person to be mutually agreed upon by Sellers and Hilco, acting in its capacity as escrow agent hereunder.

"**Escrow Agreement**" has the meaning specified in Section 3.3(b).

"**Escrow Amount**" has the meaning specified in Section 3.3(b).

"**Excluded Assets**" has the meaning specified in Section 2.2.

"**Excluded Contracts and Leases**" has the meaning specified in Section 2.3(a).

"**Excluded Defective Merchandise**" means (i) any item of Defective Merchandise that is not saleable in the ordinary course because it is so damaged or defective that it cannot reasonably be used for its intended purpose and (ii) any item of Inventory that has been marked out of stock, set aside for return to vendor, or received some other similar designation.

"**Excluded Liabilities**" has the meaning specified in Section 2.5.

"**Excluded Goods**" has the meaning specified in Section 3.5.

"**File**" means the files set forth on Schedule 1.1 together with updated files, if any, received by Hilco from Sellers on or prior to the Initial Closing Date.

"**Final Order**" means an order which has not been stayed.

"**GAAP**" has the meaning specified in Section 1.2(f).

"**Governmental Authority**" means any government, governmental entity, department, commission, board, agency or instrumentality, or any court, tribunal or judicial body, in each case whether federal, state, commonwealth, county, provincial, local or foreign.

"**Governmental Order**" means any Law, order, judgment, injunction, decree, stipulation or determination issued, promulgated or entered by or with any Governmental Authority of competent jurisdiction.

"**Gross Rings**" has the meaning specified in Section 3.5.

"**Initial Closing**" and "**Initial Closing Date**" have the meanings specified in Section 4.1.

"**Initial Purchase Price Payment**" has the meaning ascribed in Section 3.3.

5

"**Intellectual Property Assignment**" has the meaning specified in Section 4.2(c).

"**Intellectual Property Rights**" means all rights in and to (a) patents, patent applications and patent disclosures, together with all re-issuances, continuations, continuations in part, revisions, extensions, reexaminations, provisionals, divisions, renewals, revivals, and foreign counterparts thereof and all registrations and renewals in connection therewith, (b) trademarks, service marks, trade dress, logos, trade names and corporate names, together with all translations, adaptations, derivations and combinations thereof and including all goodwill associated therewith, and all applications, registrations and renewals in connection therewith, (c) copyrightable works, copyrights and all applications, registrations and renewals in connection therewith, (d) mask works and all applications, registrations and renewals in connection therewith, (e) trade secrets, inventions and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer, vendor, distributor, and supplier lists and related information (including contact information, email addresses, transaction history, etc.), pricing and cost information, business and marketing plans and proposals, assembly, test, installation, service and inspection instructions and procedures, technical, operating and service and maintenance manuals and data, hardware reference manuals and engineering, programming, service and maintenance notes and logs), (f) Software, (g) Internet addresses, uniform resource locaters, domain names, websites and web pages, social media pages, (h) Social Media Accounts, and (i) goodwill relating to any of the foregoing.

"**Inventory**" means all inventories relating to the Business which are on hand at the Sellers' Stores, Distribution Center, in transit thereto, or wherever located as of the Closing Date.

"**Hilco**" has the meaning specified in the introductory paragraph.

"**Knowledge**" of the Sellers with respect to a given matter means the knowledge that the individuals identified on **Appendix I** actually possess or should possess in the exercise of reasonable diligence and investigation with respect to the matter, given their respective positions with, and authority with respect to, the Sellers.

"**Law**" means any law, ordinance, regulation, rule, code or rule of common law, or otherwise of any Governmental Authority.

"**Leased Real Property**" means all of the right, title and interest of the Sellers under all legally binding leases, subleases, licenses, concessions and other agreements, pursuant to which the Sellers hold a leasehold or sub-leasehold estate in, or are granted the right to use or occupy, any land, buildings, improvements, fixtures or other interest in real property which is used in the operation of the Business as presently conducted.

"**Liability**" means any claim, as defined by Bankruptcy Code Section 101(5) including any indebtedness, obligation or other liability (whether or not absolute, accrued, matured, contingent, liquidated, known, suspected, fixed or otherwise), including, but not limited to, any fine, assessment, penalty, judgment, award, loss, claim, demand, damage or settlement in respect of any Action.

"**Lien**" means any security interest, pledge, mortgage, lien, charge, hypothecation,

6

adverse claim of ownership or use, restriction on transfer (such as a right of first refusal or other similar right), defect of title, encumbrance, or other interest of any kind or character.

"**Merchandise**" means (A) all finished goods Inventory that are owned by the Sellers and located at the Stores as of the Initial Closing Date; (B) Distribution Center Merchandise; and (C) Defective Merchandise (other than Excluded Defective Merchandise).  Notwithstanding the foregoing, "Merchandise" shall not include: (1) goods which belong to sublessees or concessionaires of Sellers; (2) goods held by Sellers on memo, on consignment, or as bailee; (3) or Excluded Defective Merchandise.

"**Merchandise Date**" has the meaning specified in Section 3.5.

"**Merchandise Report**" has the meaning specified in Section 3.5.

"**Merchandise Purchase Price Adjustment**" has the meaning specified in Section 3.5.

"**Merchandise Taker**" has the meaning specified in Section 3.5.

"**Merchandise Taking**" has the meaning specified in Section 3.5.

"**Operation Permits**" has the meaning specified in Section 5.6(c).

"**Other Transaction Documents**" has the meaning specified in Section 5.2.

"**Periodic Taxes**" has the meaning specified in Section 4.4(b).

"**Permits**" means permits, licenses, franchises, approvals, certificates, certifications, consents, waivers, concessions, registrations or other authorizations of any Governmental Authority.

"**Permitted Encumbrances**" means easements, rights-of-way, real property restrictive covenants, and other similar real property encumbrances which, in the aggregate, are not substantial in amount and which do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the Sellers.

"**Person**" means an individual, firm, partnership, limited liability company, association, unincorporated organization, trust, corporation, or any other entity, including a Governmental Authority.

"**Petition Date**" has the meaning specified in the Preamble.

"**Personal Property**" means all tangible personal property, including apparatus, materials, furniture, fixtures, supplies, parts, equipment, computers, servers, machinery, vehicles, rolling stock, and other tangible property of Sellers.

"**Proposed Transactions**" has the meaning specified in the Preamble.

"**Proration Periods**" has the meaning specified in Section 4.4(b).

"**Purchase Price**" has the meaning specified in Section 3.1.

"**Purchaser**" has the meaning specified in the introductory paragraph to this Agreement.

"**Receipt Deadline**" shall mean the date that is 14 calendar days after the Initial Closing Date.

"**Retail Price**" means, with respect to each item of Merchandise, the lowest ticketed, shelf, hang-tag, hardmarked or the price reflected on the File; provided, however, that, for the avoidance of doubt, "Retail Price" excludes any temporary point of sale promotional price.

"**Retained Books and Records**" shall have the meaning set forth in the definition of Books and Records.

"**Retained IP**" has the meaning specified in Section 2.3(f).

"**Retained Rights of Action**" has the meaning specified in Section 2.2(d).

"**Rights of Action**" means any and all rights, claims (including claims as defined in the Bankruptcy Code), lawsuits, causes of action, rights of recovery, rights of set off, rights of recoupment, refunds, demands, defenses, judgments, accounts, and rights, claims, powers or privileges of any kind or character whatsoever, known or unknown, suspected or unsuspected, whether arising prior to, on or after the Petition Date, in contract or in tort, at law or in equity, or under any other theory of law, held by the Sellers against any Person.

"**Sale Approval Order**" means an order of the Bankruptcy Court approving this Agreement and the Proposed Transactions in the form of **Exhibit C**.

"**Sellers**" has the meaning specified in the introductory paragraph to this Agreement.

"**Software**" means any computer program, operating system, application, system, firmware or software of any nature, whether operational, active, under development or design, non-operational or inactive, including all object code, source code, comment code, algorithms, processes, formulae, interfaces, navigational devices, menu structures or arrangements, icons, operational instructions, scripts, commands, syntax, screen designs, reports, designs, concepts, visual expressions, technical manuals, tests scripts, user manuals and other documentation therefor, whether in machine-readable form, virtual machine-readable form, programming language, modeling language or any other language or symbols, and whether stored, encoded, recorded or written on disk, tape, film, memory device, paper or other media of any nature, and all databases necessary or appropriate in connection with the operation or use of any such computer program, operating system, application, system, firmware or software.

"**Specified Stores**" means those Stores that will not be closed and will be operated as a going concern by a Designated Purchaser, which will be identified as part of the auction and will be reflected on Schedule 1.1(b).

"**Stores**" means the Sellers' retail store locations set forth on Schedule 1.1(a).

"**Store Closing Sale**" has the meaning specified in the Preamble.

"**Tax**" or "**Taxes**" means any federal, commonwealth, state, county, provincial, local or foreign income, gross receipts, sales, use, ad valorem, employment, severance, transfer, gains, profits, excise, franchise, personal and real property, capital stock, premium, minimum and alternative minimum or other taxes, fees, levies, licenses, duties, assessments or charges of any kind or nature whatsoever imposed by any Governmental Authority (whether payable directly or by withholding and including any tax liability incurred or borne as a transferee or successor or by contract, or otherwise), together with any interest, surcharges, penalty (civil or criminal), or additional amounts imposed by, any Governmental Authority with respect thereto.

"**Tax Return**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and further including any amendment thereof.

"**Termination Date**" has the meaning specified in Section 11.1(b).

"**Transaction Taxes**" has the meaning specified in Section 4.4(a).

"**Treasury Regulations**" means the regulations promulgated by the United States Department of the Treasury pursuant to and in respect of provisions of the Code. All references herein to Sections of the Treasury Regulations shall include any corresponding provision or provisions of succeeding, similar, substitute, proposed or temporary final Treasury Regulations or their successor Treasury Regulations.

"**Update**" has the meaning specified in Section 7.5.

1.2    Interpretation.  The following provisions shall govern the interpretation of this Agreement:

(a)    "Herein" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section, Subsection, Appendix, Exhibit or Schedule.

(b)    Headings or captions are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

(c)    Words importing the singular number only shall include the plural and vice versa, words importing the masculine gender shall include the feminine and neuter genders and vice versa, and words importing individuals shall include Persons and vice versa, in each case, as the context so requires.

(d)    The calculation of time within which or following which any act is to be done or step is to be taken pursuant to this Agreement excludes the date that is the reference day in calculating such period.

(e)    Unless specified otherwise, whenever anything is required to be done or any action is required to be taken hereunder on or by a day that is not a Business Day, then such thing may be validly done and such action may be validly taken on or by the next succeeding day that is a Business Day.

9

(f)     Accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles as employed in the United States of America ("**GAAP**"). Wherever in this Agreement reference is made to a calculation to be made in accordance with GAAP, such reference shall be deemed to be to GAAP from time to time applicable as at the date on which such calculation is made or required to be made in accordance with GAAP.

(g)     As used in this Agreement, reference to dollar amounts, unless otherwise specifically indicated, shall mean the lawful money of the United States of America.

(h) The terms "include," "includes" and "including" mean including without limiting the generality of any description preceding such term, and, for purposes of this agreement, the rule of *ejusdem generis* shall not be applicable to limit a general statement that follows an enumeration of specific matters, to matters similar to the matters specifically enumerated.

(i) All references to Articles, Sections, Subsections, Appendices, Exhibits or Schedules in this Agreement are to Articles, Sections, Subsections, Appendices, Exhibits or Schedules of or to this Agreement unless otherwise specified.

## ARTICLE 2.    PURCHASE AND SALE OF APA ASSETS

2.1    <u>Designated Assets</u>.    Upon the terms and subject to the conditions of this Agreement and the Sale Order, at and as of the Effective Time, pursuant to sections 105 and 363 of the Bankruptcy Code, Hilco and Sellers hereby designate Agent to serve as their exclusive Agent for purposes of conducting the Store Closing Sale and selling, transferring, pursuing or otherwise disposing of the Designated Assets, free and clear of all Liabilities and Encumbrances, subject to and in accordance with the terms and conditions of this Agreement and the Agency Agreement.  "**<u>Designated Assets</u>**" means the following:

(a)     all Merchandise of Sellers in the Closing Stores and Distribution Center Merchandise received at the Closing Stores no later than fourteen (14) days after the Initial Closing Date (<u>provided</u> that the sale of Merchandise shall be subject to and in accordance with the terms of the Agency Agreement);

(b)     all Personal Property owned by the Sellers and located at (or in the vicinity of) the Closing Stores; and

(c)     all Cash physically held at any the Closing Stores as of the Initial Closing Date.

2.2    <u>Purchase of the Acquired Assets</u>.  Upon the terms and subject to the conditions of this Agreement, at and as of the Effective Time, (i) on the Initial Closing Date and throughout the Designation Rights Period, the Agent shall have the right to designate one or more Designated Purchasers to purchase and accept one or more Acquired Assets and (ii) the Sellers shall sell, transfer, convey, assign and deliver to each such Designated Purchaser designated by Agent, free and clear of all Liabilities (other than Assumed Liabilities) and Liens (other than Permitted Encumbrances), and each Designated Purchaser shall purchase and accept from the

10

Sellers, all right, title and interest of the Sellers in and to all tangible and intangible rights, properties and assets of every nature, kind and description, used or useful in the Business, wheresoever located, whether arising by contract, Law or otherwise, and whether or not carried or reflected on the Books and Records, as the same may exist at the Effective Time, including such rights, properties and assets hereafter acquired by the Sellers but excluding the Designated Assets and the Excluded Assets (collectively, the "**Acquired Assets**") so designated by Agent. Without limiting the generality of the foregoing and except for the Designated Assets and Excluded Assets, the Acquired Assets shall include all right, title and interest of the Sellers in and to the following as the same may exist at the Effective Time:

(a)    All Contracts, including the Leased Real Property, listed or described on **Appendix II** (as may be amended from time to time during the Designation Rights Period, collectively, the "**Assumed Contracts and Leases**");

(b)    All pre-paid expenses, prepayments, security deposits and other deposits included in prepaid assets relating to the Assumed Contracts and Leases (excluding deposits relating to Excluded Contracts and Leases), or rights of payment with respect thereto (including rights to insurance proceeds);

(c)    All Merchandise at the Specified Stores and all other Inventory (but, expressly excluding Merchandise in Section 2.1(a));

(d)    All Intellectual Property Rights, including all trademarks, trade names, patents and domain names owned by the Sellers and all Software owned or licensed by the Sellers (including related documentation), except for the Retained IP;

(e)    All telephone and facsimile numbers at each Designated Store;

(f)    All Books and Records relating to other Acquired Assets (other than the Retained Books and Records);

(g)    To the extent transferable, all Permits, including any pending applications for or with regard to any Permit, with respect to a Specified Store;

(h)    All guarantees, warranties, indemnities and similar rights in favor of the Sellers;

(i)    All Cash physically held at any Specified Stores as of the Initial Closing Date;

(j)    All refunds of insurance premiums to be paid by the Sellers to the Designated Purchaser pursuant to Section 8.3; and

(k)    All rights of Sellers to receive proceeds of cash collateral that secure the letters of credit listed on Schedule 2.2(l) as of the Closing Date totaling approximately $12,500,000.00.

2.3    Excluded Assets.    Notwithstanding anything to the contrary contained herein, including in Section 2.1 and 2.2, the Sellers shall retain all of their right, title and interest in and

to, and shall not transfer to the Designated Purchaser, the following (collectively, the "**Excluded Assets**"):

(a)    All Contracts and leases other than the Assumed Contracts and Leases (collectively, the "**Excluded Contracts and Leases**") and deposits relating thereto;

(b)    All Cash (but expressly excluding Cash referenced in Sections 2.1 and 2.2 and all Cash or other proceeds generated from the sale or other disposition of the Designated Assets and Acquired Assets from and after the Effective Time);

(c)    All Tax refunds, carry forwards or carry backs;

(d)    All Rights of Action; provided, that Sellers, and any successor-in-interest thereto, shall notify and obtain consent from Designated Purchaser in advance of commencing any action against a party listed on Appendix II as may be amended from time to time during the Designation Rights Period;

(e)    All Personal Property not included in Section 2.1(b).

(f)    All intellectual property (including the domain name and/or any trademarks) relating to chefs.com ("**Retained IP**");

(g)    All Retained Books and Records (but the Sellers shall provide reasonable access to Retained Books and Records reasonably requested by Sellers for operation of the Business after the Closing Date);

(h)    This Agreement and all other agreements between the Sellers on the one hand and Hilco, Agent or a Designated Purchaser on the other hand entered into on or after the date of this Agreement; and

(i)    A deposit held by Bank of America to support gift cards and credit card chargebacks in the approximate amount of $1.2 million.

(j)    All insurance policies maintained by the Sellers.

2.4    Assumed Liabilities.  At and as of the Effective Time, a Designated Purchaser shall assume **only** the following Liabilities of the Sellers (collectively, the "**Assumed Liabilities**"):

(a)    All Liabilities accruing or due to be performed from and after the Effective Time pursuant to or in respect of all Assumed Contracts and Leases to the extent the Bankruptcy Court authorizes assumption and assignment of such contracts;

(b)    All Liabilities arising after the Effective Time out of the ownership of the Acquired Assets;

(c)    50% of all Liabilities for Transaction Taxes under Section 4.4(a) hereof; and

(d)    All Liabilities for the portion of Periodic Taxes for which a Designated

Purchaser is liable under Section 4.4(b).

2.5     Excluded Liabilities.  Except with respect to the Assumed Liabilities, Hilco, the Agent, and each Designated Purchaser do not and shall not be deemed to assume or be liable for or bound by any Liabilities of the Sellers (whether or not asserted, scheduled or evidenced by a filed proof of claim or other form of writing evidencing such claim filed in the Bankruptcy Case, whether secured, priority, administrative or unsecured, or whether accruing prior to or after the commencement of the Bankruptcy Case or the Initial Closing Date) (such Liabilities, collectively, the "**Excluded Liabilities**"). For the avoidance of doubt and without intending to limit the generality or effect of the foregoing, the Excluded Liabilities shall include the following Liabilities of the Sellers:

(a)     Subject to payment of Cure Amounts in Section 2.6, all Liabilities under the Assumed Contracts and Leases accruing prior to the Effective Time;

(b)     All Liabilities under the Excluded Contracts and Leases or in respect of any other Excluded Asset, in each case whether accruing prior to, at or after the Effective Time; and

(c)     All Liabilities for the portion of Periodic Taxes for which the Sellers are liable under Section 4.4(b).

2.6     Assumed Contracts and Leases; Cure Amounts.  The applicable Designated Purchaser shall pay all Cure Amounts in respect of the Assumed Contracts and Leases on the earlier of (i) the applicable Closing (including, if applicable, the Initial Closing) and (ii) the last day of the Designation Rights Period. Nothing in this Agreement or any Other Transaction Document, nor the consummation of the Proposed Transactions, shall be construed as an attempt or agreement to assign any Assumed Contract and Lease unless and until the Designated Purchaser shall have paid the Cure Amount with respect to such Assumed Contract and Lease.

## ARTICLE 3.   CONSIDERATION

3.1     Consideration.  The purchase price payable by Hilco to the Sellers (the "**Purchase Price**") in consideration of the right to sell the Designated Assets and the sale, transfer, conveyance, assignment, and delivery of the Acquired Assets to the Designated Purchaser(s), and in reliance upon the representations, warranties, covenants and agreements of the Sellers set forth herein, is an amount equal to $32,063,686.00 (the "**Unadjusted Purchase Price**"), (a) less the Deposit, and (b) plus or minus the Merchandise Purchase Price Adjustment. As additional consideration for the transfer of the Acquired Assets to the Designated Purchasers hereunder, a Designated Purchaser shall assume the related Assumed Liabilities pursuant to Section 2.3.

3.2     Deposit. Hilco has delivered the Deposit.

3.3     Purchase Price Escrow.

(a)     On the Initial Closing Date, Hilco shall pay the Sellers an amount equal to 85% of the Unadjusted Purchase Price, less the Deposit (the "**Initial Purchase Price Payment**").

(b)      On the Initial Closing Date, Hilco shall deliver into escrow with the Escrow Agent an amount equal to fifteen percent (15%) of the Unadjusted Purchase Price (the "**Escrow Amount**").  The Escrow Agent shall act as escrow agent and hold, safeguard and disburse the Escrow Amount pursuant to the terms and conditions of this Agreement and an Escrow Agreement by and among Purchaser, Sellers, and the Escrow Agent (the "**Escrow Agreement**"). The Escrow Amount shall not be subject to any Lien or attachment of any creditor of any party hereto and will be used solely for the purposes and subject to the conditions set forth in this Agreement and the Escrow Agreement.  The Escrow Amount shall not be commingled with any other funds. The Sellers and Hilco shall use their commercially reasonable best efforts to cause the Escrow Agent to execute and become a party to this Agreement solely for purposes of this Section 3.3 and 11.2.

(c)      After issuance of the Merchandise Report, the Sellers and Hilco shall jointly instruct the Escrow Agent to release the Escrow Amount to the appropriate Person(s) pursuant to Section 3.5(k) hereof.

3.4      Purchase Price Allocation.  Seventy-five days following the Initial Closing, Hilco and the Sellers shall agree upon a statement (the "**Allocation Statement**") setting forth the value of the APA Assets that shall be used for the allocation of the Purchase Price (together with the Assumed Liabilities) among the APA Assets. The Allocation Statement shall be determined in accordance with Section 1060 of the Code and the applicable Treasury Regulations. The Sellers and each Designated Purchaser shall report an allocation of such Purchase Price among the APA Assets in a manner entirely consistent with the Allocation Statement and shall act in accordance with such Allocation Statement in the preparation of financial statements and filing of all Tax Returns (including filing Internal Revenue Service Form 8594 with its federal income tax return for the taxable year that includes the Closing Date) and in the course of any Tax audit, Tax review or Tax litigation matter relating hereto. Nothing in the Allocation Statement shall be binding upon creditors of the Sellers or in any way bind any party in interest to the Bankruptcy Case.

3.5      Merchandise Taking.   Commencing as promptly as practicable following the Initial Closing Date, Sellers and Agent shall cause to be taken a SKU level Cost Value and Retail Price physical inventory of all Merchandise at 30 Stores (the "**Taking Stores**") as described in this Section 3.5 (collectively, the "**Merchandise Taking**").  Agent and Sellers shall each select 15 Taking Stores.   The results of the Merchandise Taking at the Taking Stores (e.g., Merchandise overages (if any), underages (if any), and other adjustments (if any) shall be averaged and extrapolated to the Merchandise in the Stores that are not Taking Stores and shall be included in the Merchandise Report; provided, however, that the Merchandise Date for purposes of Gross Rings for each Taking Store shall be the date of the Merchandise Taking at the last Taking Store.

(a)      The Merchandise Taking shall be completed in each of the Taking Stores and the Distribution Center as soon as practicable (the date of the Merchandise Taking at each Taking Store being the "**Merchandise Date**" for each Store), but in any event no

later than twenty-one (21) days after the Initial Closing Date (subject to the availability of
the Merchandise Taker); Merchandise located in Merchant's Distribution Center or in-
transit from the Distribution Center to a Taking Store that arrives after the Merchandise
Date for such Taking Store shall be counted by Sellers and Agent upon receipt at such
Store.

(b)    The Merchandise Taker will conduct the physical inventory in accordance
with such procedures and instructions as are consistent with the usual and customary
practices of the industry or as may otherwise be mutually and reasonably agreed upon by
the Merchandise Taker, Sellers, and Agent, and otherwise in accordance with the terms
and conditions of this Section 3.5.  Sellers and the Agent shall each be entitled to have
advisors present during the Merchandise Taking and to review, reconcile, and verify the
listing and tabulation of the Merchandise Taker (after review, reconciliation and mutual
written verification thereof by Agent and Sellers, the "**Merchandise Report**"), and the
fees and expenses of the Merchandise Taker shall be borne fifty percent (50%) by Agent
and fifty percent (50%) by the Sellers.  Sellers and Agent will direct the Merchandise
Taker to deliver the Merchandise Report no later than seven (7) calendar days, if
practicable, after the completion of the Merchandise Taking.

(c)    Sellers and Agent may (but shall not be required to) agree that during the
conduct of the Merchandise Taking the Taking Stores (or any section thereof) shall be
closed to the public, and no sales or other transactions shall be conducted within the
applicable Store.  Sellers and Agent further agree that until the Merchandise Taking in a
particular Store is completed, neither the Sellers nor Agent shall: (i) move Merchandise
within or about the Taking Store so as to make any such items unavailable for counting as
part of the Merchandise Taking; or (ii) remove or add any hang tags, price tickets,
inventory control tags affixed to any Merchandise or any other kind of in-store pricing
signage within the Taking Store.  Sellers agree to cooperate with Merchandise Taker and
Agent to conduct the Merchandise Taking (including by making available to
Merchandise Taker and Agent information relating to sales, units, costs, Cost Value, and
Retail Price, and making available to Merchandise Taker and Agent Merchant's books,
records, work papers and personnel to the extent reasonably necessary to calculate the
Cost Value and Retail Price of the Merchandise).  The Parties agree that the Merchandise
Taking will commence at a time that will minimize the number of hours that the Taking
Stores will be closed for business.

(d)    At each Taking Store, for the period from the Initial Closing Date until the
Merchandise Date for such Store, Sellers and Agent shall jointly keep (i) a strict count of
gross register receipts less applicable sales taxes but excluding any prevailing Store
Closing Sale discounts ("**Gross Rings**"), and (ii) cash reports of sales within such Taking
Store.  Register reports shall show for each item sold the Cost Value and Retail Price for
such item and the markdown or discount, if any, specifically granted by the Agent.  All
such records and reports shall be made available to Sellers and Agent during regular
business hours upon reasonable notice.  Any Merchandise sold using the Gross Rings
method shall be included as Merchandise, and all Merchandise sold during the Gross
Rings period shall be included in the Merchandise Report at its applicable Cost Value

(without taking into account any of Agent's point of sale discounts or point of sale markdowns).

(e)    The Merchandise Report shall not include Inventory that (i) is Excluded Defective Merchandise; (ii) is not transferable under applicable Law; (iii) belongs to sublessees or concessionaires of Sellers; (iv) any Intventory received at the Stores after the Receipt Deadline; or (v) consists of raw materials, work in process, supplies, or material used or consumed in connection with the Business (collectively, the "**Excluded Goods**"), in each case, determined as mutually agreed upon by Sellers and Agent in accordance with usual and customary practices of the industry.

(f)    The Merchandise Report shall include all Merchandise in the Stores, excluding the Excluded Goods, and shall be supplemented to include all Distribution Center Merchandise that is received at a Store after the applicable Merchandise Date, but on or before fourteen (14) days after the Initial Closing Date.

(g)    Sellers and Agent estimate that the aggregate Cost Value of the Merchandise to be included in the Sale will be $39.9 million (the "**Estimated Merchandise Value**").  To the extent that the actual Merchandise Value is higher or lower than the Estimated Merchandise Value, then the Purchase Price shall be increased (if the actual Merchandise Value is higher than the Estimated Merchandise Value) or decreased (if the actual Merchandise Value is lower than the Estimated Merchandise Value), as applicable, on a dollar for dollar basis equal to the amount of such difference.

(h)    If the ratio of the aggregate Cost Value of the Merchandise to the aggregate Retail Price of the Merchandise is a percentage greater than the Cost Factor Threshold, then the Purchase Price shall be reduced in accordance with Schedule 3.5(h) (the cumulative adjustment of Sections 3.5(g) and 3.5(h) corresponding effect on the Purchase Price, the "**Merchandise Purchase Price Adjustment**").

(i)    The Merchandise Report prepared by the Merchandise Taker shall be prepared in accordance with the usual and customary practices, policies and procedures of Sellers and shall show, among other things, the aggregate Cost Value and Retail Price determined in the manner provided above.

(j)    From and after the date of this Agreement, neither Sellers nor any Person acting on behalf or direction of Sellers shall transfer or cause to be transferred any Merchandise or Personal Property located at Stores prior to, on or after the date of this Agreement to any of the Stores or the Distribution Center.

(k)    If the net effect of the Merchandise Purchase Price Adjustment is an increase in the amount of the Purchase Price, then within five (5) Business Days after the issuance of the Merchandise Report, (i) Agent shall pay such increased Purchase Price amount to Sellers, and Sellers and Agent will instruct the Escrow Agent to deliver the entire Escrow Amount to Sellers.  If the net effect of the Merchandise Purchase Price Adjustment is a decrease in the amount of the Purchase Price, then within five (5) Business Days after the issuance of the Merchandise Report, Sellers and Agent will

instruct the Escrow Agent to (i) deliver to Agent an amount equal to such Purchase Price reduction and (ii) deliver the remainder of the Escrow Amount to Sellers (provided that if such Purchase Price reduction exceeds the amount of the Escrow Amount, then Agent shall be entitled to receive the entire Escrow Amount in sole satisfaction of such Purchase Price reduction).

## ARTICLE 4. CLOSINGS

4.1     Closings.  The (i) initial consummation of the Proposed Transactions (the "**Initial Closing**") shall take place on earlier of (i) the first Business Day following the satisfaction or waiver of all conditions set forth in Article 9 (other than those conditions that by their terms are to be satisfied at the Initial Closing) and (ii) April 28, 2023 (the "**Initial Closing Date**") and (ii) each subsequent consummation of the Proposed Transactions (each a "**Closing**") with respect to one or more Acquired Assets shall take place on the first Business Day following the satisfaction or waiver of all conditions set forth in Article 9 (other than those conditions that by their terms are to be satisfied at the Closing) (each a "**Closing Date**") with respect to such Acquired Assets, in each case commencing at 10:00 a.m. at the offices of Munsch Hardt Kopf & Harr, P.C., 500 N. Akard St., Suite 3800, Dallas, Texas 75201 and/or remotely by exchange of documents and signatures (or their electronic counterparts), or at such other time, place and date as may be mutually agreed upon by Hilco and each Designated Purchaser and the Sellers. Each Closing will be effective as of 12:01 a.m. ("**Effective Time**") on the Initial Closing Date or applicable Closing Date, as applicable.  In connection with each subsequent Closing, Sellers, Hilco and each Designated Purchaser shall deliver the appropriate documents contemplated by sections 4.2 and 4.3 for the applicable Acquired Assets and Assumed Contracts and Leases.

4.2     The Sellers' Deliveries.  At or prior to the Initial Closing, the Sellers shall deliver to Hilco, the Agent, and each Designated Purchaser, as applicable, the Designated Assets and Acquired Assets, free and clear of all Liens (other than Permitted Encumbrances) and Liabilities (other than Assumed Liabilities), and the following:

(a)     Bill of Sale. The Bill of Sale duly executed by the Sellers and notarized;

(b)     Assignment and Assumption Agreement.  The Assignment and Assumption Agreement pertaining to the Assumed Contracts and Leases duly executed by the Sellers, substantially in the form of **Exhibit D** (the "**Assignment and Assumption Agreement**");

(c)     Intellectual Property Assignment.  The Trademark, Patent and Domain Name Assignment duly executed by the Sellers, substantially in the form of **Exhibit E**, covering the assignment of the registered trademarks, service marks, patents, domain names and other Intellectual Property Rights included in the Acquired Assets (the "**Intellectual Property Assignment**");

(d)     Titles to Vehicles. Titles and licenses to any vehicles or rolling stock owned by the Sellers and included in the Acquired Assets duly endorsed and notarized;

(e)     FIRPTA. A non-foreign affidavit of the Sellers (and/or its tax-paying parent if any of the Sellers is a disregarded entity under the Code) dated as of the Closing

17

Date in form and substance as required under the Treasury Regulations issued pursuant to Section 1445 of the Code;

(f)    <u>Bankruptcy Filings</u>. Copy, as entered in the Bankruptcy Case, of the Sale Approval Order; and

(g)    <u>Agency Agreement</u>.  The Agency Agreement duly executed by the Sellers.

(h)    <u>Other Documents and Instruments</u>. Such other endorsements, assignments, assumptions, instruments and documents as may be reasonably requested by Hilco, the Agent, and each Designated Purchaser, as applicable, to consummate the Proposed Transactions, each in form and substance reasonably satisfactory to Hilco, the Agent, and each Designated Purchaser, as applicable, and its counsel (including such other endorsements, assignments, assumptions, instruments and documents as may be reasonably requested by Hilco, the Agent, and each Designated Purchaser, as applicable,'s senior lenders and their counsel).

4.3    <u>Hilco's & Designated Purchaser(s)' Deliveries</u>.  At or prior to the Initial Closing, Hilco shall deliver to the Sellers the following:

(a)    <u>Purchase Price</u>. By wire transfer of immediately available funds, an amount, if any, required to be made by Hilco pursuant to Section 3.3(a) and (b);

(b)    <u>Assignment and Assumption Agreement</u>. The Assignment and Assumption Agreement pertaining to the Assumed Contracts and Leases duly executed by each Designated Purchaser;

(c)    <u>Intellectual Property Assignment</u>. The Intellectual Property Assignment duly executed by each Designated Purchaser;

(d)    <u>Agency Agreement</u>. The Agency Agreement duly executed by the Agent;

(e)    <u>Other Documents and Instruments</u>. Such other endorsements, assignments, assumptions, instruments and documents as may be reasonably requested by the Sellers to consummate the Proposed Transactions, each in form and substance reasonably satisfactory to the Sellers and their counsel; and

(f)    <u>Expenses</u>.  By wire transfer of immediately available funds, an amount necessary to prefund May rent as an Expense under the Agency agreement.

4.4    <u>Taxes</u>.

(a)    <u>Transaction Taxes</u>. Any Taxes that may be payable by reason of the sale of the Acquired Assets under this Agreement in the Proposed Transactions (including any transfer, sales, use, value added, gross receipts, stamp, duty, stamp duty, documentary, registration, business and occupation and other similar taxes) ("**Transaction Taxes**") shall be split equally by the applicable Designated Purchaser, on the one hand, and the Sellers, on the other hand, regardless of whether any Tax authority seeks to collect such Taxes from the Sellers or any Designated Purchaser. Notwithstanding the foregoing, in

18

no event shall any party to this Agreement be responsible for the Taxes based on net income, margin or gain of the other party or parties that arises as a consequence of the consummation of the Proposed Transactions.

(b)     Tax Prorations. As to any Acquired Assets acquired by each Designated Purchaser, the Sellers and each Designated Purchaser shall apportion the liability for real and personal property taxes and ad valorem Taxes ("**Periodic Taxes**") for all Tax periods including but not beginning or ending on the Initial Closing Date or subsequent Closing Date (the "**Proration Periods**"). The Periodic Taxes described in this Section 4.4(b) shall be apportioned between the Sellers and each Designated Purchaser as of the Initial Closing and each subsequent Closing, with each Designated Purchaser liable for that portion of the Periodic Taxes equal to the Periodic Tax for the Proration Period multiplied by a fraction, the numerator of which is the number of days remaining in the Proration Period from and after the Closing Date (including the Closing Date), and the denominator of which is the total number of days covered by such Proration Period. The Sellers shall be liable for that portion of the Periodic Taxes for the Proration Period for which each Designated Purchaser is not liable under the preceding sentence. At the Closing, Hilco shall receive a credit against the Unadjusted Purchase Price of the Sellers' portion of the Periodic Taxes that are due and payable during the relevant Proration Period on or after the Initial Closing and each subsequent Closing and, if applicable, each Designated Purchaser shall be charged with each such Designated Purchaser's portion of such Periodic Taxes that are due and payable (and have been paid) before the Closing Date. If the Initial Closing and each subsequent Closing shall occur before the tax rate is fixed, the apportionment of ad valorem taxes shall be upon the basis of the tax rate for the preceding year applied to the latest assessed valuation. If, after the Closing Date, Periodic Taxes for the Proration Periods are determined to be higher or lower than those that have been apportioned as set forth above, each such Designated Purchaser shall, as applicable, within 30 days of receiving the relevant tax bill, either pay the amount such Designated Purchaser owes the Sellers or provide an invoice to the Sellers of the amount the Sellers owe the Designated Purchaser, which amount the Sellers shall promptly thereafter pay to the Designated Purchaser as an administrative expense in the Bankruptcy Case. For purposes of this Section 4.4(b), the Proration Period for ad valorem taxes and real and personal property taxes shall be the fiscal period for which such taxes were assessed by the relevant tax jurisdiction.

## ARTICLE 5.    REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except as specifically set forth on the disclosure schedules attached to this Agreement ("**Disclosure Schedules**"), as a material inducement to Hilco to enter into this Agreement and consummate the Proposed Transactions, the Sellers hereby represent and warrant to Hilco, Agent, and each Designated Purchaser that the statements contained in this Article 5 are true and correct on the date hereof and as of the Initial Closing Date and each subsequent Closing Date. The Disclosure Schedules shall be arranged in sections and subsections corresponding to the numbered and lettered sections and subsections contained in this Article 5.

5.1     Organization.     The Sellers are duly organized, validly existing and in good standing under the laws of their respective states of formation, except as affected by the

pendency of the Bankruptcy Case, has all requisite power and authority to own, lease and operate its properties and to carry on the Business as it is now being conducted in the ordinary course. The Sellers are duly qualified to transact business and are in good standing in each jurisdiction where the character of its activities requires such qualification. The Sellers have heretofore made available to Hilco true, correct and complete copies of their organizational documents as are currently in effect.

5.2    Authorization.  Subject only to Bankruptcy Court approval pursuant to the Sale Approval Order, the Sellers have full power and authority to execute and deliver this Agreement and each agreement, document or instrument contemplated hereby (collectively, the "**Other Transaction Documents**") required to be delivered by them hereby or in connection herewith and to perform their obligations under this Agreement and the Other Transaction Documents required to be delivered by them hereby or in connection herewith and, subject to the requisite Governmental Authority authorizations set forth on **Schedule 5.2**, to consummate the Proposed Transactions. The execution and delivery by the Sellers of this Agreement and the Other Transaction Documents required to be delivered by them hereby or in connection herewith and the performance by the Sellers of their obligations hereunder and thereunder have been duly and validly authorized by all necessary action on the part of the Sellers. This Agreement and each of the Other Transaction Documents required to be delivered by the Sellers hereby or in connection herewith have been, or when executed and delivered will have been, duly executed and delivered by the Sellers and is, or once executed will be, the valid and binding agreement of the Sellers, enforceable against them in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and other similar Laws relating to or affecting the enforceability of creditors' rights generally, general equitable principles (regardless of whether enforcement is sought in a proceeding at law or in equity) and the discretion of the courts in granting equitable remedies.

5.3    Governmental Authority Authorizations and Other Consents.  Except as set forth on **Schedule 5.3**, (i) no other consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Authority or other Person is required in connection with the execution and delivery of this Agreement by the Sellers, and (ii) no consent, approval, order, authorization of, or registration, declaration or filing with any Governmental Authority or other Person is required in connection with the performance of this Agreement or the execution, delivery or performance by the Sellers of the Other Transaction Documents required to be delivered by it hereby or in connection herewith or the consummation by the Sellers of the Proposed Transactions and fulfillment of and compliance by the Sellers with the terms and conditions of this Agreement and the Other Transaction Documents required to be delivered by them hereby or in connection herewith.

5.4    Noncontravention.  Subject to the provisions of the Sale Approval Order and except as set forth on **Schedule 5.4**, neither the execution and delivery by the Sellers of this Agreement or any of the Other Transaction Documents required to be delivered by it hereby or in connection herewith, the performance by the Sellers of their obligations hereunder or thereunder, nor the consummation by the Sellers of the Proposed Transactions in accordance with the terms hereof, will, in any material respect, violate or conflict with, constitute a breach of or default under, result in the loss of any benefit under, or permit the acceleration or increase the amount or

scope of any obligation under any Law applicable to the Sellers or by which the Sellers or any of the Acquired Assets are bound, including any order of the Bankruptcy Court.

       5.5      <u>Litigation</u>.  Except as set forth on **Schedule 5.5** and except for Actions filed in the Bankruptcy Court, there are no Actions pending or, to the Knowledge of the Sellers, threatened in writing against the Sellers that questions or challenges (i) the validity of this Agreement or the Other Transaction Documents, (ii) any action taken or proposed to be taken by the Sellers pursuant to this Agreement or the Other Transaction Documents or in connection with the Proposed Transactions, or (iii) the Sellers' Intellectual Property Rights. Except as set forth on **Schedule 5.5** and except for Actions filed in the Bankruptcy Court, there are no Actions pending or, to the Knowledge of the Sellers, threatened in writing against the Sellers that involves or affects the Acquired Assets or the Business.

       5.6      <u>Compliance with Laws; Permits</u>.

       (a)      Except as excused by the Bankruptcy Code or Bankruptcy Court or otherwise in connection with the Bankruptcy Case or as disclosed on **Schedule 5.6(a)**, (i) the Sellers are not in material violation of any Laws relating to the Business or the Acquired Assets, (ii) the Sellers have not been notified in writing that they have been or may be charged with, and, to the Sellers' Knowledge, the Sellers have not been charged with or threatened in writing with any charge concerning, any material violation of any provision of any Law relating to the Business or the Acquired Assets that has not already been resolved and (iii) the Sellers are not in material violation of, or in default under, and no event has occurred which, with the lapse of time or the giving of notice, or both, would result in the material violation of or default under, the terms of any Governmental Order relating to the Acquired Assets or the Business.

       (b)      **Schedule 5.6(b)** sets forth a list of all Permits of a type other than the types enumerated in the first sentence of Section 5.6(c) held by the Sellers for the operation of the Business as currently conducted (collectively, the "**Business Permits**"). Except as set forth on **Schedule 5.6(b)**, all the Business Permits are valid and in full force and effect. Except as set forth on **Schedule 5.6(b)**, the Sellers are in compliance in all material respects with the Business Permits and no suspension or cancellation of any of the Business Permits is pending or, to the Knowledge of the Sellers, threatened. True, correct and complete copies of each Business Permit listed or required to be listed on **Schedule 5.6(b)** have been delivered or made available to each Designated Purchaser.

       (c)      The Sellers have all necessary zoning and use permits, construction and building permits and approvals and any other similar governmental and quasi-governmental authorizations relating to the construction, operation and use of the Leased Real Property of the Sellers (the "**Operation Permits**").  All of the Operation Permits were legally issued and are valid and in full force and effect.  All of the Operation Permits are listed on the attached **Schedule 5.6(c)**. Except as set forth on **Schedule 5.6(c)**, the Sellers are in compliance in all material respects with the Operation Permits and no suspension or cancellation of any of the Operation Permits is pending or, to the Knowledge of the Sellers, threatened. True, complete and correct copies of each Operation Permit have been delivered or made available to each Designated Purchaser.

5.7     Title to Acquired Assets.  Except as set forth on **Schedule 5.7**, the Sellers have good and marketable title to (or in the case of leased assets, valid and enforceable leasehold rights in), is the lawful owner or lessee of, and pursuant to the Sale Approval Order has the full right to sell, transfer, convey, assign and deliver, the Acquired Assets to be sold by the Sellers free and clear of all Liabilities (other than Assumed Liabilities) and Liens (other than Permitted Encumbrances). No Affiliate of the Sellers has any interest in any of the Acquired Assets. At and as of the Closing, the Sellers will convey to the Hilco, Agent, and each Designated Purchaser good and marketable title to (or in the case of leased assets, valid and enforceable leasehold rights in) the Acquired Assets free and clear of all Liabilities (other than Assumed Liabilities) and Liens (other than Permitted Encumbrances).

5.8     Validity of Contracts.

(a)     There are no Actions pending or, to the Knowledge of the Sellers, threatened in writing by or against the Sellers that question or challenge the validity of any Assumed Contract and Lease. Each Assumed Contract and Lease is valid, binding and enforceable against the parties thereto in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and other similar Laws relating to or affecting the enforceability of creditors' rights generally, general equitable principles (regardless of whether enforcement is sought in a proceeding at law or in equity) and the discretion of the courts in granting equitable remedies.

(b)     Except as excused by the Bankruptcy Code or Bankruptcy Court or otherwise in connection with the Bankruptcy Case, the Sellers have duly performed all of their material obligations under each Assumed Contract and Lease to the extent that such obligations to perform have accrued, and no material breach or default, or, to the Sellers' Knowledge, alleged material breach or default or event that would (with the passage of time, notice or both) constitute a material breach or default by the Sellers has occurred thereunder.

(c)     Except as excused by the Bankruptcy Code or Bankruptcy Court or otherwise in connection with the Bankruptcy Case, to the Knowledge of the Sellers, no material breach or default or event that would (with the passage of time, notice or both) constitute a material breach or default by any third party has occurred with respect to the Assumed Contracts and Leases.

(d)     The Sellers have delivered or made available to each Designated Purchaser a true, correct and complete copy of all Assumed Contracts and Leases and all amendments or modifications thereto.

5.9     Environmental Matters.

(a)     Except as set forth on **Schedule 5.9(a)**, the Sellers are in compliance in all material respects with all applicable Environmental Laws, and there are no written or, to the Knowledge of the Sellers, verbal claims pursuant to any Environmental Laws pending or, to the Knowledge of the Sellers, threatened, against the Sellers in connection with the conduct or operation of the Business or the ownership or use of the Acquired Assets.

22

(b)     Except as set forth on **Schedule 5.9(b)**, there are no material Liabilities under any Environmental Law with respect to the Sellers' Leased Real Property or operation of the Business. Except as set forth on **Schedule 5.9(b)**, neither the Sellers nor, to the Knowledge of the Sellers, any other Person has used the Sellers' Leased Real Property or the Business for the manufacture, handling, transportation, treatment, storage or disposal of Hazardous Substances except in the ordinary course of business in material compliance with Environmental Law. Except as set forth on **Schedule 5.9(b)**, to the Knowledge of the Sellers, the Sellers do not own and/or operate nor have the Sellers owned and/or operated underground or aboveground storage tanks that store or have stored any Hazardous Substance on any of the Sellers' Leased Real Property, there have been no releases of any Hazardous Substances on or from, nor are there any Hazardous Substances on, at, or under any of the Sellers' Leased Real Property or related to Sellers' operation of the Business that violate any applicable Environmental Law, including violations that require notification to any Governmental Authority or require any response action pursuant to any applicable Environmental Law.

5.10    <u>Financial Advisors</u>.   Neither Hilco, nor the Agent, nor any Designated Purchaser is or will become obligated to pay any fee or commission or like payment to any lawyer, broker, finder or financial advisor as a result of the consummation of the Proposed Transactions based upon any arrangement made by or on behalf of Sellers.

5.11    <u>Inventory</u>.   The Inventory as a whole is of a quantity and quality historically useable or saleable in the conduct of the Business. All Inventory other than Excluded Goods is free from defects in materials and workmanship (normal wear and tear excepted), except as would not be material to the Business.

## ARTICLE 6.    REPRESENTATIONS AND WARRANTIES OF HILCO

Except as specifically set forth on the Disclosure Schedules attached to this Agreement, as a material inducement to the Sellers to enter into this Agreement and consummate the Proposed Transactions, Hilco hereby represents and warrants to the Sellers that the statements contained in this Article 6 are true and correct on the date hereof and as of the Initial Closing Date. The Disclosure Schedules will be arranged in sections and subsections corresponding to the numbered and lettered sections and subsections contained in this Article 6.

6.1    <u>Organization</u>.   Hilco is an limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has all the requisite power and authority to own, operate and lease its properties and to carry on its business as it is now being conducted.

6.2    <u>Authorization</u>.   Hilco has full power and authority to execute and deliver this Agreement and the Other Transaction Documents required to be delivered by it hereby or in connection herewith, to perform its obligations under this Agreement and the Other Transaction Documents required to be delivered by it hereby or in connection herewith and to consummate the Proposed Transactions. The execution and delivery by the Hilco/Agent of this Agreement and the Other Transaction Documents required to be delivered by it hereby or in connection herewith and the performance by Hilco/Agent of its obligations hereunder and thereunder have

been or will be duly and validly authorized by all necessary action on the part of Hilco/Agent. This Agreement and each of the Other Transaction Documents required to be delivered by Hilco/Agent hereby or in connection herewith have been, or when executed and delivered will have been, duly executed and delivered by Hilco/Agent and is, or once executed will be, the valid and binding agreement of Hilco/Agent, enforceable against it in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and other similar Laws relating to or affecting the enforceability of creditors' rights generally, general equitable principles (regardless of whether enforcement is sought in a proceeding at law or in equity) and the discretion of the courts in granting equitable remedies.

6.3     Noncontravention.   Except as would not result in a material adverse effect on Hilco/Agent's ability to consummate the transactions contemplated hereby, none of the execution and delivery by Hilco/Agent of this Agreement or any of the Other Transaction Documents required to be delivered by it hereby or in connection herewith, the performance by Hilco/Agent of its obligations hereunder or thereunder, nor the consummation by Hilco/Agent of the Proposed Transactions, will violate or conflict with, constitute a breach of or default under, result in the loss of any benefit under, or permit the acceleration or increase the amount or scope of any obligation under, (i) the certificate of formation, operating agreement or any other organizational document, as the case may be, of Hilco/Agent, (ii) any Contract to which Hilco/Agent is a party or by which Hilco/Agent (or any of its respective properties or assets or the Acquired Assets) is subject or bound, (iii) any Governmental Order to which Hilco/Agent is party or by which Hilco/Agent or any of its properties or assets or any of the Acquired Assets is bound, or (iv) any Law applicable to Hilco/Agent or by which Hilco/Agent or any of its properties or assets are bound.

6.4     Solvency; Availability of Funds.

(a)     As of the Initial Closing and immediately after consummating the Proposed Transactions, Hilco/Agent will not be insolvent (either because of its financial condition is such that the sum of its debts is greater than the fair value of its assets or because the present fair value of its assets will be less than the amount required to pay its probable liabilities on its debts as they become absolute and matured).

(b)     Hilco/Agent has or will have at the Closing sufficient funds to pay the Initial Purchase Price Payment and deposit with the Escrow Agent the Escrow Amount in full at the Initial Closing and consummate the Proposed Transactions.

(c)     Each Designated Purchaser has or will have at Closing sufficient access to capital to satisfy the Assumed Liabilities.

## ARTICLE 7.   PRE-CLOSING COVENANTS

The parties hereto agree as follows with respect to the period prior to the Closing:

7.1     Conduct of Business.   Except as otherwise expressly contemplated by this Agreement or with the prior written consent of Hilco, prior to the Initial Closing the Sellers shall:

(a)     conduct the Business with respect to the Acquired Assets in the ordinary

course of business in accordance with prior practices;

(b)    maintain insurance upon all of the Acquired Assets in such amounts and of such kinds comparable to that in effect on the date of this Agreement;

(c)    use their commercially reasonable efforts to (i) preserve the present business operations, organization, and goodwill of the Business with respect to the Acquired Assets, and (ii) preserve the present relationships with customers, employees, and suppliers of the Business with respect to the Acquired Assets;

(d)    not renew, amend or voluntarily terminate any Assumed Contract or Lease set forth on Appendix II;

(e)    not sell, encumber or grant any Lien or other right with respect to the Acquired Assets;

(f)    use "liquidation" sales or use "brand sale", "going out of business", "out of business", "going out of business sale", "we quit", "quitting business", or "liquidation/liquidating", "store closing", "sale on everything", "everything must go", or similar language or theme;

(g)    offer, promote, advertise, or market any (i) storewide promotion or storewide discount or offer or (ii) implement or continue any promotion or discount that is greater than what the Company offered last year during the same time period in a retail location that was not closing; and

(h)    not agree to do anything prohibited by this Section 7.1 or do or agree to do anything that would cause the Sellers' representations and warranties herein to be false in any material respect.

7.2    <u>Consummation of Transaction</u>.

(a)    Each of the Sellers, Hilco, Agent, and each Designated Purchaser shall use its reasonable best efforts to take, or cause to be taken, all actions, or do, or cause to be done, all things, necessary to consummate the Proposed Transactions as promptly as practicable, and neither the Sellers, Hilco, Agent, nor the Designated Purchaser shall take any action after the date hereof (other than any action required to be taken under this Agreement or to which the other shall have granted its consent) that could reasonably be expected to materially delay the consummation of the Proposed Transactions.

(b)    In furtherance and not in limitation of Section 7.2(a), the Sellers shall use their reasonable best efforts to obtain all consents and approvals of any Governmental Authority or any other Person (including Bankruptcy Court approvals) necessary in order to conduct the Store Closing Sale and transfer any of the Acquired Assets from the Sellers to each Designated Purchaser or otherwise to consummate the Proposed Transactions. Hilco/Agent and each Designated Purchaser shall cause its personnel and representatives to cooperate fully with the reasonable requests of the Sellers and its representatives, accountants and counsel in connection with obtaining such consents and approvals.

(c)     In furtherance and not in limitation of Section 7.2(a), each of the Sellers, Hilco/Agent and each Designated Purchaser shall use its reasonable best efforts to make and obtain approval of all filings with all Governmental Authorities for the issuance and/or transfer to each Designated Purchaser of the Permits necessary in order for the Designated Purchaser to operate the Business and own the Acquired Assets from and after the Effective Time. The Sellers shall cause its personnel and representatives to cooperate fully with the reasonable requests of Designated Purchaser and its representatives, accountants and counsel in connection with such issuance and/or transfer of such Permits.

7.3     <u>Bankruptcy Case</u>.

(a)     The Sellers shall, subject to the requirements and obligations under the Bankruptcy Code, approval of assignment by the Bankruptcy Court, and the payment by Designated Purchaser of Cure Amounts, assume all of their rights and obligations pursuant to the Assumed Contracts and Leases as of the Closing Date.

(b)     Each Designated Purchaser shall take the following actions in the Bankruptcy Case:

(i)     The Designated Purchaser shall use its reasonable best efforts to provide, as required under the Bankruptcy Code and the Bid Procedures Order, adequate assurance of the future performance of the Assumed Contracts and Leases by the Designated Purchaser.

(ii) The Hilco and Designated Purchaser shall promptly take all actions reasonably requested by the Sellers to assist in obtaining the Bankruptcy Court's entry of the Sale Approval Order, such as furnishing affidavits or other documents or information for filing with the Bankruptcy Court and making Hilco and Designated Purchaser's employees and representatives available to testify before the Bankruptcy Court.

7.4     <u>Notice of Noncompliance</u>.   The Sellers shall notify Hilco and Designated Purchaser in writing of any violations of Law by the Sellers of which they have Knowledge as soon as reasonably practicable after obtaining such Knowledge and shall use their commercially reasonable efforts to cure any such violations.

7.5     <u>Update of Disclosure Schedules</u>.  The Sellers shall, no later than 10 days prior to the Closing Date (other than the Initial Closing Date), supplement in writing the Disclosure Schedules with respect to any event, matter, condition or circumstance first arising after the date of this Agreement that, if existing or known as of the date of this Agreement, would have been required to be set forth or described in the Disclosure Schedules and that does not arise out of a breach by the Sellers of a covenant in this Article 7 (the "**<u>Update</u>**"), provided that the Update shall not be deemed to cure any breach of any representation or warranty of the Sellers made in this Agreement or have any effect on the satisfaction of the closing conditions set forth in Section 9.3.

7.6     <u>Employees</u>.

(a)    Unless a longer period is required by law, beginning 10 days prior to the Closing Date, each Designated Purchaser or its duly authorized representatives shall have the right to meet with and interview certain of the Sellers' employees designated as the top leaders of each division and/or team of Sellers' Business at any time and place mutually acceptable to each Designated Purchaser and such employee or employees. Neither Hilco, Agent, nor any Designated Purchaser is under any obligation to continue to employ any of the Sellers' employees, but may do so on terms mutually agreeable to Purchaser and each of Sellers' employees.

(b)    Sellers agree that any unpaid salaries, vacation and other employee benefits due and payable for the periods prior to the Initial Closing Date (or for such periods that become due and payable after the Initial Closing Date) to the Sellers' employees and all accrued payroll taxes with respect thereto shall be the responsibility of Sellers.  Liability for payment of employee wages and benefits following the Initial Closing Date shall be determined in accordance with the Agency Agreement.

## ARTICLE 8.    POST-CLOSING COVENANTS

8.1    <u>Further Assurances</u>.    At any time and from time to time from and after the Closing, the Sellers, Hilco, Agent, Designated Purchaser shall, at the request the other party, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, such instruments and other documents and perform or cause to be performed such acts and provide such information, as may reasonably be requested by such other party to evidence or effectuate the transactions contemplated hereunder.

8.2    <u>Access to Records After the Closing</u>.  From and after the Closing Date, each party hereto shall have reasonable access to inspect and copy all books and records relating to the Acquired Assets or the Assumed Liabilities that the other parties hereto may retain after the Closing Date. Such access shall be afforded by the party maintaining such records upon receipt of reasonable advance notice and during normal business hours. Nothing contained in this Section 8.2 shall require Hilco, Agent, Designated Purchaser, or the Sellers to retain any books or records longer than such books or records would be retained in the ordinary course of business; <u>provided</u>, <u>however</u>, that, if the party maintaining such books and records shall desire to dispose of any of such books and records, such party shall, prior to such disposal, give the other party a reasonable opportunity, at such other party's expense, to segregate and remove such books and records as such other party may select.

8.3    <u>Insurance</u>.  With respect to any insurance policy maintained by the Sellers, at the written request of such Designated Purchaser, the Sellers shall use their reasonable best efforts to ensure that Designated Purchaser shall have the right to make, or, if made prior to the Effective Time, to continue to pursue, directly any claim under such insurance policy relating to the Acquired Assets. If, notwithstanding the foregoing, Designated Purchaser itself does not have the right to make or continue to pursue any such claim directly, at the written request of Designated Purchaser, the Sellers shall use their reasonable best efforts to make or continue to pursue such claim under such insurance policy for the benefit of Designated Purchaser. Designated Purchaser acknowledges that any right of Designated Purchaser under this Section 8.3 shall be subject to any deductibles, exclusions and other terms of the applicable insurance policy. The Sellers shall

27

maintain all insurance policies in effect on the date hereof until the Closing Date. To the extent the Sellers terminate any such insurance policy after the Effective Time, all refunds of premiums made to the Sellers shall be an Acquired Asset and shall be paid by the Sellers to Designated Purchaser.

8.4   <u>Name Change</u>.  From and after the Effective Time, the Sellers and their Affiliates (if any) shall cease using the names set forth on **<u>Schedule 8.4</u>** or any derivation thereof.  Within 10 business days after the Closing Date, the Sellers shall amend their organizational and governing documents to change their names to a name not including or similar to the words "Tuesday Morning," "TMI," Friday Morning," "Days of the Week," or "Nights of the Week."

## ARTICLE 9.   CONDITIONS

9.1   <u>Conditions to Each Party's Obligations</u>.  The respective obligations of each party to consummate the Proposed Transactions shall be subject to the condition that, at the Initial Closing Date and each subsequent Closing Date:

(a)   <u>Sale Approval Order</u>. The Sale Approval Order shall have been entered in the Bankruptcy Case and shall be a Final Order.

(b)   <u>Initial Closing Date</u>. The Initial Closing Date shall have occurred on or prior to April 28, 2023.

(c)   <u>No Injunction</u>. There shall be no Governmental Order, or Action pending by or before any Governmental Authority to obtain a Governmental Order, to the effect that the Proposed Transactions may not be consummated as herein provided or otherwise seeking to prohibit or restrict the consummation of the Proposed Transactions;

(d)   <u>Allocation Schedule</u>.  The Sellers and Hilco shall have agreed upon the Allocation Schedule.

(e)   <u>No Threat of Injunction</u>. No written notice shall have been received from any Governmental Authority indicating an intent to restrain, prevent, materially delay or restructure the Proposed Transactions.

9.2   <u>Conditions to Obligations of the Sellers</u>.  The obligations of the Sellers to consummate the Proposed Transactions shall be subject to the fulfillment on or prior to the Closing Date of each of the following conditions (unless waived in writing by the Sellers in their absolute and sole discretion):

(a)   <u>Closing Deliveries</u>. Hilco, Agent, and/or Designated Purchaser, as applicable, shall have tendered or delivered to the Sellers the items listed in Section 4.3.

(b)   <u>Representations and Warranties of Hilco, Agent, nor any Designated Purchaser</u>. Each of the representations and warranties of Hilco, Agent, and/or Designated Purchaser set forth in Article 6 shall be true and correct in all material respects (other than such representations and warranties that are qualified as to materiality, which shall

28

be true and correct in all respects) as of the date of this Agreement, and shall be true and
correct in all material respects (other than such representations and warranties that
are qualified as to materiality, which shall be true and correct in all respects) at and as of the
Initial Closing Date and each subsequent Closing Date with the same force and effect as
though newly made as of that date.

(c)     Covenants of Hilco, Agent, and/or Designated Purchaser. Hilco, Agent,
and/or Designated Purchaser shall have performed in all material respects all of its
obligations under this Agreement, including payment of Cure Amounts, that, by the
terms of such obligations, are to be performed on or before the Closing Date.

(d)     Officer's Certificate. The Sellers shall have received a certificate duly
executed by a senior officer of Hilco, Agent, and/or Designated Purchaser, in a form
reasonably satisfactory to the Sellers, to the effect that each of the conditions specified in
Sections 9.2(b) and 9.2(c) have been satisfied.

9.3     Conditions to Obligations of Hilco, Agent, and/or Designated Purchaser.   The
obligations of Hilco, Agent, and/or Designated Purchaser to consummate the Proposed
Transactions shall be subject to the fulfillment on or prior to the Initial Closing Date and each
subsequent Closing Date of each of the following conditions (unless waived in writing by Hilco,
Agent, and each Designated Purchaser in its absolute and sole discretion):

(a)     Consents and Approvals; Permits. The Sellers shall have obtained the
consents and approvals listed on **Appendix III** and each Designated Purchaser shall have
obtained the Permits listed on **Appendix IV**.

(b)     Sale Approval Order. On or prior to the Closing Date, the Sale Approval
Order shall have remained in full force and effect and shall not have been stayed,
vacated, modified or supplemented in any material respect without Hilco's prior written
consent.

(c)     Closing Deliveries. On or prior to the Closing Date, the Sellers shall have
delivered to Hilco, the Agent, or Designated Purchaser, as applicable, the items set forth
in Section 4.2.

(d)     Representations and Warranties of the Sellers. Each of the representations
and warranties of the Sellers set forth in Article 5 shall be true and correct in all material
respects (other than such representations and warranties that are qualified as to
materiality, which shall be true and correct in all respects) as of the date of this
Agreement, and shall be true and correct in all material respects (other than such
representations and warranties that are qualified as to materiality, which shall be true and
correct in all respects) at and as of the Initial Closing Date and each subsequent Closing
Date with the same force and effect as though newly made as of that date.

(e)     Covenants of the Sellers. The Sellers shall have performed in all material
respects all of their obligations under this Agreement that, by the terms of such
obligations, are to be performed on or before the Initial Closing Date and each subsequent
Closing Date.

29

(f)    Officer's Certificate. Hilco, the Agent, or Designated Purchaser, as applicable, shall have received a certificate duly executed by a senior officer of the Sellers, in a form reasonably satisfactory to Hilco, the Agent, or Designated Purchaser, as applicable, to the effect that each of the conditions specified in Sections 9.3(d) and 9.3(e) have been satisfied.

(g)    Affiliate Agreements. Each Designated Purchaser shall have entered into agreements with the Sellers' Affiliates, if necessary, in order to facilitate such Purchaser's operation of the Business after the Closing.

## ARTICLE 10.    NO SURVIVAL; "AS IS/WHERE IS" SALE

10.1    No Survival of Representations and Warranties.    None of the representations, warranties, covenants or other agreements of the parties made herein or in any Other Transaction Document, nor any rights arising out of any breach of such representations, warranties, covenants or other agreements, shall survive the Initial Closing or Closing, as applicable, except for those covenants and agreements contained herein and therein, which, by their terms, contemplate performance in whole or in part after the Initial Closing/Closing, which shall survive in accordance with their terms.

10.2    "AS IS/WHERE IS" SALE.    EXCEPT AS EXPRESSLY SET FORTH IN ARTICLE 5, THERE ARE NO REPRESENTATIONS OR WARRANTIES OF ANY KIND (INCLUDING ANY REPRESENTATIONS OR WARRANTIES AS TO THE QUALITY OR FITNESS OF THE ACQUIRED ASSETS FOR THEIR INTENDED PURPOSES OR ANY PARTICULAR PURPOSE), EXPRESSED OR IMPLIED, WITH RESPECT TO THE ACQUIRED ASSETS OR THE ASSUMED LIABILITIES. HILCO, THE AGENT, AND EACH DESIGNATED PURCHASER, AS APPLICABLE, ACKNOWLEDGES THAT THE ACQUIRED ASSETS ARE BEING SOLD, TRANSFERRED, CONVEYED, ASSIGNED AND DELIVERED TO, AND PURCHASED AND ACCEPTED BY, HILCO, THE AGENT, AND EACH DESIGNATED PURCHASER, AS APPLICABLE, ON AN "AS IS/WHERE IS" BASIS.

## ARTICLE 11.    TERMINATION

11.1    Termination of Agreement.    This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Initial Closing:

(a)    by the mutual written consent of Hilco and the Sellers;

(b)    by either the Sellers or Hilco, upon written notice to the other, if the Proposed Transactions have not been consummated or if the Initial Closing Date has not occurred by April 28, 2023 ("**Termination Date**"), provided, however, that, if the failure to consummate the Proposed Transactions is due to material breach by the party attempting to terminate this Agreement, such party shall have no right to do so;

(c)    by either the Sellers or Hilco, upon written notice to the other, if a Governmental Authority issues a Final Order prohibiting the Proposed Transactions;

(d)      by Hilco or the Sellers, upon written notice to the other, if the Bankruptcy Court enters an order authorizing and approving an Alternative Transaction, unless Purchaser is the designated back-up bidder as determined in the Sale Approval Order;

(e)      by Hilco, upon written notice to the Sellers, if there shall be a material breach by the Sellers of any representation, warranty, covenant or agreement contained in this Agreement which would reasonably be expected to result in a failure of a condition set forth in Sections 9.3(d) or 9.3(e) to be satisfied, which breach has not been cured by the earlier of (i) 10 days after the giving of written notice by Hilco to the Sellers of such breach and (ii) the Termination Date; or

(f)      by the Sellers, upon written notice to Hilco, if there shall be a material breach by Hilco of any representation, warranty, covenant or agreement contained in this Agreement which would reasonably be expected to result in a failure of a condition set forth in Sections 9.2(c) or 9.2(d) to be satisfied, which breach has not been cured by the earlier of (i) 10 days after the giving of written notice by the Sellers to Hilco of such breach and (ii) the Termination Date.

11.2    Effect of Termination.    Upon the termination of this Agreement pursuant to Section 11.1, this Agreement, except this Section 11.2 and Article 12, shall become void and have no further effect and there shall be no liability hereunder on the part of the Sellers or Hilco with respect to this Agreement except in connection with its obligations set forth in such Sections and Articles.  Upon the termination of this Agreement for any reason, the Escrow Agent shall deliver to Hilco the Escrow Amount and the Sellers shall deliver to Hilco the Deposit; provided, however, that if this Agreement is terminated by the Sellers pursuant to Section 11.1(f), then the Sellers shall be entitled to retain the Deposit.

## ARTICLE 12.    MISCELLANEOUS PROVISIONS

12.1    Expenses.    Each party hereto will bear its own expenses in connection with the Proposed Transactions.

12.2    Public Announcements.    Other than statements made in the Bankruptcy Court (or in pleadings filed therein), Hilco and the Sellers shall consult with each other before issuing any press releases or making any public statement or other public communication with respect to this Agreement or the Proposed Transactions. Hilco and the Sellers shall not issue any such press release or make any such public statement or public communication without the prior written consent of the other party, which shall not be unreasonably withheld or delayed; provided, however, that either party hereto may, without the prior consent of the other party, issue such press release or make such public statement as may, upon the advice of counsel, be required by applicable Law, any Governmental Authority with competent jurisdiction or any listing agreement with any national securities exchange; provided, further, that the party intending to make such press release shall give the other party prior notice and shall use its commercially reasonable efforts consistent with such applicable Law or other obligation to consult with the other party with respect to the text thereof.  Notwithstanding the foregoing, Hilco/Agent is

31

hereby authorized to issue a customary press release announcing the commencement of the Store Closing Sale on the Initial Closing Date.

      12.3   <u>Amendment; Waiver</u>.  None of this Agreement or the Other Transaction Documents may be amended, modified or supplemented except by a written instrument signed by all parties hereto or thereto as the case may be. No waiver of any of the terms or provisions of this Agreement or any Other Transaction Document shall be effective unless set forth in a written instrument signed by the party granting such waiver. No waiver of any of the terms or provisions of this Agreement or any Other Transaction Document shall be deemed to be or shall constitute a waiver of any other term or provision hereof or thereof (whether or not similar), nor shall such waiver constitute a continuing waiver. No failure of a party hereto to insist upon strict compliance by the other party hereto with any covenant or agreement contained in this Agreement shall operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

      12.4   <u>Notices</u>.

      (a)   All notices, requests, demands or other communications required or permitted under this Agreement shall be in writing and mailed or delivered by facsimile transmission, hand or courier service:

|  |  |
|---|---|
| If to the Sellers, to: | Tuesday Morning Corporation<br>6250 LBJ Freeway<br>Dallas, TX 75240<br>Email: aberger@tuesdaymorning.com<br>Attn: Andrew Berger |
|  | With a copy, which shall not constitute notice, to: |
|  | legal@tuesdaymorning.com |
|  | Munsch Hardt Kopf & Harr, P.C.<br>500 N. Akard Street, Suite 3800<br>Dallas, TX 75201<br>Email: dperry@munsch.com<br>Attn: Deborah Perry |
|  | Munsch Hardt Kopf & Harr, P.C.<br>500 N. Akard Street, Suite 3800<br>Dallas, TX 75201<br>Email: klippman@munsch.com<br>Attn: Kevin Lippman |
| If to Hilco/Agent, to: | Hilco Merchant Resources, LLC<br>5 Revere Drive, Suite 206 |

Northbrook, IL 60062
Attn:  Sarah Baker
sbaker@hilcoglobal.com

With a copy, which shall not constitute notice, to:

Reimer & Braunstein LLP
Times Square Tower, Suite 2506
Seven Times Square
New York, New York 10036
Email: sfox@riemerlaw.com
Attn: Steven Fox

(b)      All notices and other communications required or permitted under this Agreement that are addressed as provided in this Section 12.4, (i) if delivered personally (with written confirmation of receipt) or by confirmed facsimile transmission, shall be effective upon delivery, and (ii) if delivered (A) by certified or registered mail with postage prepaid, shall be effective five (5) Business Days or (B) by an internationally recognized overnight express mail service such as Federal Express, UPS, or DHL Worldwide, with courier fees paid by the sender, shall be effective two (2) Business Days following the date when mailed or couriered, as the case may be. Either party hereto may from time to time change its address for the purposes of notices to such party by a similar notice specifying a new address, but no such change shall be deemed to have been given until it is actually received by the party sought to be charged with its contents.

12.5    Succession and Assignment.  This Agreement and all of the terms and provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. None of the parties hereto may assign this Agreement or any of its rights, interest or obligations hereunder without the prior written approval of the other; provided, however, that (i) Hilco/Agent may assign any or all of its rights under this Agreement to one or more of its Affiliates and/or syndicate the transaction with one or more third parties without the Sellers' consent and (ii) with the consent of Hilco/Agent (which such consent shall not be unreasonably withheld or delayed) and following an order of the Bankruptcy Court, Sellers may assign their rights and obligations under this Agreement. Upon any such permitted assignment, the references in this Agreement to the Sellers or Hilco/Agent, as applicable, shall also apply to any such assignee unless the context otherwise requires.  Any assignments made in contravention of the terms of this Section 12.5 shall be void *ab initio*.

12.6    Governing Law.  This Agreement, the Other Transaction Documents, and the legal relations between the parties hereto shall be governed and interpreted in accordance with the laws of the State of Texas without regard to principles of conflicts of law, except to the extent that United States bankruptcy law is applicable.

12.7    Consent to Jurisdiction.

(a)      Until the entry of an order either closing or dismissing the Bankruptcy Case, each party hereto hereby: (i) irrevocably elects as the sole judicial forum for the

33

adjudication of any matter arising under or in connection with this Agreement or any Other Transaction Document, and consents to the exclusive jurisdiction of, the Bankruptcy Court; (ii) expressly waives any defense or objection to jurisdiction or venue based on the doctrine of *forum non conveniens*; and (iii) stipulates that the Bankruptcy Court shall have *in personam* jurisdiction over such party.

(b)     After the entry of an order either closing or dismissing the Bankruptcy Case, each party hereto hereby submits to the jurisdiction of the state and federal courts in Dallas County, Texas (the "**Dallas Courts**") in any action arising out of or relating to this Agreement or any Other Transaction Document, and each such party hereto hereby irrevocably agrees that all claims in respect of any such action shall be heard and determined in Dallas Courts. Each party hereto, to the extent permitted by applicable Law, hereby expressly waives any defense or objection to jurisdiction or venue based on the doctrine of *forum non conveniens*, and stipulates that the Dallas Courts shall have *in personam* jurisdiction and venue over such party for the purpose of litigating any dispute or controversy between the parties arising out of or relating to this Agreement or any Other Transaction Document. In the event that either party hereto shall commence or maintain any action arising out of or relating to this Agreement or any Other Transaction Document in a forum other than Dallas Courts, the other party hereto shall be entitled to request the dismissal or stay of such action, and each party hereto stipulates for itself that such action shall be dismissed or stayed. To the extent that either party hereto has or hereafter may acquire any immunity from the jurisdiction of Dallas Courts or form any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution or otherwise) with respect to itself or its property, each such party hereby irrevocably waives such immunity.

12.8     WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER TRANSACTION DOCUMENTS. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 12.8.

12.9     Entire Agreement.  This Agreement, the Agency Agreement, and the Other Transaction Documents, each of which are incorporated herein, embody the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersede all prior agreements, commitments, arrangements, negotiations or understandings, whether oral or written, between the parties hereto, their respective Affiliates or any representatives of any of them with respect thereto. There are no agreements, covenants or understandings with respect to the subject matter of this Agreement or the Other Transaction Documents other than those expressly set forth or referred to herein or therein and no representations or warranties of any

34

kind or nature, whatsoever, express or implied, have been made or shall be deemed to have been made by the parties hereto except those expressly made in this Agreement and the Other Transaction Documents.

12.10    Severability.   Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable Law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of any other provision or portion of any provision in such jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction in such manner as will effect as nearly as lawfully possible the purposes and intent of such invalid, illegal or unenforceable provision. To the extent permitted by Law, the parties hereto waive any provision of Law that renders any such provision prohibited or unenforceable in any respect. Notwithstanding anything to the contrary set forth herein, the provisions hereof for entry of the Sale Approval Order are not severable and may not be reformed.

12.11    No Third Party Beneficiaries.   Except as and to the extent otherwise provided herein, nothing in this Agreement is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any Person other than the parties hereto and their respective successors and permitted assigns.

12.12    Exhibits, Appendices and Schedules.   All Appendices, Exhibits, and Schedules hereto, or other documents expressly referenced in and incorporated into this Agreement, are hereby incorporated into this Agreement and are hereby made a part hereof as it set out in full in this Agreement.

12.13    Counterparts.   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which, when taken together, shall constitute one and the same instrument. Any counterpart may be executed by facsimile signature and such facsimile signature shall be deemed an original.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed, as of the date first above written.

**THE SELLERS:**

TUESDAY MORNING CORPORATION

By: _____
Name: Andrew Berger
Title:  Chief Executive Officer

TMI HOLDINGS, INC.

By: _____
Name: Andrew Berger
Title:  Chief Executive Officer

TUESDAY MORNING, INC.

By: _____
Name: Andrew Berger
Title:  Chief Executive Officer

FRIDAY MORNING, LLC

By: _____
Name: Andrew Berger
Title:  Chief Executive Officer

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

Signature Page – Asset Purchase Agreement

DAYS OF THE WEEK, INC.


By: _____
Name: Andrew Berger
Title:  Chief Executive Officer


NIGHTS OF THE WEEK, INC.


By: _____
Name: Andrew Berger
Title:   Chief Executive Officer


TUESDAY MORNING PARTNERS, LTD.


By: _____
Name: Andrew Berger
Title: Chief Executive Officer

IN WITNESS WHEREOF, the undersigned has caused this Agreement to be duly executed, as of the date first above written.

**PURCHASER**:

HILCO MERCHANT RESOURCES, LLC

By: _____
Name: Ian S. Fredericks
Title:   President

EXHIBIT A

AGENCY AGREEMENT

Exhibit A

Agency Agreement

This Agency Agreement ("<u>Agreement</u>"), effective upon the Initial Closing (the "<u>Closing</u>") of the transactions contemplated by the APA, is made as of April 28, 2023 (the "<u>Signing Date</u>"), by and among Tuesday Morning Corporation, TMI Holdings, Inc., Tuesday Morning, Inc., Friday Morning, LLC, Days of the Week, Inc., Nights of the Week, Inc., and Tuesday Morning Partners, Ltd.  (collectively, "<u>Merchant</u>" or "<u>Debtors</u>") and Hilco Merchant Resources, LLC ("<u>Agent</u>").  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the APA (as defined below).

Section 1.  **<u>Recitals.</u>**

WHEREAS, on February 14, 2023, Merchant filed chapter 11 cases in the United States Bankruptcy Court for the Northern District of Texas (such cases, collectively, the "<u>Bankruptcy Case</u>" and such court, or other court of competent jurisdiction in which the Bankruptcy Case is filed, the "<u>Bankruptcy Court</u>");

WHEREAS, simultaneously with the execution hereof, Agent and Merchant entered into an Asset Purchase Agreement (the "<u>APA</u>"), which contemplated, among other things, the transactions set forth in this Agreement;

WHEREAS, as of the date hereof, Merchant operates 199 stores; Exhibit 1 contains a list of Stores to be closed pursuant to this Agreement (collectively, the "<u>Closing Stores</u>").

WHEREAS, Merchant desires that Agent act as Merchant's exclusive agent for the limited purposes of: (a) selling all of the Merchandise in or transferred to the Closing Stores from the Closing Stores by means of a "going out of business", "store closing", "sale on everything", "everything must go", or similar sale ("<u>Store Advertising</u>") in accordance with the terms of this Agreement; (b) disposing of the Designated F&E (as defined below) (the foregoing clauses (a) and (b), and as further described below, the "<u>Sale</u>"); and

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Agent and Merchant hereby agree as follows:

Section 2.  **<u>Appointment of Agent/Approval Order.</u>**

(a)    Upon the Closing, Merchant hereby appoints Agent, and Agent hereby agrees to serve, as Merchant's exclusive agent for the limited purpose of conducting the Sale, all in accordance with the terms and conditions of this Agreement.

(b)    Upon Closing, Agent shall be authorized to use (i) Store Advertising with respect to Closing Stores and the Approval Order shall provide that Agent shall be required to comply with applicable federal, state and local laws, regulations and ordinances, including, without limitation, all laws and regulations relating to advertising, privacy, consumer protection, occupational health and safety and the environment, together with all applicable statutes, rules, regulations and orders of, and applicable restrictions imposed by, governmental authorities (collectively, the "<u>Applicable General Laws</u>"), other than all applicable laws, rules and regulations in respect of "going out of business", "store closing" or similar-themed sales and permitting (collectively, the "<u>Liquidation Sale Laws</u>"), <u>provided</u> that the Sale is conducted in accordance with the terms of this Agreement, the Sale Guidelines and the Approval Order; and <u>provided</u> further that the Approval Order shall provide that so long as the Sale is conducted in

accordance with the Sale Guidelines and the Approval Order and in a safe and professional manner, Agent shall be deemed to be in compliance with any Applicable General Laws.

Section 3.  **Proceeds.**

3.1  Proceeds; Control of Proceeds.

(a)  For purposes of this Agreement, "Proceeds" shall mean the aggregate of (i) the total amount (in dollars) of all sales of Merchandise made under this Agreement and all service and shipping revenue, in each case during the Sale Term and exclusive of Sales Taxes; and (ii) all proceeds of Merchant's insurance for loss or damage to Merchandise arising from events occurring during the Sale Term.  For purposes of this Agreement, "Other Proceeds" shall mean (i) the total amount (in dollars) of all sales of Designated F&E made under this Agreement; (ii) the total amount (in dollars) of all sales of Excluded Goods; and (iii) the total amount (in dollars) of all sales of Additional Agent Goods (as defined below) made under this Agreement. Merchant hereby irrevocably agree that, as compensation for Agent's services hereunder, Agent shall receive and retain for its sole and exclusive benefit all Proceeds and Other Proceeds.

(b)  Upon Closing, all Proceeds and Other Proceeds shall be controlled by Agent in the manner provided for below.

(1)  Agent may (but shall not be required to) establish its own accounts (including without limitation credit card accounts and systems), dedicated solely for the deposit of the Proceeds and Other Proceeds and the disbursement of amounts payable to Agent hereunder (the "Agency Accounts"), and Merchant shall promptly, upon Agent's reasonable request, execute and deliver all necessary documents to open and maintain the Agency Accounts (at Agent's sole cost and expense); provided, however, Agent shall have the right, in its sole and absolute discretion, to continue to use Merchant's Designated Deposit Accounts (as defined below) as the Agency Accounts in which case Merchant's Designated Deposit Accounts shall be deemed to be Agency Accounts.  Agent shall exercise sole signatory authority and control with respect to the Agency Accounts.  The Agency Accounts shall be dedicated solely to the deposit of Proceeds and Other Proceeds and other amounts contemplated by this Agreement and the distribution of amounts payable hereunder.  Upon request, Agent shall deliver to Merchant copies of all bank statements and other information relating to such accounts.  Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, any bank fees and charges, including wire transfer charges, related to the Sale and the Agency Accounts, whether received during or after the Sale Term.  Upon Agent's notice to Merchant of Agent's designation of the Agency Accounts (other than Merchant's Designated Deposit Accounts), all Proceeds and Other Proceeds of the Sale (including processor receivables and credit card Proceeds and Other Proceeds) shall be deposited into the Agency Accounts unless otherwise agreed to by Agent.

(2)  Agent shall have the right to use Merchant's credit card facilities, including Merchant's credit card terminals and processor(s), credit card processor coding, Merchant's identification number(s) and existing bank accounts for credit card transactions relating solely to the Sale. In the event that Agent elects to use Merchant's credit card facilities, Merchant shall process credit card transactions on behalf of Agent and for Agent's account, applying customary practices and procedures. Without limiting the foregoing, Merchant shall cooperate with Agent to download data from all credit card terminals each day during the Sale Term to effect settlement with Merchant's credit card processor(s), and shall take such other actions necessary to process credit card transactions on behalf of Agent under Merchant's identification number(s).  At Agent's reasonable request, Merchant shall cooperate with Agent to establish Merchant's identification numbers under Agent's name to enable Agent to process all such credit card Proceeds and Other Proceeds for Agent's account.  Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, any credit card fees, charges, and

chargebacks related to the Sale, whether received during or after the Sale Term.  Agent shall not be responsible for, as an Expense or otherwise, any credit card fees, charges, or chargebacks that do not relate to the Sale, whether received prior to, during or after the Sale Term.

(3)     Unless and until Agent establishes its own Agency Accounts (other than Merchant's Designated Deposit Accounts), all Proceeds, Other Proceeds, and other amounts contemplated by this Agreement (including processor receivables and credit card Proceeds and Other Proceeds), shall be collected by Merchant and deposited on a daily basis into depository accounts designated by, and owned and in the name of, Merchant for the Closing Stores, which accounts shall be designated solely for the deposit of Proceeds and Other Proceeds and other amounts contemplated by this Agreement (including processor receivables and credit card Proceeds and Other Proceeds), and the disbursement of amounts payable to or by Agent hereunder (the "Designated Deposit Accounts").  The Designated Deposit Accounts shall be cash collateral accounts, with all cash, credit card payments, checks and similar items of payment, deposits and any other amounts in such accounts being Proceeds, Other Proceeds, or other amounts contemplated hereunder, and Merchant hereby grants to Agent a first priority senior security interest in each Designated Deposit Account and all proceeds (including Proceeds and Other Proceeds) in such accounts from and after the Sale Commencement Date.  If requested by Agent, each account shall be subject to an agreement between and among Agent and Merchant, and the subject bank, providing for, among other things, that such bank will comply with instructions originated by Agent directing the disposition of funds in such account without further consent of Merchant (a "Control Agreement").  If, notwithstanding the provisions of this Section 3.3(b), Merchant receives or otherwise has dominion over or control of any Proceeds, Other Proceeds, or other amounts due to Agent under this Agreement, Merchant shall be deemed to hold such Proceeds, Other Proceeds, and other amounts "in trust" for Agent and shall not commingle Proceeds, Other Proceeds, or other amounts due to Agent with any of Merchant's other funds or deposit such Proceeds, Other Proceeds, or other amounts in any account except a Designated Deposit Account or as otherwise instructed by Agent.

(4)     On each Business Day, Merchant shall promptly pay to Agent by wire funds transfer all funds in the Designated Deposit Accounts (including, without limitation, Proceeds (including from credit card sales), Other Proceeds, and all other amounts due to Agent) deposited into the Designated Deposit Accounts for the prior day(s) without any offset or netting of Expenses or other amounts that may be due to Merchant.  Agent shall notify Merchant of any shortfall in such payment in which case, Merchant shall promptly pay to Agent funds in the amount of such shortfall.

(5)     Agent shall purchase all cash in the Closing Stores on and as of the start of business on the Sale Commencement Date on a dollar for dollar basis, which shall be paid to Merchant as soon as practicable after the cash can be counted.

3.2     Bulk Sales.  Agent shall be authorized to sell Merchandise in bulk to one or more purchasers, in which case Merchant shall execute any such documents of transfer prepared by Agent at Agent's sole cost and expense.

Section 4.  **Expenses of the Sale.**

4.1     Expenses.  Agent shall be unconditionally responsible for all "Expenses," which expenses shall be paid by Agent in accordance with Section 4.2 below.  Agent hereby agrees to pre-fund all Expenses consistent with Merchant's customary funding practices and timing (the "Prefunding Obligations"); provided, however, that to the extent the actual Expenses related to the Prefunding Obligations are less than the Prefunding Obligations, Agent shall be entitled to a dollar for dollar credit against other Expenses or entitled to a refund of such overfunding.  As used herein, "Expenses" shall mean the Closing Store-level operating expenses

of the Sale which arise during the Sale Term and are attributable to the Sale, limited to the following:

(a)     actual payroll (including overtime) with respect to all Retained Employees used in connection with conducting the Sale for actual days/hours worked at a Closing Store during the Sale Term (including hours worked by those employees performing the Merchandise Taking) as well as payroll (including overtime) for any temporary employees/labor engaged for the Sale;

(b)     any amounts payable by Merchant for benefits for Retained Employees (including FICA, unemployment taxes, workers' compensation and healthcare insurance, but excluding Excluded Payroll Benefits) for Retained Employees used in the Sale, in an amount not to exceed 16.0% of the base payroll for each Retained Employee in the Closing Stores (the "Payroll Benefits Cap");

(c)     the actual Occupancy Expenses (including, if applicable, the portion of any percentage rent obligations attributable to the sale of Merchandise and Additional Agent Merchandise during the Sale Term to the extent set forth on Exhibit 4.1(c) attached hereto) for the Closing Stores on a per Closing Store and per diem basis in an amount not to exceed the per Closing Store, per category, per diem amounts shown on Exhibit 4.1(c), whether due and owing or accrued during the Sale Term and due and payable after the Sale Term, set forth on Exhibit 4.1(c) attached hereto; provided, further, that the parties hereby acknowledge that the amounts set forth on Exhibit 4.1(c) identify Merchant's percentage rent that may become due and payable under Merchant's leases;

(d)     Retention Bonuses for Retained Employees, as provided for in Section 9.5 below;

(e)     advertising and direct mailings relating to the Sale, Closing Store interior and exterior signage and banners, and signwalkers, in each case relating to the Sale;

(f)     credit card fees, bank card fees, and chargebacks and credit/bank card discounts with respect to Merchandise sold in the Sale;

(g)     bank service charges (for accounts that service any Closing Store(s), corporate accounts, and Agency Accounts), check guarantee fees, wire transfer costs, and bad check expenses to the extent attributable to the Sale;

(h)     costs for additional Supplies at the Closing Stores necessary to conduct the Sale as requested by Agent;

(i)     all fees and charges required to comply with applicable laws in connection with the Sale as agreed to by Agent;

(j)     Closing Store cash theft and other store cash shortfalls in the registers;

(k)     all costs and expenses associated with Agent's on-site supervision of the Closing Stores, the Distribution Center, and corporate offices, including (without limitation) any and all fees, wages, taxes, third party payroll costs and expenses, and deferred compensation of Agent's field personnel, travel to, from or between the Closing Stores, Distribution Center, and corporate offices, and costs and expenses relating thereto (including reasonable and documented corporate travel to monitor and manage the Sale); postage, courier and overnight mail charges requested by Agent;

(l)     postage, courier and overnight mail charges requested by Agent;

(m)    fifty percent (50%) of cost of the Merchandise Taker;

(n)    third party payroll processing expenses associated with the Sale;

(o)    costs of transfers initiated by Agent of Merchandise between and among the Closing Stores during the Sale Term, including delivery and freight costs, it being understood that Agent shall be responsible for coordinating such transfer of Merchandise, subject, however, to the provisions of Section 8.1(e); provided, however, that any such costs shall be negotiated by Agent on an arms'-length basis and Agent shall utilize Merchant's existing agreements if practicable and if the costs of transfers under such existing agreements would be less than any costs that are negotiated by Agent; and

(p)    the actual costs and expenses of Agent providing such additional services as Agent deems appropriate for the Sale.

Notwithstanding anything herein to the contrary, to the extent that any Expense category listed in Section 4.1 is also included on Exhibit 4.1(c), Exhibit 4.1(c) shall control and such Expenses shall not be double counted.   There will be no double counting or payment of Expenses to the extent that Expenses appear or are contained in more than one Expense category or are payable to Merchant.

As used herein, the following terms have the following respective meanings:

(1)    "Central Service Expenses" means costs and expenses for Merchant's central administrative services necessary for the Sale, including, without limitation, internal payroll processing, MIS services, cash and inventory reconciliation, data processing and reporting, email preparation and distribution, information technology, e-commerce platform operations (if any), updates (including marketing and store locator updates during the Sale Term, but excluding any direct to consumer sales), maintenance and other services related thereto, and accounting (collectively, "Central Services").

(2)    "Excluded Payroll Benefits" means the following (i) benefits arising, accruing or attributable to the period prior to, during, or after the Sale Term:  (w) vacation days or vacation pay, (x) sick days or sick leave or any other form of paid time off, (y) maternity leave or other leaves of absence and (z) ERISA coverage and similar contributions and/or (ii) any other benefits in excess of the Payroll Benefits Cap, including, without limitation, any payments due under the WARN Act.

(3)    "Occupancy Expenses" means, with respect to the Closing Stores, base rent, percentage rent, HVAC, utilities, common area maintenance ("CAM"), storage costs, real estate and use taxes, Merchant's association dues and expenses, utilities expenses, cash register maintenance, routine repairs, building maintenance, trash and snow removal, housekeeping and cleaning expenses, local and long-distance telephone and internet/wifi expenses, security (including, without limitation, security systems, courier and guard service, building alarm service and alarm service maintenance), and rental for furniture, fixtures, and equipment.

(4)    Notwithstanding any other provision of this Agreement to the contrary, "Expenses" shall not include: (i) Excluded Payroll Benefits; (ii) Central Service Expenses; (iii) Occupancy Expenses or any occupancy-related expenses of any kind or nature in excess of the respective per Closing Store, per category, per diem occupancy-related amounts expressly provided for as an Expense under Section 4.1(c) above to the extent actually incurred; (iv) any expenses of any kind relating to or arising from Merchant's corporate office; (v) any item other than the Expenses specifically listed in Sections 4.1(a)-(p) (including, for the avoidance of doubt, any costs and expenses in excess of any monetary caps set forth in Sections 4.1(a)-(p)); and (vi) any other costs, expenses, or liabilities payable by Merchant not provided for herein, all of which shall be paid solely by Merchant, as applicable, promptly

when due, subject to the provisions of the Bankruptcy Code, the APA, and the Approval Order.  For the avoidance of doubt, all costs, expenses, and liabilities incurred in connection with the Sale and the transactions contemplated hereby (including those paid by Merchant) that do not constitute Expenses, including those expressly set forth in the immediately preceding sentence, shall be the responsibility of, and borne by, Merchant.

4.2    Payment of Expenses.

Agent shall be responsible for the payment of all Expenses out of Proceeds (or from Agent's own accounts if and to the extent there are insufficient Proceeds).  All Expenses projected to be incurred during each week of the Sale (*i.e.* Sunday through Saturday) shall be pre-paid by Agent to Merchant in accordance with Section 4.1 and immediately following the Weekly Sale Reconciliation for any given week, any overpayments in such week shall be credited to the pre-payment of Expenses for the following week; provided, however, in the event that the actual amount of an Expense is unavailable on the date of the reconciliation (such as payroll), Merchant and Agent shall agree to an estimate of such amounts, which amounts will be reconciled once the actual amount of such Expense becomes available. Agent and Merchant may review or audit the Expenses at any time and, in connection with such audit, Merchant shall have the right to request clarification regarding the amount of any costs or expenses that are included by Agent as Expenses but which Merchant believes do not qualify as Expenses under Section 4.1 hereof.  Without limiting the foregoing, any Expenses prepaid by Merchant for periods during the Sale Term will be reimbursed by Agent in connection with the Weekly Sale Reconciliation on the second Wednesday following the Initial Closing Date.

4.3    Distribution Center Expenses

Distribution Center Merchandise shall be delivered from the Distribution Center to the Closing Stores in accordance with the Allocation Schedule, but in any event no later than fourteen (14) days after the Initial Closing Date.  All costs and expenses of operating the Distribution Center, including, without limitation, use and occupancy expenses, Distribution Center employee payroll and other obligations, and/or processing, transferring, consolidating, shipping, freight, and/or delivering goods within or from the Distribution Center (the "Distribution Center Expenses") shall be the responsibility of and paid by the Merchant.

Section 5.    **Excluded Goods.**

5.1    Excluded Goods.  If requested at the beginning of the Sale Term, Agent shall accept and use commercially reasonable efforts to sell Excluded Goods or such other property designated by the Seller that .  The proceeds from the sale of Excluded Goods shall be shared as follows:  twenty percent (20%) to the Agent and eighty percent (80% to Merchant, which amounts shall be reconciled and paid as part of each Weekly Sale Reconciliation.  If Merchant does not request Agent to sell Excluded Goods.  Agent shall have no responsibility whatsoever for Excluded Goods and Merchant shall remove them from the sales floor.  In no event shall Excluded Goods be shipped to the Closing Stores absent Agent's express written consent.  Regardless if Agent sells or does not sell Excluded Goods, Agent shall have no cost, expense, or responsibility in connection with any goods not included in Merchandise.

Section 6.  **Sale Term.**

6.1    Term.    Subject to satisfaction of the conditions precedent set forth in Section 10 hereof, the Sale shall commence on the Initial Closing Date (such date, the "Sale Commencement Date").  Agent shall complete the Sale at each Closing Store no later than sixty-five (65) days after the Sale Commencement Date (the "Sale Termination Date", and the period from the Sale Commencement Date to the applicable Sale Termination Date as to each such Closing Store being the "Sale Term").    Notwithstanding the foregoing, Agent may, in its discretion, terminate the Sale earlier on a store-by-store basis upon not less than ten Business Days' prior written notice (a "Vacate Notice") to Merchant (the "Vacate Date").

6.2    Vacating the Closing Stores.    At the conclusion of the Sale at each Closing Store, Agent agrees to leave each Closing Store in "broom clean" condition, ordinary wear and tear excepted, except for unsold items of Designated F&E and other assets or property of Merchant which may be abandoned by Agent in place in a neat and orderly manner pursuant to Section 7 below and accordance with the sale guidelines attached hereto as Exhibit 6.2 (the "Sale Guidelines").  Agent shall vacate each Closing Store on or before the Sale Termination Date as provided for herein at which time Agent shall surrender and deliver the Closing Store premises and Closing Store keys to Merchant.  Agent's obligations to pay all Expenses for the Closing Stores shall continue until the Vacate Date for each Closing Store.  Effective upon the Vacate Date, the Merchant shall reject the leases associated with the Leased Real Property for, and abandon any remaining Merchandise and Personal Property in, the Closing Stores to be vacated as of each applicable Vacate Date.  Effective as of the Sale Termination Date, the Merchant Shall reject all remaining leases associated with the Leased Real Property for, and abandon any remaining Merchandise and Personal Property in, the remaining Closing Stores to be vacated as of the Sale Termination Date.

Section 7.  **FF&E.**

7.1    Designated F&E.    Agent shall sell all Personal Property at the Closing Stores (collectively, "Designated F&E") and shall be responsible for the costs and expenses incurred in connection with the disposition of the Designated F&E, which, for the avoidance of doubt, shall not include an Occupancy Expenses for the corporate office, any payroll or benefits associated with employees at the corporate office, or any costs associated with Central Services.

7.2    Abandonment of Designated F&E.    Upon five Business Days' prior written notice by Agent to Merchant (which notice Merchant will share with its term lenders), Agent shall be authorized to abandon any and all unsold Designated F&E in place without any cost or liability to any party.

Section 8.  **Conduct of the Sale.**

8.1    Rights of Agent.    In addition to any other rights granted to Agent elsewhere in this Agreement, Agent shall be permitted to conduct the Sale at the Closing Stores by means of Store Advertising throughout the Sale Term without compliance with any Liquidation Sale Laws.  Agent shall conduct the Sale in the name of and on behalf of Merchant in a commercially reasonable manner and in compliance with the terms of this Agreement and subject to the Approval Order.  Agent shall conduct the Sale in accordance with the Sale

Guidelines.  In addition to any other rights granted to Agent hereunder in conducting the Sale, Agent, in the exercise of its reasonable discretion shall have the right, subject to the limitations set forth herein:

       (a)      to establish Sale prices and discounts and Closing Store hours;

       (b)      except as otherwise expressly included as an Expense, to use without charge during the Sale Term all Personal Property and all leased or licensed personal property, computer hardware and software, existing Supplies, intangible assets (including all Intellectual Property), Closing Store keys, case keys, security codes and safe and lock combinations required to gain access to and operate the Closing Stores, and any other assets of Merchant located at the Closing Stores (whether owned, leased, or licensed);

       (c)      (i) to be provided by Merchant (at no additional cost to Agent) with central office facilities, central administrative services and personnel to process and perform Central Services and provide other central office services reasonably necessary for the Sale; (ii) to use reasonably sized offices located at Merchant's central office facility to effect the Sale; and (iii) to use all Intellectual Property (but solely in connection with the Sale and pursuant to such reasonable restrictions requested by Merchant in order for Merchant to comply with its privacy policy and applicable laws governing the use and dissemination of confidential consumer personal data);

       (d)      to establish and implement advertising, signage and promotion programs consistent with this Agreement, including, without limitation, by means of media advertising, and similar interior and exterior signs and banners, and the use of sign walkers consistent with the provisions herein;

       (e)      to transfer Merchandise between and among the Closing Stores at Agent's expense; provided, however, Agent shall not transfer Merchandise between and among Stores so as to make the Merchandise unavailable for purposes of the Merchandise Taking; and

       (f)      subject to the provisions of Section 8.10 below, to include Additional Agent Goods as part of the Sale.

       8.2      Terms of Sales to Customers; Final/As Is Sales.  All sales of Merchandise will be "final sales" and "as is," and appropriate signage and sales receipts will reflect the same. Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.  All sales will be made only for cash, nationally recognized bank debit and credit cards, gift cards, or gift certificates.  Agent shall clearly mark all receipts for the Merchandise sold at the Closing Stores during the Sale Term so as to distinguish such Merchandise from the goods sold prior to the Sale Commencement Date.

       8.3      Sales Taxes.  During the Sale Term, all sales, excise, gross receipts and other taxes attributable to sales of Merchandise, as indicated on Merchant's point of sale equipment (other than taxes on income) payable to any taxing authority having jurisdiction (collectively, "Sales Taxes") shall be added to the sales price of Merchandise and collected by Agent, on Merchant's behalf, at the time of sale.  All Sales Taxes indicated on Merchant's point of sale equipment shall be deposited into a segregated account designated by Merchant solely for the deposit of such Sales Taxes ("Merchant Sales Taxes Account").  For the avoidance of doubt, Merchant will have payment authority on the Merchant Sales Tax Account from inception until Merchant no longer has any obligation with respect to the payment of Sales Taxes hereunder.

For any Merchant Sales Tax Account that Agent obtains control or payment authority over, Agent agrees to remit any funds in such Merchant Sales Tax Account to Merchant. Merchant shall prepare and file all applicable reports and documents required by the applicable taxing authorities with respect to Sales Taxes incurred on transactions processed under Merchant's identification number(s), and Merchant shall promptly pay all such Sales Taxes from the Merchant Sales Taxes Account. Merchant will be given access to the computation of gross receipts for verification of all such tax collections. Provided that Agent performs its responsibilities in accordance with this Section 8.3, Agent shall have no further obligation to Merchant, any taxing authority, or any other party, and Merchant shall indemnify and hold harmless Agent from and against any and all costs, including, without limitation, reasonable attorneys' fees, assessments, fines or penalties which Agent sustains or incurs as a result or consequence of the failure by such party to promptly pay such Sales Taxes to the proper taxing authorities and/or the failure by such party to promptly file with such taxing authorities all reports and other documents required by applicable law to be filed with or delivered to such taxing authorities. If Agent fails to perform its responsibilities in accordance with this Section 8.3, and provided Merchant complies with their obligations hereunder, Agent shall indemnify and hold harmless Merchant from and against any and all costs, including, without limitation, reasonable attorneys' fees, assessments, fines or penalties which Merchant sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and/or the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant to file any requisite returns with such taxing authorities.

8.4     Supplies.  Agent shall have the right to use, without charge, all existing supplies located at the Closing Stores, Distribution Center and corporate office(s), including, without limitation, boxes, bags, paper, twine and similar sales materials (collectively, "Supplies"). In the event that additional Supplies are required in any of the Closing Stores during the Sale, Merchant agrees to promptly provide the same to Agent at Merchant's cost therefor, if available, for which Agent shall promptly reimburse Merchant, as applicable.

8.5     Returns of Merchandise.  During the first fourteen (14) days of the Sale Term (the "Return Deadline") Agent shall accept Returned Merchandise, provided that such return is in compliance with Merchant's return policy in effect immediately prior to the Sale Commencement Date. If such Returned Merchandise is first quality finished goods capable of being sold it shall be included in the Sale, and shall be included for purposes of determining the Merchandise Purchase Price Adjustment at the applicable Cost Value attributable thereto (for any item of Returned Merchandise that is NOT first quality finished goods capable of being sold at normal retail price, but nonetheless capable of being resold, the parties shall apply a Cost Value mutually agreed upon by Agent and Merchant for each such item returned). For any returned item that is NOT otherwise capable of being resold, Merchant shall reimburse Agent for the refund issued by Agent pursuant to the Weekly Sale Reconciliation for any given week. Except to the extent that Merchant and Agent agree that Merchant's POS or other applicable systems can account for returns of goods, all returns must be noted and described in a mutually agreeable return log on a weekly basis during the Sale.

8.6     Gift Certificates; Membership Program.  Agent shall accept Merchant's gift certificates, gift cards, return credits, and similar merchandise credits issued by Merchant (collectively, "Gift Certificates") for fourteen (14) days following the Sale Commencement Date

(the "Redemption Period"). Merchant shall reimburse Agent in cash for all Gift Certificates redeemed during the Redemption Period as part of each Weekly Sale Reconciliation.

8.7    Sale Reconciliation. On each Wednesday during the Sale Term, Agent and Merchant shall cooperate to reconcile Expenses of the Sale, Proceeds and Other Proceeds of the Sale, and reconcile such other Sale-related items as any party shall reasonably request, in each case for the prior week or partial week (i.e. Sunday through Saturday), all pursuant to procedures reasonably agreed upon Merchant and Agent (the "Weekly Sale Reconciliation"). Within thirty (30) days after the end of the Sale Term, or as soon as practicable thereafter, Agent and Merchant shall complete a final reconciliation of the Sale (the "Final Reconciliation"), the written results of which shall be certified by representatives of each of Merchant and Agent as a final settlement of accounts between Merchant and Agent. Within five (5) days after the completion of the Final Reconciliation and execution of a settlement letter including an appropriate mutual release, all unpaid amounts pursuant to the Final Reconciliation shall be paid to and by the appropriate parties. Once executed by Merchant and Agent, such settlement and Final Reconciliation shall be deemed approved without further order of the Bankruptcy Court (other than the Approval Order). During the Sale Term, and thereafter until all of Merchant's and Agent's obligations under this Agreement have been satisfied, Merchant and Agent shall have reasonable access to Merchant's and Agent's records with respect to the Sale (including, without limitation, Merchandise, Expenses, Proceeds, and Other Proceeds) to review and audit such records.

8.8    Force Majeure. If any casualty, epidemic, pandemic, act or threatened act of terrorism, or act of God prevents or substantially inhibits the conduct of business in the ordinary course at any of the Closing Stores for a period of five (5) consecutive days, the Merchandise located at such Closing Store shall, in Agent's reasonable discretion (after consultation with Merchant), be eliminated from the Sale and considered to be deleted from this Agreement as of the date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto and the Purchase Price shall be adjusted using the Merchandise Purchase Price Adjustment; provided, however, that the proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder and shall be offset against the associated Merchandise Purchase Price Adjustment.

8.9    Right to Monitor. Merchant shall have the right to monitor the Sale and activities attendant thereto and to be present in the Closing Stores during the hours when the Closing Stores are open for business; provided that Merchant's presence does not unreasonably disrupt the conduct of the Sale. Merchant shall also have a right of access to the Closing Stores at any time in the event of an emergency situation and shall promptly notify Agent of such emergency.

8.10    Additional Agent Goods.

(a)    Agent shall have the right to supplement the Merchandise in the Sale with additional goods procured by Agent which are of like kind, and no lesser quality to the Merchandise in the Sale ("Additional Agent Goods"). The Additional Agent Goods shall be purchased by Agent as part of the Sale at Agent's sole expense (and such purchase price shall not constitute an Expense). Sales of Additional Agent Goods shall be run through Merchant's cash register systems, provided however, Agent shall mark the Additional Agent Goods using either a "dummy" SKU or department number, or in such

Exhibit A – Asset Purchase Agreement

other manner so as to distinguish the sale of Additional Agent Goods from the sale of Merchandise, and Merchant shall promptly and without delay set up all such SKU's for use by Agent. Agent and Merchant shall also cooperate so as to ensure that the Additional Agent Goods are marked in such a way that a reasonable consumer could identify the Additional Agent Goods as non-Merchant, provided that Agent shall be solely responsible (at its own expense) for ensuring that all Additional Agent Goods are pre-ticketed by Agent in a way that will distinguish such Additional Agent Goods from the Merchandise as required by this Section 8.10.  Additionally, Agent shall provide signage in the Closing Stores notifying customers that the Additional Agent Goods have been included in the Sale.

(b)    Agent and Merchant intend that the transactions relating to the Additional Agent Goods are, and shall be construed as, a true consignment from Agent to Merchant in all respects and not a consignment for security purposes.  At all times and for all purposes the Additional Agent Goods and their proceeds shall be the exclusive property of Agent, and no other person or entity shall have any claim against any of the Additional Agent Goods or their proceeds.  The Additional Agent Goods shall at all times remain subject to the exclusive control of Agent.

(c)    Merchant shall until the Sale Termination Date, at Agent's sole expense (and not as an Expense), insure the Additional Agent Goods and, if required, promptly file any proofs of loss with regard to same with Merchant's insurers.  Agent shall be responsible for payment of any deductible under any such insurance in the event of any casualty affecting the Additional Agent Goods, which amount shall be deemed an Additional Agent Goods expense.

(d)    Merchant acknowledges, and the Approval Order shall provide, that the Additional Agent Goods shall be consigned to Merchant as a true consignment under Article 9 of the Code.  Merchant acknowledges and agrees and the Approval Order shall provide that Agent is hereby granted a first priority security interest in and lien upon (i) the Additional Agent Goods and (ii) the Additional Agent Goods proceeds, which security interest shall be deemed perfected pursuant to the Approval Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that Agent is hereby authorized to deliver all required notices and file all necessary financing statements and amendments thereof under the applicable UCC identifying Agent's interest in the Additional Agent Goods as consigned goods thereunder and Merchant as the consignee therefor, and Agent's security interest in and lien upon such Additional Agent Goods and Additional Agent Goods proceeds).  Agent hereby agrees that, in consideration of Merchant's agreement to this Section 8.10, the proceeds from the sale of Additional Agent Goods shall be shared as follows:  ninety-five percent (95.0%) to the Agent and five percent (5.0%) to Merchant, which amounts shall be reconciled and paid as part of each Weekly Sale Reconciliation.

8.11  Sale of Additional Inventory.

8.12  Collective Bargaining Agreements; Leases.  Merchant hereby represents and warrants that Merchant is not and has not been within the prior twelve months a party to any collective bargaining agreement.  Agent shall not be obligated to comply with Merchant's collective bargaining agreements or leases/occupancy agreements; except as provided for in Sections 4.1(a) and 4.1(c) herein.

Section 9.  **Employee Matters.**

9.1    Merchant's Employees.  Agent may use all of Merchant's Closing Store-level employees in the conduct of the Sale to the extent Agent deems reasonably necessary for the Sale (each such employee, a "Retained Employee"), and Agent may select and schedule the number and type of Retained Employees.  Notwithstanding the foregoing, Merchant's employees

shall at all times remain employees of Merchant.  Agent's selection and scheduling of Merchant's employees shall at all times comply with all applicable laws and regulations. Merchant and Agent agree that, except to the extent that wages and benefits of Retained Employees constitute Expenses hereunder, nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, Excluded Payroll Benefits, Worker Adjustment Retraining Notification Act ("WARN Act") claims and other termination type claims and obligations, or any other amounts required to be paid by statute or law; nor shall Agent become liable under any employment agreement, collective bargaining agreement, or be deemed a joint or successor employer with respect to such employees.  Merchant shall not, without the prior consent of Agent, raise the salary or wages or increase the benefits for, or pay any bonuses or other extraordinary payments to, any Closing Store employees prior to the Sale Termination Date.  Other than in the ordinary course of business, Merchant shall not transfer any employee in anticipation of the Sale nor any Retained Employee during the Sale Term, in each case without Agent's prior consent.

9.2    Termination of Employees.  Agent may in its discretion stop using any Retained Employee at any time during the Sale, subject to the conditions provided for herein.  In the event that Agent desires to cease using any Retained Employee, Agent shall notify Merchant at least five (5) days prior thereto; provided, however, that, in the event that Agent determines to cease using an employee "for cause" (such as dishonesty, fraud or breach of employee duties), the five (5) day notice period shall not apply; provided, further, however, that Agent shall immediately notify Merchant of the basis for such "cause."

9.3    From and after the date of this Agreement and until the Sale Termination Date, Merchant shall not transfer or dismiss employees of the Closing Stores except "for cause" without Agent's prior consent.  Notwithstanding the foregoing, Agent shall not have the right to terminate the actual employment of any employee, but rather may only cease using such employee in the Sale and paying any Expenses with respect to such employee (and all decisions relating to the termination or non-termination of such employees shall at all times rest solely with Merchant).  Merchant shall be entitled to terminate any Retained Employee following notification from Agent that such Retained Employee is no longer necessary to the Sale.

9.4    Payroll Matters.  During the Sale Term, Merchant shall process the payroll for all Retained Employees and any former employees and temporary labor engaged for the Sale. Each Wednesday (or such other date as may be reasonably requested by Merchant to permit the funding of the payroll accounts before such payroll is due and payable) during the Sale Term, Agent shall transfer to Merchant's payroll accounts an amount equal to the base payroll for Retained Employees plus related payroll taxes, workers' compensation and benefits for such week, to the extent such amount constitutes Expenses hereunder.

9.5    Employee Retention Bonuses.  Agent may pay, as an Expense, retention bonuses ("Retention Bonuses") (which bonuses shall be inclusive of payroll taxes, but as to which no benefits shall be payable), up to a maximum of ten percent (10%) of base payroll for all Closing Store-level Retained Employees, to such Closing Store-level Retained Employees who do not voluntarily leave employment and are not terminated "for cause," as Agent may determine in its discretion.  The amount of such Closing Store-level Retention Bonuses shall be

Exhibit A – Asset Purchase Agreement

in an amount to be determined by Agent, in its discretion, and shall be payable within thirty (30) days after the Sale Termination Date, and shall be processed through Merchant's payroll system.

Section 10.  **Conditions Precedent and Subsequent.**

(a)    The willingness of Agent to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Agent:

(1)    All representations and warranties of Merchant hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and on the Sale Commencement Date.

(2)    No later than April 28, 2023 (such date, the "Approval Order Deadline"), the Bankruptcy Court shall have entered  an order (the "Approval Order") in a form reasonably satisfactory to Merchant and Agent that authorizes Merchant and Agent to enter into this Agreement and authorizes Merchant to conduct the Sale in accordance with the terms of this Agreement and provides, *inter alia,* that subject to the Closing, (i) this Agreement is in the best interest of Merchant, Merchant's estates, creditors, and other parties in interest, (ii) this Agreement (and each of the transactions contemplated hereby) is approved in its entirety; (iii) Merchant and Agent shall be authorized to continue to take any and all actions deemed necessary or desirable to implement this Agreement and each of the transactions contemplated hereby; (iv) upon payment of the Initial Purchase Price Payment and the Escrow Amount, Agent shall be entitled to sell all Merchandise and Designated F&E hereunder free and clear of all liens, claims or encumbrances thereon; (v) Agent shall have the right to use the Closing Stores and all related Closing Store services, furniture, fixtures, equipment and other assets of Merchant as designated hereunder for the purpose of conducting the Sale, free of any interference from any entity or person, subject to compliance with the Sale Guidelines (as defined below) and Approval Order; (vi) Agent, as agent for Merchant, is authorized to conduct, advertise, post signs, utilize signwalkers, and otherwise promote the Sale consistent with the Store Advertising, in accordance with the Sale Guidelines (as the same may be modified and approved by the Bankruptcy Court) and without further compliance with the Liquidation Sale Laws (as defined above), subject to compliance with the Sale Guidelines and Approval Order; (vii) Agent shall be granted a limited, non-exclusive license and right to use until the Sale Termination Date all Intellectual Property in connection with the Sale; (viii) all newspapers and other advertising media in which the Sale is advertised shall be directed to accept the Approval Order as binding and to allow Merchant and Agent to consummate the transactions provided for in this Agreement, including, without limitation, the conducting and advertising of the Sale in the manner contemplated by this Agreement; (ix) all utilities, landlords, creditors and other interested parties and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the Sale, or institute any action in any court (other than in the Bankruptcy Court) with respect to Merchandise or the Designated F&E or before any administrative body which in any way directly or indirectly interferes with or obstructs or impedes the conduct of the Sale; (x) the Bankruptcy Court shall retain jurisdiction over the parties to enforce this Agreement; (xi) Agent shall not be liable for any claims against Merchant other than as expressly provided for in this Agreement; (xii) subject to Agent having satisfied its payment obligations hereunder, any amounts owed by Merchant to Agent under this Agreement shall be granted the status of superpriority claims in Merchant's Bankruptcy Case pursuant to section 364(c) of Title 11, United States Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code") senior to all other superpriority claims; (xiii) Agent shall be granted a valid, binding, enforceable and perfected security interest for the obligations of Merchant as provided for in Section 15 hereof (without the necessity of filing financing statements to perfect the security interests); (xiv) the Bankruptcy Court finds that time is of the essence in effectuating this Agreement and proceeding with the Sale uninterrupted; (xv) the Bankruptcy Court finds that Merchant's decisions to (a) enter into this Agreement and (b) perform under and make payments required by this Agreement is a reasonable exercise of Merchant's sound business judgment consistent

with its fiduciary duties and is in the best interests of Merchant, its estate, its creditors, and other parties in interest; (xvi) the Bankruptcy Court finds that this Agreement was negotiated in good faith and at arm's length between Merchant and Agent and that Agent is entitled to the protection of section 363(m) of the Bankruptcy Code; (xvii) the Bankruptcy Court finds that Agent's performance under this Agreement will be in good faith and for valid business purposes and uses, as a consequence of which Agent is entitled to the protection and benefits of sections 363(m) and 364(e) of the Bankruptcy Code; (xviii) this Agreement is approved pursuant to Bankruptcy Code section 363; and (xix) in the event any of the provisions of the Approval Order are modified, amended or vacated by a subsequent order of the Bankruptcy Court or any other court, Agent shall be entitled to the protections provided in Bankruptcy Code sections 363(m) and 364(e) and, no such appeal, modification, amendment or vacatur shall affect the validity and enforceability of the sale or the liens or priority authorized or created under this Agreement or the Approval Order.

(b)    The willingness of Merchant to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Merchant:

(1)    All representations and warranties of Agent hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and on the Sale Commencement Date;

(2)    the entry by the Bankruptcy Court of the Approval Order; and

(3)    the payment of the Initial Purchase Price Payment and deposit of the Escrow Amount with the Escrow Agent.

Section 11.  **Representations, Warranties, and Covenants.**

11.1    Merchant's Representations, Warranties, and Covenants.    Merchant hereby represents, warrants, and covenants in favor of Agent as follows:

(a)    Merchant entities (i) are duly organized, validly existing and in good standing under the laws of their state of incorporation or formation, as applicable,  (except as may be a result of the commencement and/or pendency of the Bankruptcy Cases); (ii) have all requisite corporate power and authority to own, lease and operate its assets and properties and to carry on its business as presently conducted; and (iii) are, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including, prior to the Closing, all jurisdictions in which the Closing Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified would not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)    Subject to entry of the Approval Order, Merchant has the right, power and authority to execute and deliver this Agreement and each other document and agreement contemplated hereby (collectively, together with this Agreement, the "Agency Documents") and to perform fully its obligations thereunder.  Subject to entry of the Approval Order, Merchant has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale, except for any such consent the failure of which to be obtained would not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.  Subject to entry of the Approval Order, each of the Agency Documents has been duly executed and delivered by Merchant and

constitutes the legal, valid and binding obligation of Merchant enforceable against it in accordance with its terms.

(c)     Merchant owns, and will own at all times prior to the Closing, good and marketable title to all of the Merchandise and Designated F&E to be included in the Sale, free and clear of all Liens.  Merchant shall not create, incur, assume or suffer to exist any security interest, lien or other charge or encumbrance upon or with respect to any of the Merchandise or the Proceeds (or the Designated F&E or Other Proceeds) other than as provided herein.

(d)     The Sellers have maintained their pricing files (including the File) in the ordinary and usual course of normal day to day operations of the Business through the date hereof consistent with past practice and taking into account the commencement of the Bankruptcy Case.  All pricing files and records are accurate in all material respects as to the actual cost to the Sellers for purchasing the goods referred to therein and as to the selling price to the public for such goods without consideration of any point of sale discounts.  Merchant represents that (i) the ticketed prices of all items of Merchandise do not and shall not include any Sales Taxes and (ii) all registers located at the Closing Stores are programmed to correctly compute all Sales Taxes required to be paid by the customer under applicable law with respect to the Merchandise, as such calculations have been identified to Merchant by its retained service provider.

(e)     Through the Sale Commencement Date, Merchant shall continue to ticket or mark all items of inventory received at the Closing Stores in a manner consistent with similar Merchandise located at the Closing Stores, and in accordance with Merchant's ordinary course past practices and policies relative to pricing and marking inventory.  Since the Signing Date, other than in accordance with Merchant's ordinary course past practices and policies relative to pricing and marking inventory, Merchant has not removed any POS promotions, sale stickers, or other markings indicating items are on sale or on clearance from the Merchandise prior to the Sale Commencement Date, and has not raised, and will not raise, prices of any Merchandise, in each case, in contemplation of the Sale.

(f)     Since April 17, 2023, Merchant has not, and through the Sale Commencement Date Merchant shall not, purchase for or transfer to or from the Closing Stores any merchandise or goods outside the ordinary course; provided, however, that in no event shall Merchant transfer any goods into the Closing Stores without Agent's consent from and after the date hereof other than in the ordinary course of business prior to the Sale Commencement Date.

(g)     To Sellers' Knowledge, all Merchandise is in compliance in all material respects with all applicable federal, state and local product safety laws, rules and standards.  Merchant shall provide Agent with its historic policies and practices, if any, regarding product recalls prior to the Sale Commencement Date.

(h)     Subject to the provisions of the Approval Order, Agent shall have the right to the unencumbered use and occupancy of, and peaceful and quiet possession of, the Closing Stores, the assets currently located at the Closing Stores, and the utilities and other services provided at the Closing Stores.  Merchant shall, until the Closing, maintain in good working order, condition and repair all cash registers, heating systems, air conditioning systems, elevators, escalators and all other mechanical devices necessary for the conduct of the Sale at the Closing Stores.  Except as otherwise restricted by the Bankruptcy Code or as provided herein and absent a bona fide dispute, until the Sale Termination Date, Merchant shall remain current on all expenses and payables necessary or appropriate for the conduct of the Sale (other than those relating to any period prior to the commencement of the Bankruptcy Cases).

(i)     Subject to approval by the Bankruptcy Court or the Approval Order, Merchant will continue to pay throughout the Sale Term all self-insured or Merchant-funded employee benefit

programs for Retained Employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs; which amounts shall be reimbursed by Agent as Expenses pursuant to Section 4.1.

(j)     Since April 17, 2023, Merchant has not intentionally taken, and shall not take, any actions with the intent of increasing the Expenses of the Sale, including without limitation increasing salaries or other amounts payable to employees, except to the extent an employee was due an annual raise in the ordinary course or in an effort to encourage one or more employees to remain in Merchant's employ (such action not being taken with any intent to increase any expense in anticipation of the Sale).

(k)     From April 17, 2023 through the Sale Commencement Date, Merchant covenants that it has and will continue to operate the Closing Stores in all material respects in the ordinary course of business including without limitation by: (i) selling inventory during such period at customary prices consistent with the ordinary course of business; (ii) not promoting or advertising any sales or in-store promotions (including POS promotions) to the public outside of Merchant's ordinary course of business; (iii) except as may occur in the ordinary course of business, not returning inventory to vendors and not transferring inventory or supplies out of or to the Closing Stores; (iv) except as may occur in the ordinary course of business, not making any management personnel moves or changes at the Closing Stores; and (v) replenishing the Closing Stores in the ordinary course of business.

(l)     To Sellers' Knowledge, Merchant has not since April 17, 2023 shipped any Excluded Defective Merchandise from the Distribution Center to the Closing Stores.  Merchant will not knowingly ship any Excluded Defective Merchandise from the date of this Agreement from the Distribution Center to the Closing Stores.

(m)     Other than filing the Bankruptcy Case, as of the date of this Agreement, no action, arbitration, suit, notice, or legal, administrative or other proceeding before any court or governmental body has been instituted by or against Merchant, or has been settled or resolved, or to Sellers' Knowledge, is threatened against or affects Merchant, which questions the validity of this Agreement, or that, if adversely determined, would have a material adverse effect on the ability of Merchant to perform its obligations under this Agreement.

(n)     At the Closing Stores or on the e-commerce platform, from and after April 17, 2023, Merchant shall not offer, promote, advertise, or market inconsistent with Merchant's ordinary course past practices and policies any (i) storewide promotion or storewide discount or offer or (ii) implement or continue any promotion or discount in connection with any "store closing,"  liquidation or similar sales commenced prior to the Sale Commencement Date.

(o)     Since April 17, 2023, Merchant has not and, from and after the date hereof through and including the Sale Termination Date, Merchant shall not transfer any goods from the Closing Stores to the Closing Stores or the Distribution Center.

11.2     Agent's Representations, Warranties, and Covenants.   Agent hereby represents, warrants and covenants in favor of Merchant as follows:

(a)     Agent: (i) is a limited liability company duly and validly existing and in good standing under the laws of the State of Delaware; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Closing Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material

adverse effect on the ability of Agent to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)    Agent has the right, power, and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder.  Agent has taken all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale. Each of the Agency Documents has been duly executed and delivered by Agent and constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms.  No court order or decree of any federal, state, or local governmental authority or regulatory body is in effect that would prevent or impair, or is required for, Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor, other than as provided herein.  No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c)    No action, arbitration, suit, notice, or legal administrative or other proceeding before any court or governmental body has been instituted by or against Agent, or has been settled or resolved or, to Agent's Knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement or which, if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

(d)    The Sale shall be conducted in compliance with all applicable state and local laws, rules, and regulations and Merchant's leases and other agreements, except as otherwise provided for in the Sale Guidelines and Approval Order.

(e)    Absent prior consent by Merchant, Agent will not cause any non-emergency repairs or maintenance (emergency repairs are repairs necessary to preserve the security of a Closing Store premise or to ensure customer safety) to be conducted at the Closing Stores.

(f)    To the best of Agent's Knowledge, all Additional Agent Goods are in compliance with all applicable federal, state or local product safety laws, rules and standards.  All Additional Agent Goods shall be of like kind and no lesser quality to the Merchandise or Inventory under Honored Open Purchase Orders located in the Closing Stores.

Section 12.    **Insurance.**

12.1    Merchant's Liability Insurance.  Merchant shall continue at its cost and expense until the Sale Termination Date, in each case, in such amounts as it currently has in effect, all of its respective liability insurance policies, including, without limitation, commercial general liability, products liability, comprehensive public liability, auto liability and umbrella liability insurance, covering injuries to persons and property in, or in connection with, Merchant's operation of the Closing Stores in effect on the date hereof (collectively, the "Liability Insurance Policies"); and Merchant shall cause Agent to be named as an additional named insured (as its interest may appear) with respect to all such policies.  Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days' prior notice to Agent of cancellation, non-renewal or material change during the Sale Term.  In the event of a claim under any such policies, Merchant shall be responsible for the payment of all deductibles, retentions or self-

insured amounts thereunder, unless it is determined that liability arose by reason of the willful misconduct or grossly negligent acts or omissions of Agent, or Agent's employees, independent contractors or agents. Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to Sale Termination Date without Agent's prior written consent.

12.2    Merchant's Casualty Insurance.    Merchant shall continue until the Sale Termination Date fire, flood, theft and extended coverage casualty insurance, in each case, in effect on the date hereof (collectively, the "Casualty Insurance Policies") covering the Merchandise in a total amount equal to no less than the Cost Value thereof. From and after the date of this Agreement until the Sale Termination Date, as applicable, all such policies will also name Agent as loss payee (as its interest may appear). In the event of a loss to the Merchandise on or after the date of this Agreement, the proceeds of such insurance attributable to the Merchandise shall constitute Proceeds hereunder. Merchant shall deliver to Agent certificates evidencing such insurance, setting forth the duration thereof and naming Agent as loss payee, in form and substance reasonably satisfactory to Agent. All such policies shall require at least thirty (30) days' prior notice to Agent of cancellation, non-renewal or material change during the Sale Term. Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Agent's prior written consent.

12.3    Agent's Insurance.    Agent shall maintain at Agent's cost as an Expense hereunder throughout the Sale Term, in such amounts as it currently has in effect, commercial general liability policies covering injuries to persons and property in or in connection with Agent's agency at the Closing Stores, and shall cause Merchant to be named as an additional insured with respect to such policies. Agent shall deliver to Merchant certificates evidencing such insurance policies setting forth the duration thereof and naming Merchant as an additional insured, in form and substance reasonably satisfactory to Merchant. In the event of a claim under any such policies, Agent shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the willful misconduct or grossly negligent acts or omissions of Merchant or Merchant's employees, as applicable, independent contractors or agents (other than Agent or Agent's employees, agents or independent contractors). Agent shall not make any change in the amount of any deductibles or self insurance amounts prior to the Sale Termination Date without Merchant's prior written consent.

12.4    Worker's Compensation Insurance.    Merchant shall continue and maintain in full force and effect workers' compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements. For the avoidance of doubt, all cost, expenses and liabilities incurred in connection with such continuation and maintenance of workers' compensation insurance shall be the responsibility of, and borne by, Merchant.

Section 13.    **Indemnification.**

13.1    Merchant's Indemnification.    Merchant shall, severally as to themselves only, indemnify and hold Agent and its officers, directors, employees, agents, representatives, and independent contractors (collectively, "Agent Indemnified Parties") harmless from and against all claims, causes of action, demands, penalties, losses, liability, damage, or other obligations, including, without limitation, reasonable attorneys' fees and expenses, directly or

indirectly asserted against, resulting from or related to: (i) Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in this Agreement; (ii) subject to Agent's compliance with its obligations under Section 8.3 hereof, any failure by Merchant (for which Merchant shall have the indemnity obligations hereunder) to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof; (iii) any failure of Merchant to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term; (iv) any consumer warranty or products liability claims relating to Merchandise; (v) any liability or other claims asserted by customers, any of Merchant's employees, or any other person against any Agent Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation, or under the WARN Act); (vi) any harassment or any other unlawful, tortious, or otherwise actionable treatment of any customers, employees or agents of Agent by Merchant or any of their respective representatives (other than Agent); (vi) any failure of Merchant to pay to any Occupancy Expenses or Central Service Expenses during the Sale Term; (vii) any breach of this Agreement by Merchant; and (viii) the gross negligence (including omissions) or willful misconduct of Merchant, as applicable, or their respective officers, directors, employees, agents (other than Agent) or representatives.

13.2    Agent Indemnification.  Agent shall indemnify and hold Merchant and its officers, directors, employees, agents and representatives harmless from and against all claims, causes of action, demands, penalties, losses, liability, damage, or other obligations, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to: (i) Agent's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in this Agreement; (ii) any claims by any party engaged by Agent as an employee or independent contractor arising out of such employment; (iii) any harassment or any other unlawful, tortious or otherwise actionable treatment of any customers, employees or agents of Merchant by Agent or any of its representatives; (iv) any consumer warranty or products liability claims relating to Additional Agent Goods; (v) as set forth in Section 8.3 above; (vi) any breach of this Agreement by Agent; and (vii) the gross negligence (including omissions) or willful misconduct of Agent, its officers, directors, employees, agents or representatives.

Section 14.  **Defaults.  The following shall constitute "Events of Default" hereunder:**

(a)    Merchant or Agent shall fail to perform any material obligation hereunder if such failure remains uncured ten (10) days after receipt of written notice thereof;

(b)    Any representation or warranty made by Merchant or Agent proves untrue in any material respect as of the date made and, to the extent curable, continues uncured ten (10) days after written notice to the defaulting party;

(c)    The entry of an order converting Merchant's Bankruptcy Case to a case under another chapter of the Bankruptcy Code (other than chapter 11) or the entry of an order appointing a chapter 11 trustee; or

(d)    The Sale is terminated prior to the Sale Termination Date or materially interrupted or impaired for any reason other than (i) an Event of Default by Agent, or (ii) any other material breach or action by Agent not authorized hereunder.

Upon an Event of Default, the non-defaulting party (in the case of (a), (b), or (d) above), or Agent (in the case of (c) above) may in its discretion elect to terminate this Agreement, and any party's damages or entitlement to equitable relief on account of an Event of Default shall (in addition to the right to terminate as provided above) be determined by a court of competent jurisdiction.

Section 15. **Agent's Security Interest.**

(a)     Subject to entry of the Approval Order and payment of the Initial Purchase Price and deposit of the Escrow Amount with the Escrow Agent at the Initial Closing, Merchant hereby grants to Agent first priority, senior security interests in and liens upon: (i) the Merchandise; (ii) the Additional Agent Goods; (iii) all Proceeds (including, without limitation, processor receivables and credit card Proceeds); (iv) the Designated F&E; (v) Other Proceeds; and (vi) all "proceeds" (within the meaning of Section 9-102(a)(64) of the Code) of each of the foregoing (all of which are collectively referred to herein as the "Agent Collateral").  Upon entry of the Approval Order, but subject to the Closing and to the preceding sentence, the security interests and liens granted to Agent hereunder shall be deemed properly perfected without the necessity of filing UCC-1 financing statements or any other documentation.

(b)     Subject to entry of the Approval Order and payment of Initial Purchase Price and deposit of the Escrow Amount with the Escrow Agent at the Initial Closing, Merchant shall not sell, grant, assign or transfer any security interest in, or permit to exist any lien or encumbrance on, any of Agent Collateral other than in favor of Agent.

(c)     In the event of an occurrence of an Event of Default other than by Agent, in any jurisdiction where the enforcement of its rights hereunder is sought, Agent shall have, in addition to all other rights and remedies, the rights and remedies of a secured party under the Code.

(d)     "Code" shall mean the Uniform Commercial Code as the same may be in effect from time to time in the State of Delaware.

Section 16. **Miscellaneous.**

16.1   Notices.  All notices and communications provided for pursuant to this Agreement shall be in writing and sent by email, by hand, by facsimile or by Federal Express or other recognized overnight delivery service, as follows:

If to Agent:          HILCO MERCHANT RESOURCES, LLC
                      5 Revere Drive, Suite 206
                      Northbrook, IL 60062
                      Attn: Ian S. Fredericks and Sarah Baker
                      Tel: (847) 418-2075
                      Fax: (847) 897-0859
                      Email: ifredericks@hilcotrading.com and
                             sbaker@hilcoglobal.com


                      With a copy (which shall not constitute notice to Agent)
                      to:

                      Reimer & Braunstein LLP
                      Times Square Tower, Suite 2506
                      Seven Times Square

Exhibit A – Asset Purchase Agreement

New York, New York 10036
Email: sfox@riemerlaw.com
Attn: Steven Fox

If to Merchant:          Tuesday Morning Corporation
                         6250 LBJ Freeway
                         Dallas, TX 75240
                         Email: aberger@tuesdaymorning.com
                         Attn: Andrew Berger

                         With a copy (which shall not constitute notice to Sellers)
                         to:

                         legal@tuesdaymorning.com

                         Munsch Hardt Kopf & Harr, P.C.
                         500 N. Akard Street, Suite 3800
                         Dallas, TX 75201
                         Email: dperry@munsch.com
                         Attn: Deborah Perry

                         Munsch Hardt Kopf & Harr, P.C.
                         500 N. Akard Street, Suite 3800
                         Dallas, TX 75201
                         Email: klippman@munsch.com
                         Attn: Kevin Lippman

16.2    Governing Law; Exclusive Jurisdiction.    This Agreement shall be governed by and interpreted in accordance with the laws of the State of Texas, without reference to any conflict of laws provisions thereof, except where governed by the Bankruptcy Code. Each of the parties hereto irrevocably and unconditionally submits, for itself and its properties, to the exclusive jurisdiction of the Bankruptcy Court, in any action or proceeding arising out of or relating to this Agreement.

16.3    Amendments; Third Party Rights. This Agreement may not be modified except in a written instrument executed by each of the parties hereto. .

16.4    No Waiver. No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party. Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

Exhibit A – Asset Purchase Agreement

16.5    Currency.  All reference to dollars in this Agreement and all schedules, exhibits, and ancillary documents related to this Agreement shall refer to US dollars.

16.6    Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon Agent and Merchant and their respective successors and permitted assigns, including, without limitation, any chapter 11 or chapter 7 trustee; provided, however, that this Agreement may not be assigned by Merchant or Agent to any party without the prior written consent of the other; further provided, however, that Agent shall have the right to syndicate this Agreement upon notice to (but not consent of) Merchant, but Agent shall remain liable under this Agreement not withstanding such syndication.

16.7    Execution in Counterparts.  This Agreement may be executed in one or more counterparts.  Each such counterpart shall be deemed an original, but all such counterparts together shall constitute one and the same agreement.  This Agreement, to the extent signed and delivered by means of a facsimile machine, electronic mail, or other electronic transmission in which the actual signature is evident, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto, each other party hereto or thereto shall re-execute original forms hereof and deliver them to all other parties.  No party hereto shall raise the use of a facsimile machine, electronic mail, or other electronic transmission in which the actual signature is evident to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine, electronic mail, or other electronic transmission in which the actual signature is evident as a defense to the formation of a contract and each party forever waives such defense.  In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the party against which enforcement is sought.

16.8    Section Headings.  The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

16.9    Wiring of Funds.  All amounts required to be paid by Merchant or Agent under any provision of this Agreement shall be made by wire transfer of immediately available funds which shall be wired by Merchant or Agent, as applicable, no later at 2:00 p.m. (Eastern Time) on the date that such payment is due; provided, however, that all of the information necessary to complete the wire transfer has been received by Merchant or Agent, as applicable, by 10:00 a.m. (Eastern Time) on the date that such payment is due.  In the event that the date on which any such payment is due is not a Business Day, then such payment shall be made by wire transfer on the next Business Day.

16.10    Nature of Remedies.  No failure to exercise and no delay in exercising, on the part of Agent, any right, remedy, power, privilege or adjustment hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, privilege, or adjustment hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, privilege, or adjustment.

16.11    Effectiveness.  For the avoidance, unless otherwise agreed to by Merchant and Agent in writing, this Agreement shall only become effective upon the Closing.

Exhibit A – Asset Purchase Agreement

16.12 APA Obligations.  Agent hereby covenants and agrees to comply with the provisions of the APA applicable to Agent.

16.13 Entire Agreement.  This Agreement and the APA contain the entire agreement between Merchant and Agent with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, without limitation, all proposals, letters of intent or representations, written or oral, with respect thereto.  In the event of any ambiguity, conflict or inconsistency between the terms of this Agreement and the terms of the APA, the applicable terms of the Agency Agreement will govern and control in all respects.

[SIGNATURE PAGE TO FOLLOW]

**IN WITNESS WHEREOF, Agent and Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.**

**MERCHANT:**

TUESDAY MORNING CORPORATION

By: _____
Name: Andrew Berger
Title:   Chief Executive Officer

TMI HOLDINGS, INC.

By: _____
Name: Andrew Berger
Title:   Chief Executive Officer

TUESDAY MORNING, INC.

By: _____
Name: Andrew Berger
Title:   Chief Executive Officer

FRIDAY MORNING, LLC

By: _____
Name: Andrew Berger
Title:   Chief Executive Officer

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

Exhibit A – Asset Purchase Agreement

DAYS OF THE WEEK, INC.

By: _____
Name: Andrew Berger
Title:   Chief Executive Officer


NIGHTS OF THE WEEK, INC.

By: _____
Name: Andrew Berger
Title:   Chief Executive Officer


TUESDAY MORNING PARTNERS, LTD.

By: _____
Name: Andrew Berger
Title:   Chief Executive Officer

**IN WITNESS WHEREOF, Agent and Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.**

**AGENT**:

HILCO MERCHANT RESOURCES, LLC

By: _____
Name: Ian S. Fredericks
Title:   President

**List of Exhibits**

Exhibit 1 – Closing Stores
Exhibit 4.1(c) – Per Store, Per Diem Occupancy Expenses
Exhibit 6.2 – Sale Guidelines

Agency Agreement

Exhibit 1 – Closing Stores

**Tuesday Morning**
**Exhibit / Schedule____**
**Store List**

| Store # | Name | Center Name | Address | City | State | Zip | Gross Sq. Ft. | Selling Sq. Ft. |
|---|---|---|---|---|---|---|---|---|
| 3 | DALL0003 | Tuesday Morning | 14303 Inwood Road | Farmers Branch | TX | 75244-3922 | 28,538 | 19,274 |
| 6 | OKLA0006 | The Charter at May | 9446 N May Avenue | Oklahoma City | OK | 73120-2712 | 16,208 | 13,474 |
| 7 | TULS0007 | Summit Square Shopping Center | 6110 E 71st St | Tulsa | OK | 74136-6734 | 22,660 | 17,427 |
| 10 | SANA0010 | Blanco Market | 18450 Blanco Road | San Antonio | TX | 78258-4050 | 14,000 | 12,600 |
| 11 | FORT0011 | Woodland West Shopping Center | 2737 W Park Row Rd | Arlington | TX | 76013-2259 | 7,946 | 6,527 |
| 12 | HOUS0012 | Corum Station I and II | 4690 Louetta Road | Spring | TX | 77388-4417 | 18,084 | 15,405 |
| 16 | KANS0016 | Nall Hills Shopping Center | 9606 Nall Avenue | Overland Park | KS | 66207-2952 | 17,858 | 11,910 |
| 17 | KANS0017 | Mission Mart Shopping Center | 5320 Martway St | Mission | KS | 66205-2913 | 9,300 | 8,370 |
| 19 | HOUS0019 | Clear Lake Center | 20740 Gulf Frwy Ste 140 | Webster | TX | 77598-4816 | 12,132 | 10,919 |
| 33 | DALL0033 | Hillside Village Shopping Center | 6465 E Mockingbird Ln Ste 354 | Dallas | TX | 75214-2454 | 12,803 | 10,556 |
| 42 | SANA0042 | Thousand Oaks Centre | 2945 Thousand Oaks Dr | San Antonio | TX | 78247-3312 | 15,143 | 10,428 |
| 46 | SANA0046 | Leon Creek Shopping Center | 6808 Huebner Road | San Antonio | TX | 78238-2144 | 14,745 | 13,271 |
| 81 | NEWO0081 | Sunshine Plaza | 2985 Hwy 190 | Mandeville | LA | 70471-3298 | 10,500 | 9,450 |
| 86 | LUBB0086 | Lubbock Parkade | 7020 Quaker Ave | Lubbock | TX | 79424-2329 | 13,015 | 11,177 |
| 92 | TYLE0092 | Tyler Town Centre | 322 East SE Loop 323 | Tyler | TX | 75701-9673 | 12,822 | 10,876 |
| 94 | JKSN0094 | County Line Plaza | 1053 E County Line Rd Ste 1041 | Jackson | MS | 39211-1851 | 12,053 | 10,292 |
| 106 | SHRE0106 | Uptown Shopping Center | 4800 Line Ave | Shreveport | LA | 71106-1500 | 10,756 | 8,537 |
| 110 | OKLA0110 | Sooner West Plaza | 3721 W Main St | Norman | OK | 73072-4639 | 11,953 | 10,211 |
| 111 | LAFA0111 | Ambassador Row Courtyards | 3605 Ambassador Caffery Space E | Lafayette | LA | 70503-5132 | 12,500 | 10,065 |
| 113 | CORP0113 | Carmel Village | 4102 S Staples | Corpus Christi | TX | 78411-2100 | 11,045 | 9,941 |
| 119 | MIDL0119 | Colonnade at Polo Park | 4610 N Garfield | Midland | TX | 79705-2652 | 9,288 | 7,841 |
| 121 | AMAR0121 | Spanish Crossroads Shopping Cent | 3415 Bell St | Amarillo | TX | 79109-4150 | 11,565 | 9,736 |
| 124 | AUGU0124 | Washington Corner Shopping Cente | 3241 Washington Rd | Augusta | GA | 30907-4122 | 12,300 | 11,070 |
| 126 | INDI0126 | Avalon Crossing | 6935 Lake Plz Dr Ste C1 | Indianapolis | IN | 46220-4088 | 9,012 | 7,544 |
| 145 | CINC0145 | Burnett Square | 8178 Montgomery Rd | Cincinnati | OH | 45236-2904 | 11,894 | 10,705 |
| 151 | WACO0151 | Lake Air Mall | 5201 Bosque Blvd Ste 380 Bldg 3 | Waco | TX | 76710-4677 | 10,689 | 9,323 |
| 156 | CLEV0156 | Alpha Retail Center | 773 Alpha Dr | Highland Heights | OH | 44143-2166 | 11,700 | 10,530 |
| 160 | HOUS0160 | Champions Village | 5419 FM 1960 W Ste E | Houston | TX | 77069-4305 | 13,378 | 11,825 |
| 162 | PHOE0162 | Arcadia Fiesta | 3055 E Indian School Rd | Phoenix | AZ | 85016-6805 | 12,150 | 9,936 |
| 254 | BATO0254 | Town & Country Shopping Center | 12694 Perkins Rd | Baton Rouge | LA | 70809-1908 | 12,800 | 10,748 |
| 266 | TALL0266 | Capital Plaza | 1806 Thomasville Rd | Tallahassee | FL | 32303-5710 | 9,918 | 8,926 |
| 268 | FORT0268 | Glade Parks | 2911 Rio Grande Blvd Ste 400 | Euless | TX | 76039-4068 | 10,837 | 9,230 |
| 272 | DALL0272 | Vista Ridge S/C | 2325 S Stemmons Frwy Ste 103 | Lewisville | TX | 75067-3468 | 15,469 | 13,005 |
| 279 | LITT0279 | Lakewood Village | 2747 Lakewood Village Dr | North Little Rock | AR | 72116-8030 | 24,221 | 17,278 |
| 285 | HOUS0285 | Sam Moon Center | 17937 I-45 S Ste 125 | Shenandoah | TX | 77385-8783 | 13,426 | 11,759 |
| 287 | CHRL0287 | Pantops Shopping Center | 540 Pantops Center | Charlottesville | VA | 22911-8665 | 10,083 | 8,203 |
| 291 | SANA0291 | Olmos Park Village | 3910 McCullough Ave | San Antonio | TX | 78212-2470 | 11,198 | 9,632 |
| 302 | PENS0302 | Trade Winds Shopping Center | 6601 N Davis Hwy Ste 220 | Pensacola | FL | 32504-6209 | 11,908 | 10,040 |
| 304 | HOUS0304 | Mason Creek Village | 870 S Mason Rd | Katy | TX | 77450-3859 | 12,100 | 10,135 |
| 314 | LONG0314 | Papacita's Village | 305 NW Loop 281 | Longview | TX | 75605-4445 | 7,025 | 6,323 |
| 317 | STLO0317 | Marshall's Plaza | 6929 S Lindbergh Blvd | Saint Louis | MO | 63125-4261 | 12,685 | 10,815 |
| 319 | MACO0319 | Rivergate Shopping Center | 265 Tom Hill Sr Blvd Unit 301 | Macon | GA | 31210-1933 | 10,671 | 8,517 |
| 324 | KNOX0324 | Town and Country Shopping Center | 148 N Peters Rd | Knoxville | TN | 37923-4907 | 24,502 | 20,294 |
| 333 | AUST0333 | The Market at Round Rock | 110 N Interstate 35 | Round Rock | TX | 78681-5003 | 15,246 | 13,091 |
| 335 | JACK0335 | Mandarin Pointe Shopping Center | 12200 San Jose Blvd Ste 6 | Jacksonville | FL | 32223-2656 | 7,953 | 6,542 |
| 340 | SANA0340 | Fiesta Trails | 12651 Vance Jackson Rd Ste 128 | San Antonio | TX | 78230-5959 | 13,074 | 11,496 |
| 343 | ABIL0343 | River Oaks Village | 3301 S 14th St | Abilene | TX | 79605-5015 | 8,336 | 6,655 |

**Tuesday Morning**
Exhibit / Schedule___
Store List

| Store # | Name | Center Name | Address | City | State | Zip | Gross Sq. Ft. | Selling Sq. Ft. |
|---|---|---|---|---|---|---|---|---|
| 344 | FTLA0344 | Embassy Lakes Shopping Center | 2671 N Hiatus Rd | Cooper City | FL | 33026-1372 | 18,645 | 15,688 |
| 348 | SPMO0348 | Brentwood Center South | 2916 S Glenstone Ave | Springfield | MO | 65804-2303 | 12,966 | 11,169 |
| 349 | KANS0349 | Hen House Marketplace | 14950 W 87th St | Lenexa | KS | 66215-6027 | 8,450 | 7,000 |
| 351 | NEWO0351 | Plaza 190 | 176 Gause Blvd W | Slidell | LA | 70460-2625 | 13,038 | 10,723 |
| 355 | GREN0355 | Vaughn's At East North Street | 3715 E North St | Greenville | SC | 29615-2363 | 12,588 | 11,329 |
| 360 | COLM0360 | Forum Shopping Center | 1400 Forum Blvd Ste 1C | Columbia | MO | 65203-1963 | 12,103 | 10,146 |
| 362 | HATT0362 | Walmart Outparcel | 6062 Hwy 98 Ste 101 | Hattiesburg | MS | 39402-8883 | 11,624 | 9,991 |
| 363 | ROAN0363 | Ridgewood Farm Village | 1923 Electric Rd | Salem | VA | 24153-7401 | 9,750 | 8,775 |
| 365 | SANA0365 | Concourse Subdivision | 8421 N US Hwy 281 Ste 105 | San Antonio | TX | 78216-6097 | 21,789 | 16,357 |
| 367 | FTSM0367 | Tuesday Morning | 7810 Rogers Ave | Fort Smith | AR | 72903-5544 | 10,744 | 8,917 |
| 368 | GULF0368 | Edgewater Village | 2650 Beach Blvd Ste 21 | Biloxi | MS | 39531-4517 | 12,273 | 9,913 |
| 371 | DALL0371 | The Village at Allen | 190 E Stacy Rd Ste 1530 | Allen | TX | 75002-8744 | 13,879 | 11,823 |
| 376 | FORT0376 | Plaza at the Parks | 1104 W Arbrook Blvd | Arlington | TX | 76015-4211 | 16,242 | 11,893 |
| 381 | LOUI0381 | Rolling Hills Plaza | 9240 Westport Rd | Louisville | KY | 40242-3227 | 14,560 | 12,307 |
| 384 | GULF0384 | Howard Shopping Center | 2674 Bienville Blvd | Ocean Springs | MS | 39564-3100 | 11,000 | 9,658 |
| 385 | LAKE0385 | Selmart Building | 3517 Ryan St | Lake Charles | LA | 70605-1607 | 9,600 | 8,640 |
| 386 | ALEX0386 | Mac Arthur Village | 1460 MacArthur Blvd | Alexandria | LA | 71301-4022 | 20,929 | 17,449 |
| 391 | FAYE0391 | Market Court | 3180 N College Ave | Fayetteville | AR | 72703-3505 | 12,567 | 10,539 |
| 396 | HOUS0396 | Home Depot Center | 10516 Old Katy Rd | Houston | TX | 77043-5100 | 12,000 | 10,800 |
| 402 | LITT0402 | Riverdale Shopping Center | 2516 Cantrell Rd Ste I | Little Rock | AR | 72202-2116 | 12,046 | 10,124 |
| 408 | MYRT0408 | Pawleys Island Plaza | 10225 Ocean Hwy Unit 400 | Pawleys Island | SC | 29585-6507 | 12,090 | 10,154 |
| 418 | WLMG0418 | South College Center | 1039 S College Rd | Wilmington | NC | 28403-4306 | 7,888 | 6,372 |
| 428 | MOBI0428 | Carriage Towne Shopping Center | 6366 Cottage Hill Rd | Mobile | AL | 36609-3111 | 8,450 | 7,605 |
| 430 | ANNA0430 | Thompson Creek Shopping Center | 380 Thompson Creek Rd | Stevensville | MD | 21666-2513 | 8,040 | 6,847 |
| 434 | HOUS0434 | Captain's Corner S/C | 172 S Friendswood Dr | Friendswood | TX | 77546-3915 | 15,170 | 11,752 |
| 438 | CINC0438 | Expressway Plaza Shopping Center | 2178 Dixie Hwy | Fort Mitchell | KY | 41017-2902 | 11,845 | 9,782 |
| 440 | DAYT0440 | Town and Country Shopping Center | 4116 W Town and Country Rd | Kettering | OH | 45429-2834 | 14,045 | 12,535 |
| 441 | LYNC0441 | Lynchburg Burlington Coat Plaza | 2138 Wards Rd | Lynchburg | VA | 24502-5312 | 7,960 | 6,722 |
| 446 | MOBI0446 | Eastern Shore Plaza | 10200 Eastern Shore Blvd | Spanish Fort | AL | 36527-5803 | 9,660 | 7,800 |
| 449 | CHAT0449 | Highland Plaza S/C | 3901 Hixson Pike Ste 133 | Chattanooga | TN | 37415-3567 | 14,940 | 12,612 |
| 467 | SPAR0467 | Converse Plaza | 1200 E Main St Ste 11 | Spartanburg | SC | 29307-1711 | 11,695 | 9,676 |
| 479 | FRAN0479 | Brighton Park Shopping Center | 1303 US Hwy 127 S Ste 103 | Frankfort | KY | 40601-4424 | 11,795 | 9,218 |
| 481 | LAWT0481 | Cache Road Square | 3801 NW Cache Rd Ste 36 | Lawton | OK | 73505-3722 | 15,047 | 12,970 |
| 487 | DALL0487 | Ridge Road Shopping Center | 1117A Ridge Rd | Rockwall | TX | 75087-4217 | 12,121 | 10,358 |
| 492 | OKLA0492 | Greenway Plaza Shopping Center | 11717 S Western Ave | Oklahoma City | OK | 73170-5802 | 11,024 | 8,813 |
| 503 | PHOE0503 | Sun Shadow Square Center | 10050 W Bell Rd | Sun City | AZ | 85351-1287 | 10,868 | 8,268 |
| 505 | KANS0505 | Summit Shopping Center | 901 NW O'Brien Rd | Lees Summit | MO | 64081-1515 | 13,196 | 10,965 |
| 507 | TULS0507 | Ranch Acres Shopping Center | 3111 S Harvard Ave | Tulsa | OK | 74135-4402 | 19,497 | 16,912 |
| 513 | AUST0513 | Lohmans Crossing | 2300 Lohmans Spur Ste 145 | Lakeway | TX | 78734-6200 | 10,484 | 8,899 |
| 522 | DALL0522 | Preston Shepard Place | 1601 Preston Rd Ste F | Plano | TX | 75093-5101 | 13,864 | 10,888 |
| 528 | DALL0528 | Broadway Village | 233 Commerce Dr | Garland | TX | 75043-5912 | 10,000 | 9,000 |
| 530 | ATLA0530 | Westpark Walk | 401 W Interstate 30 | Peachtree City | GA | 30269-1484 | 21,066 | 17,473 |
| 531 | CHAS0531 | Summerville Plaza | 622 Bacons Bridge Rd | Summerville | SC | 29485-4102 | 18,124 | 13,254 |
| 533 | MOBI0533 | Plantation Pointe | 90 Plantation Pointe | Fairhope | AL | 36532-2962 | 10,175 | 8,777 |
| 540 | NEWO0540 | Celebration Center | 1801 Airline Dr | Metairie | LA | 70001-5977 | 16,993 | 14,915 |
| 554 | LASC0554 | Pan American Plaza | 1723 E University Blvd | Las Cruces | NM | 88001-5780 | 9,344 | 7,726 |
| 556 | SARA0556 | The Parkway Collection | 6050 N Lockwood Ridge Rd | Sarasota | FL | 34243-2525 | 10,033 | 9,030 |

Tuesday Morning
Exhibit / Schedule___
Store List

| Store # | Name | Center Name | Address | City | State | Zip | Gross Sq. Ft. | Selling Sq. Ft. |
|---|---|---|---|---|---|---|---|---|
| 564 | ROCK0564 | Commons at Winthrop College | 725 Cherry Rd Ste 190 | Rock Hill | SC | 29732-3150 | 11,877 | 9,854 |
| 568 | TEXA0568 | Town West S/C | 2315 Richmond Rd Ste 9B | Texarkana | TX | 75503-2447 | 18,988 | 13,365 |
| 575 | HTSP0575 | Temperance Hill Square | 4332 Central Ave | Hot Springs | AR | 71913-7437 | 10,220 | 9,198 |
| 580 | DALL0580 | Razor Ranch | 2608 W University Dr | Denton | TX | 76201-160 | 12,353 | 10,423 |
| 582 | SANG0582 | Southwest Plaza Shopping Center | 3578 Knickerbocker Rd | San Angelo | TX | 76904-7611 | 12,000 | 10,800 |
| 585 | CLAR0585 | Tradewinds South Shopping Center | 1951 Madison St | Clarksville | TN | 37043-5066 | 11,780 | 10,040 |
| 586 | TAMP0586 | Lithia Square Shopping Center | 911 Lithia Pinecrest Rd | Brandon | FL | 33511-6120 | 10,000 | 9,000 |
| 598 | GULF0598 | Pineville Plaza S/C | 19099 Pineville Rd Ste 102 | Long Beach | MS | 39560-4423 | 22,968 | 12,493 |
| 602 | BOIS0602 | Westpark Town Plaza | 301 N Milwaukee St | Boise | ID | 83704-9135 | 10,571 | 8,945 |
| 611 | YORK0611 | South York Village Center | 2142 S Queen St | York | PA | 17403-4826 | 9,932 | 8,939 |
| 613 | MEMP0613 | City Center | 632 W Poplar Ave | Collierville | TN | 38017-2540 | 13,315 | 11,340 |
| 617 | CAPE0617 | Lambert Plaza | 155 Siemers Dr Ste 1 | Cape Girardeau | MO | 63701-4920 | 9,400 | 7,604 |
| 623 | VERO0623 | Vero Mall | 1295 US Highway 1 | Vero Beach | FL | 32960-5700 | 10,560 | 9,504 |
| 625 | HOUS0625 | Montgomery Plaza Shopping Center | 1406 N Loop 336 W | Conroe | TX | 77304-3535 | 11,324 | 10,091 |
| 632 | BATO0632 | Woodlawn Park | 6632 Jones Creek Rd | Baton Rouge | LA | 70817-3054 | 15,797 | 12,979 |
| 634 | TEMP0634 | Market Place Shopping Center | 3064 S 31st St | Temple | TX | 76502-1803 | 15,122 | 12,867 |
| 637 | BROW0637 | Resaca Village Shopping Center | 1601 Price Rd | Brownsville | TX | 78521-1463 | 9,528 | 7,762 |
| 639 | DBCH0639 | Rivergate Village Shopping Center | 130 S Nova Rd | Ormond Beach | FL | 32174-6115 | 12,000 | 10,550 |
| 640 | PITT0640 | Quaker Village | 12 Ohio River Blvd | Leetsdale | PA | 15056-1149 | 14,000 | 12,600 |
| 642 | KANS0642 | Stanley Square Shopping Center | 8038 W 151st St | Stanley | KS | 66223-2116 | 10,019 | 8,070 |
| 649 | DETR0649 | Downtown Farmington Center | 23314 Farmington Rd | Farmington | MI | 48336-3102 | 14,620 | 11,789 |
| 667 | CHAR0667 | Huntersville Square | 102 Statesville Rd Ste E1 | Huntersville | NC | 28078-6082 | 13,065 | 11,280 |
| 674 | DALL0674 | Westgate Shopping Center | 117 S Central Expwy | Mckinney | TX | 75070-3743 | 20,000 | 16,259 |
| 678 | BOWL0678 | Ashley Center | 1751 Scottsville Rd | Bowling Green | KY | 42104-3357 | 8,293 | 6,973 |
| 681 | OKLA0681 | Chisholm Shopping Center | 1111 Garth Brooks Blvd | Yukon | OK | 73099-4106 | 12,309 | 10,363 |
| 686 | MYRT0686 | Shoppes at 70th | 6908 N Kings Hwy | Myrtle Beach | SC | 29572-3020 | 15,515 | 13,062 |
| 690 | LANC0690 | Wheatland Center | 1825 Columbia Ave | Lancaster | PA | 17603-4335 | 12,300 | 10,534 |
| 694 | JKTN0694 | Hamilton Hills | 621 Old Hickory Blvd | Jackson | TN | 38305-2911 | 12,059 | 9,527 |
| 727 | SANA0727 | New Braunfels Market Place | 651 N Business Interstate Hwy 35 Stre 1400 | New Braunfels | TX | 78130-7877 | 15,087 | 12,635 |
| 731 | BOIS0731 | Eastgate Shopping Center | 656 E Boise Ave | Boise | ID | 83706-5118 | 11,500 | 10,350 |
| 733 | NASH0733 | Broad Street Centre | 1250 NW Broad St | Murfreesboro | TN | 37129-1713 | 7,910 | 7,119 |
| 735 | CLEM0735 | Keowee Village Shopping Center | 113 Bilo Pl | Seneca | SC | 29678-2541 | 8,500 | 7,650 |
| 747 | FTWB0747 | Uptown Station | 99 Eglin Pkwy NE | Fort Walton Beach | FL | 32548-4973 | 8,210 | 6,795 |
| 748 | JKSN0748 | Crossgates Village | 1578 W Government St | Brandon | MS | 39042-2418 | 8,640 | 7,279 |
| 756 | BENT0756 | Scottsdale Center | 208 S Promenade Blvd | Rogers | AR | 72758-1623 | 18,081 | 14,837 |
| 759 | CHAT0759 | Cleveland Corners | 820 25th St NW | Cleveland | TN | 37311-3713 | 9,967 | 7,013 |
| 764 | JACK0764 | Sadler Square | 2146 Sadler Sq | Fernandina Beach | FL | 32034-4458 | 14,145 | 12,128 |
| 770 | STS0770 | Lanier Plaza | 1919 Glynn Ave | Brunswick | GA | 31520-6162 | 10,852 | 8,715 |
| 782 | ATLA0782 | Saddlebrook Shopping Center | 10945 State Bridge Rd | Alpharetta | GA | 30022-8164 | 10,033 | 8,294 |
| 786 | AUST0786 | Rivery Towne Crossing | 1103 Rivery Blvd Ste #270 | Georgetown | TX | 78628-305 | 15,346 | 13,602 |
| 803 | SHER0803 | Sherman Centre | 2711 N US Highway 75 | Sherman | TX | 75090-2567 | 13,170 | 11,202 |
| 809 | FARG0809 | Homestead Mall | 3223 13th Ave SW | Fargo | ND | 58103-6310 | 8,000 | 6,485 |
| 816 | ATLA0816 | Towne Lake Center | 1432 Towne Lake Pkwy | Woodstock | GA | 30189-8263 | 15,069 | 12,319 |
| 827 | LITT0827 | The Shoppes of Benton | 20496 Interstate 30 N | Benton | AR | 72019-9836 | 12,352 | 10,214 |
| 837 | BRAN0837 | Shoppes at Branson Meadows | 4310 Gretna Rd | Branson | MO | 65616-7201 | 12,500 | 10,234 |
| 843 | AKRO0843 | Stow - Hudson Towne Center | 1614 Norton Rd | Stow | OH | 44224-1412 | 12,456 | 9,635 |
| 869 | OXFD0869 | Old Town Square Shopping Center | 1913 University Ave | Oxford | MS | 38655-4113 | 13,896 | 11,896 |

TM_Exhibts_040623_215pm.xlsx
4/6/2023 2:15 PM

Tuesday Morning
Exhibit / Schedule____
Store List

| Store # | Name | Center Name | Address | City | State | Zip | Gross Sq. Ft. | Selling Sq. Ft. |
|---|---|---|---|---|---|---|---|---|
| 873 | PRES0873 | Village At The Boulders | 1260 Gail Gardner Way | Prescott | AZ | 86305-1687 | 12,039 | 10,446 |
| 874 | PANA0874 | Beach Shopping Center | 7928 Front Beach Rd | Panama City Beach | FL | 32407-4817 | 8,459 | 6,981 |
| 882 | ASHE0882 | Blue Ridge Mall | 1800 Four Seasons Blvd H13 | Hendersonville | NC | 28792-2891 | 8,972 | 7,451 |
| 885 | STAG0885 | Seabridge Square Shopping Center | 1799 US Highway 1 S | St Augustine | FL | 32084-4238 | 10,760 | 8,721 |
| 889 | JOPL0889 | Concorde Plaza | 2639 E 32nd St | Joplin | MO | 64804-4320 | 8,333 | 6,748 |
| 890 | FAYT0890 | Town And Country Shopping Center | 1375 N Sandhills Blvd | Aberdeen | NC | 28315-2211 | 9,416 | 7,842 |
| 897 | DALL0897 | Waxahachie Market Place | 1700 N Hwy 77 Ste 166 | Waxahachie | TX | 75165-7892 | 11,950 | 10,134 |
| 898 | CHIC0898 | Stonehill Center | 900 Route 22 | Fox River Grove | IL | 60021-0000 | 11,301 | 8,955 |
| 902 | CHAS0902 | Island Plaza Shopping Center | 1291 Folly Rd Ste 104 | James Island | SC | 29412-4105 | 26,850 | 14,559 |
| 911 | HOUS0911 | Katy Ranch Crossing | 24427 Katy Frwy | Katy | TX | 77494-0000 | 12,500 | 10,679 |
| 914 | FORT0914 | Weatherford Ridge | 735 Adams Dr | Weatherford | TX | 76086-6277 | 14,905 | 12,832 |
| 916 | SANA0916 | Forum Crossing | 3150 Pat Booker Rd Ste 112 | Universal City | TX | 78148-2726 | 15,201 | 13,348 |
| 941 | FLAU0941 | Florence Square S/C | 179 Cox Creek Pkwy S | Florence | AL | 35630-3264 | 7,721 | 6,476 |
| 942 | CHIC0942 | Lake View Plaza | 15846 S LaGrange Rd | Orland Park | IL | 60462-4702 | 19,264 | 15,906 |
| 946 | FORT0946 | Keller Crossing Shopping Center | 1580 Keller Pkwy FM 1709 | Keller | TX | 76248-0000 | 13,781 | 11,550 |
| 953 | AUST0953 | Northlake Plaza | 2511 N US Highway 281 | Marble Falls | TX | 78654-3895 | 6,541 | 5,306 |
| 964 | INDI0964 | Merchants Square | 2188 E 116th St Ste D102 | Carmel | IN | 46032-3213 | 12,447 | 10,664 |
| 981 | HUNT0981 | Village Shoppes of Madison | 12090 County Line Rd Ste 1 | Madison | AL | 35758-2002 | 9,933 | 8,241 |
| 984 | PARI0984 | Paris Towne Center | 3552 Lamar Ave | Paris | TX | 75460-5026 | 10,709 | 9,099 |
| 1002 | LAKH1002 | Havasu North | 1795 Kiowa Ave Ste103 | Lake Havasu City | AZ | 86403-3146 | 10,650 | 9,092 |
| 1010 | DALL1010 | MacArthur Park | 7787 N MacArthur Blvd | Irving | TX | 75063-0000 | 12,030 | 9,885 |
| 1014 | NEWC1014 | Field Club Commons | 3332 Wilmington Rd | New Castle | PA | 16105-1039 | 7,974 | 6,564 |
| 1017 | SPID1017 | Plaza 410 | 410 Padre Blvd | South Padre Island | TX | 78597-6603 | 8,095 | 7,285 |
| 1027 | STVL1027 | Village Crossing | 402 Hwy 12 W | Starkville | MS | 39759-0000 | 16,814 | 14,497 |
| 1028 | BURL1028 | Rosewood Village Shopping Center | 3394 S Church St | Burlington | NC | 27215-9150 | 10,000 | 8,494 |
| 1033 | BATO1033 | Acadian Perkins Plaza | 3735 Perkins Rd | Baton Rouge | LA | 70808-2950 | 12,500 | 11,255 |
| 1034 | HILT1034 | Sheridan Dr | 1 Sherington Dr | Bluffton | SC | 29910-6018 | 13,464 | 11,200 |
| 1039 | PENS1039 | Gulf Breeze Shopping Center | 330 Gulf Breeze Pkwy | Gulf Breeze | FL | 32561-4492 | 12,664 | 10,145 |
| 1048 | SANA1048 | River Oaks Shopping Center | 851 Junction Hwy | Kerrville | TX | 78028-5056 | 11,075 | 9,835 |
| 1053 | JKSN1053 | The Market at Grant's Ferry | 630 Grants Ferry Rd | Flowood | MS | 39232-6844 | 8,146 | 6,777 |
| 1056 | CLMB1056 | Tuesday Morning | 4905 Forest Dr | Columbia | SC | 29206-4916 | 14,523 | 12,430 |
| 1062 | CHPK1062 | Great Bridge Shopping Center | 237 Battlefield Blvd S Ste 10 | Chesapeake | VA | 23322-5231 | 13,162 | 10,619 |
| 1065 | HOUS1065 | Merchants Park | 901A N Shepherd Dr | Houston | TX | 77008-6526 | 13,045 | 10,817 |
| 1069 | EAST1069 | Tred Avon Square | 210 Marlboro Ave Ste 47 | Easton | MD | 21601-2765 | 10,756 | 9,042 |
| 1070 | LXMR1070 | Lexington Towne Centre | 932 N Lake Dr | Lexington | SC | 29072-2151 | 9,100 | 7,251 |
| 1076 | MYRT1076 | Surfwood Plaza | 240 Hwy 17 N | North Myrtle Beach | SC | 29582-2938 | 13,626 | 11,300 |
| 1091 | HATT1091 | Parkside Plaza | 934 N 16th Avenue | Laurel | MS | 39440-3362 | 9,488 | 7,209 |
| 1094 | OKLA1094 | Uptown Plaza Shopping Center | 7517 SE 15th | Midwest City | OK | 73110-5425 | 21,051 | 15,550 |
| 1098 | AUST1098 | The Parke Shopping Center | 5001 183A Toll Rd Ste J100 | Cedar Park | TX | 78613-7938 | 12,312 | 10,384 |
| 1103 | MYRT1103 | The Market at Murrell's Inlet Sh | 736 & 740 Mink Ave | Murrells Inlet | SC | 29576-6300 | 8,400 | 7,102 |
| 1112 | FLAG1112 | The Marketplace at Flagstaff Mal | 5005 E Marketplace Dr Ste170 | Flagstaff | AZ | 86004-2857 | 15,284 | 12,891 |
| 1116 | STLO1116 | Ellisville Square | 15921 Manchester Rd | Ellisville | MO | 63011-2101 | 21,359 | 17,600 |
| 1128 | GALV1128 | Galveston Plaza | 2727 61st St | Galveston | TX | 77551-1847 | 8,819 | 7,454 |
| 1129 | SEDO1129 | Oak Creek Factory Outlets | 6657 State Rte 179 Ste 2 | Sedona | AZ | 86351-8994 | 11,726 | 9,983 |
| 1131 | JACK1131 | Roosevelt Plaza | 4524 9 St Johns Ave | Jacksonville | FL | 32210-0000 | 8,133 | 6,770 |
| 1141 | LITT1141 | Race Street Place | 2701 E Race Ave Ste 6 | Searcy | AR | 72143-4737 | 15,349 | 13,209 |
| 1148 | TUCS1148 | Oro Valley Marketplace | 11835 N Oracle Rd Ste 133 | Oro Valley | AZ | 85737-7838 | 8,000 | 7,000 |

TM_Exhibits_040623_215pm.xlsx
4/6/2023 2:15 PM

**Tuesday Morning**
Exhibit / Schedule
Store List

| Store # | Name | Center Name | Address | City | State | Zip | Gross Sq. Ft. | Selling Sq. Ft. |
|---|---|---|---|---|---|---|---|---|
| 1149 | ROAN1149 | Towers Shopping Center | 660 Brandon Ave SW | Roanoke | VA | 24015-3212 | 14,450 | 12,278 |
| 1151 | MONR1151 | Fred's Center | 1703 N 18th St | Monroe | LA | 71201-4917 | 9,600 | 7,747 |
| 1155 | ASHE1155 | Westgate Shopping Center | 44 Westgate Pkwy | Asheville | NC | 28806-3808 | 18,000 | 15,000 |
| 1182 | PLMC1182 | Island Walk | 250 Palm Coast Pkwy NE Unit 603 | Palm Coast | FL | 32137-8225 | 13,879 | 11,254 |
| 1189 | AUST1189 | Great Hills Station | 10225 Research Blvd Ste 3000B | Austin | TX | 78759-5704 | 18,079 | 15,466 |
| 1195 | OKLA1195 | Edmond Crossing | 28 E 33rd St | Edmond | OK | 73013-4603 | 11,512 | 9,657 |
| 1197 | DALL1197 | Parkway Towne Crossing | 4995 Eldorado Pkwy Ste 520 | Frisco | TX | 75033-8617 | 11,084 | 9,413 |
| 1199 | CHAR1199 | Tuesday Morning | 10828 Providence Road | Charlotte | NC | 28277-2684 | 13,039 | 10,466 |
| 1212 | LKLN1212 | Southgate Shopping Center | 2625 S Florida Ave | Lakeland | FL | 33803-3858 | 19,949 | 17,563 |
| 1219 | MOBI1219 | Riviera Square | 2524 S McKenzie St | Foley | AL | 36535-340 | 10,045 | 8,320 |
| 1236 | HOUS1236 | Shoppes at Kingsgate | 1365 Kingwood Dr | Houston | TX | 77339-303 | 17,538 | 13,528 |
| | **199** | | | | | | **12,718** | **10,539** |

Agency Agreement

Exhibit 4.1(c) – Per Store, Per Diem Occupancy Expenses

Agency Agreement

Exhibit 6.2 – Sale Guidelines

## [_] SALE GUIDELINES

A.      The Sale shall be conducted so that the Stores in which sales are to occur will remain open no longer than during the normal hours of operation provided for in the respective leases for the Stores.

B.      The Sale shall be conducted in accordance with applicable state and local "Blue Laws", where applicable, so that no Sale shall be conducted on Sunday unless the Merchant had been operating such Store on a Sunday.

C.      On "shopping center" property, the Agent shall not distribute handbills, leaflets or other written materials to customers outside of any Stores' premises, unless permitted by the lease or, if distribution is customary in the "shopping center" in which such Store is located; provided that Agent may solicit customers in the Stores themselves. On "shopping center" property, the Agent shall not use any flashing lights or amplified sound to advertise the Sale or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

D.      At the conclusion of the Sale, the Agent shall vacate the Stores in broom clean condition, and shall leave the Locations in the same condition as on Sale Commencement Date, ordinary wear and tear excepted, in accordance with Section 6 of the Agency Agreement, provided, however, that the Merchant and the Agent hereby do not undertake any greater obligation than as set forth in an applicable lease with respect to a Store. The Agent and Merchant may abandon any FF&E not sold in the Sale at the Stores at the conclusion of the Sale. Any abandoned FF&E left in a Store after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Merchant. For the avoidance of doubt, as of the Sale Termination Date, the Agent may abandon, in place and without further responsibility, any FF&E located at a Store.

E.      . The Merchant and the Agent may advertise the Sale as a "going out of business," "store closing" "sale on everything", "everything must go", or similar themed sale.

F.      Agent shall be permitted to utilize display, hanging signs, and interior banners in connection with the Sale; provided, however, that such display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner. The Merchant and the Agent shall not use neon or day-glo on its display, hanging signs, or interior banners.  Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines.  In addition, the Merchant and the Agent shall be permitted to utilize exterior banners at (i) non-enclosed mall Stores and (ii) enclosed mall Stores to the extent the entrance to the applicable Store does not require entry into the enclosed mall common area; provided, however, that such banners shall be located or hung so as to make clear that the Sale is being conducted only at the affected Store, shall not be wider than the storefront of the Store, and shall not be larger than 4 feet x 40 feet.  In addition, the Merchant and the Agent shall be permitted to utilize sign walkers and A-frames in a safe and professional manner and in accordance with the terms of the Approval Order.   Nothing contained in these Sale Guidelines shall be construed to create or impose upon the Agent any additional restrictions not contained in the applicable lease agreement.

F.      Conspicuous signs shall be posted in the cash register areas of each of the affected Stores to effect that "all sales are final."

G.      Except with respect to the hanging of exterior banners, the Agent shall not make any alterations to the storefront or exterior walls of any Stores.

H.      The Agent shall not make any alterations to interior or exterior Store lighting. No property of the landlord of a Store shall be removed or sold during the Sale. The hanging of exterior banners or in-Store signage and banners shall not constitute an alteration to a Store.

1

I.      The Agent shall keep Store premises and surrounding areas clear and orderly consistent with present practices.

J.      Subject to the provisions of the Agency Agreement the Agent shall have the right to sell all furniture, fixtures, and equipment located at the Stores and Distribution Center(s) (the "FF&E"). The Agent may advertise the sale of the FF&E in a manner consistent with these guidelines at the Stores and Distribution Center(s). The purchasers of any FF&E sold during the sale shall be permitted to remove the FF&E either through the back shipping areas at any time, or through other areas after Store business hours. For the avoidance of doubt, as of the Sale Termination Date, the Agent may abandon, in place and without further responsibility, any FF&E.

K.      The Agent shall be entitled to include Additional Agent Goods in the Sale in accordance with the terms of the Approval Order and the Agency Agreement.

L.      At the conclusion of the Sale at each Store, pending assumption or rejection of applicable leases, the landlords of the Stores shall have reasonable access to the Stores' premises as set forth in the applicable leases. The Merchant, the Agent and their agents and representatives shall continue to have exclusive and unfettered access to the Stores.

M.      Post-petition rents shall be paid by the Merchant as required by the Bankruptcy Code until the rejection or assumption and assignment of each lease. Agent shall have no responsibility therefor.

N.      The rights of landlords against Merchant for any damages to a Store shall be reserved in accordance with the provisions of the applicable lease.

O.      If and to the extent that the landlord of any Store affected hereby contends that the Agent or Merchant is in breach of or default under these Sale Guidelines, such landlord shall email or deliver written notice by overnight delivery on the Merchant's counsel and the Agent's counsel as follows:

If to the Merchant:

If to the Agent:

2

EXHIBIT B

BILL OF SALE

Exhibit B

Bill of Sale

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Tuesday Morning Corporation, TMI Holdings, Inc., Tuesday Morning, Inc., Friday Morning, LLC, Days of the Week, Inc., Nights of the Week, Inc., and Tuesday Morning Partners, Ltd. (collectively, the "**Sellers**" and each, a "**Seller**"), do hereby grant, bargain, transfer, sell, assign, convey and deliver to Hilco Merchant Resources, LLC ("**Purchaser**"), all of their right, title, and interest in and to the Acquired Assets, as such term is defined in the Asset Purchase Agreement, dated as of April 24, 2023 (the "**Agreement**"), among Sellers and Purchaser, to have and to hold the same unto Purchaser, its successors and assigns, forever.

This Bill of Sale is subject in all respects to the terms and conditions of the Agreement, all of which shall survive the execution and delivery of this Bill of Sale in accordance with the terms of the Agreement. The Acquired Assets are being delivered pursuant to the terms and conditions contained in the Agreement. Nothing contained herein shall supersede, amend, alter or modify (nor shall it be deemed or construed to supersede, amend, alter or modify) any of the terms or conditions of the Agreement in any manner whatsoever. In the event of any conflict between the provisions of this Bill of Sale and the provisions of the Agreement, the provisions of the Agreement shall control and prevail.

Purchaser acknowledges that Sellers make no representation or warranty with respect to the Acquired Assets being conveyed hereby except as specifically set forth in the Agreement. Notwithstanding anything herein to the contrary, the Acquired Assets shall not include the Excluded Assets (as defined in the Agreement). This Bill of Sale shall be governed and interpreted in accordance with federal bankruptcy law, to the extent applicable, and where state law is implicated the laws of the State of Texas, without regard to principles of conflicts of law, except to the extent that United States bankruptcy law is applicable.  The Bankruptcy Court (as defined in the Agreement) will have jurisdiction over the parties hereto and any and all disputes between or among the parties, whether in law or equity, arising out of or relating to this Bill of Sale or any agreement contemplated hereby. Each of the parties hereto hereby irrevocably waives any and all right to trial by jury in any legal proceeding arising out of or related to this Bill of Sale or the transactions contemplated hereby.

[Signature page follows]

IN WITNESS WHEREOF, the undersigned have duly executed this Bill of Sale to be effective as of the Effective Date.

**SELLERS**:

TUESDAY MORNING CORPORATION

By:_____
Name: Andrew Berger
Title: Chief Executive Officer

TMI HOLDINGS, INC.

By:_____
Name: Andrew Berger
Title: Chief Executive Officer

TUESDAY MORNING, INC.

By:_____
Name: Andrew Berger
Title: Chief Executive Officer

FRIDAY MORNING, LLC

By:_____
Name: Andrew Berger
Title: Chief Executive Officer

[Signatures continue on following page]

Exhibit B – Asset Purchase Agreement

DAYS OF THE WEEK, INC.


By:_____
Name: Andrew Berger
Title: Chief Executive Officer


NIGHTS OF THE WEEK, INC.


By:_____
Name: Andrew Berger
Title: Chief Executive Officer


TUESDAY MORNING PARTNERS, LTD.


By:_____
Name: Andrew Berger
Title: Chief Executive Officer

IN WITNESS WHEREOF, the undersigned have duly executed this Bill of Sale to be effective as of the Effective Date.

**PURCHASER**:

HILCO MERCHANT RESOURCES, LLC

By:_____
Name: Ian S. Fredericks
Title:  President

EXHIBIT C

SALE APPROVAL ORDER

Exhibit C

<u>Sale Approval Order</u>

(see attached)

Exhibit C – Asset Purchase Agreement

EXHIBIT D

ASSIGNMENT AND ASSUMPTION AGREEMENT

Exhibit D

Assignment and Assumption Agreement

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "**Agreement**") is made to be effective as of April 28, 2023 (the "**Effective Date**"), by and among Tuesday Morning Corporation, TMI Holdings, Inc., Tuesday Morning, Inc., Friday Morning, LLC, Days of the Week, Inc., Nights of the Week, Inc., and Tuesday Morning Partners, Ltd. (collectively, the "**Sellers**" and each, a "**Seller**") and Hilco Merchant Resources, LLC (the "**Purchaser**").  This Agreement is executed pursuant to the terms of that certain Asset Purchase Agreement, dated as of April 24, 2023, by and among Sellers and Purchaser (the "**Purchase Agreement**").

In consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Sellers and Purchaser agree as follows:

1.      Capitalized Terms.  Any capitalized term not defined in this Agreement shall have the meaning assigned to such term in the Purchase Agreement.

2.      Assignment and Assumption of Liabilities.  Upon the terms and subject to the conditions of the Purchase Agreement, Sellers hereby assign to Purchaser, and Purchaser hereby assumes from Sellers and shall thereafter be responsible for the payment, performance or discharge of the Assumed Liabilities.  Notwithstanding anything to the contrary in this Agreement, except for the Assumed Liabilities, Purchaser shall not assume and shall not be in any way liable or responsible for (whether directly, indirectly, contingently or otherwise) any Excluded Liabilities, and the parties hereto agree that all such Excluded Liabilities shall remain the sole responsibility of Sellers.

3.      Assignment and Assumption of Assumed Contracts and Leases. Sellers hereby sell, assign, grant, convey and transfer to Purchaser all of Sellers' respective right, title and interest in and to the Assumed Contracts and Leases.  Purchaser hereby accepts such assignment and transfer of the Assumed Contracts and Leases and assumes all of Sellers' duties and obligations under the Assumed Contracts and Leases (other than the Excluded Liabilities) and agrees to pay, perform and discharge, as and when due, all of the obligations of Sellers under the Assumed Contracts and Leases (other than the Excluded Liabilities) accruing on and after the Effective Date, all with full force and effect as if Purchaser were a signatory to each of such Assumed Contracts and Leases.  Notwithstanding anything herein to the contrary, the Assumed Contracts and Leases shall not include the Excluded Contracts and Leases.

4.      Purchase Agreement. Notwithstanding any other provisions of this Agreement to the contrary, nothing contained in this Agreement shall in any way supersede, replace, restate, amend, expand, or otherwise modify in any way any provision or limitation of the Purchase Agreement or any rights, obligations, representations, warranties or remedies of the parties under the Purchase Agreement. This Agreement is being delivered pursuant to the Purchase Agreement to effect the transfer of the Assumed Contracts and Leases and the Assumed Liabilities pursuant to the Purchase Agreement, and it is subject to all of the terms, conditions and limitations set forth in the Purchase Agreement.

5.      Governing Law.  This Agreement shall be governed and interpreted in accordance with the laws of the State of Texas without regard to principles of conflicts of law, except to the extent that United States bankruptcy law is applicable.

6.      Further Assurances.  Each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances, and assurances

and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

7.      <u>No Third Party Beneficiaries</u>.    The sole purpose hereof is to transfer and convey to Purchaser the Assumed Contracts and Leases and the Assumed Liabilities and to evidence the assumption by Purchaser of the Assumed Liabilities and not to create third party beneficiary rights.

8.      <u>Counterparts</u>.    This Agreement may be executed (including by facsimile or other electronic transmission) in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

9.      <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

[SIGNATURE PAGE FOLLOWS]

The undersigned have caused this Agreement to be executed as of the Effective Date.

**SELLERS**:

TUESDAY MORNING CORPORATION


By:_____
Name: Andrew Berger
Title: Chief Executive Officer


TMI HOLDINGS, INC.


By:_____
Name: Andrew Berger
Title: Chief Executive Officer


TUESDAY MORNING, INC.


By:_____
Name: Andrew Berger
Title: Chief Executive Officer


FRIDAY MORNING, LLC


By:_____
Name: Andrew Berger
Title: Chief Executive Officer

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

Exhibit D – Asset Purchase Agreement

DAYS OF THE WEEK, INC.


By:_____
Name: Andrew Berger
Title: Chief Executive Officer


NIGHTS OF THE WEEK, INC.


By:_____
Name: Andrew Berger
Title: Chief Executive Officer


TUESDAY MORNING PARTNERS, LTD.


By:_____
Name: Andrew Berger
Title: Chief Executive Officer

EXHIBIT E

INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT

Exhibit E

Intellectual Property Assignment Agreement

This INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT (this "**Agreement**"), effective as of April 28, 2023 (the "**Effective Date**"), is by and among Tuesday Morning Corporation, TMI Holdings, Inc., Tuesday Morning, Inc., Friday Morning, LLC, Days of the Week, Inc., Nights of the Week, Inc., and Tuesday Morning Partners, Ltd. (collectively, the "**Assignors**" and each, an "**Assignor**") and Hilco Merchant Resources, LLC (the "**Assignee**"). Assignors and Assignee may be referred to in this Agreement individually as a "**Party**" and together as the "**Parties**".

In consideration of good and valuable consideration as acknowledged by the Parties it is agreed by and between the Parties as follows:

ARTICLE I
DEFINITIONS

For purposes of this Agreement, the following capitalized terms are defined in this <u>Article 1</u> and shall have the meaning specified herein.

"**Copyrights**" means, collectively, any and all copyright rights, design rights, copyright applications, copyright registrations and like protections in each work or authorship and derivative work thereof, whether published or unpublished and whether or not the same also constitutes a trade secret, including those listed on <u>Exhibit A</u> to this Agreement.

"**Domains**" mean the internet domain names listed on <u>Exhibit B</u> to this Agreement.

"**Patents**" means, collectively, all patents, patent applications and like protections including, without limitation, improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same, including any rights to those listed on <u>Exhibit C</u> to this Agreement.

"**Trademarks**" means, collectively, trademarks, trademark applications, service marks, trade names, trade dress, design rights, domain names and other identifiers of origin (including all applications for, or registrations of, each of the foregoing), and the entire goodwill of the business of Assignors, including those as listed on <u>Exhibit D</u> to this Agreement.

"**Assigned Property**" means, collectively, the Copyrights, Domains, Patents, and Trademarks as those terms are defined in this Agreement, including without limitation (i) the goodwill of the business associated therewith, (ii) all rights of Assignor, if any, to obtain registrations, renewals, and extensions of the Assigned Property, individually or collectively, that may be secured under the laws now or hereafter in force and effect in the United States, or in any other country or countries; and (b) all rights of Assignor, if any, to sue for all past infringements of the Assigned Property, both at common law and under the statutes of the United States or any other country.

Exhibit E – Asset Purchase Agreement

ARTICLE II
ASSIGNMENT

1. **Assignment**. Assignors hereby irrevocably assign, transfer, and convey to Assignee, its successors and assigns, any and all of their right, title, and interest in and to the Assigned Property. By making this Agreement, Assignors are not representing or warranting that they have any rights or interests in or to the Domains listed on <u>Exhibit B</u> to this Agreement.

2. **Successors and Assigns.**  This Assignment will be fully binding upon, inure to the benefit of and be enforceable by the Parties and their respective successors and assigns.

3. **Severability**. The provisions of this Agreement are severable and the invalidity or unenforceability of any provision does not affect the validity or enforceability of the other provisions of this Agreement.

4. **Counterparts**. This Agreement may be executed (including by facsimile or other electronic transmission) in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

5. **Governing Law**.  This Agreement shall be governed and interpreted in accordance with the United States bankruptcy law, except to the extent that the laws of the State of Texas, without regard to principles of conflicts of law, are applicable.

[SIGNATURE PAGE FOLLOWS]

Exhibit E – Asset Purchase Agreement

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.

**ASSIGNORS**:

TUESDAY MORNING CORPORATION

By:_____
Name: Andrew Berger
Title: Chief Executive Officer

TMI HOLDINGS, INC.

By:_____
Name: Andrew Berger
Title: Chief Executive Officer

TUESDAY MORNING, INC.

By:_____
Name: Andrew Berger
Title: Chief Executive Officer

FRIDAY MORNING, LLC

By:_____
Name: Andrew Berger
Title: Chief Executive Officer

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

DAYS OF THE WEEK, INC.


By:_____
Name: Andrew Berger
Title: Chief Executive Officer


NIGHTS OF THE WEEK, INC.


By:_____
Name: Andrew Berger
Title: Chief Executive Officer


TUESDAY MORNING PARTNERS, LTD.


By:_____
Name: Andrew Berger
Title: Chief Executive Officer

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.

**ASSIGNEE**:

HILCO MERCHANT RESOURCES, LLC

By:_____
Name: Ian S. Fredericks
Title: President

## Exhibit A - Copyrights

None.

## Exhibit B – Domains

### Network Solutions

emailtuesdaymorning.com

etreasures.info

etreasures.us

napastyle.com

napastyle.info

napastyle.net

napastylebarndoor.com

teusday-morning.biz

teusday-morning.com

teusday-morning.info

teusday-morning.net

teusday-morning.org

teusday-morning.us

teusdaymorning.biz

teusdaymorning.info

teusdaymorning.net

teusdaymorning.org

teusdaymorning.us

tm-etreasures.biz

tm-etreasures.co.uk

tm-etreasures.com

tm-etreasures.info

tm-etreasures.net

tm-etreasures.org

tm-etreasures.us

tmdirect.biz

tmdirect.com

tmdirect.org tmdirect.us

tmdirect.xyz tmsurvey.com

tuesday-morning.biz

tuesday-morning.co.uk tuesday-
morning.info tuesday-morning.net

tuesday-morning.us tuesdayam.biz

tuesdayam.co.uk tuesdayam.info

tuesdayam.net tuesdayam.org

tuesdayam.us tuesdaymoring.biz

tuesdaymoring.co.uk

tuesdaymoring.info

tuesdaymoring.net

Exhibit E – Asset Purchase Agreement

**CSCGlobal**

tuesdaymoring.org

tuesdaymoring.us

tuesdaymorning.biz

tuesdaymorning.info

tuesdaymorning.online

tuesdaymorning.org

tuesdaymorning.us

tuesdaymorning.xxx

tuesdaymorningcorporation.biz

tuesdaymorningcorporation.co.uk

tuesdaymorningcorporation.com

tuesdaymorningcorporation.info

tuesdaymorningcorporation.net

tuesdaymorningcorporation.org

tuesdaymorningcorporation.us

tuesdaymorningdirect.biz

tuesdaymorningdirect.co.uk

tuesdaymorningdirect.com

tuesdaymorningdirect.info

tuesdaymorningdirect.net

tuesdaymorningdirect.org

tuesdaymorningdirect.site

tuesdaymorningdirect.us

tuesdaymorningoffer.biz

tuesdaymorningoffer.info

tuesdaymorningoffer.net

tuesdaymorningoffer.org

tuesdaymorningoffer.us

tuesdaymorningonline.biz

tuesdaymorningonline.info

tuesdaymorningonline.net

tuesdaymorningonline.org

tuesdaymorningonline.us

tuesdaymorning.com

## Exhibit C – Patents

| Debtor | Patent | Patent/ Application No. | Issue Date | Status | Owned/ Licensed |
|---|---|---|---|---|---|
| Tuesday Morning Partners, Ltd. | Culinary Utensil | D787281 | 5/23/2017 | Issued | Owned |
| Tuesday Morning Partners, Ltd. | Basting Brush Head | D784027 | 4/18/2017 | Issued | Owned |
| Tuesday Morning Partners, Ltd. | Kitchen Implement Handle | D778106 | 2/7/2017 | Issued | Owned |
| Tuesday Morning Partners, Ltd. | Splatter Shield | D778128 | 2/7/2017 | Issued | Owned |
| Tuesday Morning Partners, Ltd. | Kitchen Implement Handle | D778107 | 2/7/2017 | Issued | Owned |
| Tuesday Morning Partners, Ltd. | Kitchen Implement Handle | D778108 | 2/7/2017 | Issued | Owned |
| Tuesday Morning Partners, Ltd. | Kitchen Implement Handle | D784073 | 4/18/2017 | Issued | Owned |
| Tuesday Morning Partners, Ltd. | Food Mill | D790292 | 6/27/2017 | Issued | Owned |
| Tuesday Morning Partners, Ltd. | Wok | D816392 | 5/1/2018 | Issued | Owned |
| Tuesday Morning Partners, Ltd. | Tagine | D798649 | 10/3/2017 | Issued | Owned |
| Tuesday Morning Partners, Ltd. | Label | D787598 | 5/23/2017 | Issued | Owned |
| Tuesday Morning Partners, Ltd. | Label | D786976 | 5/16/2017 | Issued | Owned |
| Tuesday Morning Partners, Ltd. | Box | D787320 | 5/23/2017 | Issued | Owned |
| Tuesday Morning Partners, Ltd. | Baking Pan Insert | D784066 | 4/18/2017 | Issued | Owned |
| Tuesday Morning Partners, Ltd. | Knife | D770850 | 11/8/2016 | Issued | Owned |
| Tuesday Morning Partners, Ltd. | Baking Sheet | D784067 | 4/18/2017 | Issued | Owned |

Exhibit E – Asset Purchase Agreement

| | | | | | |
|---|---|---|---|---|---|
| Tuesday Morning Partners, Ltd. | Container Divider | D823133 | 7/17/2018 | Issued | Owned |
| Tuesday Morning Partners, Ltd. | Container | D930442 | 9/14/2021 | Issued | Owned |
| Tuesday Morning Partners, Ltd. | Shears | D786634 | 5/16/2017 | Issued | Owned |
| Tuesday Morning Partners, Ltd. | Food Storage Container | D854382 | 7/23/2019 | Issued | Owned |
| Tuesday Morning Partners, Ltd. | Food Storage Container | D917237 | 4/27/2021 | Issued | Owned |
| Tuesday Morning Partners, Ltd. | Cookware Basting Projections | D835453 | 12/11/2018 | Issued | Owned |
| Tuesday Morning Partners, Ltd. | Cookware Basting Projection | D882332 | 4/28/2020 | Issued | Owned |
| Tuesday Morning Partners, Ltd. | Cookware Lid With Basting Projections | 10264921 | 4/23/2019 | Issued | Owned |
| Tuesday Morning Partners, Ltd. | Cookware Lid With Basting Projections | 16/389585 | 07/12/22 | Issued Patent #11382459 B2 | Owned |

Exhibit E – Asset Purchase Agreement

## Exhibit D – Trademarks

| Debtor | Trademark | Jurisdiction | Registration No. | Registration Date | Status | Owned/ Licensed |
|---|---|---|---|---|---|---|
| Tuesday Morning Partners, Ltd. | Bird Logo | United States of America | 4832441 | 10/13/2015 | Registered | Owned |
| Tuesday Morning Partners, Ltd. | TUESDAY MORNING | United States of America | 4993124 | 7/5/2016 | Registered | Owned |
| Tuesday Morning Partners, Ltd. | TUESDAY MORNING | United States of America | 1211932 | 10/5/1982 | Registered | Owned |
| Tuesday Morning Partners, Ltd. | TUESDAY MORNING (Stylized - blue background - one line) | United States of America | 5247596 | 7/18/2017 | Registered | Owned |
| Tuesday Morning Partners, Ltd. | TUESDAY MORNING (Stylized - blue background) | United States of America | 5247597 | 7/18/2017 | Registered | Owned |
| Tuesday Morning Partners, Ltd. | TUESDAY MORNING (Stylized - one line) | United States of America | 5242780 | 7/11/2017 | Registered | Owned |
| Tuesday Morning Partners, Ltd. | TUESDAY MORNING (Stylized - stacked) | United States of America | 5247598 | 7/18/2017 | Registered | Owned |
| Tuesday Morning Partners, Ltd. | TUESDAY MORNING PERKS | United States of America | 4471915 | 1/21/2014 | Registered | Owned |

Exhibit E – Asset Purchase Agreement

| Debtor | Trademark | Jurisdiction | Registration No. | Registration Date | Status | Owned/ Licensed |
|---|---|---|---|---|---|---|
| Tuesday Morning Partners, Ltd. | INCREDIBLE DEALS FOR YOUR HOME | United States of America | 6037215 | 4/21/2020 | Registered | Owned |
| Tuesday Morning Partners, Ltd. | NAPASTYLE | United States of America | 3042352 | 1/10/2006 | Registered | Owned |
| Tuesday Morning Partners, Ltd. | THE BEST KITCHEN STARTS HERE | United States of America | 3303245 | 10/2/2007 | Registered | Owned |
| Tuesday Morning, Inc. | TM CARES FUND and Design TM Cares FUND | United States of America | 6102837 | 7/14/2020 | Registered | Owned |
| Tuesday Morning, Inc. | TUESDAY MORNING CARES | United States of America | 6075672 | 6/9/2020 | Registered | Owned |

Exhibit E – Asset Purchase Agreement

APPENDICES

ASSET PURCHASE AGREEMENT

Appendix I

Sellers Knowledge Group

Andrew Berger
Dell Young
Phillip Hixon
Martin Lewis
Steve Dunlap
Jennyfer Grey

Appendix I

Appendix II

Assumed Contracts and Leases

None.

Appendix III

Required Consents and Approvals

None.

Appendix III

Appendix IV

Required Permits

None.

Appendix IV

SCHEDULE 2.2(l)

UNDRAWN LETTERS OF CREDIT

4/22/2023

Tuesday Morning APA Schedule 2.2(l)
Undrawn Letters of Credit as of the Initial Closing Date

| Created Date | Expiration Date | Beneficiary | Letter of Credit ID | Letter of Credit Balance | Description |
|---|---|---|---|---|---|
| 05/26/2022 | 04/20/2023 | THE CIT GROUP/COMMERCIAL SERVICES, INC. | IS00028583 4 U | 2,500,000 | Merchandise factor |
| 06/02/2022 | 11/17/2023 | ARROWOOD INDEMNITY COMPANY ON BEHALF OF | IS00028554 8 U | 250,000 | Supports unpaid Workers Compensation claims from past policy periods |
| 06/08/2022 | 06/03/2023 | ZURICH AMERICAN INSURANCE COMPANY | IS00028556 4 U | 201,233 | Supports unpaid Workers Compensation claims from past policy periods |
| 06/02/2022 | 04/01/2024 | SAFETY NATIONAL CASUALTY CORPORATION | IS00028557 0 U | 7,350,000 | Supports unpaid Workers Compensation claims from past policy periods |
| 05/25/2022 | 11/01/2023 | BOND SAFEGUARD INSURANCE COMPANY AND/OR | IS00028587 5 U | 2,300,000 | Supports import duties |
| | | | | **12,601,233** | |